2 ct.

Dauphin

1:00-EM-005

Kane/Emerg. N/c Focus1

Summons issued

① 2/23/0 vtg

# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,
3200 Highland Avenue
Downers Grove, IL 60515-1282,

               Plaintiff,

        v.

NATIONAL PRESCRIPTION
ADMINISTRATORS, INC.,
711 Ridgedale Avenue
East Hanover, NJ 07936,

      and

DAVID W. NORTON,
1220 Whitby Road
Richmond, VA 23277,

              Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.

1:00-CV-312

J. Kane

**FILED**
HARRISBURG, PA

FEB 2 2 2000

MARY E. D'ANDREA, CLERK
Per _____

## VERIFIED COMPLAINT

Plaintiff, First Health Group Corp. ("First Health"), by its attorneys, Fox, Rothschild,

O'Brien & Frankel, LLP, files the following complaint against defendants, National

Prescriptions Administrators, Inc. ("NPA") and David W. Norton ("Norton"). First Health

asserts claims that seek injunctive relief and damages against Norton for breach of contract,

misappropriation of trade secrets, breach of fiduciary duty and intentional interference with

prospective contractual relations. First Health asserts claims that seek injunctive relief and

damages against NPA for misappropriation of trade secrets, inducing a breach of fiduciary duty,

tortious interference with contractual relations and intentional interference with prospective contractual relations. In support thereof, First Health avers the following:

## THE PARTIES

1.      Plaintiff, First Health, is a Delaware corporation with its principal place of business at 3200 Highland Avenue, Downers Grove, IL 60515-1282.

2.      Founded in 1982, First Health is the nation's premier full-service national health benefits company.

3.      First Health specializes in, among other things, providing large, national employers with a fully integrated, single-source for their group health programs.  Further, through its wholly-owned subsidiary company, First Health Services Corporation ("FHSC"), First Health serves state Medicaid and entitlement programs with claims administration, pharmacy benefits management and clinical management services.

4.      Defendant, NPA, is a New Jersey corporation with its principal place of business at 711 Ridgedale Ave., East Hanover, NJ 07936.  NPA is in the business of, among other things, providing healthcare management services.

5.      Defendant, Norton, is an individual who resides at 1220 Whitby Road, Richmond, VA 23277.  Norton is an employee and/or officer of NPA.

## VENUE AND JURISDICTION

6.      This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to First Health's claims occurred in this district.

## BACKGROUND

8.     Through FHSC, First Health represents one of the leading healthcare administration and management firms in the United States, offering a full range of health data administration, pharmacy benefit management, utilization and quality review services for Medicaid, government healthcare programs, and managed care organizations.

9.     As the nation's fourth largest pharmacy benefit management company, FHSC provides a complete array of pharmacy benefit administration and clinical management services.

10.     On November 4, 1983, the General Assembly of the Commonwealth of Pennsylvania enacted legislation that established the Pharmaceutical Assistance Contract for the Elderly (the "PACE Program").

11.     In 1983, in response to the PACE Program's initial Request for Proposal, FHSC was selected as the PACE Program Contractor, responsible for administering the PACE Program.

12.     Since 1983, FHSC has been the only contractor to administer the PACE Program, having won three (3) subsequent bids in 1987, 1990 and 1995.

13.     FHSC's current contract to administer the PACE Program expires on June 1, 2000.

14.     Norton was first employed by The Computer Company (now known as First Health Services Corporation) in February, 1974, as a project manager.  With the exception of two brief intervals with other companies, First Health employed Norton until October 28, 1999.

15.     For approximately two of his years with First Health, Norton was the vice president for PACE Operations.  During this time period, Norton was responsible for the overall operation of FHSC's PACE contract.

3

16.     Norton also served as senior vice president of the Pharmacy Business Unit, which included the PACE Program.

17.     In his capacity as a First Health employee (for approximately seventeen years) and an officer responsible for the PACE Program, Norton gained an intimate working knowledge of First Health's confidential and proprietary business information pertaining to, among other things, pricing, marketing, and the highly technical procedures, processes, policies, systems and methods for the operation, administration and management of the PACE Program, as well as the Department's particular needs and requirements for that program.

18.     First Health maintains the confidential and proprietary business nature of its information pertaining to pricing, marketing, and the highly technical procedures, processes, policies, systems and methods for the operation, administration and management of the PACE Program, as well as information regarding the Department's particular needs and requirements by, among other methods, requiring its employees to execute employment agreements that contain clear and precise obligations of confidentiality.

19.     On or about October 1, 1997, Norton and First Health executed an Employment Agreement (the "Agreement").  A true and correct copy of the Agreement is attached hereto and marked as Exhibit "A".

20.     The Agreement governed, among other things, the terms of Norton's employment with respect to First Health's pharmacy management and benefits programs (operated through FHSC), and it delineated certain contractual obligations that Norton agreed to honor.

21.     Section 7 of the Agreement entitled, "Confidentiality", states:

> [Norton] agrees not to directly or indirectly use or disclose,
> for the benefit of any person, firm or entity other than [First Health]
> and its subsidiary companies, the Confidential Business Information
> of [First Health].  Confidential Business Information means information

4

or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding [First Health's] past, present, and prospective clients and their particular needs and requirements, and their own confidential information.

Upon termination of employment, with or without cause, [Norton] agrees to return to [First Health] all policy and procedure manuals, records, reports, records, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in [Norton's] possession and/or control which relate to (I) the Confidential Business Information of [First Health], (ii) [Norton's] employment with [First Health], or (iii) the business activities or facilities of [First Health] or its past, present, or prospective clients.

See Agreement at Section 7 (emphasis added).

22.    Section 8 of the Agreement entitled, "Restrictive Covenant", states in pertinent part:

For a period of one year after termination of employment, with or without cause, [Norton] will not directly or indirectly, for the purpose of selling services provided or planned by [First Health] at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of [First Health]. An actual customer, for purposes of this Section, is any customer to whom [First Health] has provided services within one year prior to [Norton's] termination. A prospective customer, for purposes of this Section, is any prospective customer to whom [First Health] sought to provide services within one year prior to the date of [Norton's] termination and [Norton] has knowledge of and was involved in such solicitation. For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of [Norton's] obligation hereunder.

Id. at Section 8.

23.    Section 9 of the Agreement entitled, "Non-Solicitation of Employees", states:

[Norton] further agrees that for a period of one year from the date of [Norton's] termination, with or without cause, [Norton] shall not

directly or indirectly solicit or hire any person who is currently or was an employee of [First Health] at any time during the twelve months prior to [Norton's] termination.

Id. at Section 9.

24.     Section 10 of the Agreement, entitled, "Remedies" states:

> In the event [Norton] breaches or threatens to breach Section 7, 8 or 9 of this Agreement, [First Health] shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach. [Norton] acknowledges that [First Health's] remedy at law is inadequate and that [First Health] will suffer irreparable injury if such conduct is not prohibited.

> [Norton] and [First Health] agree that, because of the difficulty of ascertaining the amount of damages in the event that [Norton] breaches Section 9 of this Agreement, [First Health] shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave [First Health's] employ. The parties further agree that the existence of this remedy will not preclude [First Health] from seeking or receiving injunctive relief.

> [Norton] further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by [Norton] against [First Health] shall not constitute a defense to the enforcement by [First Health] of either of these paragraphs.

Id. at Section 10 (emphasis added).

25.     Norton's employment with First Health terminated effective October 28, 1999.

26.     Before the effective termination date of Norton's employment with First Health, on or about September 14, 1999, the Commonwealth of Pennsylvania Department of Aging (the "Department") forwarded a Request for Proposal ("RFP") to FHSC and other potential bidders with respect to the PACE Program for the contract period commencing June 1, 2000 (the "PACE Contract").

27.     First Health, through FHSC, timely submitted its bid proposal to provide services, as outlined in the RFP, to the Department for the PACE Contract.

28.     On reliable information and belief, Norton was directly involved and instrumental in preparing NPA's bid proposal for the PACE Contract in response to the RFP of September 14, 1999, and was proposed by NPA as the officer-in-charge of the management and administration of the PACE Program.

29.     Upon reliable information and belief, Norton, acting on behalf of NPA, made an oral presentation to the Department for the purpose of securing the PACE Contract; Norton's presentation took place sometime between the issuing of the RFP on September 14, 1999 and February 3, 2000, the date the notice of award was issued.

30.     In accordance with the RFP, and answers by the Department to questions submitted by bidders, proposals were evaluated on the basis of three categories: Technical Proposal – 60%; Participation of Socially-Economically Restricted Businesses – 10%; and Costs – 30%. In accordance with Part III "Criteria for Selection" of the RFP, the evaluation committee was to recommend for selection the proposal that most closely met the requirements of the RFP and satisfied the needs of the Department, taking into consideration criteria set forth in that Part III. Included in the criteria for selection were subsections relating to contractor qualifications and professional and managerial personnel.

31.     On or about February 3, 2000, the Department advised FHSC that FHSC had not received the highest total points in the bid proposal evaluation process and, as a result,  the Department would enter into negotiations with NPA for the PACE Contract.

32.     Part III, Section C of the RFP lists as criteria, "[t]he quality, relevancy and recency of similar projects performed by the bidder"; significantly, NPA does not now, nor has it ever, managed and administered either the PACE Program or a comparable program in any state or commonwealth that provides pharmaceutical assistance to the elderly. In fact, in connection

7

with two previous procurements, NPA submitted proposals for the PACE Program in Pennsylvania and, in each instance, failed to obtain the bid because its bid proposals were evaluated as substantially insufficient.

33.    Part III, Section D of the RFP's criteria calls for the evaluation of qualifications of professional and managerial personnel who would be assigned to the job by the bidder; qualifications are to be measured with particular reference to experience on projects similar to that described in the RFP. Beyond Dave Norton, who NPA has wrongfully and unlawfully proposed as its officer-in-charge of the PACE Program, NPA does not have professional and managerial personnel who have the experience and related education for a project such as PACE; the only such professional and management personnel are the existing staff of First Health dedicated to the PACE Program.

34.    In fact, even with respect to the PACE Program's current project manager, on February 3, 2000, Norton solicited a present First Health employee, Robert Howells, to work for NPA, and assist in managing and administering the PACE Contract. At First Health, Mr. Howells is presently responsible for overseeing the PACE Program, and he possesses the most current experience with hands-on management of the PACE Program.

35.    Even without the benefit of reviewing NPA's bid proposal, the timing and circumstances outlined above force First Health to conclude that NPA could not have suddenly submitted its first competitive bid proposal for the PACE Program without Norton having provided NPA with First Health's confidential and proprietary business information pertaining to the pricing, marketing, and the highly technical procedure, processes, policies, systems and methods for the operation, administration and management of the PACE Program; such

8

information is not contained in any previous RFP or First Health proposal; and Norton, as a result of his employment with First Health, possesses knowledge of such information.

36.     Further, upon reliable information and belief, NPA, in its bid proposal for the PACE Contract, represented that it would use key managers and administrative staff who are current First Health employees and assigned to the PACE Program.  Such a representation is without merit.

37.     The key professional and managerial staff of First Health assigned to the PACE Program are longstanding, valued employees, and First Health will make appropriate efforts to retain these key personnel or arrange to assign them to other programs; First Health has no obligation to the Department in its Turnover Plan with respect to First Health employees and, as a result, those employees would not necessarily be made available to NPA.

38.     All of First Health's employees assigned to the PACE Program are subject to restrictions in their employment on the use and disclosure of confidential and proprietary business information and, as a result, are not free to become employed with a different company and perform the same services with respect to the PACE Program without violating confidentiality obligations that they agreed to honor.

39.     As a practical matter (and with one exception noted above), to the best of First Health's knowledge and belief, no current employees have been asked by NPA, its agents or representatives, if they would even be willing to accept employment at NPA, rather than remain with First Health as their longstanding employer.

40.     On February 10, 2000, pursuant to the administrative rules of the Department, First Health filed a bid protest with the Department in which First Health protests the award of the PACE Contract to NPA on the following grounds: (1) based on reliable information and

9

belief, Norton violated the Agreement in connection with the preparation of NPA's bid proposal, and (2) NPA does not have the requisite qualifications and personnel to satisfy the RFP of September 14, 1999. This administrative appeal with respect to the award of the PACE Contract to NPA is currently pending.

41.     First Health is entitled to a temporary, preliminary and, ultimately, permanent injunction that enjoins Norton from (i) further soliciting, diverting and/or performing any services with respect to the PACE Contract, (ii) further soliciting or attempting to hire current First Health employees for the PACE Contract, (iii) further using or disclosing any confidential and proprietary business information that is owned by First Health, and (iv) participating or having any involvement in the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract concerning the PACE Program or any similar program in another state or commonwealth.

42.     First Health entitled to a temporary, preliminary and permanent injunction that enjoins NPA from (i) managing and/or administrating the PACE Contract; (ii) further soliciting, diverting and/or performing any services with respect to the PACE Contract, including negotiating and/or entering into a contract to manage and/or administer the PACE Program; (iii) further soliciting or attempting to hire First Health employees for the PACE Contract; (iv) further using or disclosing any confidential and proprietary business information that is owned by First Health and has been disclosed to it by Norton, and (v) permitting Norton to participate and/or be involved with the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract involving the PACE Program or any similar program.

## COUNT I

### First Health v. Norton

### (Breach of Contract)

43.    First Health incorporates herein by reference paragraphs 1 through 42 above as if set forth at length.

44.    The Agreement is a valid and enforceable contract between First Health and Norton.

45.    As consideration for, and in reliance upon, Norton's promises and obligations in the Agreement, First Health has paid Norton wages and other compensation for a period of over two years and provided him with access to valuable confidential and proprietary business information that First Health owns.

46.    Norton's conduct (as detailed above) demonstrates that he has breached, and will continue to breach unless enjoined by this Court, the confidentiality clause (Section 7) of the Agreement, which prohibits, among other things, the disclosure and/or use of confidential and proprietary business information that is owned by First Health.

47.    Norton's conduct demonstrates that he has breached, and will continue to breach unless enjoined by this Court, the customer non-solicitation clause (Section 8) of the Agreement which, among other things, prohibits Norton from (for the purpose of selling services provided or planned by First Health) soliciting or diverting an actual or prospective customer of First Health for one year after the date of his termination from First Health.

48.    With respect to the PACE Program, Section 8's limited exception does not permit the activity engaged in by Norton.  The exception is limited to unsolicited requests.  Incredibly, Norton met with representatives of the Department as early as May 1999; as a result, while still

an employee of First Health, Norton engaged in solicitation activity on behalf of a direct competitor that violated his contractual obligations to First Health. Further, Section 8 does not permit Norton to appear at oral presentations on behalf of a competitor of First Health or be proposed as key personnel within NPA's proposal.

49.     Norton's conduct (as detailed above) demonstrates that he has breached, and will continue to breach unless enjoined by this Court, the <u>employee</u> non-solicitation clause (Section 9) of the Agreement, which prohibits Norton from, among other things, soliciting or hiring any First Health employees.

50.     First Health has a clear right to relief and will likely prevail on the merits of its claims against Norton and NPA.

51.     First Health will suffer immediate and irreparable injury as a result of Norton's breach of contract.

52.     First Health has no remedy at law for Norton's breach of the Agreement.

53.     First Health will suffer greater harm if the relief it seeks is not granted than Norton will if the relief is granted because the (i) disclosure and/or use of First Health's confidential and proprietary business information, and (ii) solicitation of First Health's customers and employees by Norton is in violation of the Agreement and will, with respect to the PACE Program and other similar programs, result in permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant David W. Norton as follows:

a.     ordering that defendant David W. Norton shall not use or disclose any

confidential and proprietary business information or material that is owned

12

by First Health Group Corp. pertaining to, among other things, First

Health Group Corp.'s computerized and manual systems, procedures,

reports, client lists, review criteria and methods, financial methods and

practices, plans, pricing and marketing techniques, as well as information

regarding First Health Group Corp.'s past, present, and prospective clients

including, but not limited to, the Commonwealth of Pennsylvania

Department of Aging, and information regarding their particular needs and

requirements, and the Commonwealth of Pennsylvania Department of

Aging's confidential information;

b.     ordering that defendant David W. Norton shall not participate or have any

involvement in the pricing, solicitation, management and/or administration

of the PACE Contract, or any current or future pharmacy benefits

administration contract concerning the PACE Program or any similar

program;

c.     ordering that defendant David W. Norton shall not, either in his individual

capacity or on behalf of any other person or business entity, directly or

indirectly, call upon, solicit or divert (i) any customer to whom First

Health Group Corp. provided services within one year prior to David W.

Norton's termination as a First Health Group Corp. employee including,

but not limited to, the Commonwealth of Pennsylvania Department of

Aging, or (ii) any prospective customer to whom First Health Group Corp.

sought to provide services within one year prior to David W. Norton's

termination as a First Health employee and about which David W. Norton

has knowledge and was involved in such solicitation;

d.      ordering that defendant David W. Norton shall not, directly or indirectly,

solicit or hire any person who is currently or was an employee of First

Health at any time within one year prior to David W. Norton's termination

as a First Health Group Corp. employee;

e.      Awarding to plaintiff First Health Group Corp. compensatory damages,

costs, interest, attorney's fees and such other relief as the Court deems just

and appropriate.

## COUNT II

### First Health v. Norton

### (Misappropriation of Trade Secrets – Under

### Common Law and 765 ILCS §§ 1065/1-1065/8)

54.    First Health incorporates herein by reference paragraphs 1 through 53 above as if

set forth at length.

55.    As a result of his employment with First Health, Norton possesses confidential,

proprietary trade secrets and business information that belongs to First Health.

56.    First Health's confidential, proprietary trade secrets and business information that

Norton possesses are sufficiently secret to derive economic value, actual or potential, from not

being generally known to other persons who can obtain economic benefit from their disclosure or

use.

57.    First Health's confidential, proprietary trade secrets and business information that Norton possesses are the subject of efforts by First Health that are reasonable under the circumstances to maintain their secrecy.

58.    Upon reliable information and belief (and as set forth above), in connection with the preparation of NPA's bid proposal for the PACE Contract, Norton, without the express or implied consent of First Health and with knowledge that that he was under a duty to maintain confidentiality, disclosed and/or used First Health's confidential, proprietary trade secrets and business information with respect to First Health's pricing, policies, products, systems and methods of operation pertaining to the management and administration of the PACE Program and information pertaining to the needs and requirements of the Department in connection with the PACE Program, for the benefit of NPA and to the detriment of First Health.

59.    Further, in violation of his contractual, statutory and common law duties, Norton's continued employment with NPA will inevitably lead him to make additional disclosures and/or use First Health's confidential, proprietary trade secrets and business information pertaining to, among other things, the manner in which First Health managed and administered the PACE Program and the needs and requirements of the Department with respect to that program, despite his knowledge that the Agreement prohibits the disclosure and/or use of such trade secrets and information, all of which represents a substantial threat of the disclosure and/or use of First Health's confidential, proprietary trade secrets and business information for the benefit of Norton and NPA and to the detriment of First Health.

60.    Norton's conduct in misappropriating the confidential, proprietary trade secrets and business information of First Health was intentional and demonstrates Norton's conscious disregard for the rights of First Health.

15

61.    First Health has a clear right to relief, and will likely prevail on the merits of its claims against Norton and NPA.

62.    First Health will suffer immediate and irreparable injury as a result of Norton's misappropriation of the confidential, proprietary trade secrets and business information.

63.    First Health has no adequate remedy at law for Norton's unlawful conduct.

64.    First Health will suffer greater harm if the relief it seeks is not granted than Norton will if the relief is granted because the disclosure and/or use of First Health's confidential, proprietary trade secrets and business information is in violation of the Agreement and Norton's statutory and common law duties to First Health, and will, with respect to the PACE Program and other similar programs, result in a permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant David W. Norton as follows:

a.    ordering that defendant David W. Norton shall not use or disclose any confidential and proprietary business information or material that is owned by First Health Group Corp. pertaining to, among other things, First Health Group Corp.'s computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques, as well as information regarding First Health Group Corp.'s past, present, and prospective clients including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, and information regarding their particular needs and

16

requirements, and the Commonwealth of Pennsylvania Department of Aging's confidential information;

b.      ordering that defendant David W. Norton shall not participate or have any involvement in the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract concerning the PACE Program or any similar program;

c.      Awarding First Health Group Corp. compensatory damages, punitive damages, costs, interest, attorney's fees and such other relief as the Court deems just and appropriate.

## COUNT III

### (Breach of Fiduciary Duty)

### First Health v. Norton

65.     First Health incorporates herein by reference paragraphs 1 through 64 above as if set forth at length.

66.     Norton, as an employee and officer of First Health until October 28, 1999, owed a fiduciary duty of utmost good faith and loyalty to First Health, his employer.

67.     Norton has breached his fiduciary duty to First Health in the following respects:

(a)     failing to disclose to First Health, prior to (and after) the effective date of his termination on October 28, 1999, his new employment with NPA and, specifically, his plan and efforts to assist NPA, a competitor of First Health, in the solicitation and management of the PACE Contract;

17

(b)     failing to disclose to First Health, prior to (and after) the effective date of his termination on October 28, 1999, his plan and intention to solicit First Health employees to become employees of NPA for the purpose of managing and administering the PACE Contract for which NPA submitted a bid proposal;

(c)     soliciting, prior to (and after) the effective date of his termination on October 28, 1999, the Department for the PACE Contract that First Health was (and still is) administering through June 1, 2000.

68.    As a direct and proximate result of Norton's breach of his fiduciary duty, First Health has suffered damages in the nature of (i) salary and other compensation paid to Norton during the period he breached his fiduciary duty, and (ii) loss of the PACE Contract.

69.    Norton's breach of his fiduciary duty to First Health was intentional and without just cause.

70.    First Health is entitled to an award of punitive damages for Norton's breach of fiduciary duty.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant David W. Norton for compensatory and punitive damages in an amount in excess of $75,000.00, plus costs, interest, attorney's fees and such other relief as the Court deems just and appropriate.

## COUNT IV

### First Health v. NPA

### (Inducing Breach of Fiduciary Duty)

71.     First Health incorporates herein by reference paragraphs 1 through 70 above as if set forth at length.

72.     Upon reliable information and belief, NPA hired Norton prior to the effective date of his termination as an employee of First Health.

73.     By hiring Norton prior to the effective date of his termination as a First Health employee and officer, having Norton actively participate in NPA's solicitation of the Department for the PACE Contract both before and after the effective date of his termination, placing Norton in a situation that requires him to disclose and/or use First Health's confidential and proprietary business information both before and after the effective date of his termination, and permitting Norton to solicit employees of First Health, NPA facilitated, furthered and supported Norton's breach of his fiduciary duty to First Health.

74.     As a direct and proximate result of NPA's inducement of Norton to breach of his fiduciary duty, First Health suffered damages in the nature of (i) salary and other compensation paid to Norton during the period he breached his fiduciary duty, and (ii) loss of the PACE Contract.

75.     NPA's inducement of Norton to breach of his fiduciary duty to First Health was intentional and without just cause.

76.     First Health is entitled to an award of punitive damages for Norton's breach of fiduciary duty.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant National Prescription Administrators, Inc. for compensatory and punitive damages in excess of $75,000.000, plus costs, interest, attorney's fees and such other relief as the Court deems just and appropriate.

**COUNT V**

**First Health v. NPA**

**(Tortious Interference with Norton's Contract)**

77.    First Health incorporates herein by reference paragraphs 1 through 76 above as of set forth at length.

78.    The agreement is a valid, enforceable contract between Norton and First Health.

79.    At all material times, NPA was aware of the Agreement and its terms.

80.    By hiring Norton and having him directly participate in the process of soliciting and procuring the PACE Contract, NPA intentionally, and without privilege or justification, induced and caused Norton to breach and violate Sections 7, 8 and 9 of the Agreement.

81.    Since the submission of its bid proposal to the Department, NPA's improper and unlawful conduct has continued unabated. As a result, NPA has unlawfully and wrongfully interfered with Norton's Agreement with First Health.

82.    First Health has a clear right to relief, and will likely prevail on the merits of its claims against Norton and NPA.

83.    First Health will suffer immediate and irreparable injury if this Court does not stop NPA's tortious interference with the Agreement.

84.    First Health has no adequate remedy at law for NPA's unlawful conduct.

85.    First Health will suffer greater harm if the relief it seeks is not granted than NPA will if the relief is granted because NPA's unlawful interference with the Agreement causes Norton to violate both the Agreement, and the statutory and common law duties owed to First Health and, with respect to the PACE Program and similar programs, will result in a permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant National Prescription Administrators, Inc. as follows:

   a.    ordering that defendant National Prescription Administrators, Inc. shall cease and desist all conduct directed to an unlawful and improper interference with David W. Norton's contractual obligations under the October 1, 1997 Employment Agreement with plaintiff First Health Group Corp.;

   b.    ordering that defendant National Prescription Administrators, Inc. shall not manage and/or administer the PACE Contract;

   c.    ordering that defendant National Prescription Administrators, Inc. shall not further solicit, divert and/or perform any services with respect to the PACE Contract, including negotiating and/or entering into a contract to manage and/or administer the PACE Program;

   d.    ordering that defendant National Prescription Administrators, Inc. shall not further solicit or attempt to hire First Health employees for the PACE Contract;

   e.    ordering that defendant National Prescription Administrators, Inc. shall not permit Norton to participate and/or be involved with the pricing,

solicitation, management and/or administration of the PACE Contract, or

any current or future pharmacy benefits administration contract involving

the PACE Program or any similar program;

    f.      ordering that defendant National Prescription Administrators, Inc. shall

not use or disclose any confidential and proprietary business information

or material that is owned by First Health Group Corp. pertaining to,

among other things, First Health Group Corp.'s computerized and manual

systems, procedures, reports, client lists, review criteria and methods,

financial methods and practices, plans, pricing and marketing techniques,

as well as information regarding First Health Group Corp.'s past, present,

and prospective clients including, but not limited to, the Commonwealth

of Pennsylvania Department of Aging, and information regarding their

particular needs and requirements, and the Commonwealth of

Pennsylvania Department of Aging's confidential information;

    g.      Awarding to plaintiff First Health Group Corp. costs, interest, attorney's

fees and such other relief as the Court deems just and appropriate.

## COUNT VI

### First Health v. NPA

### (Misappropriation of Trade Secrets)

86.    First Health incorporates herein by reference paragraphs 1 through 85 above as if set forth at length.

87.    As a result of his employment with First Health, Norton possesses confidential, proprietary trade secrets and business information that belongs to First Health.

88.    First Health's confidential, proprietary trade secrets and business information that Norton possesses are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic benefit from their disclosure or use.

89.    First Health's confidential, proprietary trade secrets and business information that Norton possesses are the subject of efforts by First Health that are reasonable under the circumstances to maintain their secrecy.

90.    Upon information and belief (and as set forth above), in connection with the preparation and submission of NPA's bid proposal for the PACE Contract, Norton, without the express or implied consent of First Health and with knowledge that that he was under a duty to maintain confidentiality, disclosed to NPA, and NPA used, First Health's confidential, proprietary trade secrets and business information with respect to First Health's pricing, policies, products, systems and methods of operation pertaining to the management and administration of the PACE Program, and information pertaining to the needs and requirements of the Department in connection with the PACE Program, for the benefit of NPA and to the detriment of First Health.

91.    Upon reliable information and belief (and as set forth above), NPA used, without the express or implied consent of First Health, the confidential, proprietary trade secrets and business information of First Health in NPA's solicitation of the PACE Contract and/or its written bid proposal submitted to the Department in response to the RFP of September 14, 1999.

92.    At the time it used First Health's confidential, proprietary trade secrets and business information, NPA knew or had reason to know that its use of such information was derived from Norton who owed a duty of confidentiality to First Health or, alternatively, before a

23

material change in its position, NPA knew or had reason to know that it acquired such information by accident or mistake.

93.     Further, in violation of his contractual, statutory and common law duties, Norton's continued employment at NPA will inevitably lead him to make additional disclosures and/or use First Health's confidential, proprietary trade secrets and business information pertaining to, among other things, the manner in which First Health managed and administered the PACE Program and the needs and requirements of the Department with respect to that program, and will inevitably lead NPA to disclose and/or use such trade secrets and information, all of which represents a substantial threat of the disclosure and/or use of First Health's confidential, proprietary trade secrets and business information for the benefit of Norton and NPA, and to the detriment of First Health.

94.     NPA's improper and unlawful conduct in misappropriating the confidential, proprietary trade secrets and business information of First Health was intentional and demonstrates NPA's conscious disregard for the rights of First Health.

95.     First Health has a clear right to relief, and will likely prevail on the merits of its claims against Norton and NPA.

96.     First Health will suffer immediate and irreparable injury as a result of the misappropriation of confidential, proprietary trade secrets and business information by Norton and NPA.

97.     First Health has no adequate remedy at law for the improper and unlawful conduct by Norton and NPA.

98.     First Health will suffer greater harm if the relief it seeks is not granted than NPA will if the relief is granted because NPA has no lawful right to disclose and/or use First Health's

confidential, proprietary trade secrets and business information, and such disclosure and/or use will, with respect to the PACE Program and similar programs, result in a permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant National Prescription Administrators, Inc. as follows:

a.  ordering that defendant National Prescription Administrators, Inc. shall cease and desist all conduct directed to an unlawful and improper interference with David W. Norton's contractual obligations under the October 1, 1997 Employment Agreement with plaintiff First Health Group Corp.;

b.  ordering that defendant National Prescription Administrators, Inc. shall not manage and/or administer the PACE Contract;

c.  ordering that defendant National Prescription Administrators, Inc. shall not further solicit, divert and/or perform any services with respect to the PACE Contract, including negotiating and/or entering into a contract to manage and/or administer the PACE Program;

d.  ordering that defendant National Prescription Administrators, Inc. shall not further solicit or attempt to hire First Health employees for the PACE Contract;

e.  ordering that defendant National Prescription Administrators, Inc. shall not permit Norton to participate in and/or be involved with the pricing, solicitation, management and/or administration of the PACE Contract, or

25

any current or future pharmacy benefits administration contract involving the PACE Program or any similar program;

f.    ordering that defendant National Prescription Administrators, Inc. shall not use or disclose any confidential and proprietary business information or material that is owned by First Health Group Corp. pertaining to, among other things, First Health Group Corp.'s computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques, as well as information regarding First Health Group Corp.'s past, present, and prospective clients including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, and information regarding their particular needs and requirements, and the Commonwealth of Pennsylvania Department of Aging's confidential information;

g.    Awarding to plaintiff First Health Group Corp. compensatory and punitive damages, costs, interest, attorney's fees and such other relief as the Court deems just and appropriate.

## COUNT VII

### First Health v. Norton and NPA

### (Tortious Interference with Prospective Economic Advantage)

99.    First Health incorporates herein by reference paragraphs 1 through 98 above as if set forth at length.

100.    At all material times, First Health has been a party to a valid and enforceable contract between itself and the Department to manage and administer the PACE Program.

26

101.   As a result of having been the only contractor for the PACE Program since its enactment, First Health had a reasonable expectation of entering into a valid business relationship with the Department for the PACE Contract for the period commencing June 1, 2000.

102.   As a result of his employment at First Health and prior involvement in First Health's management and administration of the PACE Program, Norton was, at all material times, knowledgeable and aware of First Health's expectation concerning the PACE Contract, and disclosed this expectation to his new employer, NPA.

103.   Norton purposefully interfered and prevented First Health's expectancy in the PACE Contract from ripening into a valid business relationship by improperly and unlawfully disclosing and/or using, among other items, First Health's confidential and proprietary business information  pertaining to the pricing, solicitation, management and administration of the PACE Program for the purpose of preparing NPA's bid proposal for the PACE Contract.

104.   NPA purposefully interfered and prevented First Health's expectancy in the PACE Contract from ripening into a valid business relationship by improperly and unlawfully disclosing and/or using, among other items, First Health's confidential and proprietary information pertaining to the pricing, solicitation, management and administration of the PACE Program for the purpose of preparing  NPA's bid proposal for the PACE Contract, and by hiring Norton to work for NPA despite his continuing contractual obligations.

105.   As a direct and proximate result of the improper and unlawful interference by Norton and NPA, First Health's bid proposal for the PACE Contract was rejected in favor of NPA's proposal.

106.    The improper and unlawful conduct of Norton and NPA since NPA's proposal was submitted to the Department evidences their further intent to violate Sections 7, 8 and 9 of the Agreement, and otherwise interfere with the prospective contractual relationship between First Health and the Department.

107.    The intended, threatened and actual tortious interference by Norton and NPA will cause First Health immediate and irreparable harm if not stopped by this Court.

108.    The improper and unlawful interference by Norton and NPA with the prospective contractual relationship between First Health and the Department is without privilege or justification.

109.    First Health has a clear right to relief, and will likely succeed on the merits of its claims against Norton and NPA.

110.    First Health will suffer irreparable injury as a result of the tortious interference with prospective contractual relations by Norton and NPA.

111.    First Health has no adequate remedy at law for the improper and unlawful conduct by Norton and NPA.

112.    First Health will suffer greater harm if the relief it seeks is not granted than Norton and/or NPA will if the relief is granted because the improper and unlawful interference with First Health's valid contractual expectation violates the Agreement, and the statutory and common law duties owed to First Health by both Norton and NPA, and will result, with respect to the PACE Program and similar programs, in a permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendants David W. Norton and National Prescription Administrators, Inc. as follows:

a.   ordering that defendants David W. Norton and National Prescription Administrators, Inc. shall not disclose or use any confidential and proprietary business information that is owned by First Health Group Corp. pertaining to, among other things, First Health Group Corp.'s computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques, as well as information regarding First Health Group Corp.'s past, present, and prospective clients including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, and information regarding their particular needs and requirements, and the Commonwealth of Pennsylvania Department of Aging's confidential information;

b.   ordering that defendant David W. Norton shall not, either in his individual capacity or on behalf of any other person or business entity, directly or indirectly, call upon, solicit or divert (i) any customer to whom First Health has provided services within one year prior to David W. Norton's termination as a First Health Group Corp. employee including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, or (ii) any prospective customer to whom First Health sought to provide services within one year prior to David W. Norton's termination as a First

Health Group Corp. employee and about which David W, Norton has

knowledge and was involved in such solicitation;

c.    ordering that defendant David W. Norton shall not, directly or indirectly,

solicit or hire any person who is currently or was an employee of First

Health at any time within one year prior to David W. Norton's termination

as a First Health Group Corp. employee;

d.    ordering that defendants David W. Norton and National Prescription

Administrators, Inc. shall cease and desist all conduct directed to an

unlawful and improper interference with plaintiff First Health Group

Corp.'s prospective contractual relation with the Commonwealth of

Pennsylvania Department of Aging pertaining to the PACE Program

contract for the period commencing June 1, 2000;

e.    ordering that defendant National Prescription Administrators, Inc. shall not

manage and/or administer the PACE Contract;

f.    ordering that defendant National Prescription Administrators, Inc. shall not

further solicit, divert and/or perform any services with respect to the PACE

Contract, including negotiating and/or entering into a contract to manage

and/or administer the PACE Program;

g.    ordering that defendant National Prescription Administrators, Inc. shall not

further solicit or attempt to hire First Health employees for the PACE

Contract;

h.    ordering that defendant David W. Norton shall not participate or have any

involvement in the pricing, solicitation, management and/or administration

of the PACE Contract, or any current or future pharmacy benefits administration contract concerning the PACE Program or any similar program;

i.    ordering that defendant National Prescription Administrators, Inc. shall not permit Norton to participate in and/or be involved with the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract involving the PACE Program or any similar program;

j.    Awarding to plaintiff First Health Group Corp. compensatory and punitive damages, costs, interest, attorney's fees and such other relief as the Court deems just and appropriate.

_____
SCOTT L. VERNICK, ESQUIRE
JEFFREY D. HUTTON, ESQUIRE
FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP
2000 Market Street, 10th Floor
Philadelphia, PA, 19103-3291
(215) 299-2000

Attorneys for Plaintiff
FIRST HEALTH GROUP CORP.

Date:  February 22, 2000

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,                  :
3200 Highland Avenue                       :
Downers Grove, IL 60515-1282,              :
                                           :
                           Plaintiff,      :        CIVIL ACTION NO.
                                           :
        v.                                 :
                                           :
NATIONAL PRESCRIPTION                      :
ADMINISTRATORS, INC.,                      :
711 Ridgedale Avenue                       :
East Hanover, NJ 07936                     :
                                           :
        and                                :
                                           :
DAVID W. NORTON,                           :
1220 Whitby Road                           :
Richmond, VA 23277                         :
                                           :
                           Defendants.     :


<u>**VERIFICATION PURSUANT TO 28 U.S.C. § 1746**</u>

        I, Teresa R. DiMarco, president of First Health Services Corporation, a wholly-owned

subsidiary of plaintiff, First Health Group Corp., pursuant to 28 U.S.C. § 1746, hereby verify

under penalty of perjury that the averments contained in the foregoing verified complaint are true

and correct to the best of my information, knowledge and belief.


                                        _____
                                        TERESA R. DIMARCO
                                        President
                                        First Health Services Corporation
                                        4300 Cox Road
                                        Glen Allen, VA 23060-3358

Date:

# EMPLOYMENT AGREEMENT

This AGREEMENT is made this 1st day of October, 1997 ("Effective Date") by and between First Health Group Corp., a Delaware corporation headquartered in Illinois ("Company"), and David W. Norton ("Employee").

## BACKGROUND

A.    Company desires to employ Employee, and Employee desires to be employed by Company.

B.    For and in consideration of the promises and of the mutual covenants hereinafter set forth, it is hereby agreed by and between the parties as follows:

## AGREEMENT

1.    Employment.   Company hereby agrees to employ Employee to perform the duties set forth in Section 3 hereof ("Employee Services").   Employee hereby accepts employment to perform Employee Services for Employer under the terms and conditions of this Agreement.

2.    Term.   The Initial Term of this Agreement will be for one year beginning on the Effective Date and will automatically renew for consecutive one year terms, unless earlier terminated pursuant to Section 8 hereof.

3.    Duties.   Employee will serve as Vice President Administration and perform all responsibilities and duties as are assigned, or delegated to Employee, by President First Health Services, which responsibilities and duties include but are not limited to the direction and leadership of the Company's First Health Services pharmacy management and benefit programs. Employee will report to and is subject to supervision by President First Health Services or his/her designee.

4.    Time Commitment.   Employee will devote Employee's time, attention and energies to the performance of Employee Services.   Employee may not be associated with, consult, advise, work for, be employed by, contract with, or otherwise devote any of the Employee's time to the pursuit of any other work or business activities which may interfere with the performance of services hereunder.

5.    Compensation and Benefits.   Company will pay the following compensation to Employee in full consideration for performance of Employee Services hereunder in accordance with Company's then-current payroll policies and procedures.

    (a)    Salary.   Employee will receive a gross annual salary of $108,108.00. This salary is payable in accordance with Company's then - current payroll policies and procedures.   The gross annual salary will be subject to annual increases as may by approved by Company.

    (b)    Incentive Compensation.   Employee will participate in the First Health Services Incentive Plan which will be based on targets established on an annual basis by Company, in its sole discretion.   The 1997, 1998 and 1999 Incentive Plans are attached hereto as Exhibits A, B, and C respectively.

(c) Expenses. Company will reimburse Employee for all reasonable and necessary expenses incurred by Employee in connection with the performance of Employee Services upon submission by Employee of expense reports with substantiating vouchers, in accordance with the Company's then current expense reimbursement policy.

(d) Stock Options. Employee will be awarded the option to purchase a minimum of 3,000 shares of Company common stock, adjusted for any stock splits, set by the Board of Directors of Company in accordance with the Company Stock Option Plan (the "Stock Options"). The awards of the Stock Options are subject to (i) approval of the Board of Directors of Company of the recommendations; and (ii) execution by Employee of the then current Stock Option Agreement.

(e) Benefits and Flexible Time Off. Employee shall be entitled to participate in such group life insurance, major medical, and other employee benefit plans (collectively "Benefit Plans") as established by Company in accordance with the applicable terms and conditions of such Benefit Plans, which Benefit Plans may be modified or discontinued by Company at any time; provided, however that Employee shall meet the requirements of the Benefit Plans for participation and in no event, including breach or wrongful termination of this Agreement, shall Employee be entitled to any amount of compensation in lieu of participation, unless otherwise provided by the terms of the Benefit Plan.

Employee shall also be entitled to paid time off in accordance with Company's then current Flexible Time Off (FTO) program. Employee shall accrue such FTO at the rate specified in the FTO program. Flexible Time Off shall be taken with due consideration for the services required of Employee and to the requirements of Company.

6. Termination.

(a) Either party may terminate this Agreement at any time following the Initial Term, without cause and without any liability to Company, upon no less than one hundred and twenty (120) day's prior written notice. In such event, Employee, if requested by Company, will continue to render Employee Services and be paid Employee's regular compensation up to the date of termination in accordance with Company's then-current payroll policies and procedures.

(b) Either party may terminate this Agreement at anytime for cause upon 14 days written notice. "Cause" includes, without limitation, breach of any provision of this Agreement or Employee's failure to adhere to the Company's policies and procedures. If the cause is not cured within the 14 day period, the Agreement may then be terminated by written notice. An opportunity to cure is not required if the party receiving notice of termination has previously been given notice of termination and the opportunity to cure the same or similar cause.

(c) Company may terminate this Agreement by written notice at anytime (including during the Initial Term) immediately for the following reasons: (i) Death or legal incapacity of Employee; (ii) Employee's conviction of a felony; (iii) willful violation of the Company's policies or standards including without limitation, Corporate Compliance standards, confidentiality and nondisclosure; or (iv) theft or dishonesty.

(d)  Company may terminate at any time (including during the Initial Term) by written notice upon Employee's other capacity or inability to perform Employee Services for a period of at least 90 consecutive days because of impairment of Employee's physical, or mental health making it impossible or impractical for Employee to perform Employee Services.

7.  Confidentiality.  Employee agrees not to directly or indirectly use or disclose, for the benefit of any person, firm or entity other than Company and its subsidiary companies, the Confidential Business Information of Company.  Confidential Business Information means information or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding Company's past, present and prospective clients and their particular needs and requirements, and their own confidential information.

Upon termination of employment, with or without cause, Employee agrees to return to Company all policy and procedure manuals, records, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in Employee's possession and/or control which relate to (i) the Confidential Business Information of Company, (ii) Employee's employment with Company, or (iii) the business activities or facilities of Company or its past, present, or prospective clients.

8.  Restrictive Covenant.  For a period of one year after termination of employment, with or without cause, Employee will not directly or indirectly, for the purpose of selling services provided or planned by Company at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of Company.  An actual customer, for purposes of this Section, is any customer to whom Company has provided services within one year prior to Employee's termination.  A prospective customer, for purposes of this Section, is any prospective customer to whom Company sought to provide services within one year prior to the date of Employee's termination and Employee has knowledge of and was involved in such solicitation.  For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of Employee's obligation hereunder.

9.  Non-Solicitation of Employees.  Employee further agrees that for a period of one year from the date of Employee's termination, with or without cause, Employee shall not directly or indirectly solicit or hire any person who is currently or was an employee of Company at any time during the twelve months prior to Employee's termination.

10.  Remedies.  In the event Employee breaches or threatens to breach Sections 7, 8 or 9 of this Agreement, Company shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach.  Employee acknowledges that Company's remedy at law is inadequate and that Company will suffer irreparable injury if such conduct is not prohibited.

Employee and Company agree that, because of the difficulty of ascertaining the amount of damages in the event that Employee breaches Section 9 of this Agreement, Company shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave Company's employ.  The parties further

agree that the existence of this remedy will not preclude employer from seeking or receiving injunctive relief.

Employee further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by Employee against Company shall not constitute a defense to the enforcement by Company of either of these paragraphs.

11. <u>Property Rights.</u>  All discoveries, designs, improvements, ideas, inventions, creations, and works of art, whether or not patentable or subject to copyright, relating to the business of Company or its clients, conceived, developed or made by Employee during employment by Company, either solely or jointly with others (hereafter "Developments") shall automatically become the sole property of Company. Employee shall immediately disclose to Company all such Developments and shall, without additional compensation, execute all assignments, application or any other documents deemed necessary by Company to perfect Company's rights therein. These obligations shall continue for a period of one year beyond the termination of employment with respect to Developments conceived, developed or made by Employee during employment with Company.

Company acknowledges and agrees that the provisions of this section shall not apply to inventions for which no equipment, supplies, facility or trade secret information of Company or its clients were used by Employee and which were developed entirely on Employee's own time unless (a) such inventions relate (i) to the business of Company or (ii) to Company's actual or demonstrably anticipated research or development or (b) such inventions result from any work performed by Employee for Company.

12. <u>Assignments.</u>  Neither party shall have the right or power to assign any rights or duties under this Agreement without the written consent of the other party, provided, however, that Company shall have the right to assign this Agreement without consent pursuant to any corporate reorganization, merger, or other transaction involving a change of control of Company or to any subsidiary company. Any attempted assignment in breach of this Section 12 shall be void.

13. <u>Severability.</u>  Each section, paragraph, clause, sub-clause and provision (collectively "Provisions") of this Agreement shall be severable from each other, and if for any reason the paragraph, clause, sub-clause or provision is invalid or unenforceable, such invalidity or unenforceability shall not prejudice or in any way affect the validity or enforceability of any other Provision hereof.

14. <u>Miscellaneous.</u>

(a)  This Agreement, the schedules and any amendments hereto contain the entire agreement of the parties with respect to the employment of the Employee and supersedes all other understandings, whether written or oral; provided, however, that Employee shall comply with all policies, procedures and other requirements of Company as established in the Colleague Handbook and Corporate Policy Manuals, not inconsistent with this Agreement.

(b)  Failure on the part of either party to insist upon strict compliance by the other with respect to any of the terms, covenants and conditions hereof, shall not be deemed a subsequent waiver of such term, covenant or condition.

(c) The provisions of any paragraph containing a termination shall survive such termination whether with or without cause and even if occasioned by Company's breach or wrongful termination.

(d) This Agreement may not be modified except in writing as signed by the parties; provided, however, that Company may amend or terminate its Benefit Plans, Incentive Plan, Corporate Policies and/or employees' rules and regulations in its sole discretion.

(e) In the event of litigation under this Agreement, the court shall have discretion to award the prevailing party reasonable attorney's fees.

15. Governing Law. It is the intention of the parties hereto that all questions with respect to the construction, formation, and performance of this Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the laws of the State of Illinois. The parties hereto submit to the jurisdiction and venue of the courts of DuPage County Illinois in respect to any matter or thing arising out of this agreement pursuant hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement in the State of Illinois as of the day and year first above written.

The Company:
First Health Group Corp.

By: _____
Its: President and
Chief Executive Officer

Employee: _____

David W. Norton

d:\home\wasikry\agrmnts\exemod1.doc