*hot · w/ proxd.*

③
2/23/0

# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,    :
3200 Highland Avenue         :
Downers Grove, IL 60515-1282, :
                             :
               Plaintiff,    :    CIVIL ACTION NO.
                             :
   v.                        :
                             :
NATIONAL PRESCRIPTION        :
ADMINISTRATORS, INC.,        :
711 Ridgedale Avenue         :
East Hanover, NJ 07936       :
                             :    **FILED**
   and                       :    HARRISBURG, PA
                             :
DAVID W. NORTON,             :    FEB 2 2 2000
1220 Whitby Road             :
Richmond, VA 23277           :    MARY E. D'ANDREA, CLERK
                             :    Per _____
           Defendants.    :          Deputy Clerk

## MOTION FOR TEMPORARY RESTRAINING ORDER
## OF PLAINTIFF FIRST HEALTH GROUP CORP.

Plaintiff, First Health Group Corp. ("First Health"), by its attorneys, Fox, Rothschild,

O'Brien & Frankel, LLP, hereby moves the Court, pursuant to Rule 65(a) of the Federal Rules of

Civil Procedure, for the entry of a temporary restraining order in the proposed form attached

hereto, upon the ground that immediate and irreparable harm will result to First Health before

final adjudication of First Health's motion for preliminary injunction.

The facts and legal grounds in support of the motion are set forth in detail in First

Health's verified complaint, the attached Affidavit of Teresa R. DiMarco, President of First

Health Services Corporation and First Health's memorandum of law in support of its motion for temporary restraining order and preliminary injunction.

WHEREFORE, plaintiff First Health Group Corp. requests that this Court grant its motion for temporary restraining order and enter an order in the proposed form as follows:

1.  ordering that defendants David W. Norton and National Prescription Administrators, Inc. shall not use or disclose any confidential and proprietary business information that is owned by First Health Group Corp. pertaining to, among other things, First Health Group Corp.'s computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques, as well as information regarding First Health Group Corp.'s past, present, and prospective clients including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, and information regarding their particular needs and requirements, and the Commonwealth of Pennsylvania Department of Aging's confidential information;

2.  ordering that defendant David W. Norton shall not, either in his individual capacity or on behalf of any other person or business entity, directly or indirectly, call upon, solicit or divert (i) any customer to whom First Health provided services within one year prior to David W. Norton's termination as a First Health Group Corp. employee including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, or (ii) any prospective customer to whom First Health Group Corp. sought to provide services within one year prior to David W. Norton's termination as a First Health Group Corp. employee and about whom David W. Norton has knowledge and was involved in such solicitation;

3.  ordering that defendant David W. Norton shall not, directly or indirectly, solicit or hire any person who is currently or was an employee of First Health Group Corp. at any time within one year prior to David W. Norton's termination as a First Health Group Corp. employee;

4.  ordering that defendant National Prescription Administrators, Inc. shall cease and desist all conduct directed to an unlawful and improper interference with defendant David W. Norton's contractual obligations under the October 1, 1997 Employment Agreement with plaintiff First Health Group Corp.;

5.  ordering that defendants David W. Norton and National Prescription Administrators, Inc. shall cease and desist all conduct directed to an

6.    unlawful and improper interference with plaintiff First Health Group Corp.'s prospective contractual relation with the Commonwealth of Pennsylvania

7.    Department of Aging pertaining to the PACE Program contract for the period commencing June 1, 2000 (the "PACE Contract");

8.    ordering that defendant National Prescription Administrators, Inc. shall not manage and/or administer the PACE Contract;

9.    ordering that defendant National Prescription Administrators, Inc. shall not further solicit, divert and/or perform any services with respect to the PACE Contract, including negotiating and/or entering into a contract to manage and/or administer the PACE Program;

10.    ordering that defendant National Prescription Administrators, Inc. shall not further solicit or attempt to hire First Health Group Corp. employees for the PACE Contract;

11.    ordering that defendant David W. Norton shall not participate or have any involvement in the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract concerning the PACE Program or any similar program;

12.    ordering that defendant National Prescription Administrators, Inc. shall not permit defendant David W. Norton to participate in and/or be involved with the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract involving the PACE Program or any similar program.

Respectfully submitted,

_____

SCOTT L. VERNICK, ESQUIRE
JEFFREY D. HUTTON, ESQUIRE
FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103-3291
(215) 299-2000

Attorneys for Plaintiff
FIRST HEALTH GROUP CORP.

Date: February 22, 2000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,  :
3200 Highland Avenue  :
Downers Grove, IL 60515-1282,  :
  :
                  Plaintiff,  :     CIVIL ACTION NO.
  :
      v.  :
  :
NATIONAL PRESCRIPTION  :
ADMINISTRATORS, INC.,  :
711 Ridgedale Avenue  :
East Hanover, NJ 07936,  :
  :
     and  :
  :
DAVID W. NORTON,  :
1220 Whitby Road  :
Richmond, VA 23277,  :
  :
           Defendants.  :

## VERIFIED COMPLAINT

Plaintiff, First Health Group Corp. ("First Health"), by its attorneys, Fox, Rothschild, O'Brien & Frankel, LLP, files the following complaint against defendants, National Prescriptions Administrators, Inc. ("NPA") and David W. Norton ("Norton"). First Health asserts claims that seek injunctive relief and damages against Norton for breach of contract, misappropriation of trade secrets, breach of fiduciary duty and intentional interference with prospective contractual relations. First Health asserts claims that seek injunctive relief and damages against NPA for misappropriation of trade secrets, inducing a breach of fiduciary duty,

tortious interference with contractual relations and intentional interference with prospective contractual relations. In support thereof, First Health avers the following:

## THE PARTIES

1.    Plaintiff, First Health, is a Delaware corporation with its principal place of business at 3200 Highland Avenue, Downers Grove, IL 60515-1282.

2.    Founded in 1982, First Health is the nation's premier full-service national health benefits company.

3.    First Health specializes in, among other things, providing large, national employers with a fully integrated, single-source for their group health programs.  Further, through its wholly-owned subsidiary company, First Health Services Corporation ("FHSC"), First Health serves state Medicaid and entitlement programs with claims administration, pharmacy benefits management and clinical management services.

4.    Defendant, NPA, is a New Jersey corporation with its principal place of business at 711 Ridgedale Ave., East Hanover, NJ 07936.  NPA is in the business of, among other things, providing healthcare management services.

5.    Defendant, Norton, is an individual who resides at 1220 Whitby Road, Richmond, VA 23277.  Norton is an employee and/or officer of NPA.

## VENUE AND JURISDICTION

6.    This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to First Health's claims occurred in this district.

## BACKGROUND

8.     Through FHSC, First Health represents one of the leading healthcare administration and management firms in the United States, offering a full range of health data administration, pharmacy benefit management, utilization and quality review services for Medicaid, government healthcare programs, and managed care organizations.

9.     As the nation's fourth largest pharmacy benefit management company, FHSC provides a complete array of pharmacy benefit administration and clinical management services.

10.     On November 4, 1983, the General Assembly of the Commonwealth of Pennsylvania enacted legislation that established the Pharmaceutical Assistance Contract for the Elderly (the "PACE Program").

11.     In 1983, in response to the PACE Program's initial Request for Proposal, FHSC was selected as the PACE Program Contractor, responsible for administering the PACE Program.

12.     Since 1983, FHSC has been the only contractor to administer the PACE Program, having won three (3) subsequent bids in 1987, 1990 and 1995.

13.     FHSC's current contract to administer the PACE Program expires on June 1, 2000.

14.     Norton was first employed by The Computer Company (now known as First Health Services Corporation) in February, 1974, as a project manager. With the exception of two brief intervals with other companies, First Health employed Norton until October 28, 1999.

15.     For approximately two of his years with First Health, Norton was the vice president for PACE Operations. During this time period, Norton was responsible for the overall operation of FHSC's PACE contract.

16.    Norton also served as senior vice president of the Pharmacy Business Unit, which included the PACE Program.

17.    In his capacity as a First Health employee (for approximately seventeen years) and an officer responsible for the PACE Program, Norton gained an intimate working knowledge of First Health's confidential and proprietary business information pertaining to, among other things, pricing, marketing, and the highly technical procedures, processes, policies, systems and methods for the operation, administration and management of the PACE Program, as well as the Department's particular needs and requirements for that program.

18.    First Health maintains the confidential and proprietary business nature of its information pertaining to pricing, marketing, and the highly technical procedures, processes, policies, systems and methods for the operation, administration and management of the PACE Program, as well as information regarding the Department's particular needs and requirements by, among other methods, requiring its employees to execute employment agreements that contain clear and precise obligations of confidentiality.

19.    On or about October 1, 1997, Norton and First Health executed an Employment Agreement (the "Agreement"). A true and correct copy of the Agreement is attached hereto and marked as Exhibit "A".

20.    The Agreement governed, among other things, the terms of Norton's employment with respect to First Health's pharmacy management and benefits programs (operated through FHSC), and it delineated certain contractual obligations that Norton agreed to honor.

21.    Section 7 of the Agreement entitled, "Confidentiality", states:

> [Norton] agrees not to directly or indirectly use or disclose, for the benefit of any person, firm or entity other than [First Health] and its subsidiary companies, the Confidential Business Information of [First Health]. Confidential Business Information means information

4



or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding [First Health's] past, present, and prospective clients and their particular needs and requirements, and their own confidential information.

Upon termination of employment, with or without cause, [Norton] agrees to return to [First Health] all policy and procedure manuals, records, reports, records, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in [Norton's] possession and/or control which relate to (I) the Confidential Business Information of [First Health], (ii) [Norton's] employment with [First Health], or (iii) the business activities or facilities of [First Health] or its past, present, or prospective clients.

See Agreement at Section 7 (emphasis added).

22.    Section 8 of the Agreement entitled, "Restrictive Covenant", states in pertinent part:

For a period of one year after termination of employment, with or without cause, [Norton] will not directly or indirectly, for the purpose of selling services provided or planned by [First Health] at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of [First Health]. An actual customer, for purposes of this Section, is any customer to whom [First Health] has provided services within one year prior to [Norton's] termination. A prospective customer, for purposes of this Section, is any prospective customer to whom [First Health] sought to provide services within one year prior to the date of [Norton's] termination and [Norton] has knowledge of and was involved in such solicitation. For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of [Norton's] obligation hereunder.

Id. at Section 8.

23.    Section 9 of the Agreement entitled, "Non-Solicitation of Employees", states:

[Norton] further agrees that for a period of one year from the date of [Norton's] termination, with or without cause, [Norton] shall not

5



directly or indirectly solicit or hire any person who is currently or was an employee of [First Health] at any time during the twelve months prior to [Norton's] termination.

Id. at Section 9.

24.    Section 10 of the Agreement, entitled, "Remedies" states:

In the event [Norton] breaches or threatens to breach Section 7, 8 or 9 of this Agreement, [First Health] shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach. [Norton] acknowledges that [First Health's] remedy at law is inadequate and that [First Health] will suffer irreparable injury if such conduct is not prohibited.

[Norton] and [First Health] agree that, because of the difficulty of ascertaining the amount of damages in the event that [Norton] breaches Section 9 of this Agreement, [First Health] shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave [First Health's] employ. The parties further agree that the existence of this remedy will not preclude [First Health] from seeking or receiving injunctive relief.

[Norton] further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by [Norton] against [First Health] shall not constitute a defense to the enforcement by [First Health] of either of these paragraphs.

Id. at Section 10 (emphasis added).

25.    Norton's employment with First Health terminated effective October 28, 1999.

26.    Before the effective termination date of Norton's employment with First Health, on or about September 14, 1999, the Commonwealth of Pennsylvania Department of Aging (the "Department") forwarded a Request for Proposal ("RFP") to FHSC and other potential bidders with respect to the PACE Program for the contract period commencing June 1, 2000 (the "PACE Contract").

27.    First Health, through FHSC, timely submitted its bid proposal to provide services, as outlined in the RFP, to the Department for the PACE Contract.

6

or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding [First Health's] past, present, and prospective clients and their particular needs and requirements, and their own confidential information.

Upon termination of employment, with or without cause, [Norton] agrees to return to [First Health] all policy and procedure manuals, records, reports, records, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in [Norton's] possession and/or control which relate to (I) the Confidential Business Information of [First Health], (ii) [Norton's] employment with [First Health], or (iii) the business activities or facilities of [First Health] or its past, present, or prospective clients.

See Agreement at Section 7 (emphasis added).

22.     Section 8 of the Agreement entitled, "Restrictive Covenant", states in pertinent part:

For a period of one year after termination of employment, with or without cause, [Norton] will not directly or indirectly, for the purpose of selling services provided or planned by [First Health] at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of [First Health]. An actual customer, for purposes of this Section, is any customer to whom [First Health] has provided services within one year prior to [Norton's] termination. A prospective customer, for purposes of this Section, is any prospective customer to whom [First Health] sought to provide services within one year prior to the date of [Norton's] termination and [Norton] has knowledge of and was involved in such solicitation. For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of [Norton's] obligation hereunder.

Id. at Section 8.

23.     Section 9 of the Agreement entitled, "Non-Solicitation of Employees", states:

[Norton] further agrees that for a period of one year from the date of [Norton's] termination, with or without cause, [Norton] shall not

5

directly or indirectly solicit or hire any person who is currently or was an employee of [First Health] at any time during the twelve months prior to [Norton's] termination.

Id. at Section 9.

24. Section 10 of the Agreement, entitled, "Remedies" states:

> In the event [Norton] breaches or threatens to breach Section 7, 8 or 9 of this Agreement, [First Health] shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach. [Norton] acknowledges that [First Health's] remedy at law is inadequate and that [First Health] will suffer irreparable injury if such conduct is not prohibited.

> [Norton] and [First Health] agree that, because of the difficulty of ascertaining the amount of damages in the event that [Norton] breaches Section 9 of this Agreement, [First Health] shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave [First Health's] employ. The parties further agree that the existence of this remedy will not preclude [First Health] from seeking or receiving injunctive relief.

> [Norton] further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by [Norton] against [First Health] shall not constitute a defense to the enforcement by [First Health] of either of these paragraphs.

Id. at Section 10 (emphasis added).

25. Norton's employment with First Health terminated effective October 28, 1999.

26. Before the effective termination date of Norton's employment with First Health, on or about September 14, 1999, the Commonwealth of Pennsylvania Department of Aging (the "Department") forwarded a Request for Proposal ("RFP") to FHSC and other potential bidders with respect to the PACE Program for the contract period commencing June 1, 2000 (the "PACE Contract").

27. First Health, through FHSC, timely submitted its bid proposal to provide services, as outlined in the RFP, to the Department for the PACE Contract.

6

28.     On reliable information and belief, Norton was directly involved and instrumental in preparing NPA's bid proposal for the PACE Contract in response to the RFP of September 14, 1999, and was proposed by NPA as the officer-in-charge of the management and administration of the PACE Program.

29.     Upon reliable information and belief, Norton, acting on behalf of NPA, made an oral presentation to the Department for the purpose of securing the PACE Contract; Norton's presentation took place sometime between the issuing of the RFP on September 14, 1999 and February 3, 2000, the date the notice of award was issued.

30.     In accordance with the RFP, and answers by the Department to questions submitted by bidders, proposals were evaluated on the basis of three categories: Technical Proposal – 60%; Participation of Socially-Economically Restricted Businesses – 10%; and Costs – 30%. In accordance with Part III "Criteria for Selection" of the RFP, the evaluation committee was to recommend for selection the proposal that most closely met the requirements of the RFP and satisfied the needs of the Department, taking into consideration criteria set forth in that Part III. Included in the criteria for selection were subsections relating to contractor qualifications and professional and managerial personnel.

31.     On or about February 3, 2000, the Department advised FHSC that FHSC had not received the highest total points in the bid proposal evaluation process and, as a result, the Department would enter into negotiations with NPA for the PACE Contract.

32.     Part III, Section C of the RFP lists as criteria, "[t]he quality, relevancy and recency of similar projects performed by the bidder"; significantly, NPA does not now, nor has it ever, managed and administered either the PACE Program or a comparable program in any state or commonwealth that provides pharmaceutical assistance to the elderly. In fact, in connection

7

with two previous procurements, NPA submitted proposals for the PACE Program in

Pennsylvania and, in each instance, failed to obtain the bid because its bid proposals were

evaluated as substantially insufficient.

33.     Part III, Section D of the RFP's criteria calls for the evaluation of qualifications of

professional and managerial personnel who would be assigned to the job by the bidder;

qualifications are to be measured with particular reference to experience on projects similar to

that described in the RFP.  Beyond Dave Norton, who NPA has wrongfully and unlawfully

proposed as its officer-in-charge of the PACE Program, NPA does not have professional and

managerial personnel who have the experience and related education for a project such as PACE;

the only such professional and management personnel are the existing staff of First Health

dedicated to the PACE Program.

34.     In fact, even with respect to the PACE Program's current project manager, on

February 3, 2000, Norton solicited a present First Health employee, Robert Howells, to work for

NPA, and assist in managing and administering the PACE Contract.  At First Health, Mr.

Howells is presently responsible for overseeing the PACE Program, and he possesses the most

current experience with hands-on management of the PACE Program.

35.     Even without the benefit of reviewing NPA's bid proposal, the timing and

circumstances outlined above force First Health to conclude that NPA could not have suddenly

submitted its first competitive bid proposal for the PACE Program without Norton having

provided NPA with First Health's confidential and proprietary business information pertaining to

the pricing, marketing, and the highly technical procedure, processes, policies, systems and

methods for the operation, administration and management of the PACE Program; such

8

information is not contained in any previous RFP or First Health proposal; and Norton, as a result of his employment with First Health, possesses knowledge of such information.

36.     Further, upon reliable information and belief, NPA, in its bid proposal for the PACE Contract, represented that it would use key managers and administrative staff who are current First Health employees and assigned to the PACE Program.  Such a representation is without merit.

37.     The key professional and managerial staff of First Health assigned to the PACE Program are longstanding, valued employees, and First Health will make appropriate efforts to retain these key personnel or arrange to assign them to other programs; First Health has no obligation to the Department in its Turnover Plan with respect to First Health employees and, as a result, those employees would not necessarily be made available to NPA.

38.     All of First Health's employees assigned to the PACE Program are subject to restrictions in their employment on the use and disclosure of confidential and proprietary business information and, as a result, are not free to become employed with a different company and perform the same services with respect to the PACE Program without violating confidentiality obligations that they agreed to honor.

39.     As a practical matter (and with one exception noted above), to the best of First Health's knowledge and belief, no current employees have been asked by NPA, its agents or representatives, if they would even be willing to accept employment at NPA, rather than remain with First Health as their longstanding employer.

40.     On February 10, 2000, pursuant to the administrative rules of the Department, First Health filed a bid protest with the Department in which First Health protests the award of the PACE Contract to NPA on the following grounds: (1) based on reliable information and

9

belief, Norton violated the Agreement in connection with the preparation of NPA's bid proposal, and (2) NPA does not have the requisite qualifications and personnel to satisfy the RFP of September 14, 1999. This administrative appeal with respect to the award of the PACE Contract to NPA is currently pending.

41.    First Health is entitled to a temporary, preliminary and, ultimately, permanent injunction that enjoins Norton from (i) further soliciting, diverting and/or performing any services with respect to the PACE Contract, (ii) further soliciting or attempting to hire current First Health employees for the PACE Contract, (iii) further using or disclosing any confidential and proprietary business information that is owned by First Health, and (iv) participating or having any involvement in the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract concerning the PACE Program or any similar program in another state or commonwealth.

42.    First Health entitled to a temporary, preliminary and permanent injunction that enjoins NPA from (i) managing and/or administrating the PACE Contract; (ii) further soliciting, diverting and/or performing any services with respect to the PACE Contract, including negotiating and/or entering into a contract to manage and/or administer the PACE Program; (iii) further soliciting or attempting to hire First Health employees for the PACE Contract; (iv) further using or disclosing any confidential and proprietary business information that is owned by First Health and has been disclosed to it by Norton, and (v) permitting Norton to participate and/or be involved with the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract involving the PACE Program or any similar program.

10

## COUNT I

### First Health v. Norton

### (Breach of Contract)

43.     First Health incorporates herein by reference paragraphs 1 through 42 above as if set forth at length.

44.     The Agreement is a valid and enforceable contract between First Health and Norton.

45.     As consideration for, and in reliance upon, Norton's promises and obligations in the Agreement, First Health has paid Norton wages and other compensation for a period of over two years and provided him with access to valuable confidential and proprietary business information that First Health owns.

46.     Norton's conduct (as detailed above) demonstrates that he has breached, and will continue to breach unless enjoined by this Court, the confidentiality clause (Section 7) of the Agreement, which prohibits, among other things, the disclosure and/or use of confidential and proprietary business information that is owned by First Health.

47.     Norton's conduct demonstrates that he has breached, and will continue to breach unless enjoined by this Court, the customer non-solicitation clause (Section 8) of the Agreement which, among other things, prohibits Norton from (for the purpose of selling services provided or planned by First Health) soliciting or diverting an actual or prospective customer of First Health for one year after the date of his termination from First Health.

48.     With respect to the PACE Program, Section 8's limited exception does not permit the activity engaged in by Norton. The exception is limited to unsolicited requests. Incredibly, Norton met with representatives of the Department as early as May 1999; as a result, while still

11

an employee of First Health, Norton engaged in solicitation activity on behalf of a direct

competitor that violated his contractual obligations to First Health. Further, Section 8 does not

permit Norton to appear at oral presentations on behalf of a competitor of First Health or be

proposed as key personnel within NPA's proposal.

49.    Norton's conduct (as detailed above) demonstrates that he has breached, and will

continue to breach unless enjoined by this Court, the employee non-solicitation clause (Section

9) of the Agreement, which prohibits Norton from, among other things, soliciting or hiring any

First Health employees.

50.    First Health has a clear right to relief and will likely prevail on the merits of its

claims against Norton and NPA.

51.    First Health will suffer immediate and irreparable injury as a result of Norton's

breach of contract.

52.    First Health has no remedy at law for Norton's breach of the Agreement.

53.    First Health will suffer greater harm if the relief it seeks is not granted than

Norton will if the relief is granted because the (i) disclosure and/or use of First Health's

confidential and proprietary business information, and (ii) solicitation of First Health's customers

and employees by Norton is in violation of the Agreement and will, with respect to the PACE

Program and other similar programs, result in permanent loss and injury to First Health's

business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and

against defendant David W. Norton as follows:

a.    ordering that defendant David W. Norton shall not use or disclose any

confidential and proprietary business information or material that is owned

12

by First Health Group Corp. pertaining to, among other things, First

Health Group Corp.'s computerized and manual systems, procedures,

reports, client lists, review criteria and methods, financial methods and

practices, plans, pricing and marketing techniques, as well as information

regarding First Health Group Corp.'s past, present, and prospective clients

including, but not limited to, the Commonwealth of Pennsylvania

Department of Aging, and information regarding their particular needs and

requirements, and the Commonwealth of Pennsylvania Department of

Aging's confidential information;

b.      ordering that defendant David W. Norton shall not participate or have any

involvement in the pricing, solicitation, management and/or administration

of the PACE Contract, or any current or future pharmacy benefits

administration contract concerning the PACE Program or any similar

program;

c.      ordering that defendant David W. Norton shall not, either in his individual

capacity or on behalf of any other person or business entity, directly or

indirectly, call upon, solicit or divert (i) any customer to whom First

Health Group Corp. provided services within one year prior to David W.

Norton's termination as a First Health Group Corp. employee including,

but not limited to, the Commonwealth of Pennsylvania Department of

Aging, or (ii) any prospective customer to whom First Health Group Corp.

sought to provide services within one year prior to David W. Norton's

termination as a First Health employee and about which David W. Norton has knowledge and was involved in such solicitation;

d.    ordering that defendant David W. Norton shall not, directly or indirectly, solicit or hire any person who is currently or was an employee of First Health at any time within one year prior to David W. Norton's termination as a First Health Group Corp. employee;

e.    Awarding to plaintiff First Health Group Corp. compensatory damages, costs, interest, attorney's fees and such other relief as the Court deems just and appropriate.

## COUNT II

### First Health v. Norton

### (Misappropriation of Trade Secrets – Under

### Common Law and 765 ILCS §§ 1065/1-1065/8)

54.    First Health incorporates herein by reference paragraphs 1 through 53 above as if set forth at length.

55.    As a result of his employment with First Health, Norton possesses confidential, proprietary trade secrets and business information that belongs to First Health.

56.    First Health's confidential, proprietary trade secrets and business information that Norton possesses are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic benefit from their disclosure or use.

14

57.    First Health's confidential, proprietary trade secrets and business information that Norton possesses are the subject of efforts by First Health that are reasonable under the circumstances to maintain their secrecy.

58.    Upon reliable information and belief (and as set forth above), in connection with the preparation of NPA's bid proposal for the PACE Contract, Norton, without the express or implied consent of First Health and with knowledge that that he was under a duty to maintain confidentiality, disclosed and/or used First Health's confidential, proprietary trade secrets and business information with respect to First Health's pricing, policies, products, systems and methods of operation pertaining to the management and administration of the PACE Program and information pertaining to the needs and requirements of the Department in connection with the PACE Program, for the benefit of NPA and to the detriment of First Health.

59.    Further, in violation of his contractual, statutory and common law duties, Norton's continued employment with NPA will inevitably lead him to make additional disclosures and/or use First Health's confidential, proprietary trade secrets and business information pertaining to, among other things, the manner in which First Health managed and administered the PACE Program and the needs and requirements of the Department with respect to that program, despite his knowledge that the Agreement prohibits the disclosure and/or use of such trade secrets and information, all of which represents a substantial threat of the disclosure and/or use of First Health's confidential, proprietary trade secrets and business information for the benefit of Norton and NPA and to the detriment of First Health.

60.    Norton's conduct in misappropriating the confidential, proprietary trade secrets and business information of First Health was intentional and demonstrates Norton's conscious disregard for the rights of First Health.

15



61.    First Health has a clear right to relief, and will likely prevail on the merits of its claims against Norton and NPA.

62.    First Health will suffer immediate and irreparable injury as a result of Norton's misappropriation of the confidential, proprietary trade secrets and business information.

63.    First Health has no adequate remedy at law for Norton's unlawful conduct.

64.    First Health will suffer greater harm if the relief it seeks is not granted than Norton will if the relief is granted because the disclosure and/or use of First Health's confidential, proprietary trade secrets and business information is in violation of the Agreement and Norton's statutory and common law duties to First Health, and will, with respect to the PACE Program and other similar programs, result in a permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant David W. Norton as follows:

      a.    ordering that defendant David W. Norton shall not use or disclose any confidential and proprietary business information or material that is owned by First Health Group Corp. pertaining to, among other things, First Health Group Corp.'s computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques, as well as information regarding First Health Group Corp.'s past, present, and prospective clients including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, and information regarding their particular needs and

requirements, and the Commonwealth of Pennsylvania Department of
Aging's confidential information;

b.      ordering that defendant David W. Norton shall not participate or have any
involvement in the pricing, solicitation, management and/or administration
of the PACE Contract, or any current or future pharmacy benefits
administration contract concerning the PACE Program or any similar
program;

c.      Awarding First Health Group Corp. compensatory damages, punitive
damages, costs, interest, attorney's fees and such other relief as the Court
deems just and appropriate.

**COUNT III**

**(Breach of Fiduciary Duty)**

**First Health v. Norton**

65.     First Health incorporates herein by reference paragraphs 1 through 64 above as if
set forth at length.

66.     Norton, as an employee and officer of First Health until October 28, 1999, owed a
fiduciary duty of utmost good faith and loyalty to First Health, his employer.

67.     Norton has breached his fiduciary duty to First Health in the following respects:

(a)     failing to disclose to First Health, prior to (and after) the effective date of
his termination on October 28, 1999, his new employment with NPA and,
specifically, his plan and efforts to assist NPA, a competitor of First
Health, in the solicitation and management of the PACE Contract;

17

(b)    failing to disclose to First Health, prior to (and after) the effective date of

his termination on October 28, 1999, his plan and intention to solicit First

Health employees to become employees of NPA for the purpose of

managing and administering the PACE Contract for which NPA submitted

a bid proposal;

(c)    soliciting, prior to (and after) the effective date of his termination on

October 28, 1999, the Department for the PACE Contract that First Health

was (and still is) administrating through June 1, 2000.

68.    As a direct and proximate result of Norton's breach of his fiduciary duty, First

Health has suffered damages in the nature of (i) salary and other compensation paid to Norton

during the period he breached his fiduciary duty, and (ii) loss of the PACE Contract.

69.    Norton's breach of his fiduciary duty to First Health was intentional and without

just cause.

70.    First Health is entitled to an award of punitive damages for Norton's breach of

fiduciary duty.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and

against defendant David W. Norton for compensatory and punitive damages in an amount in

excess of $75,000.00, plus costs, interest, attorney's fees and such other relief as the Court deems

just and appropriate.

## COUNT IV

### First Health v. NPA

### (Inducing Breach of Fiduciary Duty)

71.    First Health incorporates herein by reference paragraphs 1 through 70 above as if set forth at length.

72.    Upon reliable information and belief, NPA hired Norton prior to the effective date of his termination as an employee of First Health.

73.    By hiring Norton prior to the effective date of his termination as a First Health employee and officer, having Norton actively participate in NPA's solicitation of the Department for the PACE Contract both before and after the effective date of his termination, placing Norton in a situation that requires him to disclose and/or use First Health's confidential and proprietary business information both before and after the effective date of his termination, and permitting Norton to solicit employees of First Health, NPA facilitated, furthered and supported Norton's breach of his fiduciary duty to First Health.

74.    As a direct and proximate result of NPA's inducement of Norton to breach of his fiduciary duty, First Health suffered damages in the nature of (i) salary and other compensation paid to Norton during the period he breached his fiduciary duty, and (ii) loss of the PACE Contract.

75.    NPA's inducement of Norton to breach of his fiduciary duty to First Health was intentional and without just cause.

76.    First Health is entitled to an award of punitive damages for Norton's breach of fiduciary duty.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant National Prescription Administrators, Inc. for compensatory and punitive damages in excess of $75,000.000, plus costs, interest, attorney's fees and such other relief as the Court deems just and appropriate.

## COUNT V

### First Health v. NPA

### (Tortious Interference with Norton's Contract)

77.  First Health incorporates herein by reference paragraphs 1 through 76 above as of set forth at length.

78.  The agreement is a valid, enforceable contract between Norton and First Health.

79.  At all material times, NPA was aware of the Agreement and its terms.

80.  By hiring Norton and having him directly participate in the process of soliciting and procuring the PACE Contract, NPA intentionally, and without privilege or justification, induced and caused Norton to breach and violate Sections 7, 8 and 9 of the Agreement.

81.  Since the submission of its bid proposal to the Department, NPA's improper and unlawful conduct has continued unabated.  As a result, NPA has unlawfully and wrongfully interfered with Norton's Agreement with First Health.

82.  First Health has a clear right to relief, and will likely prevail on the merits of its claims against Norton and NPA.

83.  First Health will suffer immediate and irreparable injury if this Court does not stop NPA's tortious interference with the Agreement.

84.  First Health has no adequate remedy at law for NPA's unlawful conduct.

85.    First Health will suffer greater harm if the relief it seeks is not granted than NPA will if the relief is granted because NPA's unlawful interference with the Agreement causes Norton to violate both the Agreement, and the statutory and common law duties owed to First Health and, with respect to the PACE Program and similar programs, will result in a permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant National Prescription Administrators, Inc. as follows:

a.    ordering that defendant National Prescription Administrators, Inc. shall cease and desist all conduct directed to an unlawful and improper interference with David W. Norton's contractual obligations under the October 1, 1997 Employment Agreement with plaintiff First Health Group Corp.;

b.    ordering that defendant National Prescription Administrators, Inc. shall not manage and/or administer the PACE Contract;

c.    ordering that defendant National Prescription Administrators, Inc. shall not further solicit, divert and/or perform any services with respect to the PACE Contract, including negotiating and/or entering into a contract to manage and/or administer the PACE Program;

d.    ordering that defendant National Prescription Administrators, Inc. shall not further solicit or attempt to hire First Health employees for the PACE Contract;

e.    ordering that defendant National Prescription Administrators, Inc. shall not permit Norton to participate and/or be involved with the pricing,

21

solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract involving the PACE Program or any similar program;

    f.    ordering that defendant National Prescription Administrators, Inc. shall not use or disclose any confidential and proprietary business information or material that is owned by First Health Group Corp. pertaining to, among other things, First Health Group Corp.'s computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques, as well as information regarding First Health Group Corp.'s past, present, and prospective clients including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, and information regarding their particular needs and requirements, and the Commonwealth of Pennsylvania Department of Aging's confidential information;

    g.    Awarding to plaintiff First Health Group Corp. costs, interest, attorney's fees and such other relief as the Court deems just and appropriate.

## COUNT VI

## First Health v. NPA

## (Misappropriation of Trade Secrets)

86.    First Health incorporates herein by reference paragraphs 1 through 85 above as if set forth at length.

87.    As a result of his employment with First Health, Norton possesses confidential, proprietary trade secrets and business information that belongs to First Health.

88.     First Health's confidential, proprietary trade secrets and business information that Norton possesses are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic benefit from their disclosure or use.

89.     First Health's confidential, proprietary trade secrets and business information that Norton possesses are the subject of efforts by First Health that are reasonable under the circumstances to maintain their secrecy.

90.     Upon information and belief (and as set forth above), in connection with the preparation and submission of NPA's bid proposal for the PACE Contract, Norton, without the express or implied consent of First Health and with knowledge that that he was under a duty to maintain confidentiality, disclosed to NPA, and NPA used, First Health's confidential, proprietary trade secrets and business information with respect to First Health's pricing, policies, products, systems and methods of operation pertaining to the management and administration of the PACE Program, and information pertaining to the needs and requirements of the Department in connection with the PACE Program, for the benefit of NPA and to the detriment of First Health.

91.     Upon reliable information and belief (and as set forth above), NPA used, without the express or implied consent of First Health, the confidential, proprietary trade secrets and business information of First Health in NPA's solicitation of the PACE Contract and/or its written bid proposal submitted to the Department in response to the RFP of September 14, 1999.

92.     At the time it used First Health's confidential, proprietary trade secrets and business information, NPA knew or had reason to know that its use of such information was derived from Norton who owed a duty of confidentiality to First Health or, alternatively, before a

23

material change in its position, NPA knew or had reason to know that it acquired such information by accident or mistake.

93.     Further, in violation of his contractual, statutory and common law duties, Norton's continued employment at NPA will inevitably lead him to make additional disclosures and/or use First Health's confidential, proprietary trade secrets and business information pertaining to, among other things, the manner in which First Health managed and administered the PACE Program and the needs and requirements of the Department with respect to that program, and will inevitably lead NPA to disclose and/or use such trade secrets and information, all of which represents a substantial threat of the disclosure and/or use of First Health's confidential, proprietary trade secrets and business information for the benefit of Norton and NPA, and to the detriment of First Health.

94.     NPA's improper and unlawful conduct in misappropriating the confidential, proprietary trade secrets and business information of First Health was intentional and demonstrates NPA's conscious disregard for the rights of First Health.

95.     First Health has a clear right to relief, and will likely prevail on the merits of its claims against Norton and NPA.

96.     First Health will suffer immediate and irreparable injury as a result of the misappropriation of confidential, proprietary trade secrets and business information by Norton and NPA.

97.     First Health has no adequate remedy at law for the improper and unlawful conduct by Norton and NPA.

98.     First Health will suffer greater harm if the relief it seeks is not granted than NPA will if the relief is granted because NPA has no lawful right to disclose and/or use First Health's

confidential, proprietary trade secrets and business information, and such disclosure and/or use will, with respect to the PACE Program and similar programs, result in a permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant National Prescription Administrators, Inc. as follows:

     a.    ordering that defendant National Prescription Administrators, Inc. shall cease and desist all conduct directed to an unlawful and improper interference with David W. Norton's contractual obligations under the October 1, 1997 Employment Agreement with plaintiff First Health Group Corp.;

     b.    ordering that defendant National Prescription Administrators, Inc. shall not manage and/or administer the PACE Contract;

     c.    ordering that defendant National Prescription Administrators, Inc. shall not further solicit, divert and/or perform any services with respect to the PACE Contract, including negotiating and/or entering into a contract to manage and/or administer the PACE Program;

     d.    ordering that defendant National Prescription Administrators, Inc. shall not further solicit or attempt to hire First Health employees for the PACE Contract;

     e.    ordering that defendant National Prescription Administrators, Inc. shall not permit Norton to participate in and/or be involved with the pricing, solicitation, management and/or administration of the PACE Contract, or

25

any current or future pharmacy benefits administration contract involving the PACE Program or any similar program;

    f.    ordering that defendant National Prescription Administrators, Inc. shall not use or disclose any confidential and proprietary business information or material that is owned by First Health Group Corp. pertaining to, among other things, First Health Group Corp.'s computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques, as well as information regarding First Health Group Corp.'s past, present, and prospective clients including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, and information regarding their particular needs and requirements, and the Commonwealth of Pennsylvania Department of Aging's confidential information;

    g.    Awarding to plaintiff First Health Group Corp. compensatory and punitive damages, costs, interest, attorney's fees and such other relief as the Court deems just and appropriate.

**COUNT VII**

**First Health v. Norton and NPA**

**(Tortious Interference with Prospective Economic Advantage)**

    99.    First Health incorporates herein by reference paragraphs 1 through 98 above as if set forth at length.

    100.    At all material times, First Health has been a party to a valid and enforceable contract between itself and the Department to manage and administer the PACE Program.

26

101.    As a result of having been the only contractor for the PACE Program since its enactment, First Health had a reasonable expectation of entering into a valid business relationship with the Department for the PACE Contract for the period commencing June 1, 2000.

102.    As a result of his employment at First Health and prior involvement in First Health's management and administration of the PACE Program, Norton was, at all material times, knowledgeable and aware of First Health's expectation concerning the PACE Contract, and disclosed this expectation to his new employer, NPA.

103.    Norton purposefully interfered and prevented First Health's expectancy in the PACE Contract from ripening into a valid business relationship by improperly and unlawfully disclosing and/or using, among other items, First Health's confidential and proprietary business information pertaining to the pricing, solicitation, management and administration of the PACE Program for the purpose of preparing NPA's bid proposal for the PACE Contract.

104.    NPA purposefully interfered and prevented First Health's expectancy in the PACE Contract from ripening into a valid business relationship by improperly and unlawfully disclosing and/or using, among other items, First Health's confidential and proprietary information pertaining to the pricing, solicitation, management and administration of the PACE Program for the purpose of preparing NPA's bid proposal for the PACE Contract, and by hiring Norton to work for NPA despite his continuing contractual obligations.

105.    As a direct and proximate result of the improper and unlawful interference by Norton and NPA, First Health's bid proposal for the PACE Contract was rejected in favor of NPA's proposal.

106.    The improper and unlawful conduct of Norton and NPA since NPA's proposal was submitted to the Department evidences their further intent to violate Sections 7, 8 and 9 of the Agreement, and otherwise interfere with the prospective contractual relationship between First Health and the Department.

107.    The intended, threatened and actual tortious interference by Norton and NPA will cause First Health immediate and irreparable harm if not stopped by this Court.

108.    The improper and unlawful interference by Norton and NPA with the prospective contractual relationship between First Health and the Department is without privilege or justification.

109.    First Health has a clear right to relief, and will likely succeed on the merits of its claims against Norton and NPA.

110.    First Health will suffer irreparable injury as a result of the tortious interference with prospective contractual relations by Norton and NPA.

111.    First Health has no adequate remedy at law for the improper and unlawful conduct by Norton and NPA.

112.    First Health will suffer greater harm if the relief it seeks is not granted than Norton and/or NPA will if the relief is granted because the improper and unlawful interference with  First Health's valid contractual expectation violates the Agreement, and the statutory and common law duties owed to First Health by both Norton and NPA, and will result, with respect to the PACE Program and similar programs, in a permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendants David W. Norton and National Prescription Administrators, Inc. as follows:

a.    ordering that defendants David W. Norton and National Prescription Administrators, Inc. shall not disclose or use any confidential and proprietary business information that is owned by First Health Group Corp. pertaining to, among other things, First Health Group Corp.'s computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques, as well as information regarding First Health Group Corp.'s past, present, and prospective clients including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, and information regarding their particular needs and requirements, and the Commonwealth of Pennsylvania Department of Aging's confidential information;

b.    ordering that defendant David W. Norton shall not, either in his individual capacity or on behalf of any other person or business entity, directly or indirectly, call upon, solicit or divert (i) any customer to whom First Health has provided services within one year prior to David W. Norton's termination as a First Health Group Corp. employee including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, or (ii) any prospective customer to whom First Health sought to provide services within one year prior to David W. Norton's termination as a First

29

Health Group Corp. employee and about which David W. Norton has

knowledge and was involved in such solicitation;

c.    ordering that defendant David W. Norton shall not, directly or indirectly,

solicit or hire any person who is currently or was an employee of First

Health at any time within one year prior to David W. Norton's termination

as a First Health Group Corp. employee;

d.    ordering that defendants David W. Norton and National Prescription

Administrators, Inc. shall cease and desist all conduct directed to an

unlawful and improper interference with plaintiff First Health Group

Corp.'s prospective contractual relation with the Commonwealth of

Pennsylvania Department of Aging pertaining to the PACE Program

contract for the period commencing June 1, 2000;

e.    ordering that defendant National Prescription Administrators, Inc. shall not

manage and/or administer the PACE Contract;

f.    ordering that defendant National Prescription Administrators, Inc. shall not

further solicit, divert and/or perform any services with respect to the PACE

Contract, including negotiating and/or entering into a contract to manage

and/or administer the PACE Program;

g.    ordering that defendant National Prescription Administrators, Inc. shall not

further solicit or attempt to hire First Health employees for the PACE

Contract;

h.    ordering that defendant David W. Norton shall not participate or have any

involvement in the pricing, solicitation, management and/or administration



of the PACE Contract, or any current or future pharmacy benefits

administration contract concerning the PACE Program or any similar

program;

i.    ordering that defendant National Prescription Administrators, Inc. shall not

permit Norton to participate in and/or be involved with the pricing,

solicitation, management and/or administration of the PACE Contract, or

any current or future pharmacy benefits administration contract involving

the PACE Program or any similar program;

j.    Awarding to plaintiff First Health Group Corp. compensatory and punitive

damages, costs, interest, attorney's fees and such other relief as the Court

deems just and appropriate.


_____

SCOTT L. VERNICK, ESQUIRE
JEFFREY D. HUTTON, ESQUIRE
FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP
2000 Market Street, 10th Floor
Philadelphia, PA, 19103-3291
(215) 299-2000

Attorneys for Plaintiff
FIRST HEALTH GROUP CORP.

Date:  February 22, 2000

Received 02/19/2000 15:38 in
02/19/2000  15:35   3048562172                    CANAAN VALLEY RESO...
FRI 16.44 FAX 804 965 7022          FIRST HEALTH

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,          :
3200 Highland Avenue               :
Downers Grove, IL 60515-1292,      :
                                   :
                    Plaintiff,     :     CIVIL ACTION NO.
                                   :
            v.                     :
                                   :
NATIONAL PRESCRIPTION              :
ADMINISTRATORS, INC.,              :
711 Ridgedale Avenue               :
East Hanover, NJ 07936             :
                                   :
        and                        :
                                   :
DAVID W. NORTON,                   :
1220 Whitby Road                   :
Richmond, VA 23277                 :
                                   :
                    Defendants.    :

### VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I, Teresa R. DiMarco, president of First Health Services Corporation, a wholly-owned

subsidiary of plaintiff, First Health Group Corp., pursuant to 28 U.S.C. § 1746, hereby verify

under penalty of perjury that the averments contained in the foregoing verified complaint are true

and correct to the best of my information, knowledge and belief.

_____
TERESA R. DIMARCO
President
First Health Services Corporation
4300 Cox Road
Glen Allen, VA 23060-3358

Date:

# EMPLOYMENT AGREEMENT

This AGREEMENT is made this 1st day of October, 1997 ("Effective Date") by and between First Health Group Corp., a Delaware corporation headquartered in Illinois ("Company"), and David W. Norton ("Employee").

## BACKGROUND

A.    Company desires to employ Employee, and Employee desires to be employed by Company.

B.    For and in consideration of the promises and of the mutual covenants hereinafter set forth, it is hereby agreed by and between the parties as follows:

## AGREEMENT

1. <u>Employment</u>.  Company hereby agrees to employ Employee to perform the duties set forth in Section 3 hereof ("Employee Services").  Employee hereby accepts employment to perform Employee Services for Employer under the terms and conditions of this Agreement.

2. <u>Term</u>.  The Initial Term of this Agreement will be for one year beginning on the Effective Date and will automatically renew for consecutive one year terms, unless earlier terminated pursuant to Section 8 hereof.

3. <u>Duties</u>.  Employee will serve as Vice President Administration and perform all responsibilities and duties as are assigned, or delegated to Employee, by President First Health Services, which responsibilities and duties include but are not limited to the direction and leadership of the Company's First Health Services pharmacy management and benefit programs. Employee will report to and is subject to supervision by President First Health Services or his/her designee.

4. <u>Time Commitment</u>.  Employee will devote Employee's time, attention and energies to the performance of Employee Services.  Employee may not be associated with, consult, advise, work for, be employed by, contract with, or otherwise devote any of the Employee's time to the pursuit of any other work or business activities which may interfere with the performance of services hereunder.

5. <u>Compensation and Benefits</u>.  Company will pay the following compensation to Employee in full consideration for performance of Employee Services hereunder in accordance with Company's then-current payroll policies and procedures.

(a)    <u>Salary</u>.  Employee will receive a gross annual salary of $108,108.00.  This salary is payable in accordance with Company's then - current payroll policies and procedures.  The gross annual salary will be subject to annual increases as may be approved by Company.

(b)    <u>Incentive Compensation</u>.  Employee will participate in the First Health Services Incentive Plan which will be based on targets established on an annual basis by Company, in its sole discretion.  The 1997, 1998 and 1999 Incentive Plans are attached hereto as Exhibits A, B, and C respectively.

(c)  Expenses.  Company will reimburse Employee for all reasonable and necessary expenses incurred by Employee in connection with the performance of Employee Services upon submission by Employee of expense reports with substantiating vouchers, in accordance with the Company's then current expense reimbursement policy.

(d)  Stock Options.  Employee will be awarded the option to purchase a minimum of 3,000 shares of Company common stock, adjusted for any stock splits, set by the Board of Directors of Company in accordance with the Company Stock Option Plan (the "Stock Options"). The awards of the Stock Options are subject to (i) approval of the Board of Directors of Company of the recommendations; and (ii) execution by Employee of the then current Stock Option Agreement.

(e)  Benefits and Flexible Time Off.  Employee shall be entitled to participate in such group life insurance, major medical, and other employee benefit plans (collectively "Benefit Plans") as established by Company in accordance with the applicable terms and conditions of such Benefit Plans, which Benefit Plans may be modified or discontinued by Company at any time; provided, however that Employee shall meet the requirements of the Benefit Plans for participation and in no event, including breach or wrongful termination of this Agreement, shall Employee be entitled to any amount of compensation in lieu of participation, unless otherwise provided by the terms of the Benefit Plan.

Employee shall also be entitled to paid time off in accordance with Company's then current Flexible Time Off (FTO) program. Employee shall accrue such FTO at the rate specified in the FTO program. Flexible Time Off shall be taken with due consideration for the services required of Employee and to the requirements of Company.

6.  Termination.

(a)  Either party may terminate this Agreement at any time following the Initial Term, without cause and without any liability to Company, upon no less than one hundred and twenty (120) day's prior written notice.  In such event, Employee, if requested by Company, will continue to render Employee Services and be paid Employee's regular compensation up to the date of termination in accordance with Company's then-current payroll policies and procedures.

(b)  Either party may terminate this Agreement at anytime for cause upon 14 days written notice. "Cause" includes, without limitation, breach of any provision of this Agreement or Employee's failure to adhere to the Company's policies and procedures. If the cause is not cured within the 14 day period, the Agreement may then be terminated by written notice.  An opportunity to cure is not required if the party receiving notice of termination has previously been given notice of termination and the opportunity to cure the same or similar cause.

(c)  Company may terminate this Agreement by written notice at anytime (including during the Initial Term) immediately for the following reasons: (i) Death or legal incapacity of Employee; (ii) Employee's conviction of a felony; (iii) willful violation of the Company's policies or standards including without limitation, Corporate Compliance standards, confidentiality and nondisclosure; or (iv) theft or dishonesty.

(d)   Company may terminate at any time (including during the Initial Term) by written notice upon Employee's other incapacity or inability to perform Employee services for a period of at least 90 consecutive days because of impairment of Employee's physical, or mental health making it impossible or impractical for Employee to perform Employee Services.

7.   Confidentiality.  Employee agrees not to directly or indirectly use or disclose, for the benefit of any person, firm or entity other than Company and its subsidiary companies, the Confidential Business Information of Company.   Confidential Business Information means information or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding Company's past, present and prospective clients and their particular needs and requirements, and their own confidential information.

Upon termination of employment, with or without cause, Employee agrees to return to Company all policy and procedure manuals, records, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in Employee's possession and/or control which relate to (i) the Confidential Business Information of Company, (ii) Employee's employment with Company, or (iii) the business activities or facilities of Company or its past, present, or prospective clients.

8.   Restrictive Covenant.  For a period of one year after termination of employment, with or without cause, Employee will not directly or indirectly, for the purpose of selling services provided or planned by Company at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of Company.   An actual customer, for purposes of this Section, is any customer to whom Company has provided services within one year prior to Employee's termination.   A prospective customer, for purposes of this Section, is any prospective customer to whom Company sought to provide services within one year prior to the date of Employee's termination and Employee has knowledge of and was involved in such solicitation.  For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of Employee's obligation hereunder.

9.   Non-Solicitation of Employees.  Employee further agrees that for a period of one year from the date of Employee's termination, with or without cause, Employee shall not directly or indirectly solicit or hire any person who is currently or was an employee of Company at any time during the twelve months prior to Employee's termination.

10.   Remedies.  In the event Employee breaches or threatens to breach Sections 7, 8 or 9 of this Agreement, Company shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach.  Employee acknowledges that Company's remedy at law is inadequate and that Company will suffer irreparable injury if such conduct is not prohibited.

Employee and Company agree that, because of the difficulty of ascertaining the amount of damages in the event that Employee breaches Section 9 of this Agreement, Company shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave Company's employ.  The parties further

agree that the existence of this remedy will not preclude employer from seeking or receiving injunctive relief.

Employee further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by Employee against Company shall not constitute a defense to the enforcement by Company of either of these paragraphs.

11. Property Rights. All discoveries, designs, improvements, ideas, inventions, creations, and works of art, whether or not patentable or subject to copyright, relating to the business of Company or its clients, conceived, developed or made by Employee during employment by Company, either solely or jointly with others (hereafter "Developments") shall automatically become the sole property of Company. Employee shall immediately disclose to Company all such Developments and shall, without additional compensation, execute all assignments, application or any other documents deemed necessary by Company to perfect Company's rights therein. These obligations shall continue for a period of one year beyond the termination of employment with respect to Developments conceived, developed or made by Employee during employment with Company.

Company acknowledges and agrees that the provisions of this section shall not apply to inventions for which no equipment, supplies, facility or trade secret information of Company or its clients were used by Employee and which were developed entirely on Employee's own time unless (a) such inventions relate (i) to the business of Company or (ii) to Company's actual or demonstrably anticipated research or development or (b) such inventions result from any work performed by Employee for Company.

12. Assignments. Neither party shall have the right or power to assign any rights or duties under this Agreement without the written consent of the other party, provided, however, that Company shall have the right to assign this Agreement without consent pursuant to any corporate reorganization, merger, or other transaction involving a change of control of Company or to any subsidiary company. Any attempted assignment in breach of this Section 12 shall be void.

13. Severability. Each section, paragraph, clause, sub-clause and provision (collectively "Provisions") of this Agreement shall be severable from each other, and if for any reason the paragraph, clause, sub-clause or provision is invalid or unenforceable, such invalidity or unenforceability shall not prejudice or in any way affect the validity or enforceability of any other Provision hereof.

14. Miscellaneous.

(a)    This Agreement, the schedules and any amendments hereto contain the entire agreement of the parties with respect to the employment of the Employee and supersedes all other understandings, whether written or oral; provided, however, that Employee shall comply with all policies, procedures and other requirements of Company as established in the Colleague Handbook and Corporate Policy Manuals, not inconsistent with this Agreement.

(b)    Failure on the part of either party to insist upon strict compliance by the other with respect to any of the terms, covenants and conditions hereof, shall not be deemed a subsequent waiver of such term, covenant or condition.

(c)  The provisions of any paragraph containing a continuing obligation after termination shall survive such termination whether with or without cause and even if occasioned by Company's breach or wrongful termination.

(d)  This Agreement may not be modified except in writing as signed by the parties; provided, however, that Company may amend or terminate its Benefit Plans, Incentive Plan, Corporate Policies and/or employees' rules and regulations in its sole discretion.

(e)  In the event of litigation under this Agreement, the court shall have discretion to award the prevailing party reasonable attorney's fees.

15.  Governing Law.  It is the intention of the parties hereto that all questions with respect to the construction, formation, and performance of this Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the laws of the State of Illinois.  The parties hereto submit to the jurisdiction and venue of the courts of DuPage County Illinois in respect to any matter or thing arising out of this agreement pursuant hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement in the State of Illinois as of the day and year first above written.

The Company:
First Health Group Corp.

By: _____
Its:  President and
      Chief Executive Officer

Employee: _____

David W. Norton

d:\home\wes2\kay\agrmts\exec\mod1.doc

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,      :
3200 Highland Avenue           :
Downers Grove, IL 60515-1282,   :
                                    :
                   Plaintiff,    :      CIVIL ACTION NO.
                                      :
         v.                       :
                                    :
NATIONAL PRESCRIPTION       :
ADMINISTRATORS, INC.,         :
711 Ridgeway Avenue          :
East Hanover, NJ 07936,      :
                                    :
       and                      :
                                    :
DAVID W. NORTON,          :
1220 Whitby Road            :
Richmond, VA 23277,        :
                                    :
               Defendants.  :

## AFFIDAVIT

I, Teresa R. DiMarco, being of sound mind, do hereby attest and affirm as follows:

1.      I am the president of First Health Services Corporation, a wholly-owned subsidiary of plaintiff, First Health Group Corp. (collectively, "First Health"), whose principal place of business is 3200 Highland Avenue, Downers Grove, IL 6051-1282. I am authorized to take this affidavit on behalf of First Health.

2.      Founded in 1982, First Health is a full-service national health benefits company.

3.     First Health specializes in, among other things, providing large, national employers with a fully integrated, single-source for their group health programs.  Further, through its wholly-owned subsidiary, First Health Services Corporation ("FHSC"), First Health serves state Medicaid and entitlement programs with claims administration, pharmacy benefits management and clinical management services.

4.     Upon reliable information and belief, defendant National Prescription Administrators, Inc. ("NPA") is in the business of, among other things,  providing healthcare management services.

5.     Through FHSC, First Health represents one of the leading healthcare administration and management firms in the United States, offering a full range of health data administration, pharmacy benefit management, utilization and quality review services for Medicaid, government healthcare programs, and managed care organizations.

6.     As the nation's fourth largest pharmacy benefit management company, FHSC provides a complete array of pharmacy benefit administration and clinical management services.

7.     On November 4, 1983, the General Assembly of the Commonwealth of Pennsylvania enacted legislation that established the Pharmaceutical Assistance Contract for the Elderly (the "PACE Program").

8.     In 1983, in response to the PACE Program's initial Request for Proposal, FHSC was selected as the PACE Program Contractor, responsible for administering the PACE Program.

9.    Since 1983, FHSC has been the only contractor to administer the PACE Program, having won three (3) subsequent bids in 1987, 1990 and 1995.

10.    FHSC's current contract to administer the PACE Program expires on June 1, 2000.

11.    Defendant David W. Norton ("Norton") was first employed by The Computer Company (now known as First Health Services Corporation) in February, 1974, as a project manager. With the exception of two brief intervals with other companies, First Health employed Norton until October 28, 1999.

12.    For approximately two of his years with First Health, Norton was the vice president for PACE Operations. During this time period, Norton was responsible for the overall operation of FHSC's PACE contract.

13.    Norton also served as senior vice president of the Pharmacy Business Unit, which included the PACE Program.

14.    In his capacity as a First Health employee (for approximately seventeen years) and an officer responsible for the PACE Program, Norton gained an intimate working knowledge of First Health's confidential and proprietary business information pertaining to, among other things, pricing, marketing, and the highly technical procedures, processes, policies, systems and methods for the operation, administration and management of the PACE Program, as well as the Department's particular needs and requirements for that program.

15.    First Health maintains the confidential and proprietary business nature of its

information pertaining to pricing, marketing, and the highly technical procedures, processes,

policies, systems and methods for the operation, administration and management of the PACE

Program, as well as information regarding the Department's particular needs and requirements

by, among other methods, requiring its employees to execute employment agreements that

contain clear and precise obligations of confidentiality.

16.    On or about October 1, 1997, Norton and First Health executed an Employment

Agreement (the "Agreement").

17.    The Agreement governed, among other things, the terms of Norton's employment

with respect to First Health's pharmacy management and benefits programs (operated through

FHSC), and it delineated certain contractual obligations that Norton agreed to honor.

18.    Section 7 of the Agreement entitled, "Confidentiality", states:

> [Norton] agrees not to directly or indirectly use or disclose,
> for the benefit of any person, firm or entity other than [First Health]
> and its subsidiary companies, the Confidential Business Information
> of [First Health].  Confidential Business Information means information
> or material which is not generally available to or used by others or the
> utility or value of which is not generally known or recognized as a
> standard practice, whether or not the underlying details are in the public
> domain, including but not limited to its computerized and manual systems,
> procedures, reports, client lists, review criteria and methods, financial
> methods and practices, plans, pricing and marketing techniques as well
> as information regarding [First Health's] past, present, and prospective
> clients and their particular needs and requirements, and their own
> confidential information.

> Upon termination of employment, with or without cause, [Norton] agrees
> to return to [First Health] all policy and procedure manuals, records,
> reports, records, notes, data, memoranda, and reports of any nature
> (including computerized and electronically stored information) which are
> in [Norton's] possession and/or control which relate to (I) the Confidential
> Business Information of [First Health], (ii) [Norton's] employment with

4

[First Health], or (iii) the business activities or facilities of [First Health] or its past, present, or prospective clients.

See Agreement at Section 7 (emphasis added).

19.    Section 8 of the Agreement entitled, "Restrictive Covenant", states in pertinent part:

> For a period of one year after termination of employment, with or without cause, [Norton] will not directly or indirectly, for the purpose of selling services provided or planned by [First Health] at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of [First Health]. An actual customer, for purposes of this Section, is any customer to whom [First Health] has provided services within one year prior to [Norton's] termination. A prospective customer, for purposes of this Section, is any prospective customer to whom [First Health] sought to provide services within one year prior to the date of [Norton's] termination and [Norton] has knowledge of and was involved in such solicitation. For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of [Norton's] obligation hereunder.

Id. at Section 8.

20.    Section 9 of the Agreement entitled, "Non-Solicitation of Employees", states:

> [Norton] further agrees that for a period of one year from the date of [Norton's] termination, with or without cause, [Norton] shall not directly or indirectly solicit or hire any person who is currently or was an employee of [First Health] at any time during the twelve months prior to [Norton's] termination.

Id. at Section 9.

21.    Section 10 of the Agreement entitled, "Remedies", states:

> In the event [Norton] breaches or threatens to breach Section 7, 8 or 9 of this Agreement, [First Health] shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach. [Norton] acknowledges that [First Health's] remedy at law is inadequate and that [First Health] will suffer irreparable injury if such conduct is not prohibited.

5

> [Norton] and [First Health] agree that, because of the difficulty of ascertaining the amount of damages in the event that [Norton] breaches Section 9 of this Agreement, [First Health] shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave [First Health's] employ. The parties further agree that the existence of this remedy will not preclude [First Health] from seeking or receiving injunctive relief.

> [Norton] further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by [Norton] against [First Health] shall not constitute a defense to the enforcement by [First Health] of either of these paragraphs.

Id. at Section 10 (emphasis added).

22. Norton's employment with First Health terminated effective October 28, 1999.

23. Before the effective termination date of Norton's employment with First Health on or about September 14, 1999, the Commonwealth of Pennsylvania Department of Aging (the "Department") forwarded a Request for Proposal ("RFP") to FHSC and other potential bidders with respect to the PACE Program for the contract period commencing June 1, 2000 (the "PACE Contract").

24. First Health, through FHSC, timely submitted its bid proposal to provide services, as outlined in the RFP, to the Department for the PACE Contract.

25. On reliable information and belief, Norton was directly involved and instrumental in preparing NPA's bid proposal for the PACE Contract in response to the RFP of September 14, 1999, and was proposed by NPA as the officer-in-charge of the management and administration of the PACE Program.

26.    Upon reliable information and belief, Norton, acting on behalf of NPA, made an oral presentation to the Department for the purpose of securing the PACE Contract; Norton's presentation took place sometime between the issuing of the RFP on September 14, 1999 and February 3, 2000, the date the notice of award was issued.

27.    In accordance with the RFP, and answers by the Department to questions submitted by bidders, proposals were evaluated on the basis of three categories: Technical Proposal – 60%; Participation of Socially-Economically Restricted Businesses – 10%; and Costs – 30%. In accordance with Part III "Criteria for Selection" of the RFP, the evaluation committee was to recommend for selection the proposal that most closely met the requirements of the RFP and satisfied the needs of the Department, taking into consideration criteria set forth in that Part III. Included in the criteria for selection were subsections relating to contractor qualifications and professional and managerial personnel.

28.    On or about February 3, 2000, the Department advised FHSC that FHSC had not received the highest total points in the bid proposal evaluation process and, as a result, the Department would enter into negotiations with NPA for the PACE Contract.

29.    Part III, Section C of the RFP lists as criteria, "[t]he quality, relevancy and recency of similar projects performed by the bidder"; significantly, NPA does not now, nor has it ever, administered either the PACE Program or a comparable program in any state or commonwealth that provides pharmaceutical assistance to the elderly. In fact, in connection with two previous procurements, NPA submitted proposals for the PACE contract in Pennsylvania and, in each instance, failed to obtain the bid because its bid proposals were evaluated as substantially insufficient.

7

30.     Part III, Section D of the RFP's criteria calls for the evaluation of qualifications of professional and managerial personnel who would be assigned to the job by the bidder; qualifications are to be measured with particular reference to experience on projects similar to that described in the RFP.  Beyond Dave Norton, who NPA has wrongfully and improperly proposed as its officer-in-charge of the PACE Program, NPA does not have professional and managerial personnel who have the experience and related education for a project such as PACE; the only such professional and management personnel are the existing staff of First Health dedicated to the PACE Program.

31.     In fact, even with respect to the PACE Program's current project manager, on February 3, 2000, Norton solicited a present First Health employee, Robert Howells, to work for NPA and assist in managing and administering the PACE Contract.  At First Health, Mr. Howells is presently responsible for overseeing the PACE Program, and he possesses the most current experience with hands-on management of the PACE Program.

32.     Even without the benefit of reviewing NPA's bid proposal, the timing and circumstances outlined above force First Health to conclude that NPA could not have suddenly submitted its first competitive bid proposal for the PACE Program without Norton having provided NPA with First Health's confidential and proprietary business information pertaining to the pricing, marketing, and the highly technical procedures, processes, policies, systems and methods for the operation, administration and management of the PACE Program; such information is not contained in any previous RFP or First Health bid proposal; and Norton, as a result of his employment with First Health, possesses knowledge of such information.

8

33.     Further, upon reliable information and belief, NPA, in its bid proposal for the PACE Contract, represented that it would use key managers and administrative staff who are current First Health employees and assigned to the PACE Program.  Such a representation is without merit.

34.     The key professional and managerial staff of First Health assigned to the PACE Program are longstanding, valued employees, and First Health will make appropriate efforts to retain these key personnel or arrange to assign them to other programs; First Health has no obligation to the Department in its Turnover Plan with respect to First Health employees and, as a result, those employees would not necessarily be made available to NPA;

35.     All of First Health's employees assigned to the PACE Program are subject to restrictions in their employment on the use and disclosure of confidential and proprietary business information and, as a result, are not free to become employed with a different company and perform the same services with respect to the PACE Program without violating confidentiality obligations that they agreed to honor.

36.     As a practical matter (and with one exception noted above), to the best of First Health's knowledge and belief, no current employees have been asked by NPA, its agents or representatives, if they would even be willing to accept employment at NPA, rather than remain with First Health as their longstanding employer.

37.     On February 10, 2000, pursuant to the administrative rules of the Department, First Health filed a bid protest with the Department in which First Health protests the award of the PACE Contract to NPA on the following grounds: (1) based on reliable information and belief, Norton violated the Agreement in connection with the preparation of NPA's bid proposal,

9

Case 1:00-cv-00312-YK    Document 6    Filed 02/22/2000    Page 52 of 91

Received 02/  2000 15:38 in 01:44 on line [0] for FAXADM    Pg 2/3
02/19/2000  15:35   3048662272              CANAAN VALLEY RESORT    PAGE  02
04/19/00  FRI 10:41 FAX 804 965 7522        FIRST HEALTH                    ☑013

and (2) NPA does not have the requisite qualifications and personnel to satisfy the RFP of September 14, 1999. This administrative appeal with respect to the award of the PACE Contract to NPA is currently pending.

38.    Unless injunctive relief is granted to stop the improper and unlawful conduct by NPA and Norton described above, First Health will suffer immediate and irreparable harm in the nature of (i) the improper and unlawful disclosure and/or use by NPA and Norton of First Health's confidential and proprietary business information pertaining to pricing, marketing, and the highly technical procedures, processes, systems, products and methods for operating, managing and administering the PACE Program, and the needs and requirements of the Department with respect to that program, (ii) the loss of valuable First Health employees as a result of the improper and unlawful solicitation and hiring of such employees by NPA and Norton; (iii) the loss of the Department as a longstanding and valued customer as a result of the improper and unlawful solicitation and diversion of the Department's business by NPA and Norton; (iv) the loss of the PACE Contract and similar contracts as a result of the improper and unlawful conduct of NPA and Norton.


TERESA R. DIMARCO
President
First Health Services Corporation
4300 Cox Road
Glen Allen, Virginia 23060


Sworn to and subscribed
before me this 19th day
of February , 2000.

Barbara A. Pickels
Notary Public
My Commission Expires: 7/31/02


10

# ● EMPLOYMENT AGREEMENT ●

This AGREEMENT is made this 1st day of October, 1997 ("Effective Date") by and between First Health Group Corp., a Delaware corporation headquartered in Illinois ("Company"), and David W. Norton ("Employee").

## BACKGROUND

A.    Company desires to employ Employee, and Employee desires to be employed by Company.

B.    For and in consideration of the promises and of the mutual covenants hereinafter set forth, it is hereby agreed by and between the parties as follows:

## AGREEMENT

1. <u>Employment</u>. Company hereby agrees to employ Employee to perform the duties set forth in Section 3 hereof ("Employee Services"). Employee hereby accepts employment to perform Employee Services for Employer under the terms and conditions of this Agreement.

2. <u>Term</u>. The Initial Term of this Agreement will be for one year beginning on the Effective Date and will automatically renew for consecutive one year terms, unless earlier terminated pursuant to Section 8 hereof.

3. <u>Duties</u>. Employee will serve as Vice President Administration and perform all responsibilities and duties as are assigned, or delegated to Employee, by President First Health Services, which responsibilities and duties include but are not limited to the direction and leadership of the Company's First Health Services pharmacy management and benefit programs. Employee will report to and is subject to supervision by President First Health Services or his/her designee.

4. <u>Time Commitment</u>. Employee will devote Employee's time, attention and energies to the performance of Employee Services. Employee may not be associated with, consult, advise, work for, be employed by, contract with, or otherwise devote any of the Employee's time to the pursuit of any other work or business activities which may interfere with the performance of services hereunder.

5. <u>Compensation and Benefits</u>. Company will pay the following compensation to Employee in full consideration for performance of Employee Services hereunder in accordance with Company's then-current payroll policies and procedures.

(a)    <u>Salary</u>. Employee will receive a gross annual salary of $108,108.00. This salary is payable in accordance with Company's then - current payroll policies and procedures. The gross annual salary will be subject to annual increases as may by approved by Company.

(b)    <u>Incentive Compensation</u>. Employee will participate in the First Health Services Incentive Plan which will be based on targets established on an annual basis by Company, in its sole discretion. The 1997, 1998 and 1999 Incentive Plans are attached hereto as Exhibits A, B, and C respectively.

(c) Expenses. Company will reimburse Employee for all reasonable and necessary expenses incurred by Employee in connection with the performance of Employee Services upon submission by Employee of expense reports with substantiating vouchers, in accordance with the Company's then current expense reimbursement policy.

(d) Stock Options. Employee will be awarded the option to purchase a minimum of 3,000 shares of Company common stock, adjusted for any stock splits, set by the Board of Directors of Company in accordance with the Company Stock Option Plan (the "Stock Options"). The awards of the Stock Options are subject to (i) approval of the Board of Directors of Company of the recommendations; and (ii) execution by Employee of the then current Stock Option Agreement.

(e) Benefits and Flexible Time Off. Employee shall be entitled to participate in such group life insurance, major medical, and other employee benefit plans (collectively "Benefit Plans") as established by Company in accordance with the applicable terms and conditions of such Benefit Plans, which Benefit Plans may be modified or discontinued by Company at any time; provided, however that Employee shall meet the requirements of the Benefit Plans for participation and in no event, including breach or wrongful termination of this Agreement, shall Employee be entitled to any amount of compensation in lieu of participation, unless otherwise provided by the terms of the Benefit Plan.

Employee shall also be entitled to paid time off in accordance with Company's then current Flexible Time Off (FTO) program. Employee shall accrue such FTO at the rate specified in the FTO program. Flexible Time Off shall be taken with due consideration for the services required of Employee and to the requirements of Company.

6. Termination.

(a) Either party may terminate this Agreement at any time following the Initial Term, without cause and without any liability to Company, upon no less than one hundred and twenty (120) day's prior written notice. In such event, Employee, if requested by Company, will continue to render Employee Services and be paid Employee's regular compensation up to the date of termination in accordance with Company's then-current payroll policies and procedures.

(b) Either party may terminate this Agreement at anytime for cause upon 14 days written notice. "Cause" includes, without limitation, breach of any provision of this Agreement or Employee's failure to adhere to the Company's policies and procedures. If the cause is not cured within the 14 day period, the Agreement may then be terminated by written notice. An opportunity to cure is not required if the party receiving notice of termination has previously been given notice of termination and the opportunity to cure the same or similar cause.

(c) Company may terminate this Agreement by written notice at anytime (including during the Initial Term) immediately for the following reasons: (i) Death or legal incapacity of Employee; (ii) Employee's conviction of a felony; (iii) willful violation of the Company's policies or standards including without limitation, Corporate Compliance standards, confidentiality and nondisclosure; or (iv) theft or dishonesty.

(d)   Company may terminate at any time (including during the initial Term) by written notice upon Employee's other incapacity or inability to perform Employee Services for a period of at least 90 consecutive days because of impairment of Employee's physical, or mental health making it impossible or impractical for Employee to perform Employee Services.

7.   Confidentiality.   Employee agrees not to directly or indirectly use or disclose, for the benefit of any person, firm or entity other than Company and its subsidiary companies, the Confidential Business Information of Company.   Confidential Business Information means information or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding Company's past, present and prospective clients and their particular needs and requirements, and their own confidential information.

Upon termination of employment, with or without cause, Employee agrees to return to Company all policy and procedure manuals, records, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in Employee's possession and/or control which relate to (i) the Confidential Business Information of Company, (ii) Employee's employment with Company, or (iii) the business activities or facilities of Company or its past, present, or prospective clients.

8.   Restrictive Covenant.   For a period of one year after termination of employment, with or without cause, Employee will not directly or indirectly, for the purpose of selling services provided or planned by Company at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of Company.   An actual customer, for purposes of this Section, is any customer to whom Company has provided services within one year prior to Employee's termination.   A prospective customer, for purposes of this Section, is any prospective customer to whom Company sought to provide services within one year prior to the date of Employee's termination and Employee has knowledge of and was involved in such solicitation.   For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of Employee's obligation hereunder.

9.   Non-Solicitation of Employees.   Employee further agrees that for a period of one year from the date of Employee's termination, with or without cause, Employee shall not directly or indirectly solicit or hire any person who is currently or was an employee of Company at any time during the twelve months prior to Employee's termination.

10.   Remedies.   In the event Employee breaches or threatens to breach Sections 7, 8 or 9 of this Agreement, Company shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach.   Employee acknowledges that Company's remedy at law is inadequate and that Company will suffer irreparable injury if such conduct is not prohibited.

Employee and Company agree that, because of the difficulty of ascertaining the amount of damages in the event that Employee breaches Section 9 of this Agreement, Company shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave Company's employ.   The parties further

agree that the existence of this remedy will not preclude employer from seeking or receiving injunctive relief.

Employee further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by Employee against Company shall not constitute a defense to the enforcement by Company of either of these paragraphs.

11.  Property Rights.  All discoveries, designs, improvements, ideas, inventions, creations, and works of art, whether or not patentable or subject to copyright, relating to the business of Company or its clients, conceived, developed or made by Employee during employment by Company, either solely or jointly with others (hereafter "Developments") shall automatically become the sole property of Company. Employee shall immediately disclose to Company all such Developments and shall, without additional compensation, execute all assignments, application or any other documents deemed necessary by Company to perfect Company's rights therein. These obligations shall continue for a period of one year beyond the termination of employment with respect to Developments conceived, developed or made by Employee during employment with Company.

Company acknowledges and agrees that the provisions of this section shall not apply to inventions for which no equipment, supplies, facility or trade secret information of Company or its clients were used by Employee and which were developed entirely on Employee's own time unless (a) such inventions relate (i) to the business of Company or (ii) to Company's actual or demonstrably anticipated research or development or (b) such inventions result from any work performed by Employee for Company.

12.  Assignments.  Neither party shall have the right or power to assign any rights or duties under this Agreement without the written consent of the other party, provided, however, that Company shall have the right to assign this Agreement without consent pursuant to any corporate reorganization, merger, or other transaction involving a change of control of Company or to any subsidiary company. Any attempted assignment in breach of this Section 12 shall be void.

13.  Severability.  Each section, paragraph, clause, sub-clause and provision (collectively "Provisions") of this Agreement shall be severable from each other, and if for any reason the paragraph, clause, sub-clause or provision is invalid or unenforceable, such invalidity or unenforceability shall not prejudice or in any way affect the validity or enforceability of any other Provision hereof.

14.  Miscellaneous.

(a)  This Agreement, the schedules and any amendments hereto contain the entire agreement of the parties with respect to the employment of the Employee and supersedes all other understandings, whether written or oral; provided, however, that Employee shall comply with all policies, procedures and other requirements of Company as established in the Colleague Handbook and Corporate Policy Manuals, not inconsistent with this Agreement.

(b)  Failure on the part of either party to insist upon strict compliance by the other with respect to any of the terms, covenants and conditions hereof, shall not be deemed a subsequent waiver of such term, covenant or condition.

(c)  The provisions of any paragraph containing a continuing obligation after termination shall survive such termination whether with or without cause and even if occasioned by Company's breach or wrongful termination.

(d)  This Agreement may not be modified except in writing as signed by the parties; provided, however, that Company may amend or terminate its Benefit Plans, Incentive Plan, Corporate Policies and/or employees' rules and regulations in its sole discretion.

(e)        In the event of litigation under this Agreement, the court shall have discretion to award the prevailing party reasonable attorney's fees.

15.        Governing Law.  It is the intention of the parties hereto that all questions with respect to the construction, formation, and performance of this Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the laws of the State of Illinois. The parties hereto submit to the jurisdiction and venue of the courts of DuPage County Illinois in respect to any matter or thing arising out of this agreement pursuant hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement in the State of Illinois as of the day and year first above written.

The Company:
First Health Group Corp.

By:

Its:  President and
      Chief Executive Officer

Employee:

David W. Norton

d:\home\wasllezy\agrmnts\execmodL.doc

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FIRST HEALTH GROUP CORP.,<br>3200 Highland Avenue<br>Downers Grove, IL 60515-1282, | : <br> : <br> : <br> : |
|             Plaintiff, | :     CIVIL ACTION NO. |
| | : |
|    v. | : |
| | : |
| NATIONAL PRESCRIPTION<br>ADMINISTRATORS, INC.,<br>711 Ridgedale Avenue<br>East Hanover, NJ 07936, | : <br> : <br> : <br> : |
| | : |
|    and | : |
| | : |
| DAVID W. NORTON,<br>1220 Whitby Road<br>Richmond, VA 23277, | : <br> : <br> : |
| | : |
|           Defendants. | : |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF FIRST HEALTH GROUP CORP.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## I.    INTRODUCTION

Plaintiff, First Health Group Corp. ("First Health"), seeks a temporary restraining order and preliminary injunction against defendants, David W. Norton ("Norton") and National Prescription Administrators, Inc. ("NPA"), to enjoin, inter alia, the continued misappropriation and use of First Health's valuable confidential and proprietary business information and the

improper solicitation of First Health employees and customers.  For the reasons set forth below,

First Health should be granted the injunctive relief requested.

## II.    **FACTS**

Founded in 1982, First Health is the nation's premier full-service national health

benefits company.  First Health specializes in, among other things, providing large, national

employers with a fully integrated, single-source for their group health programs.  Further,

through its wholly-owned subsidiary company, First Health Services Corporation ("FHSC"),

First Health constitutes one of the leading healthcare administration and management firms in

the United States, offering a full range of health data administration, pharmacy benefit

management, utilization and quality review services for Medicaid, government healthcare

programs, and managed care organizations.  As the nation's fourth largest pharmacy benefit

management company, FHSC provides a complete array of pharmacy benefit administration and

clinical management services.

On November 4, 1983, the General Assembly of the Commonwealth of Pennsylvania

enacted legislation that established the Pharmaceutical Assistance Contract for the Elderly (the

"PACE Program").  In 1983, in response to the PACE Program's initial Request for Proposal,

FHSC was selected as the PACE Program Contractor, responsible for administering the PACE

Program.  FHSC has been the only contractor to administer the PACE Program, having won

three (3) subsequent bids in 1987, 1990 and 1995.  FHSC's current contract to administer the

PACE Program expires on June 1, 2000.

Norton was first employed by The Computer Company (now known as First

Health Services Corporation) in February, 1974, as a project manager.  With the exception of

two brief intervals with other companies, First Health employed Norton until October 28, 1999.

2

For approximately two of his years with First Health, Norton was the vice president for PACE Operations. During this time period, Norton was responsible for the overall operation of First Health's PACE contract. Norton also served as senior vice president of the Pharmacy Business Unit, which included the PACE Program.

In his capacity as a First Health employee (for approximately seventeen years) and an officer involved in the PACE Program, Norton gained an intimate working knowledge of First Health's confidential and proprietary business information pertaining to, among other things, pricing, marketing, and the highly technical procedures, processes, policies, systems and methods for the operation, administration and management of the PACE Program, as well as the Department's particular needs and requirements for that program.

First Health maintains its confidential and proprietary business information pertaining to the pricing, marketing, and the highly technical procedures, processes, policies, systems and methods for the operation, administration and management of the PACE Program, as well as information regarding the Department's particular needs and requirements by, among other methods, requiring its employees to execute employment agreements that contain clear and precise obligations of confidentiality.

On or about October 1, 1997, Norton and First Health executed an Employment Agreement ("Agreement"). A true and correct copy of the Agreement is attached hereto and marked as Exhibit "A". The Agreement governed, among other things, the terms of Norton's employment with respect to First Health's pharmacy management and benefits programs (operated through FHSC) and it delineated certain contractual obligations that Norton agreed to honor.

3

For example, Section 7 of the Agreement entitled, "Confidentiality", states:

> [Norton] agrees not to directly or indirectly use or disclose, for the benefit of any person, firm or entity other than [First Health] and its subsidiary companies, the Confidential Business Information of [First Health].  Confidential Business Information means information or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding [First Health's] past, present, and prospective clients and their particular needs and requirements, and their own confidential information.
>
> Upon termination of employment, with or without cause, [Norton] agrees to return to [First Health] all policy and procedure manuals, records, reports, records, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in [Norton's] possession and/or control which relate to (I) the Confidential Business Information of [First Health], (ii) [Norton's] employment with [First Health], or (iii) the business activities or facilities of [First Health] or its past, present, or prospective clients.

See Agreement at Section 7 (emphasis added).

Section 8 of the Agreement entitled, "Restrictive Covenant", states in pertinent part:

> For a period of one year after termination of employment, with or without cause, [Norton] will not directly or indirectly, for the purpose of selling services provided or planned by [First Health] at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of [First Health]. An actual customer, for purposes of this Section, is any customer to whom [First Health] has provided services within one year prior to [Norton's] termination. A prospective customer, for purposes of this Section, is any prospective customer to whom [First Health] sought to provide services within one year prior to the date of [Norton's] termination and [Norton] has knowledge of and was involved in such solicitation.  For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of [Norton's] obligation hereunder.

4

Id. at Section 8.[1]

Section 9 of the Agreement, entitled, "Non-Solicitation of Employees", states:

> [Norton] further agrees that for a period of one year from the date of [Norton's] termination, with or without cause, [Norton] shall not directly or indirectly solicit or hire any person who is currently or was an employee of [First Health] at any time during the twelve months prior to [Norton's] termination.

Id. at Section 9.

Section 10 of the Agreement, entitled, "Remedies", states:

> In the event [Norton] breaches or threatens to breach Section 7, 8 or 9 of this Agreement, [First Health] shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach.  [Norton] acknowledges that [First Health's] remedy at law is inadequate and that [First Health] will suffer irreparable injury if such conduct is not prohibited.

> [Norton] and [First Health] agree that, because of the difficulty of ascertaining the amount of damages in the event that [Norton] breaches Section 9 of this Agreement, [First Health] shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave [First Health's] employ.  The parties further agree that the existence of this remedy will not preclude [First Health] from seeking or receiving injunctive relief.

> [Norton] further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by [Norton] against [First Health] shall not constitute a defense to the enforcement by [First Health] of either of these paragraphs.

Id. at Section 10 (emphasis added).

Norton's employment with First Health terminated effective October 28, 1999.  Before that termination date, on or about September 14, 1999, the Commonwealth of Pennsylvania Department of Aging (the "Department") forwarded a Request for Proposal ("RFP") to FHSC

---

[1]    For reasons that will discussed below, the limited exception in Section 8 pertaining to unsolicited requests for proposals from government agencies does not apply in this case.

and other potential bidders with respect to the PACE Program for the contract period

commencing June 1, 2000. First Health, through FHSC, timely submitted its bid proposal to

provide services, as outlined in the RFP, to the Department for the contract period commencing

June 1, 2000 (the "PACE Contract").

Norton was directly involved and instrumental in preparing NPA's bid proposal for the

PACE Contract in response to the RFP of September 14, 1999. Further, Norton, acting on behalf

of NPA, made an oral presentation to the Department for the purpose of securing the PACE

Contract. Norton's presentation took place sometime between the issuing of the RFP on

September 14, 1999 and February 3, 2000, the date the notice of award was issued.

In accordance with the RFP and answers by the Department to questions submitted by

bidders, proposals were evaluated on the basis of three categories: Technical Proposal – 60%;

Participation of Socially-Economically Restricted Businesses – 10%; and Costs – 30%. In

accordance with Part III "Criteria for Selection" of the RFP, the evaluation committee was to

recommend for selection the proposal that most closely met the requirements of the RFP and

satisfied the needs of the Department, taking into consideration criteria set forth in that Part III.

Included in the criteria for selection were subsections relating to contractor qualifications and

professional and managerial personnel. On or about February 3, 2000, the Department advised

FHSC that FHSC had not received the highest total points in the bid proposal evaluation process

and, as a result, the Department would enter into negotiations with NPA for the continued

performance of the PACE contract.

Part III, Section C of the RFP lists as criteria, "[t]he quality, relevancy and recency

of similar projects performed by the bidder". Significantly, NPA does not now, nor has it ever,

administered either the PACE Program or a comparable program in any state or commonwealth

that provides pharmaceutical assistance to the elderly. In fact, in connection with two previous procurements, NPA submitted proposals for the PACE contract in Pennsylvania and, in each instance, failed to obtain the bid because its bid proposals were evaluated as <u>substantially insufficient</u>.

Part III, Section D of the RFP's criteria calls for the evaluation of qualifications of professional and managerial personnel who would be assigned to the job by the bidder; qualifications are to be measured with particular reference to experience on projects similar to those described in the RFP. Beyond Norton, who NPA has wrongfully and unlawfully proposed as its officer-in-charge of the PACE Program, NPA does not have professional and managerial personnel who have the experience and related education for a project such as PACE; the only such professional and management personnel are the existing staff of First Health dedicated to the PACE Program. In fact, even with respect to the PACE Program's current project manager, on February 3, 2000, Norton solicited a present First Health employee, Robert Howells, to work for NPA and assist in administering the PACE Contract. At First Health, Mr. Howells is presently responsible for overseeing the PACE contract and he possesses the most current experience with hands-on management of the PACE Program.

Even without the benefit of reviewing NPA's proposal, the timing and circumstances outlined above force First Health to conclude that NPA could not have suddenly submitted its <u>first</u> competitive bid proposal for the PACE Program without Norton having provided NPA with First Health's confidential and proprietary business information pertaining to the pricing, marketing, and the highly technical procedure, processes, policies, systems and methods for the operation, administration and management of the PACE Program. Such information is not

7

contained in any previous RFP or First Health bid proposal, and Norton, as a result of his

employment with First Health, possesses knowledge of such information.

Moreover, NPA, in its bid proposal for the PACE Contract, represented that it would use

key managers and administrative staff who are current First Health employees and assigned to

the PACE Program.  Such a representation is without merit.

The key professional and managerial staff of First Health assigned to the PACE Program

are longstanding, valued employees, and First Health will make appropriate efforts to retain

these key personnel or arrange to assign them to other programs; First Health has no obligation

to the Department in its Turnover Plan with respect to First Health employees and, as a result,

those employees would not necessarily be made available to NPA.  Significantly, all of First

Health's employees assigned to the PACE Program are subject to restrictions in their

employment on the use and disclosure of confidential and proprietary business information and,

as a result, are not free to become employed with a different company and perform the same

services with respect to the PACE Program without violating confidentiality obligations that they

agreed to honor.

On February 10, 2000, pursuant to the administrative rules of the Department, First

Health filed a bid protest with the Department in which First Health protests the award of the

PACE Contract to NPA on the following grounds: (1) Norton violated the Agreement in

connection with the preparation of NPA's bid proposal and (2) NPA does not have the requisite

qualifications and personnel to satisfy the RFP of September 14, 1999.  This administrative

appeal with respect to the award of the PACE Contract to NPA is currently pending.

Nevertheless, First Health has independent causes of action against Norton and NPA for, <u>inter</u>

<u>alia</u>, misappropriation of trade secrets and breach of contract.

As a result of the improper and unlawful conduct of Norton and NPA, the Department awarded the PACE Contract to NPA. Unless this Court enjoins Norton and NPA from, among other things, a further misappropriation of trade secrets, and tortious interference with existing and prospective contractual relationships, First Health stands to lose not only the PACE Contract, but also its confidential and proprietary business information, and valued employees that significantly contribute to First Health's business integrity and overall success.

## II.    **ARGUMENT**

A preliminary injunction is properly issued when, on balance, the following factors weigh in favor of the moving party:

> (1) the likelihood that the plaintiff will prevail on the merits at the final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.

See American Tel. And Tel. Co. v. Windback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994), cert. den., 514 U.S. 1103 (1995) (citing Opticians Ass'n of Am. v. Independent Opticians of Am., 920 F.2d 187, 191-92 (3d Cir. 1990). The standard for a temporary restraining order is the same for that of a preliminary injunction. See Babn Technologies Corp. v. Bruno, 1998 WL 720171, * 3 (E.D. Pa. Sept. 2, 1998) (citing Bieros v. Nicola, 857 F. Supp. 445, 446 (E.D. Pa. 1994)).

Based on the facts as detailed above and the legal principles described more fully below, First Health is entitled to a temporary, preliminary and, ultimately, permanent injunction that enjoins Norton from (i) further soliciting, diverting and/or performing any services with respect to the PACE Contract, (ii) further soliciting or attempting to hire current First Health employees for the PACE Contract, (iii) further using or disclosing any confidential and proprietary business

information that is owned by First Health; (iv) participating or having any involvement in the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract concerning the PACE Program or any similar program.  First Health is also entitled to a temporary, preliminary and permanent injunction that enjoins NPA from (i) managing and/or administrating the PACE Contract; (ii) further soliciting, diverting and/or performing any services with respect to the PACE Contract, including negotiating and/or entering into a contract to manage and/or administer the PACE Program; (iii) further soliciting or attempting to hire First Health employees for the PACE Contract; (iv) further using or disclosing any confidential and proprietary business information that is owned by First Health and has been disclosed to it by Norton, and (v) permitting Norton to participate in and/or be involved with the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefit administration contract involving the PACE Program or any similar program.

### A.    Injunctive Relief Against NPA and Norton Will Prevent Irreparable Harm to First Health

The irreparable harm resulting from Norton's breach of the Agreement entitles First Health to injunctive relief.  It is well-established that an injunction may be used to enjoin a breach of a restrictive covenant.  See Merrill Lynch, Pierce, Fenner & Smith v. Masri, 1996 WL 283644 at * 4-5 (E.D. Pa. May 28, 1996) (preliminary injunction issued to stop violation of covenant not to compete); Babn Technologies Corp. (preliminary injunction issued to stop former employee's use of former employer's confidential information for benefit of competitor); John G. Bryant Co. v. Sling Testing & Repair, Inc., 369 A.2d 1164 (Pa. 1977) (preliminary injunction issued to enforce non-competition restriction in employment agreement).  Accord George S. May Intern Co. v. International Profit Associates, 256 Ill.App.3d 779, 628 N.E. 2d

10

647, 653 (Ill.App. 1 Dist. 1993).  In John G. Bryant Co., 369 A.2d at 167, the Supreme Court of

Pennsylvania stated:

> It is not the initial breach of a covenant which necessarily establishes the
> existence of irreparable harm but rather the threat of the unbridles continuation of
> the violation and the resultant incalculable damage to the former employer's
> business that constitutes the justification for equitable intervention.

In this case, money damages are simply not an adequate remedy.  Money damages cannot

realistically compensate First Health for the loss of future business if NPA is able to bid

successfully for the management and administration of similar state-run pharmacy benefit

programs because, with Norton's knowledge and help, it unlawfully uses First Health's

confidential and proprietary business information, and solicits First Health's employees.  See

Records Ctr., Inc. v. Comprehensive Management, Inc., 525 A.2d 433, 436 (Pa. Super. 1987)

(potential injury from breach of restrictive covenant agreement "is particularly difficult to

quantify").

The use of confidential or trade secret information by a former employee constitutes

irreparable harm and may be enjoined.  See Mixing Equipment Co. v. Philadelphia Gear, Inc.,

436 F.2d 1308 (3d Cir. 1971) (former employee's breach of restrictive covenant and new

employer's inducement of breach constitute irreparable harm); Merrill Lynch, 1996 WL 283644

at * 4 (court finds irreparable harm if former employee allowed to convert confidential

information for own personal use and for benefit of new employer); Air Products and

Chemicals, Inc. v. Johnson, 442 A.2d 1114 (Pa. Super. 1982) (enjoining disclosure and use of

trade secret on misappropriation of trade secret claim).

Norton flagrantly violated Sections 7, 8 and 9 of his Agreement by (1) participating

directly in NPA's solicitation of the PACE Contract and preparing its bid proposal, (2) disclosing

and/or using First Health's confidential and proprietary business information as part of  NPA's

11

submission for the PACE Contract, and (3) soliciting a First Health employee, who plays an

integral part in the PACE Program, to work for NPA. Further, by virtue of working at NPA and

attempting to fulfill his duties at that company, Norton will inevitably disclose and/or use more

of First Health's confidential and proprietary business information if NPA submits bids for

similar pharmacy assistance contracts in other states. First Health runs a substantial risk of

losing these future bids because Norton's misappropriate has given NPA access to First Health's

confidential and proprietary business information. In fact, in many instances, First Health will

have no way of knowing that NPA unlawfully used its confidential and proprietary business

information to secure those bids.

As a result, Norton and NPA have caused, and will continue to cause, irreparable harm to

First Health. Put simply, motivated and induced by NPA, Norton breached the carefully drawn

restrictions in his Agreement and violated common law duties that he owes to First Health.

Significantly, Section 10 of the Agreement entitled, "Remedies", states that, in the event

Norton breached Sections 7, 8 or 9, First Health "shall" be entitled to injunctive relief enjoining

any actual or threatened breach, and that Norton "acknowledges that [First Health's] remedy at

law is inadequate and that [First Health] will suffer irreparable injury if such conduct is not

prohibited". See Agreement at Section 10. Accordingly, both the Agreement and the governing

law recognize that the element of "irreparable harm" is satisfied in this case.

## B.     First Health Will Likely Prevail On The Merits Of Its Claims

First Health asserts several claims against Norton and NPA that form the basis of its

request for injunctive relief – breach of contract, misappropriation of trade secrets, tortious

12

interference with contract, and intentional interference with prospective contractual relations. First Health is likely to prevail on each of these claims at the final hearing in this matter.[2]

### 1.  NPA And Norton Misappropriated First Health's Confidential And Proprietary Business Information

First Health's claim for misappropriation of trade secrets against Norton and NPA is based on the Illinois Trade Secrets Act, 765 ILCS §§ 1065/1-1065/8 ("ITSA"). First Health will establish the existence of trade secrets – in the nature of confidential and proprietary business information – and either actual or threatened misappropriation.[3] See Pepsico, Inc. v. Redmond,

---

[2]    Section 15 of the Agreement entitled, "Governing Law", states that "it is the intention of the parties hereto that all questions with respect to the construction formation, and performance of this Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the law of the State of Illinois". See Agreement at Section 15. The Third Circuit has stated that "a contract's references to the laws of a particular state may provide persuasive evidence that the parties to the contract intended for that state's law to apply". Assicurazioni Generali, S.P.A. v. Clover, 195 F.3d 161, 165 (3d Cir. 1999) (citing Restatement (Second) of Conflict Laws § 187, cmt. a). As a result, Illinois law applies to First Health's breach of contract and misappropriation of trade secrets claims. The law of Pennsylvania applies to the claims for intentional interference with contract and intentional interference with prospective contractual relations. See Clark v. Modern Group Ltd. 9 F.3d 321, 326 (3d Cir. 1993) ("When we sit in diversity, we apply the substantive law of the forum"); Greenberg v. Tomlin, 816 F. Supp. 1039, 1057, n. 10 (E.D. Pa. 1993) ("Federal courts sitting in diversity cases must apply the substantive law of the states in which they sit."). First Health notes that Pennsylvania common law on the enforceability of restrictive covenants and misappropriation of trade secrets is generally consistent with the law of Illinois.

[3]    Under the ITSA, "misappropriation" means:

(1)  acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(2)  disclosure or use of a trade secret of a person without express or implied consent by another person who:

(A)  used improper means to acquire knowledge of the trade secret; or

(B)  at the time of the disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(I)     derived from or through a person who utilized improper means to acquire it;

(II)    acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(III)   derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

54 F. 3d 1262, 1269-70 (7th Cir. 1995) (party seeking injunction to prevent misappropriation of trade secrets must show existence of trade secret and actual or threatened misappropriation).

Norton possesses confidential and proprietary trade secrets belonging to First Health that he gained as a result of working for First Health for approximately seventeen years, and having direct responsibility for the PACE Program. These "trade secrets" pertain, among other items, to pricing and marketing strategies, and the highly technical procedures, processes, policies, systems and methods for the operation, administration and management of the PACE Program. First Health's confidential, proprietary trade secrets and business information that Norton possesses are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic benefit from their disclosure or use. See 765 ILCS § 1065/2(b). Moreover, these confidential, proprietary trade secrets and business information are the subject of efforts by First Health that are reasonable under the circumstances to maintain their secrecy including, but not limited to, requiring its employees to execute employment agreements that contain clear and precise obligations of confidentiality. Significantly, Norton's obligation of confidentiality to First Health, as provided for in the Agreement, extends to information that may be in the public domain. Id.

While preparing NPA's bid proposal for the PACE Contract, Norton, without the express or implied consent of First Health and with knowledge that that he was under a duty to maintain confidentiality, disclosed to NPA and/or used First Health's confidential and proprietary business information in the nature of First Health's pricing and marketing strategies, and the highly technical procedures, processes, policies, systems and methods of operation, administration and

---

(C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

765 ILCS § 1065/2(b).

management for the PACE Program, and the Department's needs and requirements with respect to that program -- all for the benefit of NPA and to the detriment of First Health. For its part, NPA , without the express or implied consent of First Health, used some or all of First Health's confidential and proprietary business information (as identified above) in its solicitation of the PACE Contract and/or in the bid proposal that it submitted in response to the RFP of September 14, 1999. At the time it used First Health's trade secrets, NPA knew or had reason to know that its knowledge of the trade secrets derived from a person (Norton) who owed a duty to First Health to maintain confidentiality. Alternatively, before a material change in its position, NPA knew or had reason to know that First Health's confidential and proprietary business information with respect to the PACE Program constituted trade secrets and that knowledge of such trade secrets had been acquired by accident or mistake. More important, even if some information relevant to the PACE bid process might be in the public domain, the bid proposal that NPA submitted to the Department had to be predicated on material that is confidential and proprietary to First Health because NPA was <u>only</u> able to put forth a successful proposal for the PACE Program <u>after</u> it hired Norton.

Separate and apart from the fact that Norton has already disclosed and/or used First Health's confidential and proprietary business information in connection with NPA's bid for the PACE Contract, there is a distinct and real threat that Norton, in his new job at NPA and in violation of his contractual and common law duties, will inevitably disclose and/or use additional aspects of First Health's trade secrets concerning, among other things, pricing and marketing strategies, and the manner in which First Health operated, administered and managed the PACE Program. Such inevitable future disclosure by Norton and NPA represents a substantial threat to First Health's business and commercial opportunities in programs similar to PACE, and warrants

the issuance of both a temporary restraining order and preliminary injunction against Norton and NPA.

Pepsico, Inc. 54 F.3d 1262, is instructive. In that case, Pepsico, Inc. ("Pepsico") sought an injunction preventing a former managerial employee from divulging Pepsico's trade secrets and confidential information in his new job with a competitor, Quaker Oats Company ("Quaker"), and from assuming any duties with Quaker relating to beverage pricing, marketing and distribution. The federal district court granted the request for a preliminary injunction, enjoining the former employee from (1) assuming his responsibilities at Quaker until after Quaker established its integration plan of two soft drinks' distribution systems, and (2) ever disclosing and/or using Pepsico's trade secrets and confidential information. See Pepsico, Inc., 54 F.3d at 1266-67. The Court of Appeals for the Seventh Circuit affirmed. The Pepsico court noted that the ITSA and existing case law in Illinois supported that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets". Id. at 1269. The court in Pepsico determined that the former employee possessed confidential information about Pepsico's plans and processes with respect to the pricing, marketing and distribution of its soft drinks that he could not help but rely on in his new job with the competing company – creating a distinct and unfair disadvantage to Pepsico. Id. at 1269-70. The Pepsico court held that Pepsico was entitled to injunctive relief tailored to restrain the threatened trade secret misappropriation.

The logic and reasoning of Pepsico apply with equal force here. Whether the concern is NPA's potential management and administration of the PACE Program, or NPA's submission of bids for similar contracts in the future, in fulfilling his duties with NPA, Norton will be forced to rely on First Health's confidential and proprietary business information.

16

For the reasons set forth above, First Health is likely to prevail on its claim for misappropriation of trade secrets.

### 2.    Norton's Breach Of The Agreement

First Health's claim for breach of contract against Norton arises from three separate provisions in the Agreement that Norton has, and inevitably, will breach again: the confidentiality provision, and the restrictions on customer and employee solicitation.

### a.    Enforcement Of The Confidentiality Restriction Requires Injunctive Relief

The question of whether a restrictive covenant is enforceable is a question of law.  See Corroon & Black of Illinois, Inc. v. Magner, 145 Ill.App.3d 151, 494 N.E.2d 785 (Ill.App. 1 Dist. 1986).  "A postemployment restrictive covenant will be enforced if its terms are reasonable." Coady v. Harpo, Inc. 308 Ill.App.3d 153, 719 N.E.2d 244, 250 (Ill.App. 1 Dist. 1999) (quoting Woodfield Group, Inc. v. DeLisle, 295 Ill.App.3d 935, 938, 693 N.E.2d 464 (Ill.App. 1 Dist. 1998)).  "To determine the reasonableness of a restrictive covenant, 'it is necessary to consider whether enforcement of the covenant will injure the public, whether enforcement will cause undue hardship to the promisor and whether the restraint imposed by the covenant is greater than is necessary to protect the interests of the employer." Id. (quoting Tower Oil & Technology Co. v. Buckley, 99 Ill.App.3d 637, 642, 425 N.E.2d 1060 (Ill.App. 1 Dist. 1981)).  The test for a valid restrictive covenant is whether it is reasonably necessary to protect the employer's legitimate business interests, or to protect the employer from unfair competition, which is a determination turning upon the unique facts of each case.  See George S. May Intern. Co., 628 N.E.2d at 653 (citations omitted).  Significantly, postemployment restrictive covenants "have a social utility in that they protect an employer from the unwarranted erosion of confidential information." Id.

17

Before deciding whether a restriction is reasonable, "the court must make a threshold determination: it must find 1) that the covenant is ancillary to a valid employment contract and 2) that it is supported by adequate consideration." Applied Micro, Inc. v. SJI Fulfillment, Inc., 941 F. Supp. 750, 753 (N.D.Ill. 1996) (citing Abel v. Fox, 274 Ill.App.3d 811, 813, 654 N.E.2d 591, 593 (Ill.App. 4 Dist. 1995) and Creative Entertainment, Inc. v. Lorenz, 265 Ill.App.3d 343, 346, 638 N.E.2d 217, 219 (Ill.App. 1 Dist. 1994)) (enforcing non-competition covenant). The confidentiality restriction in this case is ancillary to Norton's Agreement; the restriction is an integral part of the employment relationship, without which First Health would not have hired Norton. In exchange for a confidentiality clause, First Health hired Norton and provided him with a meaningful compensation package. Such consideration is clearly adequate to render the covenant enforceable. See Pepsico, Inc., 54 F.3d at 1271-72 (confidentiality agreement in employment contract is enforceable when supported by valuable consideration) (citations omitted).

As a matter of law, the confidentiality restriction in the Agreement is reasonable. First Health does not seek to restrain the course Norton's career after his departure. He is free to choose the nature, geographic location and timing of his employment. The confidentiality restriction merely precludes Norton from disseminating confidential and proprietary business information that he obtained or learned during his employment at First Health, or from assuming responsibilities with a new employer that will inevitably lead him to disclose and/or use such information. Such a restriction is, as a matter of law, reasonable under the circumstances of this case due to the sensitive nature of the information that has been described.

The fact that the confidentiality restriction in this case does not have a time or geographic limitation does not render it invalid. Section 1065/8(b)(1) of the ITSA provides, "[A] contractual

18

or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographic limitation on the duty." 765 ILCS § 1065/8(b); see also Coady, 719 N.E.2d at 250 (court enjoins former employee's violation of confidentiality clause noting that "a confidentiality agreement will not be deemed unenforceable for lack of durational or geographic limitations where trade secrets and confidential information are involved") (citing Pepsico, Inc., 54 F.3d at 1272 n. 10).

Further, the Agreement's confidentiality restriction is tailored to protect First Health's legitimate business interests. The restriction is designed to safeguard First Health's substantial investment in the design, implementation, management and administration of state-sponsored pharmacy benefit programs, and insulated First Health from potential competitors, such as NPA. Specifically, the restriction covers material that Norton has and will necessarily use in his job at NPA with respect to the PACE Contract and similar contracts – that is, First Health's confidential and proprietary business information that pertains to pricing, marketing, and the highly technical procedures, processes, policies, systems and methods for the operation, administration and management of the PACE Program, as well as the particular needs and requirements of the Department with respect to that program. With knowledge of First Health's strategies and practices, NPA will be able to anticipate the direction of First Health's pricing and marketing with respect to future proposals for pharmacy benefit administration contracts. In view of the unlawful conduct by NPA and Norton to date, First Health runs the substantial risk of losing future contract bids.

As a result, First Health's legitimate business interests, and the actual and continuing threat of misappropriation by NPA and Norton of First Health's confidential and proprietary business information warrants the enforcement of the Agreement's confidentiality restrictions

19

and granting of injunctive relief to First Health.  See Pepsico, Inc., 54 F.3d at 1272 (enjoining

former employee's inevitable breach of confidentiality agreement by working for competitor of

former employer).

For the foregoing reasons, First Health is likely to prevail on its claim for breach of the

Agreement's confidentiality restriction.

### b.    Enforcement Of The Restrictions Against Soliciting First Health's Customers And Employees Requires Injunctive Relief

The Agreement's restrictions on soliciting First Health's customers and employees

restrictions(Sections 8 and 9, respectively) were also essential preconditions to Norton's

employment, without which he would not have been offered a job at First Health.  The

consideration supporting these non-solicitation restrictions in the Agreement is the employment

itself and the substantial compensation package.  These restrictions are ancillary to, and a

condition of, Norton's employment.

The non-solicitation restrictions are also reasonably limited in time and scope.  Under

Section 8, Norton is prohibited from soliciting or diverting First Health's actual or prospective

customers for one year.  "Actual customer" is defined as "any customer to whom Company [First

Health] has provided services within one year prior to Employee's termination."  See Agreement

at Section 8.  The Department, for whom First Health is currently providing services under the

PACE Program and has done so since 1983, falls within this definition.  "Prospective customer"

is defined as "any prospective customer to whom Company [First Health] sought to provide

services within one year prior to the date of Employee's termination and Employee has

knowledge of and was involved in such solicitation."  Id.  Under Section 9, Norton is prohibited,

for one year from the date of his termination, from "solicit[ing] or hir[ing] any person who is

currently or was an employee of Company [First Health] at any time during the twelve months prior to Employee's termination". Id. at Section 9.

Significantly, the limited "exception" under the customer non-solicitation restriction, which states that, "[f]or purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of [Norton's] obligation hereunder", does not insulated Norton and NPA from liability here. See Agreement at Section 8 (emphasis added). With respect to the PACE Contract, this limited exception simply does not permit the kind and extent of activity engaged in by Norton. First, the exception is limited to unsolicited requests. Incredibly, on behalf of NPA, Norton met with representatives of the Department as early May, 1999. Thus, while still an employee of First Health and before the effective date of his termination, Norton solicited one of First Health' current customer for the benefit of a direct competitor - NPA. Second, Section 8 does not permit Norton to appear and make oral presentations on behalf of a competitor of First Health, or to be proposed as key personnel within NPA's proposal. As a result, Norton has violated the Agreement's restriction on soliciting First Health's customers.

The one-year duration of the restriction on soliciting customers and employees is plainly reasonable. First Health invested considerable time and expense to acquire and maintain customers, such as the Department, who have pharmacy assistance programs. Similarly, First Health has spent seventeen years dedicating resources to train its employees with respect to the management and administration of the PACE Program. Under these circumstances, the one year limitation in Sections 8 and 9 of the Agreement provides First Health a reasonable period of time to protect its investment and place in the market. See e.g., Midwest Television, Inc. v. Oloffson,

21

298 Ill.App.3d 548, 699 N.E.2d 230 (Ill.App. 3 Dist. 1998) (upholding one year term for non-competition agreement); <u>Millard Maintenance Service Co. v. Bernero</u>, 207 Ill.App.3d 736, 566 N.E.2d 379 (Ill.App. 1 Dist. 1990) (two-year time restriction in non-competition covenant reasonable).

The customer non-solicitation provision is also reasonable because it only restricts Norton from soliciting customers to whom First Health provided services within one year before Norton's termination date, and customers to whom First Health sought to provide services and about whom Norton had knowledge and was involved in the solicitation. As a result, the restriction is carefully designed to protect First Health's legitimate business interests, and maintain and expand its customer base, without the risk of Norton diverting First Health's existing customers and prospective ones. Similarly, the restriction on not soliciting employees serves First Health's legitimate business interest of preserving a work force that it has carefully trained for its operations, without the risk that Norton will attempt to recruit these employees for the benefit of himself or a competitor.

Finally, in soliciting Robert Howells, the First Health employee currently in charge of administering the PACE Program, Norton has violated the Agreement's employee non-solicitation provision. In addition, by soliciting Robert Howells through Norton and representing in its bid proposal for the PACE Contract that NPA would use First Health's employees to manage and administer the PACE Program, NPA has engaged in unfair competition. <u>See Morgan's Home Equipment Corp. v. Martucci</u>, 136 A.2d 838, 847 (Pa. 1957) ("The systematic inducing of employees to leave their present employment and take work with another is unlawful when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled

employees. So also, when the inducement is made for the purpose of having employees commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers, the injured employer is entitled to protection.") (citing Albert Pick Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (1st Cir.), cert. den., 286 U.S. 552 (1932).

For the foregoing reasons, First Health is likely to prevail on its claim for breach of the non-solicitation restrictions in Norton's Agreement.

### 3.   NPA Has Tortiously Interfered With Norton's Agreement

A cause of action for intentional interference with contractual relations consists of the following elements: (1) an existing contractual relationship between the plaintiff and a third party; (2) the defendant interfered with the performance of that contract by inducing a breach or otherwise causing the third party not to perform; (3) the defendant was not privileged to act in this manner; and (4) the plaintiff suffered pecuniary loss as a result of the breach of contract. See Al Hamilton Contracting Co. v. Cowder, 644 A.2d 188, 191 (Pa. Super. 1994). See also, Grund v. Donegan, 298 Ill.App.3d 1034, 700 N.E.2d 157, 159 (Ill.App. 1 Dist. 1998) (applying similar Illinois standard).

In this case, NPA intentionally interfered with the Agreement between First Health and Norton. First Health and NPA are competitors for the PACE Contract. On two previous occasions, NPA has attempted unsuccessfully to secure a PACE Contract. Each time, on the merits, First Health's superior knowledge, experience and skill defeated NPA's attempts. The Agreement is a valid, enforceable contract between Norton and First Health. At all material times, NPA was aware of that contractual relationship and, more importantly, the restrictions (particularly the one protecting the confidentiality of First Health's proprietary business information) the Agreement placed on Norton. Nonetheless, NPA hired Norton -- a former First

23

Health employee with intimate and extensive knowledge of its pricing, marketing and

management of the PACE Program -- and directly involved him in the solicitation and bid for the

PACE Contract.  As a result, NPA, intentionally and without privilege or justification, induced

and caused Norton to violate Sections 7, 8 and 9 of the Agreement.  Since the submission of its

bid proposal, NPA's course of wrongful and unlawful conduct continues unabated, and only

evidences a further intent to induce and cause Norton to breach his Agreement with First Health.

As a result, this Court should order immediate injunctive relief to stop NPA's continued tortious

interference with Norton's performance under the Agreement.  See Mixing Equipment Co.

(enjoining competitor from inducing employee's breach of confidentiality restriction with former

employer).

### 4.    NPA and Norton Intentionally Interfered With First Health's Prospective Contract With The Department

A claim for intentional interference with prospective contractual relations requires the

following elements: (1) a prospective contractual relation; (2) the defendant's purpose or intent is

to harm plaintiff by preventing the relation from occurring; (3) that defendant lacks a privilege or

justification, and (4) actual damages.  See Barmasters Bartending School, Inc. v. Authentic

Bartending School, Inc., 931 F. Supp. 377 (E.D. Pa. 1996) (applying Pennsylvania law)

(enjoining competing bartending school based on claim for intentional interference with

prospective contractual relations).[4]

---

[4]    Illinois has a comparable tort called tortious interference with prospective economic advantage, in which a plaintiff must establish:  (1) its reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference.  Dowd & Dowd, Ltd. v. Gleason, 181 Ill.2d 460, 693 N.E.2d 358, 370-71 (Ill. 1998) (law firm's allegations supported claim for tortious interference with prospective economic advantage against departing members and law firm they subsequently formed).  For the reasons set forth below, the elements of this tort are likewise met in this case.

Here, First Health has a clear right to relief on its claim for intentional interference with prospective contractual relations against Norton and NPA. At all material times, First Health has been a party to a valid and enforceable contract between itself and the Department to manage and administer the PACE Program. As a result of having been the sole contractor for the PACE Program since 1983, First Health had, and has, a reasonable expectation or probability of entering into a valid business relationship with the Department for the PACE Contract for the period commencing June 1, 2000. See Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979) (prospective contractual relationship means reasonable probability, i.e., "something less than a contractual right, [but] something more than a mere hope"). First Health's expectation is particularly strong in light of the fact that NPA's two previous bids were evaluated as substantially insufficient.

At all material times, Norton knew that First Health expected to enter into another contract with the PACE Program because he was a long-term First Health employee with direct participation in that program. For its part, NPA was similarly aware of First Health's plan and expectation because both companies are competitors who have submitted previous bids. Yet, without privilege or justification, both Norton and NPA purposefully interfered and prevented First Health's expectancy from ripening into a valid contract with the Department by, among other methods, unlawfully disclosing and/or using First Health's confidential and proprietary business information (as previously described), and disregarding the explicit terms of Norton's Agreement with First Health. As a direct and proximate result of the improper interference by Norton and NPA, The Department rejected First Health's bid proposal for the PACE Contract in favor of NPA's proposal.

25

To date and since submitting their bid proposal to the Department, the unlawful conduct by Norton and NPA shows no sign ending without the immediate intervention by this Court. Unless this Court orders immediate injunctive relief, both NPA and Norton will continue to pursue the PACE Contract, cause First Health irreparable harm and tortiously interfere with First Health's prospective contractual relationship.

**C.    There Is No Threat Of Irreparable Injury To Norton and NPA**

As demonstrated , First Health will suffer irreparable injury unless preliminary injunctive relief is granted. By way of contrast, the granting of immediate injunctive relief will not cause irreparable injury to Norton and NPA.

Pending a hearing on the merits of First Health's claims, this Court's enforcement of the confidentiality and non-solicitation restrictions in Norton's Agreement not only restores and preserves the status quo, but also puts and end to the unlawful misappropriation and tortious interference by Norton and NPA. Presumably, NPA will continue to employ Norton; if it does not, then NPA hired Norton for an unlawful purpose that has been uncovered and stopped. NPA will continue to solicit pharmacy assistance contracts, but only without using the competitive edge developed and honed by other vendors in the market place, such as First Health. To the extent that any irreparable injury may be asserted by Norton and/or NPA, such "injury" is nothing more than the foreseeable and predictable consequence of their wrongful conduct, and is not the type of harm that deserves protection by this Court. See e.g., Specialty Bakeries, Inc. v. City Bagels, Inc., 1995 WL 141188 at * 4 (E.D. Pa., Mar. 31, 1995) (enjoining bagel company from violating restrictive covenant in franchise agreement despite hardship); Jiffy Lube Intern, Inc. v. Weiss Bros., Inc., 834 F. Supp. 683, 693 (D.N.J. 1993) ("harm which follows a defendant

who willfully breaches a contractual undertaking is not a basis for denying a plaintiff the relief to which it is legally entitled").

### D.    Entering Injunctive Relief Will Promote The Public Good

The enforcement of employment agreements, with reasonable restrictions on post-employment conduct, serves to promote the public good and allow employers to engage in rational business planning that safeguards proprietary information and a highly-trained workforce. In Hillard v. Medtronic, Inc., 910 F. Supp. 173, 179 (M.D. Pa. 1995), the court recognized that "the public interest is furthered by protecting legitimate business interests." Moreover, the granting of injunctive relief will not undermine the sound and efficient administration of the PACE Program. Since 1983, First Health has continuously proved its ability to manage the Program in an effective manner. As a result, in this case, there is no countervailing public interest that would warrant denying the injunctive relief requested by First Health.

## III.    CONCLUSION

For the reasons set forth above, plaintiff First Health Group Corp. respectfully urges this Court to grant a temporary restraining order and preliminary injunction against Norton and NPA as follows:

a.    ordering that defendants David W. Norton and National Prescription Administrators, Inc. shall not disclose or use any confidential and proprietary business information that is owned by plaintiff First Health Group Corp. pertaining to, among other things, First Health Group Corp.'s computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques, as well as information regarding First Health Group Corp.'s past, present, and prospective clients including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, and information regarding their particular needs and requirements, and the Commonwealth of Pennsylvania Department of Aging's confidential information.;

b.     ordering that defendant David W. Norton shall not, either in his individual capacity or on behalf of any other person or business entity, directly or indirectly, call upon, solicit or divert (i) any customer to whom First Health has provided services within one year prior to David W. Norton's termination as a First Health Group Corp. employee including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, or (ii) any prospective customer to whom First Health sought to provide services within one year prior to David W. Norton's termination as a First Health Group Corp. employee and about which David W. Norton has knowledge and was involved in such solicitation;

c.     ordering that defendant David W. Norton shall not, directly or indirectly, solicit or hire any person who is currently or was an employee of plaintiff First Health Group Corp. at any time within one year prior to David W. Norton's termination as a First Health Group Corp. employee;

d.     ordering that defendants David W. Norton and National Prescription Administrators, Inc. shall cease and desist all conduct directed to an unlawful and improper interference with plaintiff First Health Group Corp.'s prospective contractual relation with the Commonwealth of Pennsylvania Department of Aging pertaining to the PACE Contract;

e.     ordering that defendant National Prescription Administrators, Inc. shall cease and desist all conduct directed at causing an unlawful and improper interference with defendant David W. Norton's contractual obligations under the October 1, 1997 Employment Agreement with plaintiff First Health Group Corp.;

f.     ordering that defendant National Prescription Administrators, Inc. shall not manage and/or administer the PACE Contract;

g.     ordering that defendant National Prescription Administrators, Inc. shall not further solicit, divert and/or perform any services with respect to the PACE Contract, including negotiating and/or entering into a contract to manage and/or administer the PACE Program;

h.     ordering that defendant National Prescription Administrators, Inc. shall not further solicit or attempt to hire First Health Group Corp. employees for the PACE Contract;

i.     ordering that defendant David W. Norton shall not participate or have any involvement in the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract concerning the PACE Program or any similar program;

j.  ordering that defendant National Prescription Administrators, Inc. shall not permit defendant David W. Norton to participate in and/or be involved with the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract involving the PACE Program or any similar program;

k.  Awarding to plaintiff First Health Group Corp. costs and attorneys' fees

and such other relief as the Court deems just and appropriate.

Respectfully submitted,

_____

SCOTT L. VERNICK, ESQUIRE
JEFFREY D. HUTTON, ESQUIRE
FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP
2000 Market Street, 10th Floor
Philadelphia, PA, 19103-3291
(215) 299-2000

Attorneys for Plaintiff
FIRST HEALTH GROUP CORP.

Date: February 22, 2000

# EMPLOYMENT AGREEMENT

This AGREEMENT is made this 1st day of October, 1997 ("Effective Date") by and between First Health Group Corp., a Delaware corporation headquartered in Illinois ("Company"), and David W. Norton ("Employee").

## BACKGROUND

A.   Company desires to employ Employee, and Employee desires to be employed by Company.

B.   For and in consideration of the promises and of the mutual covenants hereinafter set forth, it is hereby agreed by and between the parties as follows:

## AGREEMENT

1.   Employment.  Company hereby agrees to employ Employee to perform the duties set forth in Section 3 hereof ("Employee Services").  Employee hereby accepts employment to perform Employee Services for Employer under the terms and conditions of this Agreement.

2.   Term.  The Initial Term of this Agreement will be for one year beginning on the Effective Date and will automatically renew for consecutive one year terms, unless earlier terminated pursuant to Section 8 hereof.

3.   Duties.  Employee will serve as Vice President Administration and perform all responsibilities and duties as are assigned, or delegated to Employee, by President First Health Services, which responsibilities and duties include but are not limited to the direction and leadership of the Company's First Health Services pharmacy management and benefit programs. Employee will report to and is subject to supervision by President First Health Services or his/her designee.

4.   Time Commitment.  Employee will devote Employee's time, attention and energies to the performance of Employee Services.  Employee may not be associated with, consult, advise, work for, be employed by, contract with, or otherwise devote any of the Employee's time to the pursuit of any other work or business activities which may interfere with the performance of services hereunder.

5.   Compensation and Benefits.   Company will pay the following compensation to Employee in full consideration for performance of Employee Services hereunder in accordance with Company's then-current payroll policies and procedures.

(a)   Salary.  Employee will receive a gross annual salary of $108,108.00.  This salary is payable in accordance with Company's then - current payroll policies and procedures.  The gross annual salary will be subject to annual increases as may by approved by Company.

(b)   Incentive Compensation.  Employee will participate in the First Health Services Incentive Plan which will be based on targets established on an annual basis by Company, in its sole discretion.  The 1997, 1998 and 1999 Incentive Plans are attached hereto as Exhibits A, B, and C respectively.

(c)  Expenses.  Company will reimburse Employee for all reasonable and necessary expenses incurred by Employee in connection with the performance of Employee Services upon submission by Employee of expense reports with substantiating vouchers, in accordance with the Company's then current expense reimbursement policy.

(d)  Stock Options.  Employee will be awarded the option to purchase a minimum of 3,000 shares of Company common stock, adjusted for any stock splits, set by the Board of Directors of Company in accordance with the Company Stock Option Plan (the "Stock Options"). The awards of the Stock Options are subject to (i) approval of the Board of Directors of Company of the recommendations; and (ii) execution by Employee of the then current Stock Option Agreement.

(e)  Benefits and Flexible Time Off.  Employee shall be entitled to participate in such group life insurance, major medical, and other employee benefit plans (collectively "Benefit Plans") as established by Company in accordance with the applicable terms and conditions of such Benefit Plans, which Benefit Plans may be modified or discontinued by Company at any time; provided, however that Employee shall meet the requirements of the Benefit Plans for participation and in no event, including breach or wrongful termination of this Agreement, shall Employee be entitled to any amount of compensation in lieu of participation, unless otherwise provided by the terms of the Benefit Plan.

Employee shall also be entitled to paid time off in accordance with Company's then current Flexible Time Off (FTO) program.  Employee shall accrue such FTO at the rate specified in the FTO program.  Flexible Time Off shall be taken with due consideration for the services required of Employee and to the requirements of Company.

6.  Termination.

(a)  Either party may terminate this Agreement at any time following the Initial Term, without cause and without any liability to Company, upon no less than one hundred and twenty (120) day's prior written notice.  In such event, Employee, if requested by Company, will continue to render Employee Services and be paid Employee's regular compensation up to the date of termination in accordance with Company's then-current payroll policies and procedures.

(b)  Either party may terminate this Agreement at anytime for cause upon 14 days written notice.  "Cause" includes, without limitation, breach of any provision of this Agreement or Employee's failure to adhere to the Company's policies and procedures.  If the cause is not cured within the 14 day period, the Agreement may then be terminated by written notice.  An opportunity to cure is not required if the party receiving notice of termination has previously been given notice of termination and the opportunity to cure the same or similar cause.

(c)  Company may terminate this Agreement by written notice at anytime (including during the Initial Term) immediately for the following reasons: (i) Death or legal incapacity of Employee; (ii) Employee's conviction of a felony; (iii) willful violation of the Company's policies or standards including without limitation, Corporate Compliance standards, confidentiality and nondisclosure; or (iv) theft or dishonesty.

(d)  Company may terminate at any time (including during the ▒▒al Term) by written notice upon Employee's other incapacity or inability to perform Employee Services for a period of at least 90 consecutive days because of impairment of Employee's physical, or mental health making it impossible or impractical for Employee to perform Employee Services.

7.  Confidentiality.  Employee agrees not to directly or indirectly use or disclose, for the benefit of any person, firm or entity other than Company and its subsidiary companies, the Confidential Business Information of Company.  Confidential Business Information means information or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding Company's past, present and prospective clients and their particular needs and requirements, and their own confidential information.

Upon termination of employment, with or without cause, Employee agrees to return to Company all policy and procedure manuals, records, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in Employee's possession and/or control which relate to (i) the Confidential Business Information of Company, (ii) Employee's employment with Company, or (iii) the business activities or facilities of Company or its past, present, or prospective clients.

8.  Restrictive Covenant.  For a period of one year after termination of employment, with or without cause, Employee will not directly or indirectly, for the purpose of selling services provided or planned by Company at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of Company.  An actual customer, for purposes of this Section, is any customer to whom Company has provided services within one year prior to Employee's termination.  A prospective customer, for purposes of this Section, is any prospective customer to whom Company sought to provide services within one year prior to the date of Employee's termination and Employee has knowledge of and was involved in such solicitation.  For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of Employee's obligation hereunder.

9.  Non-Solicitation of Employees.  Employee further agrees that for a period of one year from the date of Employee's termination, with or without cause, Employee shall not directly or indirectly solicit or hire any person who is currently or was an employee of Company at any time during the twelve months prior to Employee's termination.

10.  Remedies.  In the event Employee breaches or threatens to breach Sections 7, 8 or 9 of this Agreement, Company shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach.  Employee acknowledges that Company's remedy at law is inadequate and that Company will suffer irreparable injury if such conduct is not prohibited.

Employee and Company agree that, because of the difficulty of ascertaining the amount of damages in the event that Employee breaches Section 9 of this Agreement, Company shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave Company's employ.  The parties further

agree that the existence ● this remedy will not preclude employer f ● seeking or receiving injunctive relief.

Employee further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by Employee against Company shall not constitute a defense to the enforcement by Company of either of these paragraphs.

11.  Property Rights.  All discoveries, designs, improvements, ideas, inventions, creations, and works of art, whether or not patentable or subject to copyright, relating to the business of Company or its clients, conceived, developed or made by Employee during employment by Company, either solely or jointly with others (hereafter "Developments") shall automatically become the sole property of Company.  Employee shall immediately disclose to Company all such Developments and shall, without additional compensation, execute all assignments, application or any other documents deemed necessary by Company to perfect Company's rights therein.  These obligations shall continue for a period of one year beyond the termination of employment with respect to Developments conceived, developed or made by Employee during employment with Company.

Company acknowledges and agrees that the provisions of this section shall not apply to inventions for which no equipment, supplies, facility or trade secret information of Company or its clients were used by Employee and which were developed entirely on Employee's own time unless (a) such inventions relate (i) to the business of Company or (ii) to Company's actual or demonstrably anticipated research or development or (b) such inventions result from any work performed by Employee for Company.

12.  Assignments.  Neither party shall have the right or power to assign any rights or duties under this Agreement without the written consent of the other party, provided, however, that Company shall have the right to assign this Agreement without consent pursuant to any corporate reorganization, merger, or other transaction involving a change of control of Company or to any subsidiary company.  Any attempted assignment in breach of this Section 12 shall be void.

13.  Severability.  Each section, paragraph, clause, sub-clause and provision (collectively "Provisions") of this Agreement shall be severable from each other, and if for any reason the paragraph, clause, sub-clause or provision is invalid or unenforceable, such invalidity or unenforceability shall not prejudice or in any way affect the validity or enforceability of any other Provision hereof.

14.  Miscellaneous.

(a)  This Agreement, the schedules and any amendments hereto contain the entire agreement of the parties with respect to the employment of the Employee and supersedes all other understandings, whether written or oral; provided, however, that Employee shall comply with all policies, procedures and other requirements of Company as established in the Colleague Handbook and Corporate Policy Manuals, not inconsistent with this Agreement.

(b)  Failure on the part of either party to insist upon strict compliance by the other with respect to any of the terms, covenants and conditions hereof, shall not be deemed a subsequent waiver of such term, covenant or condition.

(c) The provisions of any paragraph containing a continuing obligation after termination shall survive ▓ h termination whether with or without caus ▓ d even if occasioned by Company's breach or wrongful termination.

(d) This Agreement may not be modified except in writing as signed by the parties; provided, however, that Company may amend or terminate its Benefit Plans, Incentive Plan, Corporate Policies and/or employees' rules and regulations in its sole discretion.

(e) In the event of litigation under this Agreement, the court shall have discretion to award the prevailing party reasonable attorney's fees.

15. Governing Law. It is the intention of the parties hereto that all questions with respect to the construction, formation, and performance of this Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the laws of the State of Illinois. The parties hereto submit to the jurisdiction and venue of the courts of DuPage County Illinois in respect to any matter or thing arising out of this agreement pursuant hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement in the State of Illinois as of the day and year first above written.

The Company:
First Health Group Corp.

By:

Its: President and
Chief Executive Officer

Employee:

David W. Norton

d:\home\wesley\agrmts\execmod1.doc