## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,      :
     :
          Plaintiff,      :
     :
          v.      :    NO. 1:00-CV-312
     :
NATIONAL PRESCRIPTION      :
ADMINISTRATORS, INC. and      :
DAVID W. NORTON,      :
     :
          Defendant.      :

*Kane*

FILED
HARRISBURG, PA

MAY 12 2000

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

### PRE-HEARING MEMORANDUM OF PLAINTIFF
### FIRST HEALTH GROUP CORP. FOR INJUNCTIVE RELIEF

Plaintiff, First Health Group Corp. ("First Health"), by and through its attorneys, Fox,

Rothschild, O'Brien & Frankel, LLP, respectfully submits the following pre-hearing

memorandum.

## I.    PROCEDURAL HISTORY

First Health instituted these proceedings on February 22, 2000, by filing a verified

complaint, a motion for a temporary restraining order and a motion for a preliminary injunction

against defendants, National Prescription Administrators, Inc. ("NPA") and David W. Norton

("Norton"). Among other things, First Health seeks to enjoin and remedy the unlawful

misappropriation and use by NPA and Norton of First Health's valuable confidential and

proprietary business information, as well as the threatened wholesale solicitation of First Health

employees, in connection with a bid proposal submitted by NPA to the Commonwealth of

Pennsylvania's Department of Aging ("PDA") for the contract to manage and administer the

Pharmaceutical Assistance Contract for the Elderly (the "PACE Contract").  A true and correct copy of First Health's verified complaint is attached hereto as Exhibit "1".

On February 22, 2000, the Court denied First Health's motion for a temporary restraining order, and scheduled a hearing on First Health's motion for a preliminary injunction for May 15, 2000.  During the interim period, the parties have completed discovery.

As set forth in the verified complaint, First Health also filed a bid protest with PDA after the announcement from PDA that NPA was the successful bidder for the PACE Contract.  First Health's administrative protest with PDA is currently pending.  On April 28, 2000, First Health submitted a supplement to its bid protest with PDA.  Although First Health's bid protest with PDA requests relief from PDA that is separate and distinct from the relief sought from this Court, First Health's supplement to its bid protest outlines, in large measure, the facts and legal arguments that provide evidence of and demonstrate First Health's claims against NPA and Norton.  The supplement to First Health's bid protest is attached hereto and marked as Exhibit "2".

## II.  LEGAL ISSUES

First Health submits the following primary issues for disposition:

1.  Whether Norton and NPA unlawfully misappropriated and used First Health's confidential and proprietary business information in the preparation and submission of NPA's 1999 bid proposal for the PACE Contract?

Suggested Answer: Yes.

2.    Whether Norton violated the confidentiality and non-disclosure

restriction (Section 7) in his employment agreement with

First Health by working with NPA in the preparation and

submission of its 1999 bid proposal for the PACE Contract?

Suggested Answer: Yes.

3.    Whether Norton violated the customer non-solicitation

restriction (Section 8) of his employment agreement with

First Health by (i) initiating contact and interviewing with

NPA for the sole purpose of providing consulting services for

its 1999 bid proposal, and (ii) leading NPA's oral interview

before PDA?

Suggested Answer: Yes.

4.    Whether Norton violated the employee non-solicitation restriction

(Section 9) of his employment agreement with First Health by,

among other things, proposing to recruit and hire First Health's

key PACE management staff and employees as part of NPA's 1999

bid proposal for the PACE Contract?

Suggested Answer: Yes.

5.    Whether NPA engaged in unfair competition by proposing to recruit

and hire First Health's PACE key management staff and employees

as part of NPA's 1999 bid proposal for the PACE Contract?

Suggested Answer: Yes.

6.    Whether NPA intentionally interfered with Norton's adherence to the contractual obligations (Section 7 (confidentiality/non-disclosure), Section 8 (customer non-solicitation) and Section 9 (employee non-solicitation)) set forth in his employment agreement with First Health in the course of preparing and submitting its 1999 bid proposal for the PACE Contract?

Suggested Answer: Yes.

7.    Whether Norton and NPA intentionally interfered with a prospective contractual relationship between First Health and PDA for the PACE Contract in the course of preparing and submitting its 1999 bid proposal for the PACE Contract?

Suggested Answer: Yes.

8.    Whether, as a result of Norton's unlawful and wrongful conduct, First Health is entitled to injunctive relief against Norton that enjoins him from, among other conduct, working with NPA in any manner related to the PACE Program?

Suggested Answer: Yes.

9.    Whether, as a result of NPA's unlawful and wrongful conduct, First Health is entitled to injunctive relief against NPA that enjoins NPA from, among other conduct, (i) recruiting and hiring First Health's key management staff and employees, and (ii) entering into any negotiations with PDA to manage and administer the PACE Contract?

Suggested Answer: Yes.

### III.     LIST OF WITNESSES

First Health anticipates that it will call the following persons to testify at trial:

1.     Teresa R. DiMarco, President, First Health Services Corporation

2.     Robert Howells, FHSC employee and current Officer-in-Charge of the PACE Program.

3.     David W. Norton

4.     Thomas Snedden, PDA's Director of the PACE Program

8.     Loretta Naccarato, President of LWN Enterprises.

### III.     LIST OF EXHIBITS

1.     Subpoena served on LWN Enterprises (Plaintiff Exhibit 1).

2.     11/10/99 letter from Loretta Naccarato to Peter Grieger (Plaintiff Exhibit 2).

3.     11/10/99 letter from Loretta Naccarato to Peter Grieger (Plaintiff Exhibit 3).

4.     RFP Reference: General Information For The Bidder (Plaintiff Exhibit 4).

5.     State Tax Liens, Commonwealth of Pennsylvania (Plaintiff Exhibit 5).

6.     Civil Suits, Commonwealth of Pennsylvania (Plaintiff Exhibit 6).

7.     SERB portion of NPA's 1999 Bid Proposal (Plaintiff Exhibit 7).

8.     Excerpt from NPA's 1999 Bid Proposal regarding LWN Enterprises (Plaintiff Exhibit 8).

9.     LWN Enterprises 12/6/99 Additional Pricing for RFP 1999-001 (Plaintiff Exhibit 9).

10.     Appendix E, Supply Consumption And Workloads (Plaintiff Exhibit 10).

11.     12/7/99 NPA Purchase Order, LWN Enterprises (Plaintiff Exhibit 11).

12.     FHSC Job Description, Officer-In-Charge (Plaintiff Exhibit 12).

13.    FHSC Job Description, Vice President Pharmacy Division (Plaintiff Exhibit 13).

14.    5/22/98 memorandum from S. Smith to Norton, enclosing 10/1/97 Employment

Agreement (Plaintiff Exhibit 14).

15.    Excerpt from NPA's 1999 Bid Proposal (68-75) (Plaintiff Exhibit 15).

16.    Excerpt from NPA's 1999 Bid Proposal (93) (Plaintiff Exhibit 16).

17.    Excerpt from NPA's 1999 Bid Proposal (17-19) (Plaintiff Exhibit 17).

18.    Excerpt from NPA's 1999 Bid Proposal (66) (Plaintiff Exhibit 18).

19.    Excerpt from NPA's 1999 Bid Proposal (83-86) (Plaintiff Exhibit 19).

20.    Excerpt from NPA's 1999 Bid Proposal (69-79) (Plaintiff Exhibit 20).

21.    Excerpt from NPA's 1999 Bid Proposal (95-96) (Plaintiff Exhibit 21).

22.    EPIC Program, Cost Proposal – Cost Summary (Plaintiff Exhibit 22).

23.    11/17/99 Consultant Agreement between NPA and Norton (Plaintiff Exhibit 23).

24.    6/7/99 from N. Zambon of First Health to Norton (Plaintiff Exhibit 24).

25.    3/23/00 letter from Norton to T. York (Plaintiff Exhibit 25).

26.    Norton's handwritten notes from conversation with R. Howells

(Plaintiff Exhibit 26).

27.    2/8/00 fax cover sheet to A. Langjahr from Norton (Plaintiff Exhibit 27).

28.    Sections 7 and 8 from Norton's 10/1/97 Employment Agreement (Plaintiff

Exhibit 28).

29.    2/10/00 letter from A. Langjahr to S. Smith (Plaintiff Exhibit 29).

30.    2/3/00 fax cover sheets sent by Norton (Plaintiff Exhibit 30).

31.    Receipt from The Packaging Store (Plaintiff Exhibit 31).

32.   1/21/00 fax cover sheet from A. Langjahr to P. Greiger, enclosing PDA's 1/21/00 notice of scheduling of oral interview (plaintiff Exhibit 32).

33.   Form 3A resume of Norton, from NPA's 1999 Bid Proposal (Plaintiff Exhibit 33).

34.   2/10/00 letter from R. Ullman to J. Welby (Plaintiff Exhibit 34).

35.   11/22/99 fax cover sheet with enclosures, from P. Greiger to Norton (Plaintiff Exhibit 35).

36.   1/26/00 fax cover sheet and enclosures from P. Greiger to R. Ullman and A. Zimmerman (Plaintiff Exhibit 36).

37.   11/29/99 letter from Norton to A. Zimmerman, enclosing invoices (Plaintiff Exhibit 37).

38.   12/13/99 letter from Norton to A. Zimmerman, enclosing invoices (Plaintiff Exhibit 38).

39.   2/3/00 Leslie Meissel invoice (Plaintiff Exhibit 39).

40.   Unsworn Declaration Under Penalty Of Perjury For David Norton (Plaintiff Exhibit 40).

41.   5/8/97 Agreement Regarding Employment between FHSC and Norton (Plaintiff Exhibit 41).

42.   9/9/80 Employee's Agreement between The Computer Company and Norton (Plaintiff Exhibit 42).

43.   11/14/75 Employee's Agreement Regarding Inventions, Trade Secrets and Records, between The Computer Company and Norton (Plaintiff Exhibit 43).

44.   Table 1.1A, PACE and PACENET Cardholder Enrollments By Quarter, July 1998 – December 1998 (Plaintiff Exhibit 44).

45.    Excerpt from 1999 RFP-001, with handwritten notations (Plaintiff Exhibit 45).

46.    Excerpt from answers to bidders' questions, with handwritten notations (Plaintiff Exhibit 46).

47.    2/20/95 FHSC memorandum from Jake L. Canova to all FHSC employees regarding Norton's promotion to Senior Vice President, Pharmacy Divisions (Plaintiff Exhibit 47).

48.    Fed.R.Civ.P. 30(b)(6) Deposition Notice for P. Greiger (Plaintiff Exhibit 48).

49.    Fed.R.Civ.P. 30 Deposition Notice for P. Greiger (Plaintiff Exhibit 49).

50.    Form 3A resume for P. Greiger in NPA's 1999 Bid Proposal (Plaintiff Exhibit 50).

51.    Table of Contents for NPA's 1999 Bid Proposal (Plaintiff Exhibit 51).

52.    Contents of NPA's 1999 SERB Envelope (Plaintiff Exhibit 52).

53.    9/14/99 PDA RFP 1999-001 (Plaintiff Exhibit 53).

54.    NPA's 12/10/99 Bid Proposal for the PACE Contract (Plaintiff Exhibit 54).

55.    Excerpt from NPA 1999 Bid Proposal (79) (Plaintiff Exhibit 55).

56.    Excerpt from NPA 1999 Bid Proposal (56) (Plaintiff Exhibit 56).

57.    Excerpt from NPA 1999 Bid Proposal (59) (Plaintiff Exhibit 57).

58.    Excerpts from 1999 RFP-001 and answers to bidders' questions (Plaintiff Exhibit 58).

59.    Excerpt from NPA 1999 Bid Proposal (78-79) (Plaintiff Exhibit 59).

60.    Excerpt from NPA 1999 Bid Proposal (94) (Plaintiff Exhibit 60).

61.    Excerpt from NPA 1999 Bid Proposal (103-104) (Plaintiff Exhibit 61).

62.    Excerpt from NPA 1999 Bid Proposal (107) (Plaintiff Exhibit 62).

63.    Handwritten notes from First Health's 1995 Bid Proposal (Plaintiff Exhibit 63).

64.    11/1/99 memorandum from P. Greiger to A. Zimmerman enclosing cost data from
       First Health's 1995 proposal (Plaintiff Exhibit 64).

65.    2/18/00 response of NPA to First Health's Bid Protest (Plaintiff Exhibit 65).

66.    PDA PACE Reference Summary (Plaintiff Exhibit 66).

67.    11/1/99 memorandum from D. Bogatch to S. Nicoletos about PACE Proposal
       (Plaintiff Exhibit 67).

68.    Unsworn Declaration Under Penalty Of Perjury For Peter Greiger
       (Plaintiff Exhibit 68).

69.    Handwritten notes on bid proposal (Plaintiff Exhibit 69).

70.    Pharmacy Business Unit Organization (Plaintiff Exhibit 70).

71.    PACE Progress memorandum (Plaintiff Exhibit 71).

72.    11/29 "To Do's" handwritten memorandum (Plaintiff Exhibit 72).

73.    "Work Plan + Narrative" (Plaintiff Exhibit 73).

74.    Prescription Communications Services (Plaintiff Exhibit 74).

75.    10/7/99 memorandum from Eileen O'Neill to S. Nicoletos regarding PACE
       Proposal, with enclosures (Plaintiff Exhibit 75).

76.    Proposal Introduction and Highlights (Executive Summary) (Plaintiff Exhibit 76).

77.    Fed.R.Civ.P. 30(b)(6) Deposition Notice for Allan Zimmerman (Plaintiff Exhibit
       77).

78.    Fed.R.Civ.P. 30 Deposition Notice for Allan Zimmerman (Plaintiff Exhibit 78).

79.    A. Zimmerman's notes from Norton interview (Plaintiff Exhibit 79).

80.    11/19 debriefing notes of Norton (Plaintiff Exhibit 80).

81.   11/23 debriefing notes of Norton (Plaintiff Exhibit 81).

82.   12/8/99 memorandum of Dick Hofheimer to A. Zimmerman and Norton (Plaintiff Exhibit 82).

83.   11/17/99 Consultant Agreement between NPA and Hofheimer (Plaintiff Exhibit 83).

84.   Form 3A Resume of Allan D. Zimmerman (Plaintiff Exhibit 84).

85.   (Inadvertently skipped).

86.   Fed.R.Civ. 30(b)(6) Deposition Notice for S. Nicoletos (Plaintiff Exhibit 86).

87.   Fed.R.Civ.P. 30 Deposition Notice for S. Nicoletos (Plaintiff Exhibit 87).

88.   11/1/99 memorandum from P. Greiger to A. Zimmerman, with handwritten notations (Plaintiff Exhibit 88).

89.   S. Nicoletos' notes relating to the preparation of NPA's 1999 Bid Proposal (Plaintiff Exhibit 89).

90.   S. Nicoletos' notes relating to the preparation of NPA's 1999 Bid Proposal (Plaintiff Exhibit 90).

91.   "Attachment A" reflecting total cost for 1998 amendment to PACE contract (Plaintiff Exhibit 91).

92.   Form 5, Cost Summary for PACE Contract (Plaintiff Exhibit 92).

93.   Reference Summary, summarizing NPA invoices (Plaintiff Exhibit 93).

94.   Assumptions For Direct Costs (Plaintiff Exhibit 94).

95.   12/0/99 NPA Purchase Order to LWN Enterprises (Plaintiff Exhibit 95).

96.   Excerpt from RFP 1999-001, with handwritten notations (Plaintiff Exhibit 96).

97.   Dun & Bradstreet report (Plaintiff Exhibit 97).

98.    Form 5, Cost Summary (Plaintiff Exhibit 98).

99.    Form 5, Cost Summary, with handwritten notations (Plaintiff Exhibit 99).

100.    Calculation Of Program Percents (Plaintiff Exhibit 100).

101.    Form 5, Cost Summary (Plaintiff Exhibit 101).

102.    Subpoena served on Thomas Snedden (Plaintiff Exhibit 102).

103.    RFP Score Sheet for NPA (Plaintiff Exhibit 103).

104.    Thomas Snedden's Technical Evaluation Point Breakdown and Evaluation

        Checklist And Scoresheet.

105.    PDA Reference Checklist (Plaintiff Exhibit 105).

106.    Transcript from PDA's 2/2/00 oral interview of NPA (Plaintiff Exhibit 106).

107.    Subpoena served on PDA (Plaintiff Exhibit 107).

108.    Technical Evaluation Point Breakdowns and Evaluation

        Checklists And Scoresheets of PDA Evaluation Committee

        (Plaintiff Exhibit 108).

109.    10/25/99 bidders' conference packet (Plaintiff Exhibit 109).

110.    2/3/00 letter from S. Sampson to R. Ullman of NPA (Plaintiff Exhibit 110).

111.    Cost Summary tabulation of S. Sampson regarding First Health and

        NPA (Plaintiff Exhibit 111)

112.    "Calculation Reminder" note of S. Sampson (Plaintiff Exhibit 112).

113.    S. Sampson note concerning P. Grieger's request to visit PDA (Plaintiff

        Exhibit 113).

114.    2/3/00 memorandum signed by R. Browdie (Plaintiff Exhibit 114).

115.    Computer Disk from PDA with RFP scores.

116. Chapter 58, "Bid Protests" (Plaintiff Exhibit 116).

117. Leslie Meissel Subpoenas (Plaintiff Exhibit 117).

118. Resume of Leslie Meissel (Plaintiff Exhibit 118).

119. Form 3A and 3B Resume of Leslie Meissel (Plaintiff Exhibit 119).

120. Subpoena served on Richard Hofheimer (Plaintiff Exhibit 120).

121. Agreement and Release between Richard Hofheimer and First Health

122. Richard Hofheimer's handwritten notes (Plaintiff Exhibit 121).

123. Proposal Introduction and Highlights (Executive Summary), with handwritten notes (Plaintiff Exhibit 123)

124. Retrospective DUR Outcomes/Savings Report (Plaintiff Exhibit 124).

125. NPA's 1999 takeover cost summary.

126. Excerpt (page 336) from NPA's 1999 Bid Proposal, "Program Operation" section.

127. Excerpt (pages 111-12) from NPA's 1999 Bid Proposal, "Program Operation" section.

128. Management Summary from NPA's 1999 Bid Proposal.

129. Excerpt (pages 20-54) from NPA's 1999 Bid Proposal, "Program Operations" section.

## IV.    **CONCLUSION**

For the reasons set forth in its verified complaint, motion for preliminary injunction and supplement to bid protest, First Health respectfully requests that the Court issue injunctive relief against NPA and Norton.

First Health further requests that this Court allow First Health to submit, within forty-five (45) days after the hearing on the motion for preliminary injunction, its proposed findings of fact and conclusions of law.

Respectfully submitted,

SCOTT L. WARNICK, ESQUIRE
JEFFREY D. HUTTON, ESQUIRE
FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103-3291
(215) 299-2000

Attorneys for Plaintiff
FIRST HEALTH GROUP CORP.

Date:   May 12, 2000

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,                  :
                                           :
                            Plaintiff,     :
                                           :
            v.                             :        NO. 1:00-CV-312
                                           :
NATIONAL PRESCRIPTION                      :
ADMINISTRATORS, INC. and                   :
DAVID W. NORTON,                           :
                                           :
                            Defendant.     :

## CERTIFICATE OF SERVICE

I, SCOTT L. VERNICK, ESQUIRE, hereby certify that I served a copy of the foregoing

pre-trial memorandum of plaintiff, First Health Group Corp., upon the following counsel of

record via telecopy and federal express mail on the date set forth below:

> Thomas York, Esquire
> Dilworth Paxson LLP
> 305 N. Front Street, Ste. 403
> Harrisburg, PA 17101
> Fax # (717) 236-7811
> Telephone (717) 236-4812

Attorney for Defendants

_____
SCOTT L. VERNICK, ESQUIRE

Date: May 12, 2000

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FIRST HEALTH GROUP CORP.,<br>3200 Highland Avenue<br>Downers Grove, IL 60515-1282, | : | |
| | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 1:00-CV-312 |
| | : | |
| v. | : | |
| | : | |
| NATIONAL PRESCRIPTION | : | |
| ADMINISTRATORS, INC., | : | |
| 711 Ridgedale Avenue | : | |
| East Hanover, NJ 07936, | : | |
| | : | |
| and | : | |
| | : | |
| DAVID W. NORTON, | : | |
| 1220 Whitby Road | : | |
| Richmond, VA 23277, | : | |
| | : | |
| Defendants. | : | |

## VERIFIED COMPLAINT

Plaintiff, First Health Group Corp. ("First Health"), by its attorneys, Fox, Rothschild,

O'Brien & Frankel, LLP, files the following complaint against defendants, National

Prescriptions Administrators, Inc. ("NPA") and David W. Norton ("Norton"). First Health

asserts claims that seek injunctive relief and damages against Norton for breach of contract,

misappropriation of trade secrets, breach of fiduciary duty and intentional interference with

prospective contractual relations. First Health asserts claims that seek injunctive relief and

damages against NPA for misappropriation of trade secrets, inducing a breach of fiduciary duty,

tortious interference with contractual relations and intentional interference with prospective

contractual relations. In support thereof, First Health avers the following:

## THE PARTIES

1.     Plaintiff, First Health, is a Delaware corporation with its principal place of

business at 3200 Highland Avenue, Downers Grove, IL 60515-1282.

2.     Founded in 1982, First Health is the nation's premier full-service national health

benefits company.

3.     First Health specializes in, among other things, providing large, national

employers with a fully integrated, single-source for their group health programs.  Further,

through its wholly-owned subsidiary company, First Health Services Corporation ("FHSC"),

First Health serves state Medicaid and entitlement programs with claims administration,

pharmacy benefits management and clinical management services.

4.     Defendant, NPA, is a New Jersey corporation with its principal place of business

at 711 Ridgedale Ave., East Hanover, NJ 07936.  NPA is in the business of, among other things,

providing healthcare management services.

5.     Defendant, Norton, is an individual who resides at 1220 Whitby Road, Richmond,

VA 23277.  Norton is an employee and/or officer of NPA.

## VENUE AND JURISDICTION

6.     This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1332

because the parties are citizens of different states and the amount in controversy exceeds

$75,000.00, exclusive of interest and costs.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because a

substantial part of the events giving rise to First Health's claims occurred in this district.

## BACKGROUND

8.      Through FHSC, First Health represents one of the leading healthcare administration and management firms in the United States, offering a full range of health data administration, pharmacy benefit management, utilization and quality review services for Medicaid, government healthcare programs, and managed care organizations.

9.      As the nation's fourth largest pharmacy benefit management company, FHSC provides a complete array of pharmacy benefit administration and clinical management services.

10.     On November 4, 1983, the General Assembly of the Commonwealth of Pennsylvania enacted legislation that established the Pharmaceutical Assistance Contract for the Elderly (the "PACE Program").

11.     In 1983, in response to the PACE Program's initial Request for Proposal, FHSC was selected as the PACE Program Contractor, responsible for administering the PACE Program.

12.     Since 1983, FHSC has been the only contractor to administer the PACE Program, having won three (3) subsequent bids in 1987, 1990 and 1995.

13.     FHSC's current contract to administer the PACE Program expires on June 1, 2000.

14.     Norton was first employed by The Computer Company (now known as First Health Services Corporation) in February, 1974, as a project manager.  With the exception of two brief intervals with other companies, First Health employed Norton until October 28, 1999.

15.     For approximately two of his years with First Health, Norton was the vice president for PACE Operations.  During this time period, Norton was responsible for the overall operation of FHSC's PACE contract.

3

16.    Norton also served as senior vice president of the Pharmacy Business Unit, which included the PACE Program.

17.    In his capacity as a First Health employee (for approximately seventeen years) and an officer responsible for the PACE Program, Norton gained an intimate working knowledge of First Health's confidential and proprietary business information pertaining to, among other things, pricing, marketing, and the highly technical procedures, processes, policies, systems and methods for the operation, administration and management of the PACE Program, as well as the Department's particular needs and requirements for that program.

18.    First Health maintains the confidential and proprietary business nature of its information pertaining to pricing, marketing, and the highly technical procedures, processes, policies, systems and methods for the operation, administration and management of the PACE Program, as well as information regarding the Department's particular needs and requirements by, among other methods, requiring its employees to execute employment agreements that contain clear and precise obligations of confidentiality.

19.    On or about October 1, 1997, Norton and First Health executed an Employment Agreement (the "Agreement"). A true and correct copy of the Agreement is attached hereto and marked as Exhibit "A".

20.    The Agreement governed, among other things, the terms of Norton's employment with respect to First Health's pharmacy management and benefits programs (operated through FHSC), and it delineated certain contractual obligations that Norton agreed to honor.

21.    Section 7 of the Agreement entitled, "Confidentiality", states:

> [Norton] agrees not to directly or indirectly use or disclose, for the benefit of any person, firm or entity other than [First Health] and its subsidiary companies. the Confidential Business Information of [First Health]. Confidential Business Information means information

4



or material which is not generally available to or used by others or the
utility or value of which is not generally known or recognized as a
standard practice, whether or not the underlying details are in the public
domain, including but not limited to its computerized and manual systems,
procedures, reports, client lists, review criteria and methods, financial
methods and practices, plans, pricing and marketing techniques as well
as information regarding [First Health's] past, present, and prospective
clients and their particular needs and requirements, and their own
confidential information.

Upon termination of employment, with or without cause, [Norton] agrees
to return to [First Health] all policy and procedure manuals, records,
reports, records, notes, data, memoranda, and reports of any nature
(including computerized and electronically stored information) which are
in [Norton's] possession and/or control which relate to (I) the Confidential
Business Information of [First Health], (ii) [Norton's] employment with
[First Health], or (iii) the business activities or facilities of [First Health]
or its past, present, or prospective clients.

See Agreement at Section 7 (emphasis added).

22.    Section 8 of the Agreement entitled, "Restrictive Covenant", states in pertinent
part:

For a period of one year after termination of employment, with or
without cause, [Norton] will not directly or indirectly, for the purpose of
selling services provided or planned by [First Health] at the time the
employment was terminated, call upon, solicit or divert any actual
customer or prospective customer of [First Health]. An actual customer,
for purposes of this Section, is any customer to whom [First Health] has
provided services within one year prior to [Norton's] termination. A
prospective customer, for purposes of this Section, is any prospective
customer to whom [First Health] sought to provide services within one
year prior to the date of [Norton's] termination and [Norton] has
knowledge of and was involved in such solicitation. For the purposes of
this Section, responding to an unsolicited request for proposal by a
customer or prospective customer which is a government agency or
government contractor will not constitute a violation of [Norton's]
obligation hereunder.

Id. at Section 8.

23.    Section 9 of the Agreement entitled, "Non-Solicitation of Employees", states:

[Norton] further agrees that for a period of one year from the date
of [Norton's] termination, with or without cause, [Norton] shall not

5



directly or indirectly solicit or hire any person who is currently or was an employee of [First Health] at any time during the twelve months prior to [Norton's] termination.

Id. at Section 9.

24.    Section 10 of the Agreement, entitled, "Remedies" states:

> In the event [Norton] breaches or threatens to breach Section 7, 8 or 9 of this Agreement, [First Health] shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach. [Norton] acknowledges that [First Health's] remedy at law is inadequate and that [First Health] will suffer irreparable injury if such conduct is not prohibited.
>
> [Norton] and [First Health] agree that, because of the difficulty of ascertaining the amount of damages in the event that [Norton] breaches Section 9 of this Agreement, [First Health] shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave [First Health's] employ. The parties further agree that the existence of this remedy will not preclude [First Health] from seeking or receiving injunctive relief.
>
> [Norton] further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by [Norton] against [First Health] shall not constitute a defense to the enforcement by [First Health] of either of these paragraphs.

Id. at Section 10 (emphasis added).

25.    Norton's employment with First Health terminated effective October 28, 1999.

26.    Before the effective termination date of Norton's employment with First Health, on or about September 14, 1999, the Commonwealth of Pennsylvania Department of Aging (the "Department") forwarded a Request for Proposal ("RFP") to FHSC and other potential bidders with respect to the PACE Program for the contract period commencing June 1, 2000 (the "PACE Contract").

27.    First Health, through FHSC, timely submitted its bid proposal to provide services, as outlined in the RFP, to the Department for the PACE Contract.

6

or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding [First Health's] past, present, and prospective clients and their particular needs and requirements, and their own confidential information.

Upon termination of employment, with or without cause, [Norton] agrees to return to [First Health] all policy and procedure manuals, records, reports, records, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in [Norton's] possession and/or control which relate to (I) the Confidential Business Information of [First Health], (ii) [Norton's] employment with [First Health], or (iii) the business activities or facilities of [First Health] or its past, present, or prospective clients.

See Agreement at Section 7 (emphasis added).

22.   Section 8 of the Agreement entitled, "Restrictive Covenant", states in pertinent part:

For a period of one year after termination of employment, with or without cause, [Norton] will not directly or indirectly, for the purpose of selling services provided or planned by [First Health] at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of [First Health]. An actual customer, for purposes of this Section, is any customer to whom [First Health] has provided services within one year prior to [Norton's] termination. A prospective customer, for purposes of this Section, is any prospective customer to whom [First Health] sought to provide services within one year prior to the date of [Norton's] termination and [Norton] has knowledge of and was involved in such solicitation. For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of [Norton's] obligation hereunder.

Id. at Section 8.

23.   Section 9 of the Agreement entitled, "Non-Solicitation of Employees", states:

[Norton] further agrees that for a period of one year from the date of [Norton's] termination, with or without cause, [Norton] shall not

5

directly or indirectly solicit or hire any person who is currently or was an employee of [First Health] at any time during the twelve months prior to [Norton's] termination.

Id. at Section 9.

24.    Section 10 of the Agreement, entitled, "Remedies" states:

> In the event [Norton] breaches or threatens to breach Section 7, 8 or 9 of this Agreement, [First Health] shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach.  [Norton] acknowledges that [First Health's] remedy at law is inadequate and that [First Health] will suffer irreparable injury if such conduct is not prohibited.

> [Norton] and [First Health] agree that, because of the difficulty of ascertaining the amount of damages in the event that [Norton] breaches Section 9 of this Agreement, [First Health] shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave [First Health's] employ.  The parties further agree that the existence of this remedy will not preclude [First Health] from seeking or receiving injunctive relief.

> [Norton] further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by [Norton] against [First Health] shall not constitute a defense to the enforcement by [First Health] of either of these paragraphs.

Id. at Section 10 (emphasis added).

25.    Norton's employment with First Health terminated effective October 28, 1999.

26.    Before the effective termination date of Norton's employment with First Health, on or about September 14, 1999, the Commonwealth of Pennsylvania Department of Aging (the "Department") forwarded a Request for Proposal ("RFP") to FHSC and other potential bidders with respect to the PACE Program for the contract period commencing June 1, 2000 (the "PACE Contract").

27.    First Health, through FHSC, timely submitted its bid proposal to provide services, as outlined in the RFP, to the Department for the PACE Contract.

6



28.    On reliable information and belief, Norton was directly involved and instrumental in preparing NPA's bid proposal for the PACE Contract in response to the RFP of September 14, 1999, and was proposed by NPA as the officer-in-charge of the management and administration of the PACE Program.

29.    Upon reliable information and belief, Norton, acting on behalf of NPA, made an oral presentation to the Department for the purpose of securing the PACE Contract; Norton's presentation took place sometime between the issuing of the RFP on September 14, 1999 and February 3, 2000, the date the notice of award was issued.

30.    In accordance with the RFP, and answers by the Department to questions submitted by bidders, proposals were evaluated on the basis of three categories: Technical Proposal – 60%; Participation of Socially-Economically Restricted Businesses – 10%; and Costs – 30%. In accordance with Part III "Criteria for Selection" of the RFP, the evaluation committee was to recommend for selection the proposal that most closely met the requirements of the RFP and satisfied the needs of the Department, taking into consideration criteria set forth in that Part III. Included in the criteria for selection were subsections relating to contractor qualifications and professional and managerial personnel.

31.    On or about February 3, 2000, the Department advised FHSC that FHSC had not received the highest total points in the bid proposal evaluation process and, as a result,  the Department would enter into negotiations with NPA for the PACE Contract.

32.    Part III, Section C of the RFP lists as criteria, "[t]he quality, relevancy and recency of similar projects performed by the bidder"; significantly, NPA does not now, nor has it ever, managed and administered either the PACE Program or a comparable program in any state or commonwealth that provides pharmaceutical assistance to the elderly.  In fact, in connection

7

with two previous procurements, NPA submitted proposals for the PACE Program in Pennsylvania and, in each instance, failed to obtain the bid because its bid proposals were evaluated as substantially insufficient.

33.     Part III, Section D of the RFP's criteria calls for the evaluation of qualifications of professional and managerial personnel who would be assigned to the job by the bidder; qualifications are to be measured with particular reference to experience on projects similar to that described in the RFP.  Beyond Dave Norton, who NPA has wrongfully and unlawfully proposed as its officer-in-charge of the PACE Program, NPA does not have professional and managerial personnel who have the experience and related education for a project such as PACE; the only such professional and management personnel are the existing staff of First Health dedicated to the PACE Program.

34.     In fact, even with respect to the PACE Program's current project manager, on February 3, 2000, Norton solicited a present First Health employee, Robert Howells, to work for NPA, and assist in managing and administering the PACE Contract.  At First Health, Mr. Howells is presently responsible for overseeing the PACE Program, and he possesses the most current experience with hands-on management of the PACE Program.

35.     Even without the benefit of reviewing NPA's bid proposal, the timing and circumstances outlined above force First Health to conclude that NPA could not have suddenly submitted its first competitive bid proposal for the PACE Program without Norton having provided NPA with First Health's confidential and proprietary business information pertaining to the pricing, marketing, and the highly technical procedure, processes, policies, systems and methods for the operation, administration and management of the PACE Program; such

8

information is not contained in any previous RFP or First Health proposal; and Norton, as a result of his employment with First Health, possesses knowledge of such information.

36.    Further, upon reliable information and belief, NPA, in its bid proposal for the PACE Contract, represented that it would use key managers and administrative staff who are current First Health employees and assigned to the PACE Program.  Such a representation is without merit.

37.    The key professional and managerial staff of First Health assigned to the PACE Program are longstanding, valued employees, and First Health will make appropriate efforts to retain these key personnel or arrange to assign them to other programs; First Health has no obligation to the Department in its Turnover Plan with respect to First Health employees and, as a result, those employees would not necessarily be made available to NPA.

38.    All of First Health's employees assigned to the PACE Program are subject to restrictions in their employment on the use and disclosure of confidential and proprietary business information and, as a result, are not free to become employed with a different company and perform the same services with respect to the PACE Program without violating confidentiality obligations that they agreed to honor.

39.    As a practical matter (and with one exception noted above), to the best of First Health's knowledge and belief, no current employees have been asked by NPA, its agents or representatives, if they would even be willing to accept employment at NPA, rather than remain with First Health as their longstanding employer.

40.    On February 10, 2000, pursuant to the administrative rules of the Department, First Health filed a bid protest with the Department in which First Health protests the award of the PACE Contract to NPA on the following grounds: (1) based on reliable information and

9

belief, Norton violated the Agreement in connection with the preparation of NPA's bid proposal, and (2) NPA does not have the requisite qualifications and personnel to satisfy the RFP of September 14, 1999. This administrative appeal with respect to the award of the PACE Contract to NPA is currently pending.

41.    First Health is entitled to a temporary, preliminary and, ultimately, permanent injunction that enjoins Norton from (i) further soliciting, diverting and/or performing any services with respect to the PACE Contract, (ii) further soliciting or attempting to hire current First Health employees for the PACE Contract, (iii) further using or disclosing any confidential and proprietary business information that is owned by First Health, and (iv) participating or having any involvement in the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract concerning the PACE Program or any similar program in another state or commonwealth.

42.    First Health entitled to a temporary, preliminary and permanent injunction that enjoins NPA from (i) managing and/or administrating the PACE Contract; (ii) further soliciting, diverting and/or performing any services with respect to the PACE Contract, including negotiating and/or entering into a contract to manage and/or administer the PACE Program; (iii) further soliciting or attempting to hire First Health employees for the PACE Contract; (iv) further using or disclosing any confidential and proprietary business information that is owned by First Health and has been disclosed to it by Norton, and (v) permitting Norton to participate and/or be involved with the pricing, solicitation, management and/or administration of the PACE Contract, or any current or future pharmacy benefits administration contract involving the PACE Program or any similar program.

10

# COUNT I

## First Health v. Norton

### (Breach of Contract)

43.    First Health incorporates herein by reference paragraphs 1 through 42 above as if set forth at length.

44.    The Agreement is a valid and enforceable contract between First Health and Norton.

45.    As consideration for, and in reliance upon, Norton's promises and obligations in the Agreement, First Health has paid Norton wages and other compensation for a period of over two years and provided him with access to valuable confidential and proprietary business information that First Health owns.

46.    Norton's conduct (as detailed above) demonstrates that he has breached, and will continue to breach unless enjoined by this Court, the confidentiality clause (Section 7) of the Agreement, which prohibits, among other things, the disclosure and/or use of confidential and proprietary business information that is owned by First Health.

47.    Norton's conduct demonstrates that he has breached, and will continue to breach unless enjoined by this Court, the customer non-solicitation clause (Section 8) of the Agreement which, among other things, prohibits Norton from (for the purpose of selling services provided or planned by First Health) soliciting or diverting an actual or prospective customer of First Health for one year after the date of his termination from First Health.

48.    With respect to the PACE Program, Section 8's limited exception does not permit the activity engaged in by Norton. The exception is limited to unsolicited requests. Incredibly, Norton met with representatives of the Department as early as May 1999; as a result, while still

an employee of First Health, Norton engaged in solicitation activity on behalf of a direct competitor that violated his contractual obligations to First Health. Further, Section 8 does not permit Norton to appear at oral presentations on behalf of a competitor of First Health or be proposed as key personnel within NPA's proposal.

49.     Norton's conduct (as detailed above) demonstrates that he has breached, and will continue to breach unless enjoined by this Court, the underline employee non-solicitation clause (Section 9) of the Agreement, which prohibits Norton from, among other things, soliciting or hiring any First Health employees.

50.     First Health has a clear right to relief and will likely prevail on the merits of its claims against Norton and NPA.

51.     First Health will suffer immediate and irreparable injury as a result of Norton's breach of contract.

52.     First Health has no remedy at law for Norton's breach of the Agreement.

53.     First Health will suffer greater harm if the relief it seeks is not granted than Norton will if the relief is granted because the (i) disclosure and/or use of First Health's confidential and proprietary business information, and (ii) solicitation of First Health's customers and employees by Norton is in violation of the Agreement and will, with respect to the PACE Program and other similar programs, result in permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant David W. Norton as follows:

　　　　a.     ordering that defendant David W. Norton shall not use or disclose any

　　　　　　　confidential and proprietary business information or material that is owned

12

by First Health Group Corp. pertaining to, among other things, First

Health Group Corp.'s computerized and manual systems, procedures,

reports, client lists, review criteria and methods, financial methods and

practices, plans, pricing and marketing techniques, as well as information

regarding First Health Group Corp.'s past, present, and prospective clients

including, but not limited to, the Commonwealth of Pennsylvania

Department of Aging, and information regarding their particular needs and

requirements, and the Commonwealth of Pennsylvania Department of

Aging's confidential information;

b.    ordering that defendant David W. Norton shall not participate or have any

involvement in the pricing, solicitation, management and/or administration

of the PACE Contract, or any current or future pharmacy benefits

administration contract concerning the PACE Program or any similar

program;

c.    ordering that defendant David W. Norton shall not, either in his individual

capacity or on behalf of any other person or business entity, directly or

indirectly, call upon, solicit or divert (i) any customer to whom First

Health Group Corp. provided services within one year prior to David W.

Norton's termination as a First Health Group Corp. employee including,

but not limited to, the Commonwealth of Pennsylvania Department of

Aging, or (ii) any prospective customer to whom First Health Group Corp.

sought to provide services within one year prior to David W. Norton's

termination as a First Health employee and about which David W. Norton

has knowledge and was involved in such solicitation;

d.      ordering that defendant David W. Norton shall not, directly or indirectly,

solicit or hire any person who is currently or was an employee of First

Health at any time within one year prior to David W. Norton's termination

as a First Health Group Corp. employee;

e.      Awarding to plaintiff First Health Group Corp. compensatory damages,

costs, interest, attorney's fees and such other relief as the Court deems just

and appropriate.

## COUNT II

### First Health v. Norton

### (Misappropriation of Trade Secrets – Under

### Common Law and 765 ILCS §§ 1065/1-1065/8)

54.    First Health incorporates herein by reference paragraphs 1 through 53 above as if

set forth at length.

55.    As a result of his employment with First Health, Norton possesses confidential,

proprietary trade secrets and business information that belongs to First Health.

56.    First Health's confidential, proprietary trade secrets and business information that

Norton possesses are sufficiently secret to derive economic value, actual or potential, from not

being generally known to other persons who can obtain economic benefit from their disclosure or

use.

14

57.    First Health's confidential, proprietary trade secrets and business information that Norton possesses are the subject of efforts by First Health that are reasonable under the circumstances to maintain their secrecy.

58.    Upon reliable information and belief (and as set forth above), in connection with the preparation of NPA's bid proposal for the PACE Contract, Norton, without the express or implied consent of First Health and with knowledge that that he was under a duty to maintain confidentiality, disclosed and/or used First Health's confidential, proprietary trade secrets and business information with respect to First Health's pricing, policies, products, systems and methods of operation pertaining to the management and administration of the PACE Program and information pertaining to the needs and requirements of the Department in connection with the PACE Program, for the benefit of NPA and to the detriment of First Health.

59.    Further, in violation of his contractual, statutory and common law duties, Norton's continued employment with NPA will inevitably lead him to make additional disclosures and/or use First Health's confidential, proprietary trade secrets and business information pertaining to, among other things, the manner in which First Health managed and administered the PACE Program and the needs and requirements of the Department with respect to that program, despite his knowledge that the Agreement prohibits the disclosure and/or use of such trade secrets and information, all of which represents a substantial threat of the disclosure and/or use of First Health's confidential, proprietary trade secrets and business information for the benefit of Norton and NPA and to the detriment of First Health.

60.    Norton's conduct in misappropriating the confidential, proprietary trade secrets and business information of First Health was intentional and demonstrates Norton's conscious disregard for the rights of First Health.

15

61.    First Health has a clear right to relief, and will likely prevail on the merits of its claims against Norton and NPA.

62.    First Health will suffer immediate and irreparable injury as a result of Norton's misappropriation of the confidential, proprietary trade secrets and business information.

63.    First Health has no adequate remedy at law for Norton's unlawful conduct.

64.    First Health will suffer greater harm if the relief it seeks is not granted than Norton will if the relief is granted because the disclosure and/or use of First Health's confidential, proprietary trade secrets and business information is in violation of the Agreement and Norton's statutory and common law duties to First Health, and will, with respect to the PACE Program and other similar programs, result in a permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant David W. Norton as follows:

a.    ordering that defendant David W. Norton shall not use or disclose any confidential and proprietary business information or material that is owned by First Health Group Corp. pertaining to, among other things, First Health Group Corp.'s computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques, as well as information regarding First Health Group Corp.'s past, present, and prospective clients including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, and information regarding their particular needs and

16

requirements, and the Commonwealth of Pennsylvania Department of

Aging's confidential information;

b.       ordering that defendant David W. Norton shall not participate or have any

involvement in the pricing, solicitation, management and/or administration

of the PACE Contract, or any current or future pharmacy benefits

administration contract concerning the PACE Program or any similar

program;

c.       Awarding First Health Group Corp. compensatory damages, punitive

damages, costs, interest, attorney's fees and such other relief as the Court

deems just and appropriate.

## COUNT III

### (Breach of Fiduciary Duty)

### First Health v. Norton

65.    First Health incorporates herein by reference paragraphs 1 through 64 above as if
set forth at length.

66.    Norton, as an employee and officer of First Health until October 28, 1999, owed a
fiduciary duty of utmost good faith and loyalty to First Health, his employer.

67.    Norton has breached his fiduciary duty to First Health in the following respects:

(a)     failing to disclose to First Health, prior to (and after) the effective date of

his termination on October 28, 1999, his new employment with NPA and,

specifically, his plan and efforts to assist NPA, a competitor of First

Health, in the solicitation and management of the PACE Contract;

17

    (b)    failing to disclose to First Health, prior to (and after) the effective date of his termination on October 28, 1999, his plan and intention to solicit First Health employees to become employees of NPA for the purpose of managing and administering the PACE Contract for which NPA submitted a bid proposal;

    (c)    soliciting, prior to (and after) the effective date of his termination on October 28, 1999, the Department for the PACE Contract that First Health was (and still is) administrating through June 1, 2000.

68.     As a direct and proximate result of Norton's breach of his fiduciary duty, First Health has suffered damages in the nature of (i) salary and other compensation paid to Norton during the period he breached his fiduciary duty, and (ii) loss of the PACE Contract.

69.     Norton's breach of his fiduciary duty to First Health was intentional and without just cause.

70.     First Health is entitled to an award of punitive damages for Norton's breach of fiduciary duty.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant David W. Norton for compensatory and punitive damages in an amount in excess of $75,000.00, plus costs, interest, attorney's fees and such other relief as the Court deems just and appropriate.

18

## COUNT IV

### First Health v. NPA

### (Inducing Breach of Fiduciary Duty)

71.    First Health incorporates herein by reference paragraphs 1 through 70 above as if set forth at length.

72.    Upon reliable information and belief, NPA hired Norton prior to the effective date of his termination as an employee of First Health.

73.    By hiring Norton prior to the effective date of his termination as a First Health employee and officer, having Norton actively participate in NPA's solicitation of the Department for the PACE Contract both before and after the effective date of his termination, placing Norton in a situation that requires him to disclose and/or use First Health's confidential and proprietary business information both before and after the effective date of his termination, and permitting Norton to solicit employees of First Health, NPA facilitated, furthered and supported Norton's breach of his fiduciary duty to First Health.

74.    As a direct and proximate result of NPA's inducement of Norton to breach of his fiduciary duty, First Health suffered damages in the nature of (i) salary and other compensation paid to Norton during the period he breached his fiduciary duty, and (ii) loss of the PACE Contract.

75.    NPA's inducement of Norton to breach of his fiduciary duty to First Health was intentional and without just cause.

76.    First Health is entitled to an award of punitive damages for Norton's breach of fiduciary duty.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant National Prescription Administrators, Inc. for compensatory and punitive damages in excess of $75,000.000, plus costs, interest, attorney's fees and such other relief as the Court deems just and appropriate.

## COUNT V

### First Health v. NPA

### (Tortious Interference with Norton's Contract)

77.    First Health incorporates herein by reference paragraphs 1 through 76 above as of set forth at length.

78.    The agreement is a valid, enforceable contract between Norton and First Health.

79.    At all material times, NPA was aware of the Agreement and its terms.

80.    By hiring Norton and having him directly participate in the process of soliciting and procuring the PACE Contract, NPA intentionally, and without privilege or justification, induced and caused Norton to breach and violate Sections 7, 8 and 9 of the Agreement.

81.    Since the submission of its bid proposal to the Department, NPA's improper and unlawful conduct has continued unabated. As a result, NPA has unlawfully and wrongfully interfered with Norton's Agreement with First Health.

82.    First Health has a clear right to relief, and will likely prevail on the merits of its claims against Norton and NPA.

83.    First Health will suffer immediate and irreparable injury if this Court does not stop NPA's tortious interference with the Agreement.

84.    First Health has no adequate remedy at law for NPA's unlawful conduct.

20

85.    First Health will suffer greater harm if the relief it seeks is not granted than NPA will if the relief is granted because NPA's unlawful interference with the Agreement causes Norton to violate both the Agreement, and the statutory and common law duties owed to First Health and, with respect to the PACE Program and similar programs, will result in a permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant National Prescription Administrators, Inc. as follows:

a.    ordering that defendant National Prescription Administrators, Inc. shall cease and desist all conduct directed to an unlawful and improper interference with David W. Norton's contractual obligations under the October 1, 1997 Employment Agreement with plaintiff First Health Group Corp.;

b.    ordering that defendant National Prescription Administrators, Inc. shall not manage and/or administer the PACE Contract;

c.    ordering that defendant National Prescription Administrators, Inc. shall not further solicit, divert and/or perform any services with respect to the PACE Contract, including negotiating and/or entering into a contract to manage and/or administer the PACE Program;

d.    ordering that defendant National Prescription Administrators, Inc. shall not further solicit or attempt to hire First Health employees for the PACE Contract;

e.    ordering that defendant National Prescription Administrators, Inc. shall not permit Norton to participate and/or be involved with the pricing,

21

solicitation, management and/or administration of the PACE Contract, or

any current or future pharmacy benefits administration contract involving

the PACE Program or any similar program;

f.      ordering that defendant National Prescription Administrators, Inc. shall

not use or disclose any confidential and proprietary business information

or material that is owned by First Health Group Corp. pertaining to,

among other things, First Health Group Corp.'s computerized and manual

systems, procedures, reports, client lists, review criteria and methods,

financial methods and practices, plans, pricing and marketing techniques,

as well as information regarding First Health Group Corp.'s past, present,

and prospective clients including, but not limited to, the Commonwealth

of Pennsylvania Department of Aging, and information regarding their

particular needs and requirements, and the Commonwealth of

Pennsylvania Department of Aging's confidential information;

g.      Awarding to plaintiff First Health Group Corp. costs, interest, attorney's

fees and such other relief as the Court deems just and appropriate.

## COUNT VI

### First Health v. NPA

### (Misappropriation of Trade Secrets)

86.     First Health incorporates herein by reference paragraphs 1 through 85 above as if
set forth at length.

87.     As a result of his employment with First Health, Norton possesses confidential,
proprietary trade secrets and business information that belongs to First Health.

22

88.    First Health's confidential, proprietary trade secrets and business information that Norton possesses are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic benefit from their disclosure or use.

89.    First Health's confidential, proprietary trade secrets and business information that Norton possesses are the subject of efforts by First Health that are reasonable under the circumstances to maintain their secrecy.

90.    Upon information and belief (and as set forth above), in connection with the preparation and submission of NPA's bid proposal for the PACE Contract, Norton, without the express or implied consent of First Health and with knowledge that that he was under a duty to maintain confidentiality, disclosed to NPA, and NPA used, First Health's confidential, proprietary trade secrets and business information with respect to First Health's pricing, policies, products, systems and methods of operation pertaining to the management and administration of the PACE Program, and information pertaining to the needs and requirements of the Department in connection with the PACE  Program, for the benefit of NPA and to the detriment of First Health.

91.    Upon reliable information and belief (and as set forth above), NPA used, without the express or implied consent of First Health, the confidential, proprietary trade secrets and business information of First Health in NPA's solicitation of the PACE Contract and/or its written bid proposal submitted to the Department in response to the RFP of September 14, 1999.

92.    At the time it used First Health's confidential, proprietary trade secrets and business information, NPA knew or had reason to know that its use of such information was derived from Norton who owed a duty of confidentiality to First Health or, alternatively, before a

23

material change in its position, NPA knew or had reason to know that it acquired such information by accident or mistake.

93.     Further, in violation of his contractual, statutory and common law duties, Norton's continued employment at NPA will inevitably lead him to make additional disclosures and/or use First Health's confidential, proprietary trade secrets and business information pertaining to, among other things, the manner in which First Health managed and administered the PACE Program and the needs and requirements of the Department with respect to that program, and will inevitably lead NPA to disclose and/or use such trade secrets and information, all of which represents a substantial threat of the disclosure and/or use of First Health's confidential, proprietary trade secrets and business information for the benefit of Norton and NPA, and to the detriment of First Health.

94.     NPA's improper and unlawful conduct in misappropriating the confidential, proprietary trade secrets and business information of First Health was intentional and demonstrates NPA's conscious disregard for the rights of First Health.

95.     First Health has a clear right to relief, and will likely prevail on the merits of its claims against Norton and NPA.

96.     First Health will suffer immediate and irreparable injury as a result of the misappropriation of confidential, proprietary trade secrets and business information by Norton and NPA.

97.     First Health has no adequate remedy at law for the improper and unlawful conduct by Norton and NPA.

98.     First Health will suffer greater harm if the relief it seeks is not granted than NPA will if the relief is granted because NPA has no lawful right to disclose and/or use First Health's

24

confidential, proprietary trade secrets and business information, and such disclosure and/or use will, with respect to the PACE Program and similar programs, result in a permanent loss and injury to First Health's business.

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendant National Prescription Administrators, Inc. as follows:

a.  ordering that defendant National Prescription Administrators, Inc. shall cease and desist all conduct directed to an unlawful and improper interference with David W. Norton's contractual obligations under the October 1, 1997 Employment Agreement with plaintiff First Health Group Corp.;

b.  ordering that defendant National Prescription Administrators, Inc. shall not manage and/or administer the PACE Contract;

c.  ordering that defendant National Prescription Administrators, Inc. shall not further solicit, divert and/or perform any services with respect to the PACE Contract, including negotiating and/or entering into a contract to manage and/or administer the PACE Program;

d.  ordering that defendant National Prescription Administrators, Inc. shall not further solicit or attempt to hire First Health employees for the PACE Contract;

e.  ordering that defendant National Prescription Administrators, Inc. shall not permit Norton to participate in and/or be involved with the pricing, solicitation, management and/or administration of the PACE Contract, or

25

any current or future pharmacy benefits administration contract involving

the PACE Program or any similar program;

f.     ordering that defendant National Prescription Administrators, Inc. shall

not use or disclose any confidential and proprietary business information

or material that is owned by First Health Group Corp. pertaining to,

among other things, First Health Group Corp.'s computerized and manual

systems, procedures, reports, client lists, review criteria and methods,

financial methods and practices, plans, pricing and marketing techniques,

as well as information regarding First Health Group Corp.'s past, present,

and prospective clients including, but not limited to, the Commonwealth

of Pennsylvania Department of Aging, and information regarding their

particular needs and requirements, and the Commonwealth of

Pennsylvania Department of Aging's confidential information;

g.     Awarding to plaintiff First Health Group Corp. compensatory and punitive

damages, costs, interest, attorney's fees and such other relief as the Court

deems just and appropriate.

COUNT VII

**First Health v. Norton and NPA**

**(Tortious Interference with Prospective Economic Advantage)**

99.    First Health incorporates herein by reference paragraphs 1 through 98 above as if set forth at length.

100.    At all material times, First Health has been a party to a valid and enforceable contract between itself and the Department to manage and administer the PACE Program.

26

101.    As a result of having been the only contractor for the PACE Program since its enactment, First Health had a reasonable expectation of entering into a valid business relationship with the Department for the PACE Contract for the period commencing June 1, 2000.

102.    As a result of his employment at First Health and prior involvement in First Health's management and administration of the PACE Program, Norton was, at all material times, knowledgeable and aware of First Health's expectation concerning the PACE Contract, and disclosed this expectation to his new employer, NPA.

103.    Norton purposefully interfered and prevented First Health's expectancy in the PACE Contract from ripening into a valid business relationship by improperly and unlawfully disclosing and/or using, among other items, First Health's confidential and proprietary business information pertaining to the pricing, solicitation, management and administration of the PACE Program for the purpose of preparing NPA's bid proposal for the PACE Contract.

104.    NPA purposefully interfered and prevented First Health's expectancy in the PACE Contract from ripening into a valid business relationship by improperly and unlawfully disclosing and/or using, among other items, First Health's confidential and proprietary information pertaining to the pricing, solicitation, management and administration of the PACE Program for the purpose of preparing NPA's bid proposal for the PACE Contract, and by hiring Norton to work for NPA despite his continuing contractual obligations.

105.    As a direct and proximate result of the improper and unlawful interference by Norton and NPA, First Health's bid proposal for the PACE Contract was rejected in favor of NPA's proposal.

27

106.    The improper and unlawful conduct of Norton and NPA since NPA's proposal was submitted to the Department evidences their further intent to violate Sections 7, 8 and 9 of the Agreement, and otherwise interfere with the prospective contractual relationship between First Health and the Department.

107.    The intended, threatened and actual tortious interference by Norton and NPA will cause First Health immediate and irreparable harm if not stopped by this Court.

108.    The improper and unlawful interference by Norton and NPA with the prospective contractual relationship between First Health and the Department is without privilege or justification.

109.    First Health has a clear right to relief, and will likely succeed on the merits of its claims against Norton and NPA.

110.    First Health will suffer irreparable injury as a result of the tortious interference with prospective contractual relations by Norton and NPA.

111.    First Health has no adequate remedy at law for the improper and unlawful conduct by Norton and NPA.

112.    First Health will suffer greater harm if the relief it seeks is not granted than Norton and/or NPA will if the relief is granted because the improper and unlawful interference with First Health's valid contractual expectation violates the Agreement, and the statutory and common law duties owed to First Health by both Norton and NPA, and will result, with respect to the PACE Program and similar programs, in a permanent loss and injury to First Health's business.

28

WHEREFORE, plaintiff First Health Group Corp. demands judgment in its favor and against defendants David W. Norton and National Prescription Administrators, Inc. as follows:

a.    ordering that defendants David W. Norton and National Prescription Administrators, Inc. shall not disclose or use any confidential and proprietary business information that is owned by First Health Group Corp. pertaining to, among other things, First Health Group Corp.'s computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques, as well as information regarding First Health Group Corp.'s past, present, and prospective clients including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, and information regarding their particular needs and requirements, and the Commonwealth of Pennsylvania Department of Aging's confidential information;

b.    ordering that defendant David W. Norton shall not, either in his individual capacity or on behalf of any other person or business entity, directly or indirectly, call upon, solicit or divert (i) any customer to whom First Health has provided services within one year prior to David W. Norton's termination as a First Health Group Corp. employee including, but not limited to, the Commonwealth of Pennsylvania Department of Aging, or (ii) any prospective customer to whom First Health sought to provide services within one year prior to David W. Norton's termination as a First

Health Group Corp. employee and about which David W, Norton has

knowledge and was involved in such solicitation;

c.  ordering that defendant David W. Norton shall not, directly or indirectly,

solicit or hire any person who is currently or was an employee of First

Health at any time within one year prior to David W. Norton's termination

as a First Health Group Corp. employee;

d.  ordering that defendants David W. Norton and National Prescription

Administrators, Inc. shall cease and desist all conduct directed to an

unlawful and improper interference with plaintiff First Health Group

Corp.'s prospective contractual relation with the Commonwealth of

Pennsylvania Department of Aging pertaining to the PACE Program

contract for the period commencing June 1, 2000;

e.  ordering that defendant National Prescription Administrators, Inc. shall not

manage and/or administer the PACE Contract;

f.  ordering that defendant National Prescription Administrators, Inc. shall not

further solicit, divert and/or perform any services with respect to the PACE

Contract, including negotiating and/or entering into a contract to manage

and/or administer the PACE Program;

g.  ordering that defendant National Prescription Administrators, Inc. shall not

further solicit or attempt to hire First Health employees for the PACE

Contract;

h.  ordering that defendant David W. Norton shall not participate or have any

involvement in the pricing, solicitation, management and/or administration

of the PACE Contract, or any current or future pharmacy benefits

administration contract concerning the PACE Program or any similar

program;

i.      ordering that defendant National Prescription Administrators, Inc. shall not

permit Norton to participate in and/or be involved with the pricing,

solicitation, management and/or administration of the PACE Contract, or

any current or future pharmacy benefits administration contract involving

the PACE Program or any similar program;

j.      Awarding to plaintiff First Health Group Corp. compensatory and punitive

damages, costs, interest, attorney's fees and such other relief as the Court

deems just and appropriate.


_____

SCOTT L. VERNICK, ESQUIRE
JEFFREY D. HUTTON, ESQUIRE
FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP
2000 Market Street, 10th Floor
Philadelphia, PA, 19103-3291
(215) 299-2000

Attorneys for Plaintiff
FIRST HEALTH GROUP CORP.

Date:  February 22, 2000

31

Received 02/19/2000
02/19/2000   15:35   3048662172
03/19/00   FRI 10:44 FAX 804 965 7022          FIRST HEALTH

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,
3200 Highland Avenue
Downers Grove, IL 60515-1282,

                                          Plaintiff,      :      CIVIL ACTION NO.

              v.

NATIONAL PRESCRIPTION
ADMINISTRATORS, INC.,
711 Ridgedale Avenue
East Hanover, NJ 07936

        and

DAVID W. NORTON,
1220 Whitby Road
Richmond, VA 23277

                                          Defendants.     :

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I, Teresa R. DiMarco, president of First Health Services Corporation, a wholly-owned
subsidiary of plaintiff, First Health Group Corp., pursuant to 28 U.S.C. § 1746, hereby verify
under penalty of perjury that the averments contained in the foregoing verified complaint are true
and correct to the best of my information, knowledge and belief.

                                                  TERESA R. DIMARCO
                                                  President
                                                  First Health Services Corporation
                                                  4300 Cox Road
                                                  Glen Allen, VA 23060-3358

Date:

# EMPLOYMENT AGREEMENT

This AGREEMENT is made this 1st day of October, 1997 ("Effective Date") by and between First Health Group Corp., a Delaware corporation headquartered in Illinois ("Company"), and David W. Norton ("Employee").

## BACKGROUND

A.    Company desires to employ Employee, and Employee desires to be employed by Company.

B.    For and in consideration of the promises and of the mutual covenants hereinafter set forth, it is hereby agreed by and between the parties as follows:

## AGREEMENT

1.    <u>Employment</u>.  Company hereby agrees to employ Employee to perform the duties set forth in Section 3 hereof ("Employee Services").  Employee hereby accepts employment to perform Employee Services for Employer under the terms and conditions of this Agreement.

2.    <u>Term</u>.  The Initial Term of this Agreement will be for one year beginning on the Effective Date and will automatically renew for consecutive one year terms, unless earlier terminated pursuant to Section 8 hereof.

3.    <u>Duties</u>.    Employee will serve as Vice President Administration and perform all responsibilities and duties as are assigned, or delegated to Employee, by President First Health Services, which responsibilities and duties include but are not limited to the direction and leadership of the Company's First Health Services pharmacy management and benefit programs. Employee will report to and is subject to supervision by President First Health Services or his/her designee.

4.    <u>Time Commitment</u>.  Employee will devote Employee's time, attention and energies to the performance of Employee Services.  Employee may not be associated with, consult, advise, work for, be employed by, contract with, or otherwise devote any of the Employee's time to the pursuit of any other work or business activities which may interfere with the performance of services hereunder.

5.    <u>Compensation and Benefits</u>.    Company will pay the following compensation to Employee in full consideration for performance of Employee Services hereunder in accordance with Company's then-current payroll policies and procedures.

(a)    <u>Salary</u>.  Employee will receive a gross annual salary of $108,108.00.  This salary is payable in accordance with Company's then - current payroll policies and procedures.  The gross annual salary will be subject to annual increases as may by approved by Company.

(b)    <u>Incentive Compensation</u>.  Employee will participate in the First Health Services Incentive Plan which will be based on targets established on an annual basis by Company, in its sole discretion.  The 1997, 1998 and 1999 Incentive Plans are attached hereto as Exhibits A, B, and C respectively.

(c)    Expenses.    ████ mpany will reimburse Employee for all reasonable and necessary expenses incurred by Employee in connection with the performance of █████ployee Services upon submission by Employee of expense reports with substantiating vouchers, in accordance with the Company's then current expense reimbursement policy.

(d)    Stock Options.    Employee will be awarded the option to purchase a minimum of 3,000 shares of Company common stock, adjusted for any stock splits, set by the Board of Directors of Company in accordance with the Company Stock Option Plan (the "Stock Options"). The awards of the Stock Options are subject to (i) approval of the Board of Directors of Company of the recommendations; and (ii) execution by Employee of the then current Stock Option Agreement.

(e)    Benefits and Flexible Time Off.    Employee shall be entitled to participate in such group life insurance, major medical, and other employee benefit plans (collectively "Benefit Plans") as established by Company in accordance with the applicable terms and conditions of such Benefit Plans, which Benefit Plans may be modified or discontinued by Company at any time; provided, however that Employee shall meet the requirements of the Benefit Plans for participation and in no event, including breach or wrongful termination of this Agreement, shall Employee be entitled to any amount of compensation in lieu of participation, unless otherwise provided by the terms of the Benefit Plan.

Employee shall also be entitled to paid time off in accordance with Company's then current Flexible Time Off (FTO) program. Employee shall accrue such FTO at the rate specified in the FTO program. Flexible Time Off shall be taken with due consideration for the services required of Employee and to the requirements of Company.

6.    Termination.

(a)    Either party may terminate this Agreement at any time following the Initial Term, without cause and without any liability to Company, upon no less than one hundred and twenty (120) day's prior written notice. In such event, Employee, if requested by Company, will continue to render Employee Services and be paid Employee's regular compensation up to the date of termination in accordance with Company's then-current payroll policies and procedures.

(b)    Either party may terminate this Agreement at anytime for cause upon 14 days written notice. "Cause" includes, without limitation, breach of any provision of this Agreement or Employee's failure to adhere to the Company's policies and procedures. If the cause is not cured within the 14 day period, the Agreement may then be terminated by written notice. An opportunity to cure is not required if the party receiving notice of termination has previously been given notice of termination and the opportunity to cure the same or similar cause.

(c)    Company may terminate this Agreement by written notice at anytime (including during the Initial Term) immediately for the following reasons: (i) Death or legal incapacity of Employee; (ii) Employee's conviction of a felony; (iii) willful violation of the Company's policies or standards including without limitation, Corporate Compliance standards, confidentiality and nondisclosure; or (iv) theft or dishonesty.

(d)   Company may terminate at any time (including during the Initial Term) by written notice upon Employee's other incapacity or inability to perform Employee's services for a period of at least 90 consecutive days because of impairment of Employee's physical, or mental health making it impossible or impractical for Employee to perform Employee Services.

7.   Confidentiality.  Employee agrees not to directly or indirectly use or disclose, for the benefit of any person, firm or entity other than Company and its subsidiary companies, the Confidential Business Information of Company.   Confidential Business Information means information or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding Company's past, present and prospective clients and their particular needs and requirements, and their own confidential information.

Upon termination of employment, with or without cause, Employee agrees to return to Company all policy and procedure manuals, records, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in Employee's possession and/or control which relate to (i) the Confidential Business Information of Company, (ii) Employee's employment with Company, or (iii) the business activities or facilities of Company or its past, present, or prospective clients.

8.   Restrictive Covenant.  For a period of one year after termination of employment, with or without cause, Employee will not directly or indirectly, for the purpose of selling services provided or planned by Company at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of Company.   An actual customer, for purposes of this Section, is any customer to whom Company has provided services within one year prior to Employee's termination.   A prospective customer, for purposes of this Section, is any prospective customer to whom Company sought to provide services within one year prior to the date of Employee's termination and Employee has knowledge of and was involved in such solicitation.  For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of Employee's obligation hereunder.

9.   Non-Solicitation of Employees.  Employee further agrees that for a period of one year from the date of Employee's termination, with or without cause, Employee shall not directly or indirectly solicit or hire any person who is currently or was an employee of Company at any time during the twelve months prior to Employee's termination.

10.   Remedies.  In the event Employee breaches or threatens to breach Sections 7, 8 or 9 of this Agreement, Company shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach.  Employee acknowledges that Company's remedy at law is inadequate and that Company will suffer irreparable injury if such conduct is not prohibited.

Employee and Company agree that, because of the difficulty of ascertaining the amount of damages in the event that Employee breaches Section 9 of this Agreement, Company shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave Company's employ.  The parties further

agree that the existence of this remedy will not preclude employer from seeking or receiving injunctive relief.

Employee further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by Employee against Company shall not constitute a defense to the enforcement by Company of either of these paragraphs.

11.  Property Rights.  All discoveries, designs, improvements, ideas, inventions, creations, and works of art, whether or not patentable or subject to copyright, relating to the business of Company or its clients, conceived, developed or made by Employee during employment by Company, either solely or jointly with others (hereafter "Developments") shall automatically become the sole property of Company.  Employee shall immediately disclose to Company all such Developments and shall, without additional compensation, execute all assignments, application or any other documents deemed necessary by Company to perfect Company's rights therein.  These obligations shall continue for a period of one year beyond the termination of employment with respect to Developments conceived, developed or made by Employee during employment with Company.

Company acknowledges and agrees that the provisions of this section shall not apply to inventions for which no equipment, supplies, facility or trade secret information of Company or its clients were used by Employee and which were developed entirely on Employee's own time unless (a) such inventions relate (i) to the business of Company or (ii) to Company's actual or demonstrably anticipated research or development or (b) such inventions result from any work performed by Employee for Company.

12.  Assignments.  Neither party shall have the right or power to assign any rights or duties under this Agreement without the written consent of the other party, provided, however, that Company shall have the right to assign this Agreement without consent pursuant to any corporate reorganization, merger, or other transaction involving a change of control of Company or to any subsidiary company.  Any attempted assignment in breach of this Section 12 shall be void.

13.  Severability.  Each section, paragraph, clause, sub-clause and provision (collectively "Provisions") of this Agreement shall be severable from each other, and if for any reason the paragraph, clause, sub-clause or provision is invalid or unenforceable, such invalidity or unenforceability shall not prejudice or in any way affect the validity or enforceability of any other Provision hereof.

14.  Miscellaneous.

(a)  This Agreement, the schedules and any amendments hereto contain the entire agreement of the parties with respect to the employment of the Employee and supersedes all other understandings, whether written or oral; provided, however, that Employee shall comply with all policies, procedures and other requirements of Company as established in the Colleague Handbook and Corporate Policy Manuals, not inconsistent with this Agreement.

(b)  Failure on the part of either party to insist upon strict compliance by the other with respect to any of the terms, covenants and conditions hereof, shall not be deemed a subsequent waiver of such term, covenant or condition.

(c)   The provisions of any paragraph containing a continuing obligation after termination shall survive such termination whether with or without cause and even if occasioned by Company's breach or wrongful termination.

(d)   This Agreement may not be modified except in writing as signed by the parties; provided, however, that Company may amend or terminate its Benefit Plans, Incentive Plan, Corporate Policies and/or employees' rules and regulations in its sole discretion.

(e)          In the event of litigation under this Agreement, the court shall have discretion to award the prevailing party reasonable attorney's fees.

15.          Governing Law.  It is the intention of the parties hereto that all questions with respect to the construction, formation, and performance of this Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the laws of the State of Illinois.  The parties hereto submit to the jurisdiction and venue of the courts of DuPage County Illinois in respect to any matter or thing arising out of this agreement pursuant hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement in the State of Illinois as of the day and year first above written.

The Company:
First Health Group Corp.

By: _____
Its:  President and
       Chief Executive Officer

Employee:

_____
David W. Norton

d:\home\wastlcry\agrmnts\execmod1.doc

# FOX ⬩ ROTHSCHILD
## O'BRIEN & FRANKEL LLP
### ATTORNEYS AT LAW

2000 MARKET STREET ⬩ PHILADELPHIA, PA 19103-3291
215-299-2000 ⬩ FAX 215-299-2150 ⬩ www.frof.com

Scott L. Vernick
Jeffrey D. Hutton
Direct Dial: (215) 299-2860
Direct Dial: (215) 299-2854
Internet Address: svernick@frof.com
Internet Address: jhutton@frof.com

April 28, 2000

**VIA TELECOPY (717-772-3382) &
VIA FEDERAL EXPRESS
(MONDAY DELIVERY)**

Richard Browdie, Secretary
Commonwealth of Pennsylvania
Department of Aging
Harrisburg, PA 17101-1919

  Re: SUPPLEMENT TO BID PROTEST
    Request For Proposal, No. 1999-001 ("RFP")
    Program Contractor for Pharmaceutical
    Assistance Contract for the Elderly Program ("PACE Program")

Dear Secretary Browdie:

  This letter will serve to supplement the bid protest filed by First Health Services Corporation ("First Health") with respect to the most recent request for proposal to manage and administer the PACE Program (the "PACE Contract"). On or about February 3, 2000, the Pennsylvania Department of Aging ("PDA") notified First Health that, based on the evaluation scores, the award of the PACE Contract would be made to National Prescription Administrators, Inc. ("NPA"). First Health submitted its original bid protest by letter dated February 9, 2000 (the "original bid protest").

ATLANTIC CITY, NJ ⬩ DOYLESTOWN, PA ⬩ EXTON, PA ⬩ LANSDALE, PA ⬩ LAWRENCEVILLE, NJ ⬩ PHILADELPHIA, PA ⬩ SELLERSVILLE, PA ⬩ VOORHEES, NJ

Richard Browdie
April 28, 2000
Page 2

### Introduction

PACE is recognized as the first and most successfully operated pharmacy benefit program for the elderly in the country. Since its inception, First Health and PDA have worked together to administer a program that has gained wide support from the public, the elderly, their doctors and pharmacists, drug manufacturers, and the Pennsylvania General Assembly. First Health has been instrumental in the substantive development of the program by (i) continually enhancing its software systems, such as the implementation of the on-line Point-Of-Sale system, installation of an imaging system, and use of vastly improved reporting capability, (ii) adding new programs like Drug Utilization Review, including new edits that are added weekly, and (iii) facilitating the prompt addition of such collateral programs as the Chronic Renal Disease program, Cystic Fibrosis, Spina Bifida and PKU (a metobolic disorder among children) and a special program for AIDS patients within the Welfare Department.

First Health, in preparing its most recent bid proposal for the PACE Contract, consciously chose not to rely unduly on its status as the incumbent contractor and its longstanding, meaningful relationship with PDA. First Health did not expect that its past successful performance would, by itself, "carry the day". Even though stability and continuity in a social assistance program are important, First Health prepared its bid proposal with the expectation that it would be judged on the merits. To this end, First Health proposed specific enhancements to the PACE Program in the precise areas that PDA had expressed an interest and/or a need (for example, disease state management and web-based information systems for further prescriber and pharmacy drug utilization review enforcement). First Health also proposed to implement these enhancements largely at its own expense, cognizant that it would gain a return later through use of these initiatives with other customers. In doing so, First Health refined its cost proposal and trimmed its profit expectations because of the long-term relationship between First Health and PDA – a relationship that First Health hoped to enjoy well into the future. Stated plainly, First Health sought to provide PDA with more service and capability, and more benefits to PACE cardholders and providers, at a price that significantly increases value for dollars expended.

Despite its confidence in the quality of its bid proposal, First Health did not assume that it would win the PACE Contract. First Health reasonably expected, however, that all of the bidding companies would uphold the standards of integrity that First Health and PDA have demonstrated with respect to prior PACE bids. Unfortunately, both First Health and PDA are victims of unfair play and a disruptive series of events caused by NPA and David W. Norton ("Norton"), the former First Health employee retained by NPA to assist in the preparation and

Richard Browdie
April 28, 2000
Page 3


presentation of NPA's bid proposal to PDA. By their conduct, NPA and Norton have not only compromised the bid process, but also the future well-being of the PACE Program.

Here, First Health will address the contentions set forth in NPA's response of February 18, 2000 ("bid protest response") to First Health's original bid protest. First Health will also expand and clarify the issues raised in its original bid protest. By way of preview, having analyzed, among other items, the bid proposals submitted by NPA to PDA in 1995 and 1999, First Health underscores the following points:

- Norton unlawfully disclosed and/or used First Health's confidential and proprietary business information in preparing NPA's bid proposal so that NPA could do what it had been unable to do before its retention of Norton – submit a seemingly competitive bid proposal for the PACE Contract.

- By initiating contact and interviewing with NPA for the sole purpose of providing consulting for its bid proposal and by leading NPA's oral presentation before PDA, Norton violated the explicit terms of his employment agreement with First Health.

- By proposing to recruit and hire First Health's key management staff and employees, Norton violated the express terms of his employment agreement with First Health, and Norton and NPA engaged in unfair competition. From a competitive standpoint, NPA's proposed plan to raid the entire First Health PACE staff jeopardizes, among other things, the premier position and depth of experience that First Health offers and demonstrates in the area of pharmacy benefits administration.

- NPA's bid proposal is not responsive to the RFP and ignores the specific directives given by PDA.

- NPA's proposal to recruit and hire First Health's PACE staff lacks integrity and fundamental merit. In this regard, NPA's proposal fails to address basic legal and practical realities and, more recently, contemplates an alternative that materially alters any perceived attraction the proposal may have had to PDA.

- NPA knowingly inflated the dollar amounts in its SERB proposal.

FOX • ROTHSCHILD
O'BRIEN & FRANKEL LLP

The physical health of Pennsylvania's elderly population and the continued success of the PACE Program are materially at risk if PDA goes forward and places the program in the hands of NPA. Plainly, the best interests of PDA and the PACE cardholders, providers and pharmacies will be served if the award of the PACE Contract to NPA is vacated. For the reasons more specifically detailed below, NPA should be disqualified from the bidding process and the PACE Contract should be awarded to First Health.

- ### Norton, In Preparing NPA's Bid Proposal, Violated The Terms Of His October 1. 1997 Employment Agreement With First Health

For your convenience, we have enclosed a copy of Norton's October 1, 1997 Employment Agreement (the "Agreement") with First Health. See Exhibit "A". Norton's extensive employment with First Health, and tenure as the Vice President for the PACE Operations and the Senior Vice President of the Pharmacy Business Unit (which included the PACE Program) are outlined in First Health's original bid protest letter. Significantly, Norton developed, prepared and wrote First Health's bid proposals for PACE (including the recent cost proposal submitted to PDA for an extension of the contract) and other pharmacy benefits programs. Norton oversaw numerous aspects of First Health's pharmacy business including, but not limited to, sales and operations, systems development, clinical services and product development. He knew intimately the confidential details of First Health's approach to the PACE Program.

In or around June, 1999, Norton requested to leave his employment with First Health. Contrary to NPA's statements in its bid protest response, Norton voluntarily resigned from First Health -- he was not "laid off" or "fired". The terms of Norton's employment agreement require 120-day notice if either party decides to end the employment relationship prior to the end of its term. See Agreement at Section 6(a). Accordingly, on the basis of terms negotiated and agreed to by Norton and First Health, Norton remained a First Health employee, and received a salary and other benefits through the official date of his employment termination -- October 28, 1999.

- ### The Enforceability Of The Confidentiality And Non-Solicitation Restrictions In The October 1, 1997 Employment Agreement

In mid-November 1999, NPA retained Norton to assist in the preparation of NPA's bid proposal for the PACE Contract. At his April 11, 2000 deposition, Norton revealed that he drafted and/or edited much of NPA's technical proposal as a member of NPA's "red- team" of reviewers, prepared NPA's cost matrix and cost buildup, and approved the ultimate price of NPA's cost proposal. See excerpts of Norton's April 11, 2000 deposition at 99-108, 133-36, attached hereto as Exhibit "B". As a result of the substantial assistance he provided, Norton violated the confidentiality, and the customer and employee non-solicitation provisions of the

Richard Browdie
April 28, 2000
Page 5

Agreement (Sections 7, 8 and 9, respectively).  The terms of these restrictive covenants are
clearly set forth in the Agreement.  See Exhibit "A".  The confidentiality provision precludes
Norton from indefinitely disclosing and/or using First Health's confidential and proprietary
business information.  The customer non-solicitation provision restricts Norton, for one year
after the date of his employment termination, from "directly or indirectly" soliciting an actual or
prospective First Health customer.  The employee non-solicitation provision prohibits Norton
from soliciting or hiring, "directly or indirectly," any First Health employee for a period of one
year after his employment termination.  Before providing precise examples of Norton's
violations, we first discuss why Norton's restrictive covenants are enforceable under applicable
law.[1]

    The question of whether a restrictive covenant is enforceable is a question of law.  See
Corroon & Black of Illinois, Inc. v. Magner, 145 Ill.App.3d 151, 494 N.E.2d 785 (Ill.App. 1
Dist. 1986).  "A postemployment restrictive covenant will be enforced if its terms are
reasonable."  Coady v. Harpo, Inc. 308 Ill.App.3d 153, 719 N.E.2d 244, 250 (Ill.App. 1 Dist.
1999) (quoting Woodfield Group, Inc. v. DeLisle, 295 Ill.App.3d 935, 938, 693 N.E.2d 464
(Ill.App. 1 Dist. 1998)).  "To determine the reasonableness of a restrictive covenant, 'it is
necessary to consider whether enforcement of the covenant will injure the public, whether
enforcement will cause undue hardship to the promisor and whether the restraint imposed by the
covenant is greater than is necessary to protect the interests of the employer'".  Id. (quoting
Tower Oil & Technology Co. v. Buckley, 99 Ill.App.3d 637, 642, 425 N.E.2d 1060 (Ill.App. 1
Dist. 1981)).  The test for a valid restrictive covenant is whether it is reasonably necessary to
protect the employer's legitimate business interests, or to protect the employer from unfair
competition, which is a determination turning upon the unique facts of each case.  See George S.
May Intern. Co., 628 N.E.2d at 653 (citations omitted).  Significantly, postemployment
restrictive covenants "have a social utility in that they protect an employer from the unwarranted
erosion of confidential information".  Id.

    Before deciding whether a restriction is reasonable, "the court must make a threshold
determination: it must find 1) that the covenant is ancillary to a valid employment contract and 2)
that it is supported by adequate consideration."  Applied Micro, Inc. v. SJI Fulfillment, Inc., 941
F. Supp. 750, 753 (N.D.Ill. 1996) (citing Abel v. Fox, 274 Ill.App.3d 811, 813, 654 N.E.2d 591,
593 (Ill.App. 4 Dist. 1995) and Creative Entertainment, Inc. v. Lorenz, 265 Ill.App.3d 343, 346,

---

[1] Section 15 of the Agreement, entitled, "Governing Law", provides that "[I]t is the intention of the parties hereto
[First Health and Norton] that all questions with respect to the construction, formation and performance of this
Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the laws of the
State of Illinois."  As a result, First Health will address Illinois law pertaining to the enforceability of restrictive
covenants.  The law of Illinois and Pennsylvania, it should be noted, is substantially the same with respect to the
issues presented in this matter.

Richard Browdie
April 28, 2000
Page 6

638 N.E.2d 217, 219 (Ill.App. 1 Dist. 1994)) (enforcing non-competition covenant). The confidentiality and non-solicitation restrictions in this case are ancillary to Norton's Agreement and an integral part of the employment relationship, without which First Health would not have hired Norton. In exchange for the confidentiality and non-solicitation provisions, First Health hired Norton and provided him with a meaningful compensation package. When First Health was acquired by a new parent entity in 1997, Norton was retained in his position, executed the new Agreement and, in turn, received new benefits such as participation in the parent company's stock option incentive plan. Such consideration is clearly adequate to render the restrictions enforceable. See Pepsico, Inc., 54 F.3d at 1271-72 (confidentiality agreement in employment contract enforceable when supported by valuable consideration) (citations omitted).

As a matter of law, the confidentiality restriction placed on Norton in the Agreement is reasonable. First Health does not seek to restrain the course of Norton's career after his departure. He is free to choose the nature, geographic location and timing of his employment. The confidentiality restriction merely precludes Norton from disseminating confidential and proprietary business information that he obtained or learned during his employment at First Health, or from assuming responsibilities or providing services to a new employer that will inevitably lead him to disclose and/or use such information. Such a restriction is, as a matter of law, reasonable under the circumstances of this case due to the sensitive nature of the information as described below.

The fact that the confidentiality restriction in this case does not have a time or geographic limitation does not render it invalid. Section 1065/8(b)(1) of the Illinois Trade Secrets Act ("ITSA") provides: "[A] contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographic limitation on the duty". 765 ILCS § 1065/8(b); see also Coady, 719 N.E.2d at 250 (court enjoins former employee's violation of confidentiality clause noting that "a confidentiality agreement will not be deemed unenforceable for lack of durational or geographic limitations where trade secrets and confidential information are involved") (citing Pepsico, Inc., 54 F.3d at 1272 n. 10).

Further, the Agreement's confidentiality restriction is tailored to protect First Health's legitimate business interests. The restriction is designed to safeguard First Health's substantial investment in the development, preparation and implementation of pricing, costs, marketing plans and strategies, and bid proposals for pharmacy benefit programs, such as the PACE Program, as well as First Health's storehouse of knowledge pertaining to the particular needs and requirements of PDA with respect to that program. With its knowledge of First Health's business strategies and practices, NPA will be able to do what it has done with respect to the PACE Contract -- anticipate the direction of First Health's pricing and marketing as to future proposals for pharmacy benefit administration contracts. In view of the unlawful conduct by Norton and NPA to date, First Health runs the substantial risk of losing future contract bids.

FOX • ROTHSCHILD
O'BRIEN & FRANKEL LLP

Richard Browdie
April 28, 2000
Page 7

The non-solicitation restrictions are also reasonably limited in time and scope. Section 8 prohibits Norton from soliciting or diverting, directly or indirectly, First Health's actual or prospective customers for one year. "Actual customer" is defined as "any customer to whom Company [First Health] has provided services within one year prior to Employee's termination". See Agreement at Section 8. PDA, for whom First Health is currently providing services under the PACE Program and has done so since 1983, falls within this definition. "Prospective customer" is defined as "any prospective customer to whom Company [First Health] sought to provide services within one year prior to the date of Employee's termination and Employee has knowledge of and was involved in such solicitation". Id. Under Section 9, Norton is prohibited, for one year from the date of his termination, from "solicit[ing] or hir[ing] any person who is currently or was an employee of Company [First Health] at any time during the twelve months prior to Employee's termination". Id. at Section 9.

The one-year duration of the restrictions on soliciting customers and employees is plainly reasonable. First Health invested considerable time, resources and expense to acquire and maintain customers, such as PDA, who have pharmacy assistance programs. Similarly, First Health has spent seventeen years dedicating appropriate resources to train its employees with respect to the management and administration of the PACE Program. Under these circumstances, the one year limitation in Sections 8 and 9 of the Agreement provides First Health with a reasonable period of time to protect its investment and position in the market. See e.g., Midwest Television, Inc. v. Oloffson, 298 Ill.App.3d 548, 699 N.E.2d 230 (Ill.App. 3 Dist. 1998) (upholding one year term for non-competition agreement); Millard Maintenance Service Co. v. Bernero, 207 Ill.App.3d 736, 566 N.E.2d 379 (Ill.App. 1 Dist. 1990) (two-year time restriction in non-competition covenant reasonable).

The customer non-solicitation provision is also reasonable because it only restricts Norton from soliciting customers to whom First Health provided services within one year before Norton's termination date, and customers to whom First Health sought to provide services, and about whom Norton had knowledge and was involved in the solicitation. As a result, the restriction is carefully designed to protect First Health's legitimate business interests, and its ability to maintain and expand its customer base, without the risk of Norton diverting First Health's existing and prospective customers. Similarly, the restriction on not soliciting employees serves First Health's legitimate business interest of preserving a work force that it has carefully trained for its operations, without the risk that Norton will attempt to usurp these employees for the benefit of himself or a competitor.

For these reasons, the confidentiality and non-solicitation provisions of the Agreement are, as a matter of law, valid and enforceable. More important, First Health believes that, as a

Richard Browdie
April 28, 2000
Page 8

result of his unlawful conduct to date, the United States District Court for the Middle District of Pennsylvania will prevent Norton from being involved in the PACE Program with NPA.

● **Norton Has Violated The Confidentiality Restriction**

     Norton, as a result of his employment at First Health, was privy to, and gained an intimate working knowledge of First Health's confidential and proprietary business information pertaining to, among other things, pricing, costs, marketing plans and strategies, and the formulation and preparation of successful bid proposals with respect to the PACE Program, as well as PDA's particular needs and requirements for that program.

     Significantly, NPA admits that it knew of Norton's Agreement with First Health and, in particular, the confidentiality and customer non-solicitation clauses that Norton was bound to honor.[2]  Still, NPA retained Norton for the specific purpose of assisting NPA in the preparation of NPA's bid proposal for the PACE Contract.  During the process of developing NPA's bid proposal, Norton disclosed and/or used First Health confidential and proprietary business information that enabled NPA to submit a successful bid proposal when it had been unable to do so in 1990 and 1995, particularly in terms of its technical responses, understanding PDA's requirements, and pricing and cost strategies.

     NPA's bid protest response incorrectly argues that First Health has no proprietary interest because any information used in the preparation of its bid proposal was either already in the "public domain" or constitutes property belonging to the PDA under Article VI of the current PACE contract.  NPA mischaracterizes, however, First Health's claim that NPA misappropriated its confidential and proprietary business information.  First Health does not dispute that the basic components (for example, hardware and software systems) of the PACE Program are either owned by PDA or are in the "public domain".  Instead, the confidential and proprietary business information at issue pertains to non-public information that goes beyond the PACE Program's basic components and extends to those items (1) that First Health highlights, emphasizes and prioritizes (or does not) when it ties those basic components together in order to manage and administer effectively the PACE Program, (2) the specific requirements, preferences and needs of PDA for the program, and (3) First Health's marketing and pricing strategies.  Such information is <u>not</u> in the "public domain", nor is it information that comes within the scope of Article VI of the current PACE contract.  To the contrary, all this type of information is First Health's confidential and proprietary business information.

---

[2] NPA's admission is found in paragraph 79 of its amended answer to the verified complaint of First Health Group Corp. filed in the proceedings captioned, <u>First Health Group Corp. v. National Prescription Administrators, Inc. and David W. Norton</u>, No. 1:00-CV-312, United States District Court for the Middle District of Pennsylvania.

FOX ● ROTHSCHILD
O'BRIEN & FRANKEL LLP

Richard Browdie
April 28, 2000
Page 9


First Health has determined that Norton and NPA unlawfully and improperly disclosed and used First Health's confidential and proprietary business information in its bid proposal for the PACE Contract. Among other things, by purporting to identify PDA's priorities for the PACE Program and trading on First Health's proprietary method of PACE management and administration, Norton and NPA have attempted to cover NPA's bid proposal with a veneer of credibility and operational experience that is readily transparent, as well as manufactured. The wrongful use and disclosure of First Health's confidential and proprietary business information by Norton and NPA includes, but is not limited to, the following:

1.    First Health's business relationship with Paragon, Inc., and the fact that Paragon provided First Health with consulting services and software that supports the integration of document imaging with respect to the PACE Program. More specifically, NPA's reference to Paragon, Inc. falsely suggests that NPA understands the role that imaging plays in cardholder eligibility determinations.

2.    First Health's pricing of takeover costs associated with a different contract on which First Health successfully bid; NPA and Norton used a similar estimate (less than one-half of NPA's takeover cost bid in its 1995 proposal) of takeover costs in NPA's bid proposal for the PACE Contract. This estimate was dramatically different than any of NPA's prior takeover bids to PACE and quite similar to one recently proposed by First Health elsewhere in which Norton was intimately involved.

3.    First Health's employee salary and cost structure, and use of recruiting incentives as a takeover strategy.

4.    First Health's business relationships with certain switch vendors pertaining to the claims processing system.

5.    First Health's use of PC-SAS as part of its SAS analysis approach.

6.    First Health's emphasis and prioritizing of a communication tracking system for managing incoming provider and cardholder inquiries.

7.    First Health's emphasis and prioritizing of on-line status reporting.

Richard Browdie
April 28, 2000
Page 10

8.     First Health's marketing strategy of providing a clinical focus,
       and emphasis on meeting and exceeding the PDA's
       requirements in the "management summary" of a PACE
       bid proposal.

9.     PDA's preference that a bid proposal emphasize
       continuing the existing program without disruption, while
       implementing enhancements and improvements to the
       PACE Program.

10.    PDA's preference that a bid proposal address the
       imaging system within the takeover work plan.

11.    PDA's preference that a subcontractor not be engaged
       to undertake the task of provider training.

12.    PDA's preference that the project director and/or other
       clinical staff attend provider training sessions with the
       provider relations manager.

13.    PDA's preference that all cardholder issues be thoroughly
       addressed in bid proposals.

As articulated above, First Health's confidential and proprietary business information constitutes "trade secrets", pursuant to 765 ILCS § 1065/2(b), because it derives economic value, actual or potential, from not being generally known to other persons, such as First Health's competitors, who can obtain economic benefit from their disclosure or use. All of Norton's knowledge of the above was acquired in the course of his employment with First Health. Moreover, such information is the subject of efforts by First Health that are reasonable under the circumstances to maintain their secrecy including, but not limited to, requiring its employees to execute employment agreements that contain clear and precise obligations of confidentiality.

Norton, in preparing NPA's bid proposal, without the express or implied consent of First Health and with knowledge that he was under a duty to maintain confidentiality, disclosed to NPA and/or used First Health's confidential and proprietary business information as outlined above – all for the benefit of NPA and to the detriment of First Health. NPA knew or had reason to know that, by retaining Norton, its bid proposal might likely incorporate First Health's trade secrets. After all, NPA hired Norton specifically to assist NPA prepare and submit a bid proposal that would compete with the bid proposal submitted by First Health. Not

Richard Browdie
April 28, 2000
Page 11

coincidentally, it is only _after_ NPA retained Norton that it was able, for the first time, to submit a successful bid for the PACE contract.[3]

This type of behavior by NPA is considered "unfair competition". Under Illinois law (and, for that matter, Pennsylvania law), a party may be held liable for the misappropriation of a trade secret as a consequence of hiring a competitor's employee and placing that employee in a position that would result in the inevitable disclosure or use of the trade secret. See Pepsico, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1997) (applying Illinois law) (upholding issuance of injunction in favor of former employer and against competitor and former employee based on inevitable disclosure doctrine); Air Products and Chemicals, Inc. v. Johnson, 442 A.2d 1114 (Pa.Super. 1981) (applying Pennsylvania law) (same). By hiring Norton, a former officer of First Health and PACE Program "officer-in-charge" (who developed, prepared and wrote numerous First Health bid proposals for the PACE contract and other pharmacy benefits programs) for the specific purpose of preparing NPA's bid proposal for the PACE Contract, and by engaging the services of Hofheimer, NPA created a situation in which the disclosure and use of First Health's confidential and proprietary business information was inevitable. By simply "setting the stage" for inevitable disclosure to occur, NPA engaged in unfair competition. Indeed, as outlined above, Norton, in assisting NPA in the preparation of its bid proposal for the PACE Contract, unlawfully and improperly disclosed and used First Health's confidential and proprietary business information.

In light of Norton's unlawful disclosure and use of First Health's confidential and proprietary business information, NPA's bid proposal for the PACE Contract lacks the essential integrity that PDA has always properly demanded of its bidders. A fundamental aspect of doing business in our society – maintaining the confidential and proprietary business information of one's employer – has been degraded in favor of unfair competition. PDA can remedy this degradation and restore the integrity of the bidding process if it vacates its award of the PACE Contract to NPA and awards the contract to First Health.

- ### Norton Has Violated The Customer Non-Solicitation Restriction

The limited "exception" under the Agreement's customer non-solicitation restriction that states, "[f]or purposes of this Section, responding to an _unsolicited request_ for proposal by a customer or prospective customer which is a government agency or government contractor will

---

[3] In addition to retaining the consulting services of Norton, NPA also engaged former First Health employee Richard Hofheimer ("Hofheimer"), who had prior experience in preparing bid proposals on behalf of First Health for pharmacy benefit programs including the PACE Program. Hofheimer's PACE experience is outlined in First Health's original bid protest. Norton and Hofheimer worked together in assisting NPA's preparation of its bid proposal for the PACE Contract.

Richard Browdie
April 28, 2000
Page 12

not constitute a violation of [Norton's] obligation hereunder", does not insulate Norton and NPA
from liability. See Agreement at Section 8 (emphasis added). With respect to NPA's solicitation
of the PACE Contract, this limited exception simply does not permit the kind and extent of
activity engaged in by Norton. First, the exception is limited to unsolicited requests. While
Norton may not have solicited a request for proposal from PDA, on his own initiative, he
specifically approached NPA in November 1999 for the precise purpose of working on its bid
proposal. See Exhibit "B" at 88-97. Second, in view of the fact that Section 8 does not permit
Norton to "call upon" existing and prospective customers of First Health, Norton's lead role at
the February 2, 2000 oral presentation on behalf of NPA violated the Agreement.

- ### Norton Has Violated The Employee Non-Solicitation Restriction

The unlawful and improper conduct of Norton and NPA includes a violation of the
employee non-solicitation restriction in the Agreement. Norton, on February 2, 2000, acting on
behalf of NPA, unlawfully solicited Robert Howells, the current First Health employee in charge
of the PACE Program. This solicitation occurred within one-year of the October 28, 1999 date
of Norton's employment termination and, therefore, Norton violated Section 9 of the Agreement.

Norton engaged in an indirect solicitation of First Health's employees by developing a
bid proposal for NPA that boasts the use of multiple incentives in the recruitment and hiring of
First Health's PACE staff as a signature feature. Moreover, NPA cannot recruit and hire First
Health's existing PACE Program staff because it is unlawful conduct for NPA to "raid" an entire
office or program of employees from First Health. As discussed below, the law does not
sanction such conduct. Any past or future attempt by Norton to recruit and hire First Health's
PACE employees on NPA's behalf not only violates the employee non-solicitation provision set
forth in the Agreement, but also gives rise to a claim for unfair competition. First Health has
every interest in protecting its PACE employees because, collectively, these employees represent
concentrated intellectual capital that allow First Health to be competitive in the marketplace.

Finally, in its bid protest response, NPA offers not to use Norton in the hiring process for
one-year. It is evident, however, that Norton would at least indirectly influence the hiring
process and decisions by virtue of his presence at NPA because of his prior knowledge and
experience with the First Health employees that NPA proposes to recruit for the PACE Program.
NPA's offer amounts to nothing more than an unworkable promise.

- ### NPA's Proposal To Recruit And Hire First Health's Current PACE Staff Lacks Integrity And Merit

NPA's bid proposal is replete with "representations" that NPA intends to solicit and hire
First Health's existing key management staff and all other employees who work on the PACE

Richard Browdie
April 28, 2000
Page 13

Program.  First, despite the pivotal part this "plan" plays in NPA's bid proposal, NPA is prepared to do an "about face" and quickly abandon this approach.  In a telephone call with Teresa R. DiMarco, President of First Health, Richard Ullman, President of NPA, stated that NPA would agree not use Norton, or any current or former First Health employees, to manage and administer the PACE Program.  In part, NPA was successful because it proposed to hire Norton and the current First Health PACE staff, and yet, NPA's top officer is suddenly willing to reject this aspect of NPA's bid.  Such a dramatic change in position by NPA is plainly inconsistent with its bid proposal and undermines its overall integrity.

Second, and most important, NPA's proposed plan to recruit and hire First Health's existing PACE Program staff is unlawful.  The Supreme Court of Pennsylvania, in Morgan's Home Equipment Corp. v. Martucci, 136 A.2d 838 (Pa. 1957), addressed the concept of unlawful enticement of a competitor's employees as follows:

> The systemic inducing of employes to leave their present employment and take work with another is unlawful when the purpose of such enticement is to cripple and destroy an integral part of competitive business organization rather than to obtain the services of particularly gifted or skilled employes.  So also, when the inducement is made for the purpose of having the employes commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers, the injured employer is entitled to protection.

Id. at 633-34 (citations omitted).  See also ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc., 90 Ill.App.3d 817, 413 N.E.2d 1299 (Ill.App. 1 Dist. 1980) (applying Illinois law) (affirming grant of injunction against former officers who left plaintiff corporation and enticed thirty employees to leave and join competitor); RUDOLF CALLMAN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 9.03 (4th ed. 1999) (citing cases from various jurisdictions).  Here, on a wholesale basis, NPA proposes to solicit First Health's entire PACE staff and, as a result, "gut" a key portion of First Health's personnel in the area of the management and administration of pharmacy benefit programs.

Third, NPA's proposal for the takeover phase is not workable to the extent that it is based on the use of First Health's staff on nights and weekends to accomplish the transition.  First Health's employees would already have additional turnover responsibilities to perform for First Health in addition to their regular duties.  As a result, NPA proposes a transition that lacks practical sense and is burdensome to PACE and First Health.  Such a transition is also not practical from a management standpoint because there would be no realistic and clear accountability as between First Health and NPA with regard to their respective turnover and

Richard Browdie
April 28, 2000
Page 14

takeover obligations. In short, NPA's bid proposal puts both the operations and transition of
PACE at risk.

Fourth, First Health has invested considerable resources in its PACE employees and their
expertise and, if the PACE Contract ultimately goes to NPA, First Health will deploy these
employees in other capacities, especially those employees in management and other key
positions. Other states are considering drug programs for the elderly similar to PACE, and have
contacted First Health because of its level of expertise. First Health will need the experience of
its PACE employees for these other potential (as well as existing) programs, and will seek to
maintain its staff if it loses the PACE Contract.

Fifth, many of First Health's current PACE employees have expressed their disapproval
of Norton, and the manner in which he and NPA have conducted themselves with respect to the
recent bid for the PACE Contract. First Health's PACE employees are not "equipment" and
cannot be assumed to simply move over to NPA along with the physical assets. These
employees are loyal to First Health and resent NPA's presumption that NPA will "lure" them to
that company. Many of First Health's personnel have stated that they do not want to work for
NPA. In fact, First Health's key managerial personnel each has over ten (10) years with the
company, and has requested that they be allowed to remain with First Health and re-assigned to
other positions in the event the PACE Program is lost. First Health is prepared to fulfill their
requests and retain them. As a result, NPA's ability to induce First Health employees to leave
and work for NPA is in considerable doubt.

Finally, NPA argues that First Health has waived its right to protest NPA's attempt to
hire First Health's employees because the PDA suggested in its answer to the bidders' question
no. 136(b) that it would react favorably to a new contractor hiring "many" of First Health's
current PACE staff, and First Health did not file its bid protest within seven (7) days after that
suggestion was made. This argument is without merit. Given the language in the Chapter 58 of
the Procurement Handbook, entitled, "Bid Protests", Section B.1., the seven-day time frame for a
protest proceeding only begins after First Health knew or should have known that NPA's bid
proposal revealed a plan to recruit and hire First Health's PACE staff, and the scope of that plan.
First Health did not know of NPA's "plan" until First Health was advised of the bid outcome on
February 3, 2000. On that date, First Health was told orally, for the first time, that NPA
proposed Norton as the officer-in-charge of the PACE Program and that NPA proposed
recruiting and hiring First Health's entire PACE staff. Certainly, PDA's answer to bidders'
question no. 136(b) did not place First Health on notice that NPA's bid proposal would threaten
the wholesale "gutting" of First Health's PACE staff. In fact, it was only after NPA submitted
its bid proposal and First Health received a copy of it that First Health was on notice as to the
scope of the unlawful conduct contemplated by Norton and NPA. Further, nothing in PDA's
answers to the bidders' questions suggests that either PDA or First Health would acquiesce in the

Richard Browdie
April 28, 2000
Page 15

wholesale raiding of First Health" current PACE staff. Put differently, PDA's answers to the bidders' questions assumes that bidders would act lawfully. As a result, First Health's February 10, 2000 bid protest was filed in a timely manner.

- **NPA Improperly Included "Pass –Through" Costs In Its SERB Pricing**

In its SERB proposal, NPA unlawfully and improperly included certain reimbursement amounts, such as postage and materials, as part of the dollar value of a contract to one SERB, LWN Enterprises. In fact, NPA overstated the dollar value of the contract to LWN Enterprises by $4,123,501.00; the actual dollar value of the contract to LWN Enterprises is only $1,487,342.00. First Health brought these facts to the attention of the Department of General Services, Bureau of Contract Administration and Business Development ("BCABD"). For its part, BCABD re-scored NPA's SERB proposal. More important, even though NPA still received a greater SERB score than First Health, NPA threatened the overall integrity of the bidding process by its willingness and attempt to submit inflated financial data. Put simply, NPA's actions tarnish and undermine the important social policy goals of the SERB program. These circumstances alone are sufficient to disqualify NPA's SERB, if not entire, bid.

- **The Technical Scores Of The First Health And NPA Bids Should Not Have Been Close Because NPA's Technical Proposal Was Non-Responsive And Revealed NPA's Lack Of Understanding Of The PACE Program**

NPA received a technical score that was only four (4) percent less than the score awarded to First Health. In our view, NPA should not have received such a comparatively high technical score because NPA's technical proposal contains numerous misstatements of fact about how the PACE Program currently operates and, even more significantly, is often non-responsive to the requirements set forth by PDA in both the RFP and the "question and answer" portion of October, 25, 1999 bidders' conference packet. The following is a list of the more severe examples of NPA's non-responsiveness to PDA and lack of understanding of the PACE Program:

    1.    PDA clearly and specifically directed that the contractor requirements in the RFP are applicable to each program, and that bidders were to respond for each program by providing a reference to the applicable components of the RFP. Instead, NPA only mentions the ancillary programs sporadically. For example, under Section IV-3 TII-2 at 55, ¶ 2 of NPA's bid proposal, no reference is made to other programs (other than PACE or PACENET) and their special requirements. PDA should interpret the omission of ancillary programs to the various components as non-responsive.

Richard Browdie
April 28, 2000
Page 16

2.    RFP performance standards require that new enrollments (providers)
be processed (i.e., the enrollment process be completed and correct)
within two (2) working days.  NPA, in Section IV-3 TII-2 at 59,
¶ 2, states that it will identify incomplete or "in process" enrollments
within two (2) days.  This statement is non-responsive to the RFP's
requirements.

3.    In the RFP, at Part IV-3 TII-2, at ¶ 2, entitled "Provider Relations
Enrollment Activities" PDA stated that all providers would be
re-enrolled in the fall of 2000, 2002 and 2004.  In PDA's answer
to Question 89 in the bidders' conference packet, however, PDA
corrected itself by stating its intent to initiate the re-enrollment
process in the fall of the year following the Commonwealth's Bureau
of Occupational and Professional Licensing renewal of pharmacy
permits, which is in odd numbered years – 2001, 2003, 2005, etc.
NPA, in its bid proposal at Section IV-3 TII-2 at 60, ¶ 4, fails to
make this correction.  Moreover, NPA fails to address separate
provider enrollment forms for the various ancillary programs.
These failures render NPA's bid proposal non-responsive.

4.    NPA's bid proposal does not, as required by the RFP, reference
producing provider manuals and bulletins for the ancillary programs
and, therefore, NPA has not agreed to produce manuals and bulletins for
SBBP, CRDP, MSUD, PKU and Spina Bifida.  See IV-3 TII-3 at 78,
no. 4 at ¶¶ 2, 3.  Only in paragraph 4 does NPA state that it will send
messages and notices to ancillary program providers.  As a result,
NPA's bid proposal is non-responsive.

5.    NPA fails to identify/explain/reference the existence of
program-specific Remittance Advices, as required in the question
and answer section of the bidders conference packet at 1, 2.  In
addition, NPA improperly views the paper Remittance Advices as
an "option" (see id. at 94, no. 3 ("If any of our Pharmacies want to
receive a payment remittance advice separately from the electronic
payment, four options are available.").  Paper Remittance Advices
are required.  NPA's response is non-responsive and non-compliant.

6.    NPA, id. at 103-04, in addressing the Claims Payment System and,
more specifically, the claims editing that takes place once a provider

FOX • ROTHSCHILD
O'BRIEN & FRANKEL LLP

Richard Browdie
April 28, 2000
Page 17

transmits a claim through POCAS to the host computer, mentions
the retrieval of claim pricing components (co-payments and
dispensing fees) from the PACE/PACENET pricing master file, but
fails to reference the ancillary programs. NPA's bid proposal is, as a
result, non-responsive to the RFP.

The items set forth above are only a sampling of the flaws in NPA's technical proposal.
Alarmingly, NPA proposed a call information tracking system (CITS) without advising PDA that
NPA had not yet actually developed the system. See excerpts from April 13, 2000 deposition of
Peter T. Greiger at 124, and excerpt from April 20, 2000 deposition of Thomas Snedden at 86,
attached hereto as Exhibit "C". In contrast, First Health's technical proposal, according to the
statements made by Mr. Snedden during the PDA debriefing, was first-rate. As a result, NPA
should not have received a technical score that was within four (4) percentage points of First
Health's technical score in light of the glaring deficiencies in NPA's technical proposal. Instead,
NPA's technical score should have been significantly less than First Health's technical score.

### Conclusion

PDA and First Health have been "blind-sided" by the conduct of Norton and NPA, who
have disrupted the bid process and award on a contract to manage and administer a first-rate and
highly valued pharmacy benefits program in this Commonwealth. The bid for the PACE
Contract has been jeopardized and tarnished by Norton and NPA's unlawful misappropriation of
First Health's confidential and proprietary business information, Norton's violations of the non-
solicitation restrictions in his employment agreement with First Health, and NPA's willingness
to engage in unfair competition. As carefully detailed above, the unlawful conduct of Norton
and NPA has tainted each section of NPA's bid proposal – technical, cost and SERB. The
unlawful conduct of Norton and NPA is the subject of the injunction proceedings in the United
States District Court for the Middle District of Pennsylvania that First Health intends to
prosecute fully. For its part, as provided for in the procurement rules, PDA should not sanction
such conduct; it should disqualify NPA.

Moreover, NPA's bid proposal is non-responsive to the RFP and demonstrates that NPA
does not sufficiently understand how the program operates. Further, NPA erroneously
represented that it is capable of taking over and successfully operating the PACE Program. First
Health does not believe that the federal court proceedings will permit Norton to participate in the
management and administration of the program, or NPA's wholesale attempt to hire First
Health's current PACE staff. In short, NPA has put at risk fundamental components of the
PACE Program – eligibility determinations, timely filling of prescriptions and prompt provider
reimbursements. Such disarray is not in the interests of PDA and PACE, and should be avoided.

FOX · ROTHSCHILD
O'BRIEN & FRANKEL LLP

Richard Browdie
April 28, 2000
Page 18


For the reasons set forth above, First Health requests that the award of the PACE Contract to NPA be vacated, and that the PACE Contract be awarded to First Health.

First Health reserves all rights to appeal PDA's decision pursuant to applicable law.


Very truly yours,

Scott L. Vernick
Jeffrey D. Hutton


:jdh
Enclosures

cc:    James G. Council, Esquire, First Health Services Corporation (via Federal Express)
       Teresa R. DiMarco, President, First Health Services Corporation (via Federal Express)

FOX • ROTHSCHILD
O'BRIEN & FRANKEL LLP

$E_f$ $^A$

# EMPLOYMENT AGREEMENT

This AGREEMENT is made this 1st day of October, 1997 ('Effective Date') by and between First Health Group Corp., a Delaware corporation headquartered in Illinois ('Company'), and David W. Norton ("Employee").

## BACKGROUND

A.    Company desires to employ Employee, and Employee desires to be employed by Company.

B.    For and in consideration of the promises and of the mutual covenants hereinafter set forth, it is hereby agreed by and between the parties as follows:

## AGREEMENT

1.  Employment.  Company hereby agrees to employ Employee to perform the duties set forth in Section 3 hereof ('Employee Services').  Employee hereby accepts employment to perform Employee Services for Employer under the terms and conditions of this Agreement.

2.  Term.  The Initial Term of this Agreement will be for one year beginning on the Effective Date and will automatically renew for consecutive one year terms, unless earlier terminated pursuant to Section 8 hereof.

3.  Duties.  Employee will serve as Vice President Administration and perform all responsibilities and duties as are assigned, or delegated to Employee, by President First Health Services, which responsibilities and duties include but are not limited to the direction and leadership of the Company's First Health Services pharmacy management and benefit programs. Employee will report to and is subject to supervision by President First Health Services or his/her designee.

4.  Time Commitment.  Employee will devote Employee's time, attention and energies to the performance of Employee Services.  Employee may not be associated with, consult, advise, work for, be employed by, contract with, or otherwise devote any of the Employee's time to the pursuit of any other work or business activities which may interfere with the performance of services hereunder.

5.  Compensation and Benefits.  Company will pay the following compensation to Employee in full consideration for performance of Employee Services hereunder in accordance with Company's then-current payroll policies and procedures.

    (a)  Salary.  Employee will receive a gross annual salary of $108,108.00.  This salary is payable in accordance with Company's then - current payroll policies and procedures.  The gross annual salary will be subject to annual increases as may by approved by Company.

    (b)  Incentive Compensation.  Employee will participate in the First Health Services Incentive Plan which will be based on targets established on an annual basis by Company, in its sole discretion.  The 1997, 1998 and 1999 Incentive Plans are attached hereto as Exhibits A, B, and C respectively.

(c)  Expenses.  Company will reimburse Employee for all reasonable and necessary expenses incurred by Employee in connection with the performance of Employee Services upon submission by Employee of expense reports with substantiating vouchers, in accordance with the Company's then current expense reimbursement policy.

(d)  Stock Options.  Employee will be awarded the option to purchase a minimum of 3,000 shares of Company common stock, adjusted for any stock splits, set by the Board of Directors of Company in accordance with the Company Stock Option Plan (the 'Stock Options'). The awards of the Stock Options are subject to (i) approval of the Board of Directors of Company of the recommendations; and (ii) execution by Employee of the then current Stock Option Agreement.

(e)  Benefits and Flexible Time Off.  Employee shall be entitled to participate in such group life insurance, major medical, and other employee benefit plans (collectively 'Benefit Plans') as established by Company in accordance with the applicable terms and conditions of such Benefit Plans, which Benefit Plans may be modified or discontinued by Company at any time; provided, however that Employee shall meet the requirements of the Benefit Plans for participation and in no event, including breach or wrongful termination of this Agreement, shall Employee be entitled to any amount of compensation in lieu of participation, unless otherwise provided by the terms of the Benefit Plan.

Employee shall also be entitled to paid time off in accordance with Company's then current Flexible Time Off (FTO) program.  Employee shall accrue such FTO at the rate specified in the FTO program.  Flexible Time Off shall be taken with due consideration for the services required of Employee and to the requirements of Company.

6.  Termination.

(a)  Either party may terminate this Agreement at any time following the Initial Term, without cause and without any liability to Company, upon no less than one hundred and twenty (120) day's prior written notice.  In such event, Employee, if requested by Company, will continue to render Employee Services and be paid Employee's regular compensation up to the date of termination in accordance with Company's then-current payroll policies and procedures.

(b)  Either party may terminate this Agreement at anytime for cause upon 14 days written notice.  "Cause" includes, without limitation, breach of any provision of this Agreement or Employee's failure to adhere to the Company's policies and procedures.  If the cause is not cured within the 14 day period, the Agreement may then be terminated by written notice.  An opportunity to cure is not required if the party receiving notice of termination has previously been given notice of termination and the opportunity to cure the same or similar cause.

(c)  Company may terminate this Agreement by written notice at anytime (including during the Initial Term) immediately for the following reasons: (i) Death or legal incapacity of Employee; (ii) Employee's conviction of a felony; (iii) willful violation of the Company's policies or standards including without limitation, Corporate Compliance standards, confidentiality and nondisclosure; or (iv) theft or dishonesty.

(d)   Company may terminate at any time (including during the Initial Term) by written notice upon Employee's other incapacity or inability to perform Employee Services for a period of at least 90 consecutive days because of impairment of Employee's physical, or mental health making it impossible or impractical for Employee to perform Employee Services.

7.  Confidentiality.  Employee agrees not to directly or indirectly use or disclose, for the benefit of any person, firm or entity other than Company and its subsidiary companies, the Confidential Business Information of Company.   Confidential Business Information means information or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding Company's past, present and prospective clients and their particular needs and requirements, and their own confidential information.

Upon termination of employment, with or without cause, Employee agrees to return to Company all policy and procedure manuals, records, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in Employee's possession and/or control which relate to (i) the Confidential Business Information of Company, (ii) Employee's employment with Company, or (iii) the business activities or facilities of Company or its past, present, or prospective clients.

8.  Restrictive Covenant.  For a period of one year after termination of employment, with or without cause, Employee will not directly or indirectly, for the purpose of selling services provided or planned by Company at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of Company.   An actual customer, for purposes of this Section, is any customer to whom Company has provided services within one year prior to Employee's termination.   A prospective customer, for purposes of this Section, is any prospective customer to whom Company sought to provide services within one year prior to the date of Employee's termination and Employee has knowledge of and was involved in such solicitation. For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of Employee's obligation hereunder.

9.  Non-Solicitation of Employees.  Employee further agrees that for a period of one year from the date of Employee's termination, with or without cause, Employee shall not directly or indirectly solicit or hire any person who is currently or was an employee of Company at any time during the twelve months prior to Employee's termination.

10.  Remedies.  In the event Employee breaches or threatens to breach Sections 7, 8 or 9 of this Agreement, Company shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach.  Employee acknowledges that Company's remedy at law is inadequate and that Company will suffer irreparable injury if such conduct is not prohibited.

Employee and Company agree that, because of the difficulty of ascertaining the amount of damages in the event that Employee breaches Section 9 of this Agreement, Company shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's annual salary of the employee(s) solicited to leave Company's employ.  The parties further

agree that the existence of this remedy will not preclude employer from seeking or receiving injunctive relief.

Employee further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by Employee against Company shall not constitute a defense to the enforcement by Company of either of these paragraphs.

11. Property Rights. All discoveries, designs, improvements, ideas, inventions, creations, and works of art, whether or not patentable or subject to copyright, relating to the business of Company or its clients, conceived, developed or made by Employee during employment by Company, either solely or jointly with others (hereafter 'Developments') shall automatically become the sole property of Company. Employee shall immediately disclose to Company all such Developments and shall, without additional compensation, execute all assignments, application or any other documents deemed necessary by Company to perfect Company's rights therein. These obligations shall continue for a period of one year beyond the termination of employment with respect to Developments conceived, developed or made by Employee during employment with Company.

Company acknowledges and agrees that the provisions of this section shall not apply to inventions for which no equipment, supplies, facility or trade secret information of Company or its clients were used by Employee and which were developed entirely on Employee's own time unless (a) such inventions relate (i) to the business of Company or (ii) to Company's actual or demonstrably anticipated research or development or (b) such inventions result from any work performed by Employee for Company.

12. Assignments. Neither party shall have the right or power to assign any rights or duties under this Agreement without the written consent of the other party, provided, however, that Company shall have the right to assign this Agreement without consent pursuant to any corporate reorganization, merger, or other transaction involving a change of control of Company or to any subsidiary company. Any attempted assignment in breach of this Section 12 shall be void.

13. Severability. Each section, paragraph, clause, sub-clause and provision (collectively 'Provisions') of this Agreement shall be severable from each other, and if for any reason the paragraph, clause, sub-clause or provision is invalid or unenforceable, such invalidity or unenforceability shall not prejudice or in any way affect the validity or enforceability of any other Provision hereof.

14. Miscellaneous.

(a) This Agreement, the schedules and any amendments hereto contain the entire agreement of the parties with respect to the employment of the Employee and supersedes all other understandings, whether written or oral; provided, however, that Employee shall comply with all policies, procedures and other requirements of Company as established in the Colleague Handbook and Corporate Policy Manuals, not inconsistent with this Agreement.

(b) Failure on the part of either party to insist upon strict compliance by the other with respect to any of the terms, covenants and conditions hereof, shall not be deemed a subsequent waiver of such term, covenant or condition.

(c)    The provisions of any paragraph containing a continuing obligation after termination shall survive such termination whether with or without cause and even if occasioned by Company's breach or wrongful termination.

(d)    This Agreement may not be modified except in writing as signed by the parties; provided, however, that Company may amend or terminate its Benefit Plans, Incentive Plan, Corporate Policies and/or employees' rules and regulations in its sole discretion.

(e)    In the event of litigation under this Agreement, the court shall have discretion to award the prevailing party reasonable attorney's fees.

15.    Governing Law.  It is the intention of the parties hereto that all questions with respect to the construction, formation, and performance of this Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the laws of the State of Illinois.  The parties hereto submit to the jurisdiction and venue of the courts of DuPage County Illinois in respect to any matter or thing arising out of this agreement pursuant hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement in the State of Illinois as of the day and year first above written.

The Company:
First Health Group Corp.

By: _____
Its:  President and
Chief Executive Officer

Employee:

_____
David W. Norton

d:\home\wasikcy\agrmnts\execmod1.doc

### First Health Services Incentive Plan

The incentive plan will be based on meeting business plan targets established on an annual basis. For 1997, the incentive plan will be paid on a pro rata basis to reflect HealthCare COMPARE's ownership of the the company for one half of the plan period. Business plan targets will be set based on EBITDA and will not include corporate allocations.

**Incentive Plan for Dave Norton, Jim Gooding, Pate McCartney, Joe Richardson, Mark Huntley and Jim Council:**

| % of Target | Incentive as a % of Base Salary |
|---|---|
| 115% | 40% |
| 110% | 30% |
| 100% | 20% |
| 90% | 10% |
| 85% | 0% |

Maximum incentive is 40% of base salary. Between target points the incentive % will be interpolated.

EXHIBIT A

## 1998 First Health Services Incentive Plan

The 1998 target will be based on the approved 1998 plan for EBITDA for First Health Services.

There will be no 1998 incentive payout if the 1998 plan is not met.

Dave Norton, Jim Gooding and Pate McCartney's incentive will be based 75% on the 1998 plan for their business unit and 25% on the 1998 plan for First Health Services.

Joe Richardson's incentive will be based 20% on the overall ISS budget, 20% on the 1998 plan for First Health Services, 30% on the plan for Rx and 30% on the plan for FAS.

Mark Huntley and Jim Council's incentive will be based on the 1998 plan for First Health Services.

The following schedule of incentive payout will be applicable:

| % of Target | % of base salary |
|-------------|------------------|
| Target      | 17.5%            |
| 112.5%      | 30.0%            |
| 120.0%      | 40.0%            |

EBITDA will be net of all incentive accruals. Between target points the incentive % will be interpolated.

EXHIBIT B

1

E

```
 1           IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
 3                       *  *  *
 4
    FIRST HEALTH GROUP CORP., :   CIVIL ACTION
 5              Plaintiff,   :
                            :
 6            vs.           :
                            :
 7   NATIONAL PRESCRIPTION   :
     ADMINISTRATORS, INC., and :
 8   DAVID W. NORTON,        :
                  Defendants. :   NO. 1:00-CV-312
 9
10                       *  *  *
11           Tuesday, April 11, 2000
12                       *  *  *
13           Oral deposition of DAVID W. NORTON,
14   taken at the offices of MORGAN LEWIS & BOCKIUS,
15   LLP, One Commerce Square, 417 Walnut Street,
16   Harrisburg, Pennsylvania  17101, beginning at
17   10:00 a.m., before Samuel Goldfarb, a Registered
18   Professional Reporter and an approved reporter of
19   the United States District Court.
20                       *  *  *
21
22           ESQUIRE DEPOSITION SERVICES
           1880 John F. Kennedy Boulevard
23                  15th Floor
           Philadelphia, Pennsylvania  19103
24                 215.988.9191
```

## DAVID W. NORTON

**86**

1  months before when I was networking, looking for
2  jobs.
3    Q.  What specifically did she say or you
4  say about the PACE contract being out for bid and
5  that NPA might bid for it?
6    A.  I don't recall the conversation.  You
7  know, I would guess that -- that PACE came up,
8  that -- that that may be a good person to call.
9  They may be bidding on it.  I don't believe she
10  knew if they were or were not.
11    Q.  Well, the suggestion that NPA might be
12  bidding for it, did that come from you or did it
13  come from Ms. Renda?
14    A.  It would come from me.
15    Q.  It would come from you?
16    A.  Probably.
17    Q.  You suggested to her that NPA might be
18  bidding for it?
19    A.  No, I didn't suggest to her at all.  I
20  asked her, after she told me to call Richard
21  Ullman, that that would be fine because they bid
22  on PACE before.
23       I -- I'm -- I don't know what I said.
24  I don't remember what I said.  You know, I'm

**87**

1  generalizing a conversation that was back in
2  November.  So I don't know really what it was.
3    MR. VERNICK:  Can I have that last part
4  about the six months ago.
5       * * *
6    (Whereupon, the court reporter read
7  back the following:
8    "QUESTION:  No.  I asked Suzanne Renda
9  does she know anybody that needs consulting
10  help, including herself.  And she says, you
11  might try to call Richard Ullman.  She had
12  told me that maybe six months before when I
13  was networking, looking for jobs.")
14       * * *
15    A.  (Continuing) Let me make sure you
16  understand, that's two phone calls.  When I was
17  looking for a job, I called her.  She suggested to
18  call him.  I did not.  I called her the same day
19  that I called Richard, before I called Richard,
20  and that's when she told me to call him again.
21  BY MR. VERNICK:
22    Q.  I see.  So if I understand your
23  testimony correctly, sometime in May of 1999, you
24  spoke with Ms. Renda?

**88**

1    A.  I don't know what month it was.  But it
2  was sometime in the spring or maybe even early
3  summer, sometime around there.
4    Q.  And during the first conversation with
5  Ms. Renda, she suggested that you call Mr. Ullman
6  at NPA.  And at that time, you did not, correct?
7    A.  That's correct.
8    Q.  Why did you not call Mr. Ullman at that
9  point in time; that is, during the earlier period?
10    A.  Because I didn't want to.
11    Q.  Why didn't you want to?
12    A.  I don't know why I didn't want to.  I
13  don't know why I didn't call him.
14    Q.  So why did you call him six months
15  later?
16    A.  Somewhat desperate.
17    Q.  And where was your meeting -- I'm
18  sorry.  The telephone conversation that you had
19  with Mr. Ullman --
20    A.  Uh-hum.
21    Q.  -- on the same day that you spoke for
22  the second time to Ms. Renda --
23    A.  Right.
24    Q.  -- tell me about that conversation, as

**89**

1  best you can, in terms of what you said and what
2  he said, that is Mr. Ullman.
3    A.  I called -- well, he called me back.
4  And he said, oh, you know Suzanne.  And we
5  chit-chatted about Suzanne, this, that and the
6  other, how's she doing, fine, this, that and the
7  other.  And he said they're working on the
8  proposal, as best I can remember now.
9    Q.  I'm only asking for your best
10  recollection.
11    A.  And -- and wanted to know if I could
12  help him with that -- suggested I could help him
13  with that, potentially.  And I agreed with that,
14  yes, I could help him with that because of my role
15  with PACE prior.
16       And he -- he invited me to come up.
17  And basically that's what we talked about.
18    Q.  Did Mr. Ullman say anything else to you
19  in that conversation?
20    A.  Probably we talked a little bit more,
21  but that's the gist of what we talked about.
22    Q.  Now, what did you mean when you said to
23  Mr. Ullman that you could help with the PACE
24  proposal or NPA's PACE proposal because of your

DAVID W. NORTON

90

1  prior role?
2      A.   Because I had experience with PACE,
3  know the program, and, you know, could help him
4  out.
5      Q.   When did you meet with Mr. Ullman?
6      A.   I believe it was either the 16th or
7  17th of November.
8      Q.   Where was that meeting?
9      A.   Their offices in New Jersey.
10     Q.   In East Hanover?
11     A.   Yes.
12     Q.   Who was present at that meeting other
13  than yourself?
14     A.   Allan Zimmerman and then Steve
15  Nicoletos came in.
16     Q.   Who is Mr. Zimmerman?
17     A.   Who is he?
18     Q.   Yes.
19     A.   Oh.
20     Q.   What's his role or position with NPA?
21     A.   He's in charge of, I believe, just
22  about everything there, other than the
23  administrative and staff functions.
24          He's in charge of pharmacy business --

91

1  the pharmacy business.  They've got other
2  businesses besides that.  He has the marketing and
3  sales and operations and whatever.
4      Q.   And what is Mr. Nicoletos' role at
5  NPA?
6      A.   I think he's CFO.
7      Q.   Now, as best you can recall, during the
8  meeting that you had with Mr. Zimmerman and
9  Mr. Ullman, what did those gentlemen say and what
10  did you say?
11     A.   That went on for about -- we were just
12  working on, if I could provide some help for them
13  in writing a proposal, where they were in the
14  proposal at that point in time, and if I could
15  provide some help with that.
16          And generally we agreed that, yes, I
17  could.  And then they had Allan draw up a
18  contract.
19     Q.   During that same meeting?
20     A.   Later that evening, that afternoon.
21     Q.   And what did you say in that meeting
22  about why you could or could not help NPA in the
23  formulation of its bid proposal for the 1999 PACE
24  contract?

92

1      A.   Because I have experience with that --
2  that particular program.  I believe in the
3  program.  I like it.  I'm a good writer, good
4  editor, good strategist.
5      Q.   During that meeting with Mr. Ullman and
6  Mr. Zimmerman, did you detail or outline for those
7  gentlemen your prior experience with the PACE
8  program?
9      A.   Yes.
10     Q.   What exactly did you say?
11     A.   I said that I was at one time an
12  officer in charge of it.  And in my most recent
13  role, I was in charge of all the pharmacy business
14  units.
15     Q.   Did you say anything else about your
16  prior experience with PACE, other than telling
17  them that you had been an officer in charge and
18  that you had been a vice president?
19     A.   You know, familiarity with the program.
20  That, you know, went along with it.
21     Q.   Did you get into a description of what
22  those various positions meant?
23     A.   Probably not detailwise.  Richard was
24  in and out of the meeting.  He tends to do that.

93

1      Q.   So most of the meeting was with
2  Mr. Zimmerman?
3      A.   I would say Richard was there half the
4  time.  They asked about my, you know, employment
5  agreement and covenants and stuff like that.  And
6  I showed them what I had with me.
7      Q.   During that meeting, you had a
8  discussion with them about your employment
9  agreement with First Health?
10     A.   They asked if I had an employment
11  agreement with them.  And I said yes.
12     Q.   What documents did you show either
13  Mr. Zimmerman or Mr. Ullman during that meeting?
14     A.   I showed them items I carried around.
15  I had recopied seven and eight and carried it
16  around with me, to just remind me of my -- my
17  covenants.  And I showed them that.
18     Q.   So during the meeting either on the
19  16th or 17th of November 1999, you showed
20  Mr. Zimmerman or Mr. Ullman Paragraphs 7 and 8
21  from your employment agreement?
22     A.   Right.  I recopied it out of my
23  employment agreement.
24     Q.   What was the discussion with Mr. Ullman

94

1   or Mr. Zimmerman after you had showed them
2   Paragraphs 7 or 8 of your October 1997 employment
3   agreement with First Health?
4       A.   They were fine with that.
5       Q.   Did either of those gentlemen express,
6   that is did either Mr. Zimmerman or Mr. Ullman
7   express, any concern about the obligations that
8   you had to First Health under Paragraphs 7 or 8 of
9   your employment agreement?
10      A.   Steve Nicoletos was there, too, and he
11  is the one who really looked at it closely and,
12  no, they did not have any -- say the question
13  again. I'm sorry.
14      Q.   Yes. Did either Mr. Zimmerman,
15  Mr. Ullman, or Mr. Nicoletos, after they looked
16  at Paragraph 7 or 8 of your October 1997
17  employment agreement at the November 16 or 17,
18  1999 meeting, express any concerns about those
19  provisions?
20      A.   They only expressed concerns that not
21  to give them any confidential information. They
22  were okay with the non-compete side.
23      Q.   Do I understand your testimony
24  correctly that Paragraph 9 of your October 1997

95

1   employment agreement with First Health was not at
2   the meeting with Mr. Ullman, Zimmerman or
3   Nicoletos?
4       A.   That's correct.
5       Q.   Why wasn't it?
6       A.   Because I didn't carry my employment
7   agreement around with me. I just carved out the
8   piece I thought that were most significant to me
9   and what could get me in trouble and carried those
10  with me.
11      Q.   Did you leave a copy of Paragraph 7 or
12  8 with either Mr. Zimmerman, Mr. Ullman or
13  Mr. Nicoletos?
14      A.   I believe they took a copy of it. I'm
15  not sure.
16      Q.   Other than what you've testified to,
17  can you remember anything else anybody said at
18  that meeting; that is, Mr. Zimmerman, Mr. Ullman
19  or Mr. Nicoletos?
20      A.   Richard wanted to win it. He has
21  wanted to win PACE since it came out a long time
22  ago. You know, that they had experience in
23  Pennsylvania. They had -- at -- oh, we had a lot
24  of discussions. We talked about their formal

96

1   proposals, you know, why they win before and what
2   they were going to do differently this time. They
3   talked about what they could bring.
4       You know, I had questions. We talked
5   for sure -- I wouldn't even have done it -- what
6   kind of computer equipment they would have, what
7   kind of backup facilities they had, things like
8   that, you know, that make it for them to be a
9   viable candidate.
10      Q.   What did any of Mr. Zimmerman,
11  Mr. Ullman or Mr. Nicoletos say about why NPA had
12  not won PACE before?
13      A.   They were -- they didn't have a very
14  good proposal, basically. It was very generic.
15  They didn't have a good proposal. They didn't
16  score well technically or financially.
17      Q.   Did they make any other statements,
18  that is did Mr. Zimmerman, Ullman or
19  Mr. Nicoletos make any other statements about why
20  they did not win previously?
21      A.   I don't recall the details, if there
22  were any.
23      Q.   Did you offer any observations at the
24  meeting about why NPA had not won previously?

97

1       A.   I didn't know, other than speculation.
2       Q.   At that meeting, did you describe for
3   those gentlemen what you could offer to NPA in the
4   course of preparing a 1999 bid proposal?
5       A.   I gave them my background. But it was
6   more Richard wanted to know if I could write, if I
7   was a good writer. That was all he was concerned
8   about, because of where they were in the proposal
9   at that time. They still had a lot of work to do
10  in the proposal.
11      Q.   Now, you said you gave them your
12  background --
13      A.   Uh-hum.
14      Q.   -- which included telling them that you
15  had been the officer in charge --
16      A.   Right.
17      Q.   -- and that you had been a vice
18  president and senior vice president for First
19  Health?
20      A.   Right.
21      Q.   Did you tell them anything else?
22      A.   Just -- just my general duties and what
23  knowledge I had of the PACE program. And I had
24  some ideas, you know, some thoughts and ideas

# DAVID W. NORTON

98

1  on -- on, you know, win themes and strategies and
2  stuff like that.
3      Q.   What thoughts and ideas were those on
4  win themes and strategies?
5      A.   Just to -- you know, you got to go in
6  with a low price.  You know, First Health does a
7  good job there.  You've got to have a good
8  technical proposal and then you've got to have a
9  low price.
10     Q.   Any other win themes and strategies?
11     A.   No.  They had most of the theme set up.
12     Q.   As you said at that meeting,
13 Mr. Norton, did you have a strategy for how NPA
14 should go in with a low price?
15     A.   No.
16     Q.   Did you ultimately develop a strategy
17 for how NPA should go in with a low price?
18     A.   Did I?
19     Q.   Yes.
20     A.   No, I did not.
21     Q.   Who developed that strategy for NPA?
22     A.   Richard and Steve, I guess.
23     Q.   Is it your testimony, Mr. Norton, that
24 with respect to the proposal that NPA submitted

99

1  for the PACE contract in 1999, that you did not
2  play any role with respect to costs and what the
3  price would be for NPA?
4      A.   I helped with the cost proposal, the
5  costing.
6      Q.   Now when you say that you helped with
7  costing for NPA's proposal, what exactly does that
8  mean?  What did you do?
9      A.   What did I do.  I put the whole cost
10 matrix, Excel spreadsheet together for the
11 proposal.  I helped develop estimates for things
12 like travel, travel expenses.  I helped develop
13 costs -- oh, I can't remember -- related to just
14 general operating procedures, operating stuff,
15 made some guesses and estimates of equipment
16 and -- and office space and lines and things like
17 that that then Steve took and -- and, you know,
18 made accurate, more accurate, based on their
19 information.  I gave them a first draft of certain
20 costs to get the ball rolling.
21     Q.   Now, you said you put together some
22 kind of matrix?
23     A.   Yeah.  The -- the price proposal is
24 about two or 300 pages long, and you have to take

100

1  one cost and spread it out over the five different
2  or six different programs by year, by -- there was
3  some other breakout, too.  So it expands from one
4  gross proposal down to multiple ones.
5      So you had to build -- you had to put
6  numbers in all those different columns for all
7  those different programs for all those different
8  years for the entire proposal.  Then you had to
9  provide supporting information relative to
10 equipment and staffing costs and equipment -- I
11 said equipment -- supplies and everything else.
12     Q.   And you prepared a draft for NPA with
13 all this information?
14     A.   Not -- not filled in, no.  I prepared a
15 spreadsheet to have it filled in, to give to
16 Steve.
17     Q.   Now, if I understand your testimony
18 correctly, Mr. Norton, you said you prepared the
19 spreadsheet, but there were no numbers filled in?
20     A.   I built a blank spreadsheet.  And then
21 I worked some numbers external from that
22 spreadsheet to give to Steve, so that he can, you
23 know, add into their spreadsheet.
24     Q.   I'm not sure I understand.  What do you

101

1  mean you worked numbers external from the
2  spreadsheet?
3      A.   I did not put the numbers in that blank
4  spreadsheet.  I gave that to Steve so that he
5  would have a model when he did his costing.
6      In terms of doing some estimates, I
7  would do them on another sheet of paper, let's
8  say, or an Excel spreadsheet and then provide them
9  to Steve for him to bless or change or do whatever
10 he did with them.
11     Q.   And for what items did you prepare
12 costing or for what items did you prepare
13 estimates?  For what specific items did you
14 prepare cost estimates?
15     A.   Okay.  I prepared cost estimates for
16 the staffing, for both takeover and operations.  I
17 prepared cost estimates for the travel.  I
18 prepared cost estimates for equipment, supplies
19 and stuff like that.
20     Q.   Anything else that you supplied cost
21 estimates for with respect to NPA's --
22     A.   There may be other ones, but I can't
23 remember them all.
24     Q.   Now, what was the basis for your

**102**

1 providing an estimate of costs for staffing for
2 NPA's proposal?
3    A.   Just my general knowledge, guessing at
4 what they were.
5    Q.   And based on your experience at First
6 Health, correct?
7    A.   Not necessarily that.  But it's just
8 generally -- yeah, I mean, I've been there for 25
9 years.  Yeah, I had some general idea, you know,
10 of what staff -- staff might make.
11    Q.   And what was the basis for you
12 providing cost estimates for the takeover and
13 operation expenses?
14    A.   Well, we built a work plan.  And in
15 that work plan, there were certain number of head
16 count.  You add that head count out and multiply
17 it times, you know, a generic rate and come up
18 with the cost of that, and any lines, whatever,
19 that would be involved with that.
20    Q.   What do you mean by "lines"?
21    A.   Telecommunications lines.  But I didn't
22 do the costing.  I didn't do any of that.
23    Q.   You didn't do the costing for
24 telecommunications?

**103**

1    A.   No.
2    Q.   So I'm not sure.  With respect to
3 takeover and operations, you provided cost
4 estimates for staffing?
5    A.   Yes.
6    Q.   All right.
7    A.   Some -- some of the estimates, yeah.
8    Q.   Now, with respect to takeover and
9 operations, did you provide cost estimates with
10 respect to anything else other than staffing?
11    A.   For?
12    Q.   For takeover and operations.
13    A.   Yes.  For -- I told you, for like
14 travel involved with that.  Because we had to have
15 a sheet for travel.  And we had to have a sheet
16 for equipment.  We had to have a sheet for
17 supplies.  And I took a first cut at some of
18 those.
19    Q.   And what was the basis for you
20 supplying a cost estimate for travel?
21    A.   Basis?
22    Q.   Yes.
23    A.   Just figure out what travel would be to
24 and from New Jersey and here of -- of staff that

**104**

1 would be involved with the takeover, you know,
2 contractor staff, things like that, travel.  And
3 just guess at what the per diem rate would be, or
4 something like that, for that.
5    Q.   What was the basis for you supplying a
6 cost estimate for equipment and supplies?
7    A.   We had a list of equipment that -- you
8 know, that we picked up that was in the RFP that
9 we had to supplement with other equipment and what
10 would be the cost of those things.  You know, as
11 equipment wears out, you replace it, things like
12 that.
13    Q.   Did you provide cost estimates for
14 anything other than staffing, takeover and
15 operations, travel, equipment and supplies?
16    A.   There may be some other ones.  I can't
17 remember that off the top of my head.
18    Q.   Now, with respect to your role on the
19 NPA proposal as far as costing and price, did you
20 play any other role other than what you've
21 described for me?
22    A.   I was involved with the red team.
23    Q.   Let me just clarify my question.  I
24 know you played other roles with respect to the

**105**

1 NPA proposal.  I'm only asking now about cost and
2 pricing.
3       You've testified that you supplied
4 certain cost estimates in certain areas and that
5 you developed a matrix.  So only on the area of
6 costing and pricing, did you do anything else for
7 NPA other than what you have testified to?
8    A.   When Steve -- when they were done
9 pricing, Steve brought me the price and I spread
10 it across those 200 pages.
11    Q.   What does that mean exactly?
12    A.   When he came down, he -- he gave me the
13 prices.  We had developed -- this gets into
14 confidential information for NPA.
15    Q.   That's okay.
16    A.   Maybe for you, but might not be for me.
17 But I think it's okay.
18       There are certain algorithms to spread
19 it out by the different programs based on
20 cardholder accounts.  Like you mentioned the
21 PACENET and the PKU.  And that's how they wanted
22 it spread out over those six or seven or eight
23 different programs.
24       And in the RFP, they had cardholders as

DAVID W. NORTON

106

1  a number of people in there. So we had to then
2  take the overall price and overall cost and
3  provide it across those particular numbers there.
4  So, you know, we had to spread it over those 200
5  different pages or sheets of those spreadsheets or
6  whatever.
7      Q.  That was with respect to costs?
8      A.  Yes.
9      Q.  What about with respect to price?
10     A.  The price was there, too. We had to do
11  the price, too. You had cost. You had margin.
12  You had -- I believe it was overhead or computer,
13  or both, or something like that. I think computer
14  was separate and then overhead was separate and
15  then price. And you had to spread those all
16  across and make them all foot, yes.
17     Q.  Did you have any discussions with
18  Mr. Nicoletos or Mr. Zimmerman or anyone else at
19  NPA about the price for NPA's proposal?
20     A.  Only what I told you before, to try to
21  get as low a price as you can.
22     Q.  Before the NPA proposal was submitted
23  to PACE or to the PDA, did you look at the price,
24  whether it was the total price or whether it was

107

1  price for individual programs?
2      A.  As I told you before, I spread it
3  across. I helped to spread it across, me and this
4  other fellow, yes, and I saw the price.
5      Q.  Did you have discussions with anyone at
6  NPA about whether the price was too high or too
7  low?
8      A.  No, I said it was a good price.
9      Q.  Do you know how Mr. Zimmerman or
10  Mr. Nicoletos arrived at the price?
11     A.  Do not.
12     Q.  How did it come to be that
13  Mr. Hofheimer, Dick Hofheimer or Richard
14  Hofheimer, got involved in helping NPA prepare its
15  1999 proposal for the PACE contract?
16     A.  I suggested they hire him when it was
17  obvious they didn't have enough resources -- or
18  didn't have -- not resources. They certainly had
19  enough resources.
20     Q.  And what role did you foresee
21  Mr. Hofheimer playing?
22     A.  I foresaw him playing the role of
23  writing the executive summary and doing red
24  teaming and general consulting on strategies.

108

1      Q.  What was Mr. Hofheimer doing at the
2  time?
3      A.  I think he was trying to extricate
4  himself from his position. I think he was on the
5  bench from his current position, but you'd have to
6  ask him that.
7      Q.  Who was he working for at the time?
8      A.  He was with a company called Health
9  Information Designs. I think that's what it's
10  called.
11     Q.  To your knowledge, did NPA hire
12  Mr. Hofheimer as a consultant to help it with its
13  1999 bid proposal for the PACE contract?
14     A.  Yes. They contracted with him.
15     Q.  What role did Mr. Hofheimer play?
16     A.  The role that I told you, what he did.
17     Q.  Would you just describe that for me
18  again?
19     A.  He wrote the management summary or
20  executive summary. I don't know what it's called
21  or what it was called in that particular proposal.
22  He did review of, you know, all the other writing
23  that was done. And he helped put together or
24  fine-tune some of the strategies that NPA had,

109

1  especially some of the clinical strategies. He
2  did all the research and everything that -- to --
3  to put in the management summary, obviously.
4      Q.  Were you aware of any discussion that
5  Mr. Hofheimer had with NPA regarding restrictive
6  covenants that might be applicable to him?
7      A.  I was not aware of any.
8      Q.  Did you have any conversation with
9  Mr. Hofheimer about any restrictive covenants from
10  First Health that might be applicable to him?
11     A.  I did not.
12     Q.  How did it come about that Les Meissel
13  was suggested for a role in the PACE contract, if
14  awarded to NPA?
15     A.  That was my idea. He had previously
16  worked on PACE. I had seen Les within the past
17  year. He was a contractor working in Richmond.
18     And I suggested to -- I don't know who
19  it was -- Allan or Peter or somebody, that he
20  would be a good candidate to bring in, if he was
21  willing. And they said fine. So I called him.
22  He was willing. And he faxed me his resume. and
23  so we wove him into the proposal.
24     Q.  When you say you saw him in Richmond as

DAVID W. NORTON

130

1    I felt that it could be a restriction.
2  That's what I told you before. It's my concern,
3  rightly or wrongly, that it would restrict me in
4  finding a job, because I had been there for 25
5  years and knew Medicaid and government work. And
6  the people that I knew and networked with were in
7  the same business. And they know about
8  restrictive covenants. They know my position at
9  First Health. And I knew I would have a
10  difficult -- I thought I would have a difficult
11  time getting on with those folks.
12    Q.  When you sent your resume out, you
13  didn't send the restrictive covenant with it, did
14  you?
15    A.  No, I did not.
16    Q.  Were there any companies that you did
17  not apply to because you were concerned about the
18  restrictive covenant?
19    A.  I don't recall what I -- you know, what
20  my decisions were at that time, whether, you know,
21  to send, who to send it to and not to send it to.
22    MR. VERNICK:  All right. It is
23  approximately 20 to one. Shall we reconvene
24  at 1:15 or do you want a longer break?

131

1    MR. YORK:  That should be fine.
2  Mr. Norton?
3    THE WITNESS:  I don't care. It's fine
4  with me.
5    MR. VERNICK:  1:15 it is.
6    MR. YORK:  Roughly.
7    MR. VERNICK:  Roughly, give or take,
8  yes.
9              * * *
10    (Whereupon, a luncheon recess was
11  taken at 12:40 p.m.)
12              * * *
13    (Whereupon, afternoon session was
14  resumed at 1:27 p.m.)
15              * * *
16    MR. VERNICK:  Back on the record.
17  BY MR. VERNICK:
18    Q.  Mr. Norton, when we took our lunch
19  break, you had testified in that your first
20  meeting with Messrs. Zimmerman, Ullman and
21  Nicoletos in the middle of November 1999, that you
22  reviewed with them Sections 7 and 8 of your
23  October '97 employment agreement with First
24  Health.

132

1    Do you remember that testimony?
2    A.  Yes.
3    Q.  All right. Now, either at that meeting
4  or after that meeting, did NPA, to your knowledge,
5  take any safeguards or put in place any
6  precautions to make sure that you did not breach
7  Paragraphs 7 and 8 of your employment agreement
8  with First Health?
9    A.  Give me an example. I don't know what
10  a safe -- what they would do in terms of
11  safeguards. But the answer is no, as far as I
12  know, but I may misunderstand the question.
13    Q.  Well, at any point in time after that
14  meeting, and let's say from that meeting until
15  December of 1999 when NPA submitted its bid
16  proposal to PACE, did you have any further
17  conversation or discussion with anyone at NPA
18  regarding the restrictions placed on you by your
19  First Health employment agreement?
20    A.  Not that I remember.
21    Q.  Between the time of that meeting in
22  November of 1999 and December of 1999, when NPA
23  submitted its bid proposal to PACE, did you
24  receive any correspondence or memoranda or

133

1  communication of any kind from NPA which cautioned
2  you to adhere to the terms of your restrictive
3  covenant?
4    A.  No.
5    Q.  During your work for NPA, did you use
6  any documents that had been prepared or authored
7  by you or anyone else at First Health?
8    A.  No.
9    Q.  Now, you testified about the work that
10  you did on the cost side of NPA's 1999 bid
11  proposal.
12    A.  Okay.
13    Q.  Did you do any other work for the bid
14  proposal?
15    A.  Yes.
16    Q.  And I don't know if you gave me those
17  categories, but if you did, I apologize, but if
18  you could give them to me again.
19    A.  I was part of the red team. I was
20  involved with helping complete some sections, and
21  I don't know the specific sections. There were
22  more -- there were two parts, I believe, to the
23  proposal. There was a -- like a work plan part
24  and then there was an operations part, I can

DAVID W. NORTON

134

1  remember well enough.
2        And it was in the work plan of that,
3  that there were some parts that weren't completed.
4  I'm pretty sure it was the work plan narrative and
5  the work plan itself. They had a work plan and a
6  work plan narrative, but I reviewed that and would
7  update it or delete things or add things, or
8  whatever. But, generally, it pretty much stayed
9  the same as it was. I just added some specificity
10 where I think it needed to be added.
11       I'm thinking of whether there is --
12 mostly in that area of the -- of -- of the work
13 plan for, you know, original writing or where I've
14 had to add paragraphs to something.
15       When I got there, the -- most of the
16 proposal was -- was in words, except for certain
17 areas. And I can't remember what they were. And
18 I was assigned to finish some of them up or do
19 them or whatever. And I can't remember them all.
20  Q.    So if I understand your testimony
21 correctly, you helped edit and write portions of
22 the work plan, the work plan summary and the
23 operations portion of the --
24  A.    Yes.

135

1  Q.    -- NPA proposal; is that correct?
2  A.    The entire technical proposal,
3  excluding the -- the executive summary and, you
4  know, the stuff that had to do with resumes and
5  things like that, getting that stuff together.
6  Q.    All right. Now, when you were editing
7  the work plan, the work plan summary and the
8  technical proposal, or when you were helping to
9  write those portions, what did you use to do that
10 kind of work?
11  A.    Just my general knowledge that I had,
12 what NPA had there before to make it more
13 consistent, weaving in their clinical programs
14 into certain of the areas. The approach to
15 staffing and -- and the takeover we had from the
16 software standpoint that had been agreed to. And
17 just making -- making those adjustments to the
18 narrative portions.
19  Q.    I'm sorry, what was that about takeover
20 for software?
21  A.    Part of the strategy is to take over
22 the software and take over the staff and take over
23 the -- the building and everything like that, just
24 to make sure that that shows in the proposal, that

136

1  that is the strategy, and make sure it's
2  consistent throughout everything that's written.
3        The writing assignments were given out
4  to a lot of different people that may not have
5  been aware of the strategy and had written and
6  turned it in. So instead of giving it back, we
7  would rewrite some of those things.
8  Q.    Is it fair to say that in the editing
9  and work that did you on the work plan, the work
10 plan summary and the technical proposal, that you
11 relied on your experience from First Health?
12  A.    I relied on my experience -- certainly
13 relied on some of my experience with First Health,
14 sure.
15  Q.    Who decided -- for example, in the NPA
16 1999 proposal, there are enhancements that are
17 shaded in gray.
18  A.    Right.
19  Q.    Was that your decision to shade those
20 in gray?
21  A.    That was my decision to shade those in
22 gray.
23  Q.    All right.
24  A.    Actually, my decision was to do it a

137

1  different way. But they elected that method.
2  Q.    But I take it that the generic notion,
3  if you will, of highlighting them in some sense
4  was your suggestion?
5  A.    Mine and Dick's, yeah.
6  Q.    Was that a technique that had been
7  previously used by First Health?
8  A.    I don't think so.
9  Q.    Mr. Norton, let me place in front of
10 you -- and for the moment, I'm not going to mark
11 this as an exhibit -- a portion of NPA's 1999
12 proposal for the PACE contract. And I just want
13 to make sure that I understand exactly what it was
14 you edited.
15       I'm showing you the table of contents
16 from NPA's 1999 bid proposal.
17  A.    Uh-hum.
18  Q.    There's a section which is II-3, which
19 is "Work Plan."
20  A.    Uh-hum.
21  Q.    Was that the portion that you edited?
22  A.    I edited -- as a red team member, I
23 touched everything.
24  Q.    You touched everything?

1          IN THE UNITED STATES DISTRICT COURT

        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3                         *  *  *

4

FIRST HEALTH GROUP CORP., :    CIVIL ACTION

5               Plaintiff,   :

                             :

6           vs.              :

                             :

7   NATIONAL PRESCRIPTION     :

    ADMINISTRATORS, INC., and :

8   DAVID W. NORTON,          :

                Defendants. :    NO. 1:00-CV-312

9

10                        *  *  *

11            Thursday, April 13, 2000

12                        *  *  *

13            Oral deposition of PETER T. GRIEGER,

14   taken at the law offices of MORGAN LEWIS &

15   BOCKIUS, LLP, One Commerce Square, 417 Walnut

16   Street, Harrisburg, Pennsylvania  17101, beginning

17   at 10:07 a.m., before Samuel Goldfarb, a

18   Registered Professional Reporter and an approved

19   reporter of the United States District Court.

20                        *  *  *

21

22            ESQUIRE DEPOSITION SERVICES

              1880 John F. Kennedy Boulevard

23                     15th Floor

              Philadelphia, Pennsylvania  19103

24                   215.988.9191

PETER T. GRIEGER

122

1  deposition testimony or did you say it during your
2  group discussion with Mr. Hofheimer and
3  Mr. Norton?
4      A.   I indicated that position on several
5  occasions, both in the group discussion and the
6  individual discussions I had with Mr. Norton.
7      Q.   And in the second discussion with
8  Mr. Norton after the group discussion, what did he
9  say about hiring incentives?
10     A.   What did he say about hiring
11  incentives?
12     Q.   Yes.  You said that after the group
13  discussion, there were two conversations during
14  which hiring incentives came up as part of the
15  conversation.
16     A.   Uh-hum.
17     Q.   You've told me about the first
18  conversation after the group discussion.
19          What happened during the second
20  conversation?
21     A.   Just a re-emphasis of the strategy of
22  recommending hiring incentives.
23     Q.   Did Mr. Norton in any conversation ever
24  stress to you that PDA thought it was important to

124

1  for NPA?
2      A.   Not that I can recall.
3      Q.   Did Mr. Norton tell you that it was
4  important to stress to PDA, in NPA's 1999
5  proposal, that NPA would have or propose some
6  kind of correspondence and inquiry tracking
7  system?
8      A.   No, he did not.
9      Q.   Did Mr. Norton have any conversation
10  with you about the CITS system?
11     A.   We had conversation regarding that
12  system.
13     Q.   And in that conversation, what did
14  Mr. Norton tell you?
15     A.   He asked me what the CITS system was.
16     Q.   And what did you tell him?
17     A.   I told him it was a mechanism whereby
18  all correspondence from cardholders, providers and
19  any other legislators, any other outside entities,
20  would be tracked and recorded in an electronic
21  medium of some sort.
22     Q.   As a proposed system, correct?
23     A.   As a proposed system, correct.
24     Q.   NPA's 1999 proposal discusses the fact

123

1  have provider training done by the prime
2  contractor and not by a SERB contractor?
3      A.   Could you phrase that again, please?
4      Q.   Sure.  In any conversations you had
5  with Mr. Norton while you were preparing NPA's
6  1999 bid proposal for the PACE contract, did he
7  stress to you that PDA thought or emphasized that
8  provider training should be done by the prime
9  contractor, that is by NPA or by First Health,
10  rather than done by a SERB contractor?
11     A.   I don't recall that he stressed that at
12  any time.
13     Q.   Did he mention it at all?
14     A.   In the course of preparing this
15  proposal, I would assume yes.  But I do not recall
16  that that actually -- that that came up.
17     Q.   In terms of a conversation between you
18  and Mr. Norton?
19     A.   Correct.
20     Q.   Did it come up in a conversation
21  between you and Mr. Hofheimer?
22     A.   No.
23     Q.   Did Mr. Hofheimer stress to you the
24  importance of hiring incentives as a selling point

125

1  that provider training will be done by a provider
2  relations manager and that the project director
3  will accompany the manager to the training
4  sessions.
5          Did that idea originate with
6  Mr. Norton?
7      A.   No.
8      Q.   Where did that idea originate?
9      A.   From me.
10     Q.   And where did you get the idea?
11     A.   I believe that it's good management
12  practice to have the project director monitor and
13  oversee those activities.
14     Q.   With respect to provider training,
15  NPA's 1999 proposal for the PACE contract also
16  includes meetings held with PDA to determine new
17  initiatives that should be included in the
18  presentation.
19          Did that idea originate with
20  Mr. Norton?
21     A.   No.
22     Q.   Where did that idea originate?
23     A.   I believe there, too, we had -- that
24  came out of our 1995 proposal, as I recall, again,

```
 1          IN THE UNITED STATES DISTRICT COURT

              FOR THE MIDDLE DISTRICT

 2                OF PENNSYLVANIA

                    *   *   *

 3

    FIRST HEALTH GROUP      : CIVIL ACTION

 4  CORP.,                  : NO. 1:00-CV-312

         Plaintiff,         :

 5       -vs-               :

    NATIONAL PRESCRIPTION,  :

 6  ADMINISTRATORS, INC.,   :

    and DAVID W. NORTON,    :

 7       Defendants.        :

 8                    *   *   *

 9

10

11          Oral deposition of TOM SNEDDEN,

12  held at the law offices of Morgan, Lewis

13  & Bockius, 417 Walnut Street, Fourth

14  Floor, Harrisburg, Pennsylvania, on

15  Thursday, April 20, 2000, beginning at

16  approximately 10:00 a.m., before Megan

17  McKay, a Registered Professional Reporter

18  and Notary Public.

19

20

21

22

              ESQUIRE DEPOSITION SERVICES

23          1880 J.F.K. Boulevard, 15th Floor

            Philadelphia, Pennsylvania 19103

24                (215) 988-9191
```

TOM SNEDEN

82

1    with the vendor for the system, Paragon,
2    and obtained a letter from somebody
3    saying that they would maintain it as it
4    is. Do whatever it took to keep it up
5    and running. So I didn't give it much
6    thought after that.
7        Q.   Did the fact that NPA had
8    contacted the current vendor, Paragon,
9    have any impact on you?
10       A.   No, not really. My sense
11   was that they had some working
12   relationship with Paragon anyway. There
13   was -- that was my sense in that, you
14   know, the fact that they had contacted
15   them, regardless of a relationship, to
16   insure that they could maintain the
17   existing system. I guess, if anything,
18   made me a little more comfortable.
19       As I said, it's important,
20   but it's not a paramount importance,
21   because it's an ancillary system. You
22   know, it's hard for me to imagine living
23   life without it now that we have it, you
24   know. It's kind of like overnight

83

1    delivery and electronic mail. We can do
2    without it, but it's really great to have
3    it. So I wouldn't want it to go away.
4        So the fact that they did
5    show a knowledge of an ownership issue
6    with that particular system, and had
7    bothered to contact the vendors was more
8    comforting to me than anything of
9    concern.
10       Q.   Where did you get the sense
11   that NPA had an existing working
12   relationship with Paragon?
13       A.   I'm recollecting from
14   reading the proposal that it was, first
15   of all, a process that was not unfamiliar
16   to them, and that it was a company with
17   which they were familiar.
18       I don't know that there was
19   anything explicit saying that they were
20   using it at a particular location, but it
21   didn't occur to me that it was something
22   that they were unfamiliar with. I should
23   say a technology that they weren't
24   unfamiliar with.

84

1        Q.   In NPA's bid proposal for
2    '99, 2000, it proposes that the training
3    for providers will be done by NPA itself
4    as opposed to having a SERB subcontractor
5    do it. Is that an important
6    consideration in your evaluation of the
7    bid proposal?
8        A.   My -- not really, but my
9    recollection is that they were going to
10   use a sub to do the training. That's my
11   recollection. That they, in fact, were
12   subcontracting it out. That's my
13   recollection.
14       But if my recollection is
15   incorrect, no, it doesn't -- it doesn't
16   make any difference to me, because it's
17   really my own state staff that directs
18   and guides and even does the training.
19   If I had more time I'd do it myself. I
20   see it as a tremendous public relation's
21   initiative and a way to get feedback on
22   how well the program is doing by our
23   providers.
24       I don't ever -- I shouldn't

85

1    say never, but the vast majority of the
2    training involves my own staff as well as
3    the contractor staff. So I really don't
4    care who from the contractor, the
5    subcontractor does it. I don't know that
6    it's all that difficult to do. The
7    important thing for me is doing it in the
8    first place and getting feedback.
9        Q.   In NPA's bid proposal for
10   the '99, 2000 they propose to use a CITS
11   system for tracking and logging calls.
12   Do you recall that in the proposal?
13       A.   Oh, sure. Unlike our MITS
14   system.
15       Q.   Was the fact that NPA was
16   proposing that enhancement a significant
17   factor for you in the evaluation of their
18   bid proposal?
19       A.   No, no. I mean, we already
20   have something like it. We already --
21   we've had this since I can remember. At
22   least a decade. And it's one of those
23   things, you know. Actually, I think it's
24   an industry standard these days, but back

TOM SNEDDEN 

86

1  when we installed it it was kind of
2  unique. It's nice to have, but not
3  unlike the imaging system. If I had to
4  do without it, I suppose I could.
5      Q.  Are you aware of the fact
6  that NPA doesn't actually have a CITS
7  system, but it's merely a proposed
8  system?
9      A.  No. I wasn't aware of that,
10  but then we didn't ask them that.
11      Q.  In NPA's proposal for '99,
12  2000 under the issue of claim's payment,
13  NPA stated, and I think I'm quoting
14  relatively accurately here, NPA has links
15  to most of the same switch vendors as the
16  incumbent. This includes NDC, Envoy and
17  QS1, close quote.
18          Did you give that
19  representation importance in your
20  evaluation of NPA's bid?
21      A.  Yes, I would have, yes.
22      Q.  Why?
23      A.  Continuity. I prefer not to
24  be changing switches and vendors, if we

87

1  can avoid it.
2      Q.  Under the subject of report
3  generation and NPA's '99, 2000 bid
4  proposal it wrote, quote, NPA proposes to
5  enhance the operation by producing online
6  status reporting, close quote.
7          Did you give that
8  representation by NPA particular
9  importance in your evaluation of their
10  bid proposal?
11      A.  It's not of any
12  consequence. It's something that I have
13  wanted for some time, and, in fact, it's
14  already occurred. First Health brought
15  that up -- I mean, activated that feature
16  earlier this year.
17          But as I said in the
18  beginning, I tried very hard to move this
19  operation to a paperless environment.
20  Anything that achieves that is a plus,
21  but I wouldn't say that this is of
22  paramount importance.
23          The weekly status reports
24  generate a lot of paper, but nothing like

88

1  the paper that's generated, say, with the
2  program's remittance devices. Something
3  that can turn that from paper to
4  electronic, that would be real important.
5      Q.  In your discussions with
6  Dave Norton, particularly during the time
7  frame when he was the officer in charge,
8  was that a particular issue that Dave
9  Norton had focused on that was, if you
10  will, preaching the benefits of online
11  status reporting?
12      A.  Well, I know I had the
13  discussions with Dave and probably Bob on
14  numerous occasions. But I wouldn't say
15  it's anything that anybody focused on,
16  because, again, it's nice, but it's of
17  relative inconsequence.
18          So there wasn't a lot of
19  focus on it, and it was, as I recollect,
20  it was my desire; not the desire of
21  Norton or Howells. This was something
22  that I was hoping to have.
23      Q.  And something that you would
24  have expressed, I assume, to Mr. Norton

89

1  while he was the officer in charge?
2      A.  Absolutely. It's something
3  I think that First Health gave some
4  thought to. I know we had discussions
5  about, you know, what that would take in
6  terms of technology applications.
7          But, you know, relative to
8  the list of other things that we were
9  trying to get done, I think everybody
10  understood it was down the list. So I
11  didn't expect anybody to focus on it.
12  But I was happy when they brought it up
13  and activated it in January, February.
14      Q.  Since the award of the bid
15  to NPA in February of 2000 --
16      A.  I would say since the
17  notification of the bid outcome. We
18  haven't awarded anything.
19      Q.  Fair enough. Have you had
20  any discussions with Mr. Norton?
21      A.  Since that -- since the
22  notification of the bid outcome, there is
23  one instance in which Mr. Norton called
24  me, and I believe it was a day or two