ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

## NO.    1:00-CV-312

---

### FIRST HEALTH GROUP CORP.,

**Plaintiff,**

**v.**

### NATIONAL PRESCRIPTION ADMINISTRATORS, INC. and DAVID W. NORTON,

**Defendants.**

FILED
HARRISBURG, PA

JUL 3 2000

MARY E. D'ANDREA, CLERK
Per: _____
Deputy Clerk

---

### PRELIMINARY INJUNCTION HEARING

### MEMORANDUM OF LAW OF PLAINTIFF
### FIRST HEALTH GROUP CORP. IN SUPPORT OF
### MOTION FOR INJUNCTIVE RELIEF

---

Scott L. Vernick, Esquire
Jeffrey D. Hutton, Esquire
FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103-3291
(215) 299-2000

Attorneys for Plaintiff
FIRST HEALTH GROUP CORP.

# TABLE OF CONTENTS

I.     INTRODUCTION…………………………………………………….………1

II.    ARGUMENT………………………………………………………….………2

    A.    The Availability And Appropriateness Of Injunctive Relief.…..……………2

    B.    First Health Prevails On The Merits…………………………………….………3

        1.    NPA And Norton Embark On A Path Of Unfair Competition
             With Respect To The PACE RFP And Contract……………….………..3

        2.    Norton Prepares NPA's 1999 Bid Proposal
             For The PACE Contract……………………………………………5

        3.    ● NPA And Norton Unlawfully Misappropriate First Health's
             Confidential And Proprietary Business Information
            ● Norton Violates The Agreement's Confidentiality
             Restriction………………………………………….…..…………7

        a.    ● First Health's Unique Methods And Detailed Operational
             Processes
            ● First Health's Understanding Of PDA's Preferences……………10

            i.    First Health's Imaging System For The
                PACE Program……………………………….……....……11

                aa.    First Health's Use Of Paragon………………………...11

                bb.    First Health's Use Of Kodak…………………………12

                cc.    PDA's Preference For A Takeover Work Plan
                    That Addresses The Imaging System………………13

            ii.    First Health's Switch Vendors………………………………..13

            iii.    First Health's Use Of PC-SAS…………………………………14

            iv.    First Health's Use Of On-Line Weekly
               Status Reports………………………………………………14

            v.    First Health's Approach To
               Provider Training………………………………………15

            vi.    First Health's Surveillance Utilization Review System
               (SURS)………………………………………………….....16

            vii.    First Health's Manufacturers' Rebate Administration………..16

viii.   First Health Integrates Imaging Documentation And Procedures With The Cardholder Services Procedures Manual.......................17

ix.   Some Providers Elect To Receive Their Remittance Advices Via Electronic Media.......................17

x.   First Health Establishes The Software And Processes Used in The Preparation Of Weekly Remittance Advices In The Provider Relations Unit....................18

xi.   First Health's Disaster Recovery And Back-Up System..................................................18

b.   First Health's Costing And Pricing Strategies For The PACE Contract.......................................18

i.   First Health's Pricing Strategy For Takeover..............................................18

ii.   First Health's Pricing Strategy For Turnover ..................19

iii.   First Health's PACE Staff Salary Structure....................20

iv.   First Health's Current Margin On The PACE Contract........20

4.   Threatened Future Disclosure Of First Health's Trade Secrets........................................23

5.   Norton Violates The Agreement And Solicited PDA........................................24

6.   Norton Violates The Agreement And Threatens To Solicit First Health's PACE Employees...............25

7.   NPA's Unlawful Attempt To "Raid" First Health's PACE Staff................................................26

8.   NPA Tortiously Interferes With Norton's Agreement.................28

9.   NPA Intentionally Interferes With First Health's Prospective Contractual Relationship With PDA......................28

C.   Injunctive Relief Against NPA And Norton Will Prevent Irreparable Harm To First Health..........................................29

III.    CONCLUSION...................................................................................30

## I.    **INTRODUCTION**

Defendants, David W. Norton ("Norton") and National Prescription Administrators, Inc.

("NPA"), in preparing and submitting NPA's 1999 bid proposal for the PACE Contract, engaged in

unfair competition – pure and simple.[1]  First, Norton unlawfully disclosed to NPA, and NPA

unlawfully used in preparing its 1999 bid proposal, First Health's confidential and proprietary business

information, including: (1) First Health's costing, pricing and marketing strategies with respect to the

PACE Program and other government-funded pharmacy benefit programs; (2) First Health's unique

methods and detailed operational processes for the management and administration of the PACE

Program; (3) First Health's highly developed understanding of PDA's needs and preferences for the

management and administration of the PACE Program, and (4) First Health's cost structure and profit

margin on the current PACE contract.

Second, both NPA and Norton threaten to recruit and hire First Health's entire

PACE staff and, as a result, cripple First Health's experience base.  Third, in his effort to prepare an

NPA bid proposal that would compete, for the first time, with a bid proposal submitted by First Health

for a PACE contract, Norton materially breached Section 7 (confidentiality), Section 8 (customer non-

solicitation) and Section 9 (employee non-solicitation) of his October 1, 1997 employment agreement

with First Health (the "Agreement").  Norton violated the confidentiality restriction by disclosing

and/or using First Health's confidential and proprietary business information.  Norton violated the

customer non-solicitation restriction by initiating contact with likely bidders for the PACE Contract for

the purpose of offering consulting services based on his FHSC PACE experience; using his FHSC

---

[1] First Health Group Corp. ("First Health") incorporates by reference, as if set forth at length herein, (i) its pre-hearing memorandum for injunctive relief, (ii ) its proposed findings of fact and (iii) the legal authority set forth in its memorandum of law in support of motion for temporary restraining order and preliminary injunction.  In addition, First Health will utilize the following acronyms in this memorandum of law: "FHSC" for First Health Services Corporation , "PDA" for the Commonwealth of Pennsylvania's Department of Aging,  "PACE Program" for the Commonwealth of Pennsylvania's Pharmaceutical Assistance Contract for the Elderly program, "PACE Contract" for the contract to manage and administer the PACE Program for the period commencing July 1, 2000, and "RFP" for the request for proposal issued by PDA on September 14, 1999 with respect to the PACE Contract.

PACE experience in the preparation of NPA's 1999 bid proposal for the PACE Contract; recommending to NPA that it propose him as its officer-in-charge of the PACE Program; and conducting PDA's oral interview with NPA.  Fourth, Norton breached the employee non-solicitation restriction by (1) recommending to NPA that it propose recruiting and hiring First Health's entire PACE staff, (2) directing and participating, as NPA's officer-in-charge of the PACE Program, the recruiting and hiring of First Health's entire PACE management team and staff, and (3) soliciting First Health's current officer-in-charge of the PACE Program to work for NPA.  Fifth, in its fury to win the PACE Contract, NPA induced Norton to breach the Agreement and, along with Norton, NPA unlawfully interfered with First Health's prospective contract with PDA.  Viewed separately or in the aggregate, as a result of these acts of unfair competition, First Health has suffered, and will continue to suffer, irreparable harm that requires the entry of preliminary and permanent injunctive relief by this Court.

II.    **ARGUMENT**

A.    **The Availability And Appropriateness Of Injunctive Relief**

Injunctive relief may remedy past wrongs and prevent the occurrence of future wrongs.  With respect to the past wrongs committed by Norton and NPA, both defendants should be enjoined from, among other unlawful conduct, profiting from their misappropriation of First Health's trade secrets.  See A.M. Skier Agency, Inc. v. Gold, 747 A.2d 936 (Pa. Super. 2000) (enjoining former employee and competitor from using confidential customer information unlawfully misappropriated from former employer); IDS Financial Services, Inc. v. Smithson, 843 F.Supp. 415 (N.D. Ill. 1994) (enjoining former employee from using confidential customer information misappropriated from employer).  With respect to preventing Norton and NPA from committing future wrongs against First Health, the Court should issue an injunction to neutralize the threat that Norton and NPA pose, among others, with respect to future misappropriation of First Health's confidential and proprietary business information.

See PepsiCo, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995) (applying Illinois law) (enjoining former employee's inevitable disclosure of former employer's trade secrets); Air Products and Chemicals, Inc. v. Johnson, 442 A.2d 1114 (Pa. Super. 1982) (same) (applying Pennsylvania law).[2]

### B.    First Health Prevails On The Merits

### 1.    NPA And Norton Embark On A Path Of Unfair Competition With Respect To The PACE RFP And Contract

Before NPA retained Norton on November 17, 1999 to prepare its 1999 bid proposal (Testimony of Norton at 309-10; P-23), Norton embarked on a path designed to undercut First Health's status as the PACE Program's administrator.  In March, 1999, Norton decided that he wanted to leave his employment with First Health (Norton at 407).  In April, 1999, Norton had dinner with Thomas Snedden ("Snedden"), PDA's Director of the PACE Program, and told him that they could not discuss the PACE Program until the completion of the 1999 re-procurement (Norton at 407-08; April 20, 2000 deposition of Snedden ("Snedden deposition") at 23, 27-28, 77-78).  Yet, in the very next month (May, 1999), Norton (while still working as a First Health employee) dined with Snedden and Richard Hofheimer ("Hofheimer"), a former First Health sales executive.  At dinner, Norton and Snedden discussed the possible changes to the federal Medicare program and their effect on the PACE Program  (Snedden deposition at 72-73; Norton at 408).  Although in May, 1999, he no longer had overall management responsibility for the PACE Program and had decided to leave First Health, Norton maintained his long-standing relationship with Snedden because Norton planned to use his knowledge of FHSC's PACE operations and his relationship with Snedden to market himself as a "consultant" to companies that were likely bidders for the PACE Contract.  In fact, from June 1999 to November 1999, Norton and Hofheimer marketed themselves as consultants who would (i) assist a

---

[2] Injunctive relief is also appropriate to remedy intentional interference with contract and intentional interference with prospective contractual relations.  See Northeast Women's Center, Inc. v. McMonagle, 939 F.2d 57 (3d Cir. 1991) (intentional interference with contract); Barmasters Bartending School, Inc. v. Authentic Bartending School, Inc., 931 F. Supp. 377 (E.D. Pa. 1996) (intentional interference with prospective contractual relations).

likely bidder with the preparation and submission of a bid proposal for the PACE Contract, and (ii) afterwards, pursue and maintain an ongoing business relationship with the successful bidder (Norton at 365-66). One such company, Consultec Incorporated, expressed to Norton its concern that Norton could not provide consulting services without violating the restrictive covenants in his Agreement with First Health (Norton at 363-64).

Undeterred by his legal obligations to First Health and "desperate for work", in November, 1999, Norton sought out NPA, a direct competitor of First Health for the PACE Contract, for the sole purpose of helping NPA prepare its bid proposal and take the management of the PACE Program away from First Health (Norton at 299-300; Testimony of Steven Nicoletos at 499). On November 17, 1999, just three weeks before the deadline for the submission of bid proposals for the PACE Contract, NPA gave Norton a perfunctory interview. At the interview, Norton only showed NPA a single-page document, that he prepared, that purported to set forth Sections 7 (confidentiality) and 8 (customer non-solicitation) of the Agreement (Norton at 301, 400-02; P-28; P-79). Incredibly, Norton did not disclose Section 9 (employee non-solicitation) or provide NPA with a complete copy of the Agreement (Norton at 300-01, 400-02; Testimony of Allen Langjahr ("Langjahr") at 532-33; P-79).[3]

On the same day that NPA interviewed Norton, Langjahr, NPA's general counsel, gave Norton a consulting agreement specifically written for the work that Norton would perform in the preparation of NPA's 1999 bid proposal. More important, Langjahr drafted the consulting agreement without first reviewing the single-page document containing Sections 7 and 8, or obtaining a complete copy of the Agreement (Langjahr at 532-33). Further, between the November 17, 1999 interview and the submission of NPA's bid proposal for the PACE Contract about three weeks later, Norton did not (i) discuss the Agreement's restrictive covenants with anyone at NPA, or (ii) receive anything in writing

---

[3] During his interview with NPA, Norton trumpeted, among other things, the following: (i) his experience with, and intimate knowledge of, the PACE Program (Norton at 300, 565-66); (ii) his intimate involvement in the preparation of FHSC's 1995 bid proposal for the PACE Program (Norton at 565-66); and (iii) his friendship with Snedden, the Director of the PACE Program (Norton at 566).

from NPA that cautioned him to adhere to those restrictive covenants (Norton at 305; Langjahr at 533-34). In addition, NPA never requested, and Norton never provided, any references (Norton at 570). In fact, NPA never attempted to contact First Health to disclose that NPA had retained Norton's consulting services (Norton at 571).

Significantly, in 1990 and 1995, NPA had submitted unsuccessful bid proposals for the PACE Program that PDA considered poorly prepared (Testimony of Peter Greiger ("Greiger") at 458-60; Snedden deposition at 36-41). NPA admits that it looked to Norton to provide it with knowledge and insights on how to win the PACE Contract that NPA could not glean from the RFP or other publicly available information (Nicoletos at 499-502). As a result, NPA's hasty retention of Norton and motives for hiring him reveal a single-minded agenda -- to secure every advantage, whether lawful or not, that Norton offered with respect to the preparation of its PACE bid proposal.

### 2.     **Norton Prepares NPA's 1999 Bid Proposal For The PACE Contract**

Norton's desperate need for employment and NPA's new corporate strategy of taking an aggressive approach to maintaining a presence in Pennsylvania after having lost a major government contract in that state (Greiger at 423), coalesced and resulted in the misappropriation of First Health's confidential and proprietary business information. Norton's self-serving testimony that he did not reveal any such information (Norton at 368) is not believable under these circumstances. Indeed, Norton displays a startling lack of credibility about the scope and significance of his contributions to NPA's 1999 bid proposal for the PACE Contract.

In an obvious attempt to minimize his role in drafting NPA's bid proposal, Norton testified that, as a member of NPA's "red team" of individuals who reviewed the bid proposal, he merely read the proposal and did not "necessarily" change or add any text (Norton at 373). Yet, Norton's admissions during other points in his testimony confirm that his contributions to writing NPA's bid

proposal were extensive. For example, on cross-examination, Norton admitted that he was involved in drafting and editing many portions of NPA's entire technical proposal (Norton at 305-06).[4]

Moreover, in part, NPA retained Norton because he could work on NPA's 1999 cost proposal full-time; Nicoletos concedes that Norton provided him with considerable assistance in preparing NPA's 1999 cost proposal (Nicoletos at 510-11). For example, Norton approved the final bid price proposed by NPA (Norton at 302-03). Norton prepared several drafts of NPA's cost proposal, and an Excel spreadsheet with preliminary cost figures for staffing, travel, equipment, supplies, general operating expenses, turnover, direct labor, other direct costs and the cost for the maintenance of imaging equipment (Norton at 302, 323-24; Nicoletos at 506-510). Further, Norton developed the cost number for the takeover and turnover portions of NPA's 1999 bid proposal (Norton at 302; Nicoletos at 508-09). Norton also established a methodology for allocating the preliminary costs to the ancillary programs that are part of the PACE Program and the RFP (Nicoletos at 506-07). Clearly, Norton's role in drafting NPA's technical and cost proposals was significant.[5] Norton also acknowledges that,

---

[4] Norton also admitted that his contributions to NPA's 1999 bid proposal included, among others, (1) recommending that NPA provide weekly on-line status reports to PDA as a project management tool (Norton at 306); (2) recommending that NPA use Paragon to provide software for integrating and maintenance services for the imaging system (Norton at 306); (3) recommending that NPA use incentives to recruit and hire First Health's current PACE staff, such as (i) retaining the staff's respective anniversary dates, and (ii) cash bonuses (Norton at 307-08, 567-68); (4) writing the statement that identifies First Health's current switch vendors (Norton at 308-09, 323); (5) writing the statement that NPA had performed an "intensive review" of First Health's "operations and processes" for the PACE Program and its ancillary programs (Norton at 309); (6) recommending that NPA divide the administrative functions for the manufacturers' rebate program between NPA's business/financial and utilization review departments (Norton at 392-93); (7) proposing himself as NPA's officer-in-charge of the PACE Program (Norton at 567); (8) adding one extra third-party liability coordinator above and beyond First Health's requirement (Norton at 322-23; P-72); (9) adding, into NPA's work plan, the recruiting and hiring of FHSC's current PACE management and employees (Norton at 323; P-73.)

[5] Norton weakens his credibility by giving inconsistent testimony about his anticipated role as NPA's officer-in-charge of the PACE Program. Norton claimed not to recall whether NPA's bid proposal called for him, as the proposed officer-in-charge, to participate in recruiting and hiring of First Health's current PACE staff (Norton at 311-12). Norton eventually acknowledged that NPA's 1999 bid proposal stated that he would arrange interview sessions with First Health's current PACE staff (Norton at 312). Norton also acknowledged that (i) the administrative assistant who is in charge of recruiting and hiring (as shown on the GAANT flow chart that is part of NPA's bid proposal) actually reports to Norton, and (ii) that NPA's takeover work plan requires Norton, as the officer-in-charge, to make "every effort" to hire the incumbent's (that is, FHSC) key managers and operations staff (Norton at 573-74, D-7, D-11). In fact, Norton's own handwritten notes, prepared while he worked on NPA's bid proposal, include a list of First Health current PACE staff, and a reference to proposing the recruiting and hiring of that staff in NPA's work plan (Norton at 321, 323). As a result, Norton's considerable admissions concerning his role in recruiting and hiring of First Health's current PACE staff undermines any attempt on his part to marginalize his direct participation.

6

with respect to the writing of NPA's bid proposal, he provided NPA with a significant augmentation

(Norton at 569).  Significantly, at NPA's oral interview with PDA, Snedden (who had been critical of

NPA's previous bid proposals) credited Norton with the improvement in the quality of NPA's 1999 bid

proposal (Snedden at 25-27; Snedden deposition at 171-73; Norton at 325; P-106 at 13-14).

### 3.   ● NPA And Norton Unlawfully Misappropriate First Health's Confidential And Proprietary Business Information
   ● Norton Violates The Agreement's Confidentiality Restriction

First Health (operating through FHSC), in its management and administration of

the PACE Program, developed and implemented unique methods and detailed operational processes

for the PACE Program that it considers to be confidential and proprietary business information.[6]

During his tenure as a First Health employee (specifically, his tenure as the officer-in-charge of the

PACE Program (1990-93) and senior vice president of First Health's pharmacy business unit (1993-

98)), Norton gained an intimate working knowledge of these unique First Health methods and

processes (Testimony of Teresa DiMarco ("DiMarco") at 54-56; Norton at 286-95).  The

distinguishing characteristics that FHSC brings to the management and administration of the PACE

Program are not set forth in the RFP (Snedden at 22, 27).

By applying its own highly developed methods and detailed operational processes to the basic

components of the PACE Program[7], FHSC ties these components together, and enables the program to

operate effectively.  Stated another way, these "ties" reflect a unique and recognizable stamp that First

Health places on the PACE Program (DiMarco at 103-04, 203-05; Snedden at 20, 27-28).  These

---

[6] Norton and NPA, to the extent they rely on the opinions of Robert Howells ("Howells"), FHSC's current officer-in-charge of the PACE Program, of what is or is not First Health's confidential and proprietary business information, are misguided. Mr. Howells is neither an authority on First Health's confidential and proprietary business information, nor is he First Health's spokesperson on that issue (DiMarco at 172-73).

[7] On an operational level, these basic components of the PACE Program include cardholder eligibility determination, cardholder services, provider enrollment, provider relations, claims adjudication, clinical programs (such as retrospective and prospective drug utilization review, disease state management programs, and establishment of drug formularies), administration of manufacturers' rebates, reporting, research, and the management of PDA's funding stream (DiMarco at 37-41).

unique ties and stamp are owned by First Health and not by PDA (Snedden at 20). In Snedden's view, the removal of one of these "ties" may render the operation of the PACE Program more difficult (Snedden at 28).

In addition to developing a proprietary set of methods and processes for operating the PACE Program, First Health, as the incumbent, and its PACE staff have learned certain PDA preferences for the procurement and administration of the PACE Program that are not referred to in the RFP (Snedden at 22). Norton, by virtue of his long tenure with the PACE Program, also knew of these identifiable preferences that PDA has for the management of the PACE Program that are not in the public domain (Norton at 288; DiMarco at 56, 59-60; Snedden deposition at 21-22). More important, First Health considers all information pertaining to PDA's preferences to be its confidential and proprietary business information (P-14 at Section 7; DiMarco at 101-04).[8] Indeed, First Health has invested seventeen (17) years of time, money and resources in its relationship with PDA, all of which has afforded First Health the benefit of this knowledge.

In this case, not only do First Health's unique methods and processes, as well as PDA's specific preferences for the PACE Program, constitute First Health's trade secrets, but also the combination or customization of these methods, processes and preferences into a single, unified approach that First Health uses to manage the PACE Program constitutes, in and of itself, a First Health trade secret. See Thermodyne Food Service Products, Inc., 940 F. Supp. at 1305 (trade secret can exist in combination of characteristics and components whose unified process design and operation in unique combination offers competitive advantage); Computer Care v. Services Systems Enterprises, Inc., 982 F.2d 1063, 1074-75 (7th Cir. 1992) (same) (citing SmokEnders, Inc. v. Smoke No More, Inc., 1974 WL 20234 (S.D. Fla., Oct. 21, 1974)).

---

[8] In fact, First Health includes the needs and requirements of its customers, such as PDA, as part of the definition of "confidential business information" in the confidentiality restriction in Norton's Agreement (P-14 at Section 7).

Further, in preparing and submitting its bid proposals, First Health developed and implemented certain costing, pricing and marketing strategies that are used for PACE and other government-funded pharmacy benefit programs (DiMarco at 33-36, 44-45, 49-51; 154-55; 203; Snedden at 25-26). During his tenure as senior vice president of FHSC's pharmacy business unit, Norton (i) had an intimate involvement in the preparation of all of FHSC's bid proposals for PACE, New York's EPIC Program, and other government-funded pharmacy benefit programs, (ii) defined the cost strategies for these bid proposals, and (iii) knew FHSC's costs, pricing and profit margins (Norton at 290-93, 296-98, 399-400, 565; DiMarco at 56-59). Courts have recognized bidding processes or strategies as confidential and proprietary information.[9]

Collectively, First Health's unique approach to the operations of the PACE Program, its costing, pricing and marketing strategies, PDA's preferences for the PACE Program (all described above), as well as FHSC's profit margin on the current PACE contract, are not in the public domain. PDA does not own these items or information. Moreover, collectively, such items and information are not ascertainable from publicly available materials reviewed by NPA as it prepared its 1999 bid proposal for the PACE Contract: the 1999 RFP and its appendices, FHSC's 1995 bid proposal for the PACE contract and the current PACE contract (Greiger at 442-43, 460, 478-79; P-64; P-69).[10] As outlined above, by unlawfully using First Health's confidential and proprietary business information, NPA, among other things, convinced PDA that it possessed a sense of familiarity, comfort and confidence with respect to the operations of the PACE Program (Snedden at 66-68). In PDA's view,

---

[9] See Stewart & Stevenson Services, Inc. v. Serv-Tech, Inc., 879 S.W.2d 89 (Tex.App. 14 Dist. 1994) (claim for trade secret misappropriation may be based on business' bidding system); Air Products and Chemicals, Inc., 442 A.2d at 1122 (protecting financial information related to plaintiff's bidding process because information gave plaintiff "an advantage via-a-vis its competitors"); Triangle Sheet Metal Works, Inc. v. Silver, 222 A.2d 220, 225 (Conn. 1966) (protecting as trade secrets plaintiff's "costs, pricing and bidding").

[10] Significantly, First Health has taken the necessary precautions to maintain the secrecy of the confidential and proprietary business information at issue here (First Health's proposed findings of fact at ¶ 177).

NPA's 1999 bid proposal displayed an air of credibility that it otherwise would have lacked (Snedden at 24-27; Snedden deposition at 171-73; P-106 at 13-14).

In this case, the misappropriation by Norton and NPA of First Health's confidential and proprietary business information is self-evident. Admissions by Norton and NPA, and other uncontroverted facts, establish their unlawful misappropriation of such information in the bid process for the PACE Contract. Moreover, when NPA hired Norton to work on its 1999 bid proposal for the PACE Contract, it knew of Norton's long-term employment with First Health, his extensive experience with the PACE Program, and the fact that he had an employment agreement with First Health that contains a post-employment obligation of confidentiality similar to the one set forth in NPA's consulting agreement with Norton. As a result, NPA should have been on alert and watchful for any information provided by Norton that constituted confidential and proprietary information of First Health. NPA knew or should have known that the information in question, disclosed to it by Norton during the preparation of NPA's 1999 bid proposal for the PACE Contract, was First Health's confidential and proprietary business information.[11] Instead, after it hired Norton, NPA did not have a single discussion with him, or provide Norton with any guidance or caution, with respect to his obligation of confidentiality to First Health. In fact, in its rush to gain a competitive advantage by using Norton, NPA looked the other way and disregarded First Health's exclusive right to use confidential and proprietary business information.

a.　●**First Health's Unique Methods And Detailed Operational Processes**
　　　●**First Health's Understanding of PDA's Preferences**

NPA's 1999 bid proposal is replete with references to the unique methods and detailed

---

[11] See C & F Packing Co., Inc. v. IBP, Inc., 1998 WL 1147139 at *6 (N.D. Ill., Mar. 16, 1998) (unreported opinion) ("a defendant may be on constructive notice that the information proffered by a third person is the trade secret of another when, based on the information in the defendant's possession, a reasonable person would have been put on inquiry and an inquiry pursued with reasonable diligence would have disclosed that the information provided to the defendant was actually wrongfully obtained from another") (citing Computer Associates Intern. Inc. v. Altai, Inc., 982 F.2d 693, 718 (2d Cir. 1992); Rohm and Haas Co. v. Adco Chemical Co., 689 F.2d 424, 431 (3d Cir. 1982); Fabkom, Inc. v. R.W. Smith & Associates, Inc., 1996 WL 531873 at *12 (S.D.N.Y. 1996)).

operational processes that First Health uses to "tie" together the PACE Program's basic components. NPA's bid proposal also displays a broad understanding of certain PDA preferences. As a result, NPA demonstrated to PDA that NPA understands the PACE operation, proposes to continue it without disruption, and unlawfully submitted a technical proposal that scored highly.

### i. First Health's Imaging System For The PACE Program

First Health uses an extensive and sophisticated imaging system to support the cardholder application and provider enrollment processes. The imaging system for the PACE Program, as developed and implemented by First Health (operating through FHSC), images the cardholder and provider application documents, and other related documents for means testing, and routes and tracks the resulting images as part of the operation of cardholder eligibility and provider services (DiMarco at 205). NPA does not presently use imaging with respect to claims processing, determining cardholder eligibility or routing the work flow of documents through an operation (Greiger at 457-58). Significantly, the current imaging system used by the PACE Program differs from the imaging system in place at the time of the 1995 procurement and FHSC's 1995 bid proposal (DiMarco at 68). Despite NPA's limited experience with imaging,[12] its 1999 bid proposal describes in detail the extensive imaging system that First Health uses for the PACE Program and precisely how it is used; significantly, NPA's description goes far beyond the information set forth in the RFP or otherwise in the public domain. As a result, NPA demonstrated to PDA that NPA it understood the importance and full use of the imaging system in the PACE operations (Snedden deposition at 81-83).

### aa. First Health's Use Of Paragon

First Health's business relationship with Paragon Systems, Inc. ("Paragon"), the provider of hardware, software and maintenance for FHSC's imaging system for the PACE Program, is confidential and proprietary to First Health (DiMarco at 68-69). Paragon's involvement with the

---

[12] Greiger testified that NPA's in-house information systems staff developed an imaging system for NPA's mail service facility four (4) years ago (Greiger at 422-23).

PACE Program did not begin until after FHSC was awarded the PACE contract in 1995 and, therefore, Paragon is not mentioned in FHSC's 1995 bid proposal (DiMarco at 68).[13]  Norton, during his tenure as a First Health employee, developed FHSC's business relationship with Paragon as it pertains to the PACE Program and the New York EPIC Program (DiMarco at 68; Norton at 307; 360-61). Significantly, NPA's October 1999 draft bid proposal does not mention Paragon.  In the final version of the takeover portion of its 1999 bid proposal, however, NPA identifies Paragon as the provider of hardware, software and maintenance for FHSC's imaging system for the PACE Program (P-15; P-132; DiMarco at 68-69).  Norton admitted that he gave such information to NPA (Norton at 306, 322). Moreover, NPA admitted that First Health's use of Paragon and the fact that Paragon provided upgrades to First Health's operation and management of the program's imaging system is not public knowledge (Greiger at 462).  While Paragon's web-site may identify "First Health Harrisburg, VA, Albany, NY" as a customer, it does not set forth the precise nature of Paragon's business relationship with First Health and connection to the PACE Program (DiMarco at 171-172).  Snedden, in evaluating the technical portion of NPA's 1999 bid proposal, found NPA's use of Paragon's involvement with the imaging system "comforting."  (Snedden at 82-83).

**bb.    First Health's Use Of Kodak**

On page 68 of its takeover work plan, NPA states that First Health licenses the software for the imaging operating system for the PACE Program from Kodak – information that is confidential and proprietary to First Health (P-15; DiMarco at 84-87; Norton at 361-63; Snedden at 5-6).  No such statement about the imaging system's <u>software</u> is set forth in either the RFP or its appendices, FHSC's 1995 bid proposal, NPA's 1995 bid proposal or NPA's October 1999 draft bid proposal (P-53; P-130; P-134; P-135; Greiger at 461; DiMarco at 86-87).  In fact, NPA's 1995 bid proposal does not contain

---

[13] Significantly, FHSC's 1995 bid proposal for the PACE Program does not contain a takeover work plan because FHSC was the incumbent contractor (DiMarco at 72).  As a result, NPA cannot reasonably argue that information about FHSC's new imaging system in NPA's 1999 takeover work plan was gleaned, in whole or in part, from its review of FHSC's 1995 bid proposal.

12

any description of the imaging system then in place for the PACE Program (Greiger at 463-64). NPA

could only have acquired such information and effectively used it from Norton's vast First Health

experience (DiMarco at 86).

### cc. PDA's Preference For A Takeover Work Plan That Addresses The Imaging System

The 1999 RFP does not instruct the bidder to describe the imaging system nor address how it

will be used in the takeover work plan (DiMarco at 86). NPA's 1995 bid proposal merely mentions

the presence of an imaging system as it then existed – it does not describe the imaging system in any

detail (Greiger at 463-64). NPA, in its 1999 bid proposal, describes the new imaging system at length,

and how it will be used, in its takeover work plan (P-15). As a result, NPA's 1999 bid proposal

suggests that, during the takeover, there will be no disruption of the critical cardholder services

function. Knowing the importance of the imaging system for eligibility determinations, provider

enrollment, and overall cardholder and provider services (DiMarco at 86; Snedden at 28)), Norton

disclosed to NPA the fact that PDA would consider as non responsive a takeover plan that failed to

thoroughly address the current imaging system.

### ii. First Health's Switch Vendors

Norton admits that he authored the statement in NPA's 1999 takeover work plan that NPA has

links to the same switch vendors as First Health, namely NDC, Envoy and QS1 (P-21; DiMarco at 74-

75; Norton at 308-09, 323). NPA's October 1999 draft bid proposal, FHSC's 1995 bid proposal and

the 1999 PACE RFP do not refer to First Health's switch vendors (DiMarco at 75; Norton at 344-45).

These three switch vendors are not the only ones in the industry such that NPA could have simply

"deduced" their business relationship with First Health. First Health's business relationship with these

companies is confidential and proprietary business information (DiMarco at 73-75). Moreover, PDA

prefers, for the sake of program continuity, that the switch vendors used by the incumbent contractor

be used by a new contract administrator (Snedden at 86-87). As a result, Snedden, in evaluating

13

NPA's 1999 bid proposal, felt that NPA's reference to and continued use of First Health switch

vendors was important. (Snedden at 86-87).

### iii.    First Health's Use Of PC-SAS

In the operations task section at 336, NPA's 1999 bid proposal trumpets, as an enhancement, its

proposed use of PC-SAS, a data analysis tool, for its statistical analysis (P-126; Norton at 359-60).

First Health's use of PC-SAS to evaluate program outcomes, which began after FHSC submitted its

1995 bid proposal and won the PACE contract (and, therefore, is not set forth in FHSC's 1995 bid

proposal) is one of the unique methods that First Health implemented so that the PACE Program will

operate at its most efficient level (DiMarco at 76-77). The 1999 RFP does not mention PC-SAS -- and

there are many software tools that a company could choose for its statistical analysis (DiMarco at 76-

77, 205-06, 225). NPA's 1995 bid proposal and October 1999 draft bid proposal do not mention PC-

SAS, nor do they describe the way in which First Health uses PC-SAS to meet PDA's need for

program evaluation (Norton at 359-60; Greiger at 457; DiMarco at 76). Norton was aware of First

Health's use of PC-SAS because of his First Health PACE experience, and disclosed this fact to NPA

along with how FHSC uses PC-SAS as a tool for researching and evaluating health care and program

outcomes (DiMarco at 76-77).

### iv.    First Health's Use Of On-Line Weekly Status Reports

NPA incorrectly contends that the 1999 RFP references the use of on-line weekly status

reports. At Section IV-3 TII-10, the 1999 RFP only addresses the specific routine operational reports

generated from the main point-of-sale system -- not the project management tool of on-line, weekly

status reports on PACE Program initiatives (DiMarco at 234-36). FHSC's 1995 bid proposal, NPA's

1995 bid proposal and NPA's October 1999 draft bid proposal do not refer to, or propose, that weekly

status reports be provided to PDA on-line (DiMarco at 81; P-130). Norton, who knew of First Health's

move toward the development of on-line weekly status reporting, admits that he recommended to NPA

14

that it include such an enhancement in its 1999 bid proposal (Norton at 306). Moreover, Snedden considered it a "plus" that NPA proposed weekly on-line status reports, a feature that (i) he had wanted before First Health implemented it, and (ii) represents a PDA preference (Snedden deposition at 87-88; Snedden at 31-32). First Health's use of weekly on-line status reporting is confidential and proprietary business information that Norton disclosed and used for NPA's benefit (DiMarco at 81).

### v.    First Health's Approach To Provider Training

In its operations work plan at 85, NPA's 1999 bid proposal states that, as part of the delivery of provider training, NPA will (i) meet with PDA to determine new initiatives for the PACE Program and the ancillary programs that should be included in provider training presentations; (ii) work with the PDA and the pharmacy association to determine if continuing education credits can be given to those pharmacists who attend provider training sessions; and (iii) initiate contacts with hotels and Commonwealth agencies to arrange for convenient meeting places for provider training sessions (P-19). First Health currently implements all of these unique approaches. NPA has acknowledged that these approaches or methods are not set forth by NPA in its 1995 bid proposal or its October, 1999 draft bid proposal (Grieger at 469-71, 476).

Moreover, NPA states, at 83-84 of its 1999 operations work plan, that it will perform the function of provider training, rather than subcontracting that responsibility to a SERB (P-19). In its 1995 bid proposal and its October 1999 draft bid proposal, NPA proposed the use of a SERB for provider training (DiMarco at 90-92; Norton at 339-40). NPA also states, in its 1999 bid proposal, that its project director will accompany the provider relations manager to provider training sessions (P-19). In its 1995 bid proposal and October 1999 draft bid proposal, NPA does not propose that the project director will attend provider training sessions (DiMarco at 92-93). In addition, the 1999 RFP does not require the project director to attend provider training sessions (DiMarco at 92-93). As PDA is aware, First Health has always conducted provider training for the PACE Program in this manner (DiMarco at

15

91-93). In short, in an effort to replicate First Health's unique approach to provider training and improve its credibility with PDA, NPA used Norton's detailed knowledge of First Health's methods (along with its understanding of PDA's preferences) for provider training.

### vi.    First Health's Surveillance Utilization Review System (SURS)

First Health, in its management and administration of the PACE Program, focuses on the evaluation of the results from its surveillance utilization review, and takes actions that are responsive to those results. First Health does not simply generate batch reports based on pre-set criteria (Norton at 358-59). In its October 1999 draft bid proposal, when it addressed surveillance utilization review, NPA focuses on the generation of batch reports based on pre-set criteria (Norton at 356-57). In contrast, the final version of NPA's 1999 bid proposal emphasizes the evaluation of analysis results and taking actions in response to those results (Norton at 346-47, 356-59).

### vii.    First Health's Manufacturers' Rebate Administration

With respect to PACE, First Health divides the administrative functions of the manufacturers' rebate program between its business/financial and utilization review departments (Norton at 346), using a combination of clinical and financial staff to maximize rebate recoveries for PDA and other public clients. NPA, as a commercial pharmacy benefit manager, would not be familiar with rebate administration as it applies to a government-funded program's direct contracts with drug manufacturers because, in the commercial context, the pharmacy benefit manager enters into its own contracts and administers one uniform set on its own terms (DiMarco at 31-33). Stated differently, under the commercial model, rebate administration is usually handled as a financial function. NPA's October 1999 draft bid proposal is silent on where the functions that support the administration of the manufacturers' rebate program should reside, but the final version of NPA's 1999 bid proposal — consistent with First Health's established and successful method — divides these functions between NPA's business and clinical utilization review departments (Norton at 345-46; P-144; P-145). Norton

16

admits that he recommended to NPA that it divide the administrative functions of the manufacturers' rebate program (Norton at 346, 393).

### viii. First Health Integrates Imaging Documentation And Procedures With The Cardholder Services Procedures Manual

NPA, in its 1999 takeover work plan at 93, states that it "presumes" that the imaging documentation and procedures for the PACE Program are integrated with the cardholder services procedure manual (P-16). This fact is not set forth in the 1999 RFP (DiMarco at 96; Greiger at 462-63). Moreover, this fact is not set forth in any previous FHSC PACE bid proposal, or in NPA's 1995 bid proposal (DiMarco at 95-96). Norton, as a result of his First Health PACE experience, knew of such integration (DiMarco at 95-96, 243-44). In view of the fact that the placement and integration of the imaging documents and procedures is not public knowledge or publicly available, NPA could have only learned and used this fact from its association with Norton (DiMarco at 95-96). Imaging is considered by Snedden to be an important aspect of the PACE Program; as a result, NPA's knowledge concerning the placement and integration of the imaging documentation and procedures builds NPA's credibility with respect to the PACE operation.

### ix. Some Providers Elect To Receive Their Remittance Advices Via Electronic Media

NPA, in its 1999 operations work plan at 79, states that providers sometimes elect to receive their remittance advices via electronic media (P-55). The RFP does not require that remittance advices be given to providers via electronic media (DiMarco at 98). Moreover, NPA's 1995 bid proposal and October 1999 draft bid proposal do not contain such a statement (P-130; Grieger at 456; DiMarco at 98), and this information is not set forth in FHSC's 1995 bid proposal (DiMarco at 98). In addition, NPA would not have any independent knowledge that providers in the PACE Program sometimes made such an election because it is a new development in FHSC's PACE operation since 1995 (DiMarco at 98). Yet, Norton was in a position to disclose to NPA for its use and expansion this

particular providers' preference because of his broad First Health PACE experience (DiMarco at 98).

### x.   First Health Establishes The Software And Processes Used in The Preparation Of Weekly Remittance Advices In The Provider Relations Unit

In its 1999 operations work plan at 79, NPA states that the software and processes used in the preparation of weekly remittance advices are established in the provider relations unit – as opposed to in a typical systems output area (P-55). In most pharmacy benefit management or health care administration operations, the computer operations area usually handles output of electronic media (DiMarco at 99). NPA could not ascertain from publicly available information the fact that, with respect to the PACE Program, the provider relations unit maintains the software and processes used in the preparation of weekly remittance advices (Greiger at 473; DiMarco at 246-47). Norton was aware of this fact from his First Health PACE experience (DiMarco at 98-99) and disclosed it to NPA.

### xi.   First Health's Disaster Recovery And Back-Up System

As FHSC's officer-in-charge of the PACE Program, Norton was responsible for all disaster recovery and back-up procedures (Norton at 338). When compared to the October 1999 draft bid proposal, NPA significantly expanded the disaster recovery and back-up plan in the final version of its 1999 bid proposal (Norton at 337-39). Plainly, given NPA's retention of Norton after the "last modified" dates in the October 1999 draft, Norton disclosed to NPA First Health's confidential and proprietary procedures for disaster recovery and back-up, which he knew were important to PDA (Norton at 338; P-138 (last modified 10/27/99).[14]

### b.   First Health's Costing And Pricing Strategies For The PACE Contract

### i.   First Health's Pricing Strategy For Takeover

---

[14] Norton, by disclosing and/or using First Health's unique methods and detailed operational processes for managing the PACE Program, also violated Section 7 of his Agreement with First Health. Section 7 prohibits Norton from disclosing and/or using First Health's "computerized manuals and systems, procedures, reports, client lists, review criteria and methods, financial methods and practices . . . as well as information regarding [First Health's] past, present and prospective clients." (P-14 at Section 7). Section 7 also prohibits Norton from disclosing "information" pertaining to the "particular needs and requirements" of First Health's past, present and prospective customers (all three categories include PDA) (P-14 at Section 7). Norton unlawfully disclosed to NPA certain PDA preferences for the operation of the PACE Program.

18

In its 1995 cost proposal for the PACE contract, NPA bid a cost for takeover of approximately $1.5 million dollars (DiMarco at 70-71). The cost proposed by NPA for takeover in its 1999 bid proposal, absent overhead and profit, is less than one-half its prior bid -- $680,812 (DiMarco at 70-71, 214-17). During the period between the 1995 and 1999 PACE re-procurements, Norton prepared First Health's takeover cost proposal for the New York EPIC Program, a bid that First Health won (Norton at 297-98; DiMarco at 58-59). Absent an allocation for corporate overhead and profit margin, the cost First Health proposed for takeover of the New York EPIC Program was $734,702 – a figure substantially similar to that proposed by NPA for PACE in 1999 (DiMarco at 214-17). Norton developed NPA's 1999 takeover cost (Nicoletos at 508-09; Norton at 302). In view of Norton's involvement, the striking similarity between First Health's cost for the EPIC takeover and NPA's cost for a PACE takeover moves decidedly away from "coincidence" and toward Norton's disclosure to NPA of First Health's confidential and proprietary pricing strategy for takeover costs, allowing NPA to lower its overall price (DiMarco at 70).

**ii.    First Health's Pricing Strategy For Turnover**

In its 1999 bid proposal, NPA bid a turnover cost of zero dollars. As to turnover cost, NPA did not review First Health's cost proposal for the two-year (1998-2000) PACE contract extension, and First Health's 1998-2000 cost proposal for turnover is not mentioned in the RFP or PDA's answers to the bidders' questions (Greiger at 458; Snedden at 23-24; P-109). In addition, the three individuals from NPA who reviewed FHSC's 1995 bid proposal did not make any notes about the cost for turnover (Grieger at 478-79). Further, in its 1995 bid proposal, NPA bid a turnover cost of $759,000.00 (DiMarco at 99-100). First Health's pricing strategy of proposing a turnover cost of zero dollars is considered by First Health to be confidential and proprietary business information (DiMarco at 100). Significantly, Norton prepared First Health's 1995 cost proposal for the PACE contract, and First Health's cost proposal for the 1998-2000 contract extension, as well as other cost proposals for

19

First Health where First Health bid zero dollars for turnover (Norton at 290-93, 296-98, 399-400, DiMarco at 57-59). In view of the fact that Norton was intimately involved in NPA's decision to bid zero dollars for turnover as part of its 1999 cost proposal (Nicoletos at 509), the evidence of record demonstrates that Norton disclosed to NPA First Health's pricing strategy of bidding a turnover cost of zero dollars, thereby lowering NPA's bid price.

### iii.    First Health's PACE Staff Salary Structure

In its operations work plan at 274, NPA states that its salaries are "equivalent, if not higher" than the salaries of First Health in its PACE operation. From his extensive tenure with First Health and the PACE Program, Norton knew the salary structure for its PACE staff (DiMarco at 73). First Health's current salary structure for its PACE employees is confidential and proprietary financial data that is not publicly available, and is not contained in FHSC's 1995 bid proposal (DiMarco at 73). As a result, NPA could not make such a statement in good faith in its 1999 bid proposal unless Norton disclosed First Health's salary structure for the PACE Program.[15]

### iv.    First Health's Current Margin On The PACE Contract

Norton provided Nicoletos with considerable assistance in preparing NPA's 1999 cost proposal for the PACE Contract (Nicoletos at 510). Nicoletos spent very little time with Norton, however, and does not know what financial data Norton used in preparing NPA's 1999 cost proposal for the PACE Contract (Nicoletos at 512). Significantly, Norton, from his wide-ranging First Health PACE experience, knew FHSC's margins with respect to FHSC's cost proposals for the 1995 PACE contract and the 1998-2000 contract extension (Norton at 293, 297). Norton also contributed to the preparation

---

[15] In addition, NPA's 1999 cost proposal sets forth a labor overhead rate that is one percent (1%) less than the labor overhead rate of First Health (DiMarco at 119-20). In its 1995 bid proposal, NPA's labor overhead rate was equal to, or higher than, First Health's labor overhead rate (id.). During his many years with First Health, Norton prepared the budgets for First Health's pharmacy division and, as a result, knew First Health's labor overhead rates (Norton at 561; DiMarco at 119-20, 182-83). Norton disclosed First Health's labor overhead rate to NPA, and NPA undercut that rate in its 1999 cost proposal to lower its total price.

of both of these cost proposals, as well as to many other First Health pharmacy business bid proposals (DiMarco at 56-57, Norton at 290-93, 296-98, 399-400).

For its 1999 bid proposal, NPA contends that, early on, its pricing strategy was to estimate FHSC's price for the first year of the PACE Contract, and then to bid a price that was ten percent less (Nicoletos at 502, 515-16, 519, 522). In its attempt to estimate FHSC's price for the first year of the PACE Contract, NPA reviewed FHSC's 1995 cost proposal, FHSC's total price for the 1998-2000 contract extension, and a March 31, 1997 Dun & Bradstreet report for a company called Health Care Compare ("HCC") (now known as First Health Group Corp.) (Nicoletos at 493, 502-03). NPA did not review FHSC's cost proposal for the 1998-2000 extension of the current PACE contract (Greiger at 458; Snedden at 23-24). The materials that were available to NPA, however, do not support its "strategy".

First, Nicoletos explained – albeit incorrectly – that the Dun & Bradstreet report contained figures for sales and net income before taxes that provided FHSC with a 50% margin (Nicoletos at 503-04; P-97). Significantly, none of the figures in the Dun & Bradstreet report for sales and net income before taxes pertain to FHSC (Nicoletos at 504). Nicoletos assumed that HCC and FHSC were one and the same company (Nicoletos at 504-05). First Health's March 1999 10K report (to which Nicoletos had access) states that HCC did not complete its acquisition of FHSC until July 1, 1997 (Nicoletos at 505-06; P-152). Undeterred, however, by an incorrect factual assumption, Nicoletos claims that he concluded that FHSC's current profit margin on the PACE contract was between the 10% margin set forth in FHSC's 1995 cost proposal, and the 50% margin set forth in the March 31, 1997 Dun & Bradstreet report (Nicoletos at 522). Second, having "determined" that FHSC had a range of a profit margin for PACE, Nicoletos then insisted on minimizing the role, if any, that margin played in his determination of NPA's 1999 bid price (Nicoletos at 522).

Third, Nicoletos refused to acknowledge that his pricing "strategy" had little, if any, financial

21

integrity, unless he was prepared to make certain assumptions about FHSC's current costs to operate the PACE Program in order to formulate a bid price of 10% less than FHSC's likely bid price (Nicoletos at 519-22).  Fourth, Nicoletos testified that he developed NPA's pricing strategy "early" in the bid proposal process (Nicoletos at 515-16).  Yet, such a contention is inconsistent with Hofheimer's memorandum dated December 8, 1999, just two days before NPA submitted its 1999 bid proposal to PDA.  In the memorandum to NPA, Hofheimer states that he still wanted to see NPA's price come within ten percent (10%) of the current First Health price (P-82, Nicoletos at 516). Hofheimer's memorandum evidences that NPA did not develop its pricing strategy until the "eleventh hour".  As a result, NPA could not have achieved its "competitive" low bid price in such a short period of time unless Norton disclosed to NPA, and NPA used, FHSC's current profit margin and costs for the PACE Program.

Finally, the total price for the 1998-2000 PACE contract extension was $17,691,376.00, or $8,845,688 per year (P-53, 1998-2000 extension at Attachment A).  The total price bid by First Health (operating through FHSC) in 1999 for the PACE Contract was $47,458,112.00 (P-111).  The average yearly price bid by First Health (operating as FHSC) in 1999 for the PACE Contract, over the five (5) years of that contract, equals $9,502,565.00.  Based on these figures, the compound annual growth rate of First Health's price from the end of the current contract extension through the five (5) years of the new PACE Contract is approximately 2.246% -- which is a modest inflationary price increase over its prior "low ball" price which it was being paid to manage and administer the PACE Program.  More important, in view of the deficiencies in Nicoletos' so-called "pricing strategy", NPA used Norton's knowledge of First Health's costs and margins to submit a lower bid price than First Health's modest price increase and, as a result, by only a 4% difference, just scraped together a total "winning" bid score (P-114; April 27, 2000 deposition of Susan Sampson at 79-80; P-38).[16]

---

[16] Section 7 of Norton's Agreement with First Health also prohibits him from disclosing First Health's "financial methods and practices, plans, pricing and marketing techniques" (P-14 at Section 7).  Norton violated this restriction by disclosing to

22

### 4.    Threatened Future Disclosure Of First Health's Trade Secrets

Norton's long tenure as a First Health employee and, more specifically, his tenure as FHSC' officer-in-charge of the PACE Program and senior vice president of FHSC's pharmacy business unit, gave him intimate knowledge of First Health's PACE operations and other pharmacy benefit programs (DiMarco at 114-15).  If Norton serves as NPA's officer-in-charge of the PACE Program, he will inevitably disclose and/or use, as part of his day-to-day responsibilities (particularly with respect to NPA's submission of bids for similar government-funded contracts in the future), (i) First Health's unique methods and detailed operational processes for managing and tying together the basic components of PACE and other contracts, (ii) the preferences of PDA and other clients for the management and administration of their programs, and (iii) First Health's costing, pricing and marketing strategies.

More important, the threat of inevitable disclosure of First Health's trade secrets does not stop with Norton.  First Health's PACE management employees and staff share Norton's intimate knowledge of the PACE Program's operations, along with other confidential and proprietary information that is essential to First Health's business (DiMarco at 116).  If NPA recruits and hires First Health's PACE employees and staff to work for NPA's operation of the PACE Program, they will find themselves in the same or similar jobs that they occupied for First Health.  As a result, by definition and necessity, NPA will have placed former First Health personnel in positions where they will disclose and/or use First Health's confidential and proprietary business information pertaining to the PACE Program.

---

NPA and/or using the First Health costing, pricing and margin information described above.  Significantly, none of the First Health confidential and proprietary business information disclosed by Norton to NPA is "generally available to or used by others" (P-14 at Section 7).  By the express terms of Section 7, the disclosure and/or use of such information is prohibited even if "the underlying details are in the public domain." (P-14 at Section 7).  As discussed above, the confidential and proprietary business information that First Health seeks to protect is not in the public domain.  As a result, Norton violated Section 7.

5.    **Norton Violates The Agreement And Solicited PDA**

The last sentence of Section 8 provides for a narrow, limited "exception" to the customer non-solicitation restriction: "[f]or purposes of this Section, responding to an <u>unsolicited request</u> for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of [Norton's] obligation hereunder" (<u>see</u> P-14 at Section 8 (emphasis added)).  Contrary to the assertions of Norton and NPA, this narrow statement does not insulate Norton from liability.  With respect to the PACE Contract, this limited exception simply does not permit the kind and extent of activity engaged in by Norton.  As intended by the parties, the purpose of Section 8 is (i) to allow Norton to assist a new employer to respond to an <u>unsolicited</u> RFP from a government agency, but (ii) to <u>preclude</u> Norton from calling upon, soliciting or diverting, <u>directly</u> <u>or</u> <u>indirectly</u>, First Health's actual and prospective customers (DiMarco at 63-64, 134-35).  The parties did not intend the last sentence to override the explicit anti-solicitation language or the other restrictive covenants set forth in the Agreement (DiMarco at 64).

Here, Norton's conduct and the circumstances of his involvement with NPA's 1999 bid proposal do not fall within the scope of the last sentence of Section 8.  First, from June, 1999 through November, 1999, Norton actively sought out and solicited work as a consultant with respect to the 1999 PACE RFP (Norton at 365-66, 299-300, 363).  He was not on PDA's bidder's list, and did not receive the RFP from PDA (Norton at 367).  More important, NPA did not initiate hiring Norton, and then, once employed, require him to work on some discreet part of its 1999 bid proposal.  Instead, in violation of Section 8, Norton manipulated his relationship with NPA from the outset.  Norton initiated contact with NPA for the sole and specific purpose of working on its 1999 PACE bid proposal.  Second, Norton recommended to NPA that it propose him as the officer-in-charge of the PACE Program (Norton at 567).  Norton's recommendation violated Section 8's restriction on soliciting PDA.  By virtue of his PACE work experience and longstanding relationship with PDA, Norton knew

24

that PDA would be favorably impressed by a bid proposal that spotlighted him as the officer-in-charge

(Snedden deposition at 64-65).  Third, Norton conducted NPA's oral interview with PDA (Norton at

313).  As a result, in violation of Section 8's explicit language, Norton unlawfully "called upon" an

existing and prospective First Health customer for the distinct purpose of diverting PDA's PACE

contract away from First Health.  In short, Norton's efforts to secure the PACE Contract for NPA were

patently solicitous, and not subject to the limited immunity in Section 8.

### 6. Norton Violates The Agreement And Threatens To Solicit First Health's PACE Employees

The purpose of Section 9 is to protect First Health from former employees, such as Norton,

who might raid First Health's highly-trained and knowledgeable employee base for the benefit of

competitors, like NPA (DiMarco at 137).  With respect to NPA's 1999 bid proposal, Norton

recommended and actively participated in formulating a plan to recruit and hire First Health's entire

key management and staff for the PACE Program (Norton at 323; P-72).  Unlike NPA's October 1999

draft bid proposal (prepared before NPA retained Norton), the final version of NPA's bid proposal sets

forth NPA's hiring plan for First Health's PACE staff, trumpets Norton's credentials for the PACE

Program, and proposes Norton as the officer-in-charge with a direct role in recruiting and hiring First

Health's PACE employees (P-54, takeover work plan at 16; P-45 at 30; P-17; P-131; P-133; Norton at

311-13, 332-35; Greiger at 476-77; DiMarco at 142).  Norton knew that PDA would bless his scheme

because First Health's current PACE staff knew Norton and worked for him during his tenure at First

Health.  In addition, as further evidence of Norton's unlawful "indirect" solicitation in violation of

Section 9, Norton recommended that NPA use certain hiring incentives to induce First Health PACE

staff to work for NPA (Greiger at 465-66; Norton at 307-08; 322-23; 567-68; P-72; P-73).

Second, after PDA announced the bid award on February 3, 2000, Norton telephoned  Howells.

During their conversation, Norton stated to Howells that he was included in the PACE staff that NPA

would attempt to recruit and hire, and that Howells did not "have anything to worry about."  (Howells

25

at 263). Howells interpreted Norton's statement to mean, among other possible interpretations, that Howells would receive an offer of employment from NPA (Howells at 264-65). Although Norton did not expressly <u>offer</u> Howells a job during their conversation, it was Norton who called Howells to discuss the bid award to NPA and its implications, and Norton plainly intimated that NPA was interested in maintaining Howells and the rest of First Health's current PACE staff. The nature and purpose of Norton's statements to Howells were in the nature of a solicitation and, as a result, violated Section 9 of the Agreement.

### 7.    NPA's Unlawful Attempt To "Raid" First Health's PACE Staff

NPA's bid proposal is replete with representations that NPA intends to solicit and hire First Health's existing key management staff and all other employees who work on the PACE Program (<u>see</u> P-54 (turnover work plan at 16); P-45 at 30; P-17; P-131; P-133; D-7; D-11; Norton at 311-13, 324-25, 332-35, 573-75; Greiger at 476-77; DiMarco at 142). Norton's proposal will gut a key portion of First Health's knowledge and experience for the management and administration of government-funded pharmacy benefit programs for the elderly.[17]

NPA, consistent with its goal to raid First Health's PACE staff and cripple First Health's ability to secure future government-funded pharmacy business, fails to acknowledge the value of these employees to First Health, and their potential for placement in other positions at First Health in the event that First Health loses the PACE Contract. First Health's current PACE staff is comprised of approximately seventy-five to eighty employees based in First Health's Harrisburg, Pennsylvania

---

[17] Such a plan is, however, unlawful. The Supreme Court of Pennsylvania, in <u>Morgan's Home Equipment Corp. v. Martucci</u>, 136 A.2d 838 (Pa. 1957), addressed the concept of unlawful enticement of a competitor's employees: "[t]he systemic inducing of employees to leave their present Employment and take work with another is unlawful when the purpose of such enticement is to cripple and destroy an integral part of competitive business organization rather than to obtain the services of particularly gifted or skilled employees. So also, when the inducement is made for the purpose of having the employees commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers, the injured employer is entitled to protection. <u>Id.</u> at 633-34 (citations omitted). <u>See also</u> <u>ABC Trans Nat. Transport, Inc. v. Aeronautics Forwarders, Inc.</u>, 90 Ill.App.3d 817, 413 N.E.2d 1299 (Ill.App. 1 Dist. 1980) (applying Illinois law) (affirming grant of injunction against former officers who left plaintiff corporation and enticed thirty employees to leave and join competitor); RUDOLF CALLMAN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 9.03 (4th ed. 1999).

office. The PACE staff represents a core asset of First Health and a collective skill set that is critical to the management and administration of government entitlement programs for senior citizens. First Health's PACE staff possesses certain skills, experience and knowledge that First Health has successfully marketed, and will continue to market, to secure other pharmacy benefit management contracts (DiMarco at 107-09, 140, 152-53, 196). First Health has invested considerable resources in its PACE employees to develop their expertise and, if the PACE Contract ultimately goes to NPA, First Health will deploy these employees in other capacities, particularly those employees in management and other key positions. First Health's loss of these employees to NPA would cripple First Health's ability to obtain contracts in the future (DiMarco at 107-09).

NPA contends that First Health somehow waived any claim based on NPA's proposal to hire First Health's entire PACE staff because, in its answer to a bidder's question, PDA stated that it would react "affirmatively" to such a proposal (P-109 at 30, answer to question 136(b)). NPA's contention lacks merit. First, NPA's so-called "waiver" argument, if pertinent at all, pertains to whether First Health filed its bid protest with PDA in a timely manner pursuant to Chapter 58 of the Procurement Handbook. The resolution of that issue is not relevant to whether First Health's claim for unfair competition is timely under the applicable statutes of limitations.[18] Second, First Health could not have waived a claim with respect to its management personnel because PDA's affirmative response to a bidder proposing the takeover of the current PACE staff specifically excluded First Health's managerial personnel (DiMarco at 250-51; Snedden at 21; P-109 at 30, answer to question 136(d)). In fact, PDA's exclusion of First Health's managerial personnel for PACE acknowledges First Health's significant investment in these employees.

---

[18] The ITSA has a five-year statute of limitations. 765 ILCS 1065/7. Under Illinois law, a breach of contract claim must be brought in five years. 735 ILCS 5/13-205. Pennsylvania's limitations period on claims for intentional interference with contract and intentional interference with prospective contractual relations is two years. 42 Pa.C.S.A. § 5524(7). Clearly, First Health filed this action within these limitations periods.

Third, First Health did not file a letter objecting or protesting PDA's affirmative view of another bidder's proposal to hire First Health's current PACE staff because (i) First Health believed that it was not ripe to file an objection or protest without first knowing precisely what another bidder proposed with respect to hiring First Health's current PACE staff, and (ii) First Health did not believe that PDA, in stating an affirmative view, meant to sanction unlawful conduct by a bidder (DiMarco at 106-07). In fact, Snedden, the Director of the PACE Program, testified that First Health could not have filed a letter or other document that objected to PDA's statement unless and until First Health had seen the full formulation and scope of NPA's proposal to hire First Health's entire PACE staff in the actual bid submitted (Snedden at 21).

### 8.    NPA Tortiously Interferes With Norton's Agreement

NPA intentionally interfered with the Agreement between First Health and Norton. NPA was aware of that contractual relationship and, more importantly, the restrictions (particularly, protecting the confidentiality of First Health's trade secrets and restricting the solicitation of First Health's customers) the Agreement placed on Norton. Nonetheless, without as much as a single telephone call or letter to First Health, NPA hired Norton – a former First Health employee with intimate and extensive knowledge of First Health's costs, margins, marketing and management for the PACE Program - and gave him a central role in NPA's bid for the PACE Contract. While NPA undoubtedly expects Norton to honor the restrictions in his consulting agreement, NPA, intentionally and without privilege or justification, induced and caused Norton to violate Sections 7, 8 and 9 the Agreement. As a result, this Court should order injunctive relief to stop NPA's tortious interference with Norton's performance under the Agreement.

### 9.    NPA Intentionally Interferes With First Health's Prospective Contractual Relationship With PDA

Here, the evidence of record establishes First Health's claim for intentional interference

28

with a prospective contractual relationship against Norton and NPA. First Health has been a party to a

valid and enforceable contract between itself and PDA to manage and administer the PACE Program.

As a result of (i) having been the contract administrator for the PACE Program since 1983, (ii)

receiving "A-plus" ratings from PDA, and (iii) always being the "low-ball" bidder, First Health had,

and has, a reasonable expectation or probability of entering into a valid business relationship with PDA

for the PACE Contract for the period commencing July 1, 2000. First Health's expectation is

particularly strong in light of the fact that NPA's two previous bids were evaluated as <u>substantially</u>

<u>insufficient</u> and priced twenty-five percent (25%) or more higher than First Health's price ( Snedden

deposition at 36-41; DiMarco at 61; Greiger at 459-60).

Norton knew that First Health expected to enter into another contract with PDA because he was

a long-term First Health senior management employee with direct and substantial participation in the

PACE Program. For its part, NPA was similarly aware of First Health's plan and expectation because

both companies are competitors who have submitted previous bids. Yet, without privilege or

justification, both Norton and NPA purposefully interfered and prevented First Health's expectancy

from ripening into a valid contract with PDA by, among other methods, unlawfully disclosing and/or

using First Health's confidential and proprietary business information (as previously described) in an

attempt to give NPA's 1999 bid proposal a veneer of credibility and substance that it did not deserve,

and disregarding the explicit terms of Norton's Agreement with First Health. As a direct and

proximate result of the improper interference by Norton and NPA, PDA awarded the PACE Contract

to NPA.

**C.    Injunctive Relief Against NPA and Norton Will Prevent
Irreparable Harm To First Health**

In this case, money damages cannot realistically compensate First Health for the continuing

threat that NPA poses to its business. First, as is clear from NPA's 1999 bid proposal for the PACE

Program, NPA intends to solicit and hire First Health's entire PACE staff – a move that jeopardizes

29

First Health's long-term investment in key personnel and intellectual capital and, by definition, subjects First Health's confidential and proprietary business information to ongoing disclosure to NPA. Second, not only should the Court not permit Norton and NPA to profit from their unlawful conduct to date, but also the Court should intervene to prevent the further disclosure and use of First Health's trade secrets that will result if Norton goes to work for NPA as its officer-in-charge of the PACE Program. Again, by definition, the role contemplated by NPA for Norton places him squarely in the position where he will disclose, use and put at risk business information proprietary to First Health. Third, Norton's continued association with NPA and NPA's stated intention to hire First Health's PACE staff amounts to nothing less than a frontal assault on First Health's ability to bid in the future on other contracts to manage a government-funded pharmacy benefit program for seniors. By virtue of having retained Norton and potentially acquiring First Health's highly skilled PACE staff, NPA now has an asset that it did not have before that will enable it to compete for such contracts, while at the same time continuing to trade on First Health's trade secrets. As a result, First Health suffers irreparable harm that cannot be compensated by money damages and requires this Court to order appropriate injunctive relief.[19]

## III.  CONCLUSION

For the reasons set forth above, plaintiff First Health Group Corp. respectfully urges this Court to grant the injunctive relief requested in the proposed order.

Respectfully submitted,

July 3, 2000                    Scott L. Vernick, Esquire, Jeffrey D. Hutton, Esquire

---

[19] Section 10 of the Agreement entitled, "Remedies", states that, in the event Norton breaches Sections 7, 8 or 9, First Health "shall" be entitled to injunctive relief enjoining any actual or threatened breach, and that Norton "acknowledges that [First Health's] remedy at law is inadequate and that [First Health] will suffer irreparable injury if such conduct is not prohibited". See Agreement at Section 10. Norton admits that he agreed to the terms of Section 10 (Norton at 570). Accordingly, both the Agreement and the governing law recognize that the element of "irreparable harm" is satisfied in this case.

30

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,               :
                                        :
                        Plaintiff,      :
                                        :
            v.                          :        NO. 1:00-CV-312
                                        :
NATIONAL PRESCRIPTION                   :
ADMINISTRATORS, INC. and                :
DAVID W. NORTON,                        :
                                        :
                        Defendants.     :

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the date set forth below, I served a copy of plaintiff, First Health

Group Corp.'s memorandum of law in support of motion for injunctive relief on the person

identified below, via federal express mail:

> Thomas B. York, Esquire
> Dilworth Paxson LLP
> 305 N. Front Street, Ste. 403
> Harrisburg, PA 17101-1236
> (717) 236-4812
> Attorney for Defendants,
> National Prescription Administrators, Inc. and
> David W. Norton

                                        _____
                                        SCOTT L. VERNICK, ESQUIRE

Date: July 3, 2000