ORIGINAL

(42)
PC
7/?

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

### NO.   1:00-CV-312

FIRST HEALTH GROUP CORP.,

                Plaintiff,

      v.

NATIONAL PRESCRIPTION ADMINISTRATORS, INC.
and DAVID W. NORTON,

                Defendants.

FILED
M?D ??? PA

JUL 3 ??

MAR? ????? ?, CLERK
Per _____
Deputy Clerk

---

### PRELIMINARY INJUNCTION HEARING

### PROPOSED FINDINGS OF FACT OF
### PLAINTIFF FIRST HEALTH GROUP CORP.

---

Scott L. Vernick, Esquire
Jeffrey D. Hutton, Esquire
FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103-3291
(215) 299-2000

Attorneys for Plaintiff
FIRST HEALTH GROUP CORP.

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................. 1

II.  PROPOSED FINDINGS OF FACT................................................1

 A. Identity Of The Parties ............................................................... 1

 B. Jurisdiction And Venue ............................................................... 2

 C. First Health's Premier Role As A Contract Administrator For Government-Funded Pharmacy Benefit Programs................................................................... 2

 D. The Contract To Manage And Administer The PACE Program ................................ 5

 E. Norton's Employment Tenure With First Health...................................................... 7

 F. Norton's October 1, 1997 Employment Agreement With First Health.................... 11

 G. Norton Leaves First Health And Immediately Attempts To Secure Consulting With Respect To PDA's 1999 RFP For The PACE Contract ................................... 15

 H. PDA's 1999 RFP For The PACE Contract..................................................17

 I. Norton Violates Section 8 Of His Agreement With First Health By Approaching NPA For The Specific Purpose Of Providing Consulting Services With Respect To NPA's 1999 Bid Proposal For The PACE Contract..................................................................18

 J. Norton's Role In The Preparation And Submission Of NPA's 1999 Bid Proposal For The PACE Contract .......................................................... 22

  a. NPA's 1990 And 1995 Bid Proposals For The Contract To Manage And Administer The PACE Program ............................................................. 22

  b. NPA Had Limited Access To Documents In The Public Domain While Preparing Its 1999 Bid Proposal .................................................. 23

  c. Norton's Preparation Of NPA's 1999 Technical Proposal...................... 23

  d. NPA Proposes Norton As The Officer-In-Charge And Hiring FHSC's Entire PACE Staff.............................................................................. 25

  e. Norton's Preparation Of NPA's 1999 Cost Proposal ............................... 27

 K. First Health's Confidential And Proprietary Business Information For The PACE Program..................................................................................30

L.  Norton Violates Section 7 Of His Agreement With First Health, And Norton And
    NPA Unlawfully Misappropriate First Health's Trade Secrets, In Preparing And
    Submitting NPA's 1999 Bid Proposal For The PACE Contract ............................... 36

    a.  First Health's Use Of Paragon ................................................. 36

    b.  First Health's Use Of Kodak .................................................. 38

    c.  First Health's Pricing Strategy For Takeover ................................. 39

    d.  First Health's Pricing Strategy For Turnover ................................. 40

    e.  First Health's PACE Staff Salary Structure .................................. 41

    f.  First Health's Use Of Incentives In Taking Over An Incumbent's
        Personnel ..................................................................... 41

    g.  First Health's Switch Vendors ............................................... 43

    h.  First Health's Use Of PC-SAS ................................................ 43

    i.  First Health's Surveillance Utilization Review System ("SURS") .......... 44

    j.  First Health's Disaster Recovery And Back-Up System ......................... 45

    k.  First Health's Manufacturers' Rebate Administration .......................... 45

    l.  First Health's Use Of On-Line Weekly Status Reports .......................... 46

    m.  PDA's Preference That The Imaging System Be Addressed In The
        Takeover Work Plan ............................................................ 47

    n.  First Health's Approach To Provider Training ................................ 48

    o.  First Health Integrates The Imaging Documentation And Procedures
        With The Cardholder Services Manual .......................................... 51

    p.  Some Providers Elect To Receive Their Remittance Advices
        Via Electronic Media .......................................................... 52

    q.  First Health's Labor Overhead Rates .......................................... 53

M.  Inevitable Disclosure Of First Health's Confidential  And Proprietary Business
    Information By Norton And First Health's PACE Staff ................................ 55

N.  NPA Pays Norton For Work On NPA's 1999 Bid Proposal ............................... 56

O.  PDA's Evaluation And Scoring Of The Bid Proposals Submitted By First
    Health And NPA ..................................................................... 56

P.   Norton Violates Section 8 Of His Agreement With First Health By Conducting
     NPA's February 2, 2000 Oral Interview With PDA .................................................. 58

Q.   Norton Violates Section 9 Of His Agreement With First Health By Soliciting
     Robert Howells, A First Health Employee.................................................60

R.   First Health's Bid Protest....................................................................61

S.   Irreparable Harm...............................................................................61

## I.    **INTRODUCTION**

Plaintiff, First Health Group Corp. ("First Health"), by and through its attorneys, Fox, Rothschild, O'Brien & Frankel, LLP, submits the following proposed findings of fact with respect to the preliminary injunction hearing conducted in these proceedings on May 15-18, 2000, and on May 24, 2000.

First Health submits these proposed findings of fact based on the evidence submitted during the preliminary injunction hearing and, with the Court's permission, certain deposition transcripts as agreed to by the parties.  In connection with these proposed findings of fact, please note the following:

1.    Where First Health has identified a particular fact as being derived from the testimony of a witness and/or document admitted into evidence, that identification is made based on First Health's good faith belief concerning the state of the record.

2.    To the extent that any of the exhibits and other documents identified in these proposed findings of fact are the subject of claims of privilege and/or confidentiality, by referring to such exhibits or other documents, First Health does not waive any claim of privilege and/or confidentiality related to a particular exhibit or other document.

3.    First Health reserves the right to revise and supplement these proposed findings of fact in light of any scheduling revisions ordered by the Court.

## II.    **PROPOSED FINDINGS OF FACT**

### A.    **Identity Of The Parties**

1.    Plaintiff, First Health, is a Delaware corporation with its principal place of business at 3200 Highland Avenue, Downers Grove, IL 60515-1282  (Complaint ¶ 1).

2.      Defendant, National Prescription Administrators, Inc. ("NPA"), is a New Jersey corporation with its principal place of business at 711 Ridgedale Avenue, East Hanover, New Jersey, 07936 (Complaint ¶ 4, Amended Answer of NPA ¶ 4).

3.      Defendant, David W. Norton ("Norton"), is an individual who resides at 1220 Whitby Road, Richmond, VA 23277 (Complaint ¶ 5, Answer of Norton ¶ 5).

**B.      Jurisdiction And Venue**

4.      This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to First Health's claims occurred in this district.

**C.      First Health's Premier Role As A Contract Administrator For Government-Funded Pharmacy Benefit Programs**

6.      First Health is the parent company of First Health Services Corporation ("FHSC") (Testimony of Teresa R. DiMarco ("DiMarco") at 61)[1].

7.      FHSC is a national company that manages and administers, in approximately twenty-two (22) states, Medicaid and other public assistance programs including, but not limited to, government-funded entitlement programs (DiMarco at 30-31, 34-35).

8.      FHSC derives an important part of its business from government-funded pharmacy benefit programs (DiMarco at 30-31).

---

[1] Ms. DiMarco, President of FHSC, testified on May 15 and 16, 2000 (DiMarco at 30).

9.    First Health (operating through FHSC) is currently the contract administrator for government-funded programs that provide prescription drug benefits for the elderly, such as the New York EPIC Program and the Commonwealth of Pennsylvania's Pharmaceutical Assistance Contract for the Elderly ("PACE") Program (DiMarco at 41-42, 58).

10.    First Health (operating through FHSC), as the contract administrator for government-funded pharmacy benefit programs, such as the PACE Program, "customizes" the management and administration services that it provides in order to meet and exceed the particular needs and requirements of the government agency with whom it contracts. (DiMarco at 31-32).

11.    First Health (operating through FHSC), as the contract administrator for government-funded pharmacy benefit programs, not only administers such programs, but also (i) applies its clinical management skills (including, but not limited to, pharmacy clinical and other medical and behavioral skills) to assist states determine whether they are paying for medically appropriate services; (ii) provides the systems development, maintenance and operations for such programs; (iii) provides operational support for such programs (such as claims processing and reporting); and (iv) assists states with the development of their own policies, systems and operations that are unique to the needs of the particular state government and consistent with the state government's specific policies, procedures and program definitions (DiMarco at 30-31).

12.    The approach of First Health (operating through FHSC) in preparing a response to a request for proposal ("RFP") issued by a government agency includes, but is not limited to, analyzing the requirements set forth in the RFP, investigating and understanding the needs and preferences of the government agency that go beyond what is outlined in the RFP, and integrating FHSC's clinical, operations, management and systems skills in order to achieve the

3

goal of meeting and exceeding the government agency's needs and requirements (DiMarco at 33-36).

13.    Pharmacy benefit management in a <u>commercial</u> environment differs from pharmacy benefit management in a <u>government</u> setting, because (i) in the commercial setting, the commercial pharmacy benefit manager markets and applies its own management, systems, operations and clinical approaches, whereas the contract administrator for a government-funded entitlement program customizes its clinical, operations and systems services to comply with the state program's policies and procedures, and satisfies the state's particular needs and requirements; (ii) in the government setting, a prospective new contract administrator may bid a takeover of the incumbent's system and operational processes for administering the entitlement program, whereas in the commercial setting, the pharmacy benefit manager bids its own defined systems, operational and clinical methods and policies, and (iii) the contract administrator for a government-funded entitlement program applies the rules and regulations of the state to determine applicant eligibility and financial means, whereas commercial pharmacy benefit managers do not conduct eligibility determinations or financial means testing (DiMarco at 31-33).

14.    Ninety-five percent (95%) of NPA's business is as an administrator of commercial health care benefit programs (Testimony of Steven Nicoletos ("Nicoletos") at 513-14).[2]

15.    NPA has never managed and administered either the PACE Program or a comparable government-funded entitlement program in any state or commonwealth that provides pharmaceutical assistance to the elderly  (Nicoletos at 514; DiMarco at 43).

---

[2] Mr. Nicoletos, NPA's senior vice president of finance and administration, testified on May 24, 2000 (Nicoletos at 492).

16.    NPA has no experience in providing means testing as it applies to eligibility determinations or income verification (Testimony of Peter Greiger ("Greiger") at 457-58, 475-76).[3]

**D.    The Contract To Manage And Administer The PACE Program**

17.    In 1983, the General Assembly of the Commonwealth of Pennsylvania enacted legislation that established the PACE Program (DiMarco at 36).

18.    In 1983, FHSC submitted a bid proposal in response to the initial RFP issued by the Commonwealth of Pennsylvania's Department of Aging ("PDA") for the PACE Program and, as a result, PDA awarded FHSC the contract to manage and administer the PACE Program (DiMarco at 41-42).

19.    Since 1983, FHSC has been the only contractor to manage and administer the PACE Program, having won three (3) subsequent bids in 1987, 1990 and 1995 (DiMarco at 43).

20.    Thomas Snedden, Director of the PACE Program, has consistently given FHSC an "A-plus" rating with respect to FHSC's performance under the PACE contract (DiMarco at 42).

21.    The basic components of the PACE Program, on an operational level, include cardholder eligibility determination, cardholder services, provider enrollment, provider relations, on-line claims adjudication, clinical programs (such as retrospective and prospective drug utilization review, disease state management programs, and establishment of drug formularies), administration of manufacturers' rebates, reporting, research, and management of PDA's funding stream (DiMarco at 37-41).

---

[3] Mr. Greiger, NPA's senior vice president for utilization management, testified on May 18, 2000 (Greiger at 416).

22.     Bid proposals that are submitted in response to an RFP for the management and administration of the PACE contract require a technical proposal, cost proposal, and proposal for the use of Socially/Economically Restricted Businesses (SERB).  The bidders' technical proposals are submitted to PDA's bid proposal evaluation committee, whose members individually score and collectively meet to discuss the technical proposals (April 20, 2000 deposition of Thomas Snedden ("Snedden deposition") at 36-41, 51-53; April 27, 2000 deposition of Susan Sampson ("Sampson deposition") at 43-45).

23.     PDA's bid proposal evaluation committee conducts oral interviews with the bidders to discuss the respective bidder's proposal.  After the interviews are completed, the committee finalizes its technical scores of the bid proposals, opens the bidders' cost and SERB proposals, and tallies the total scores of the bid proposals.  (Snedden deposition at 53-55; Sampson deposition at 43-46, 48-49, 59-60, 76-77).

24.     In each and every re-procurement of the PACE contract before 1999, FHSC had always been the "low-ball" bidder with respect to its proposed price (DiMarco at 61; Snedden deposition at 179).

25.     In its 1987, 1990 and 1995 bid proposals for the PACE contract, FHSC proposed new innovations and enhancements for the PACE Program, and focused on both PDA's needs and requirements as set forth in the respective RFP's and other public documents, and those needs and preferences that FHSC knew as a result of its longstanding business relationship with PDA (DiMarco at 42-45).

26.     The contract term of the PACE contract entered into between PDA and FHSC in 1995 was originally three (3) years.  In 1998, PDA extended its contract with FHSC for the two-year period from 1998-2000 (Snedden deposition at 175).

27.    FHSC's current contract to manage and administer the PACE Program is scheduled to expire on or about June 30, 2000, but PDA is considering extending the term of the contract for six months (Testimony of Thomas Snedden ("Snedden") at 18)[4].

**E.    Norton's Employment Tenure With First Health**

28.    In the 1970's, The Computer Company ("TCC") (now known as FHSC) first employed Norton as an analyst and programmer in its information systems area.  Norton later became a systems manager and project manager for a number of the company's Medicaid installations, where TCC bid on Medicaid programs to either takeover an incumbent's system and operation, or develop a new system and operation for the states in question (DiMarco at 54; Norton at 544).

29.    In the 1980's, Norton became TCC's vice president in charge of the development, maintenance and enhancement of TCC's application systems which support its business of administration of public entitlement programs; in this position, Norton expanded his knowledge of taking over another contractor's system and operations (DiMarco at 54-55).

30.    From approximately 1990 to 1993, Norton was the vice president and "officer-in-charge" of the PACE Program and was responsible for, among other things, the day-to-day operations of the PACE Program, FHSC's business relationship with PDA, and serving as the principal liaison to PDA and Snedden (DiMarco at 55-56; Testimony of Norton at 287)[5].

31.    Norton participated in the preparation of FHSC's 1990 bid proposal for the PACE contract as a member of FHSC's editing team (Norton at 286-87).

---

[4] Mr. Snedden testified on May 17, 2000.  The Court should be aware that, subsequent to the preliminary injunction hearing, PDA extended the current PACE contract to December 31, 2000.

[5] Mr. Norton testified on May 16, 17 and 24, 2000.

32.    With respect to FHSC's 1990 bid proposal for the PACE contract, Norton gathered cost information pertaining to the development of a point-of-sale prescription claims processing system for the PACE Program (Norton at 286).

33.    In 1990, after PDA awarded the PACE contract to FHSC, Norton developed the point-of-sale prescription claims processing system for the PACE Program (Norton at 287).

34.    Norton, in his role as vice president and officer-in-charge of the PACE Program, was responsible for the general management of FHSC's PACE office and staff, as well as the budget and financial information of the PACE Program (Norton at 287).

35.    Norton, in his role as vice president and officer-in-charge of the PACE Program, prepared cost projections for the contract with PDA, including costs for personnel and equipment (Norton at 287-88).

36.    Norton, in his role as vice president and officer-in-charge of the PACE Program, prepared a budget of the cost to operate FHSC's PACE office in Harrisburg, Pennsylvania (Norton at 288).

37.    Norton, in his role as vice president and officer-in-charge of the PACE Program, implemented a clinical program of prospective drug utilization review (Norton at 289).

38.    Norton, in his role as vice president and officer-in-charge of the PACE Program, initiated the development and installation of the imaging system for cardholder eligibility and other documents (Norton at 289).

39.    Norton, in his role as vice president and officer-in-charge of the PACE Program, gained intimate knowledge of FHSC's profit margins with respect to the PACE Program (Norton at 289-90).

40.     In 1993, FHSC promoted Norton to senior vice president of its pharmacy business unit, a position he held until 1998.  In this capacity, Norton was responsible for overseeing the management and administration of all of FHSC's pharmacy business including, but not limited to, the PACE Program (DiMarco at 56; Norton at 290-93).

41.     In his capacity as senior vice president of FHSC's pharmacy business unit, Norton was responsible, from the standpoint of management and administration, for bringing the PACE Program's ancillary programs (e.g., Spina Bifida, PACENET, Cystic Fibrosis, PKU) on line, and approved strategic planning for those ancillary programs (Norton at 294-95).

42.     In his capacity as senior vice president of FHSC's pharmacy business unit, Norton (i) met with PDA representatives and visited FHSC's PACE office in Harrisburg every four to six weeks, (ii) continuously monitored the operations of the PACE Program, (iii) knew of the status of the PACE Program at any given time, (iv) approved strategic planning for the PACE ancillary programs, and (v) discussed with PDA the directions or enhancements that PDA wanted for the PACE Program (Norton at 293-94).

43.     In his capacity as senior vice president of FHSC's pharmacy business unit, Norton was responsible for all FHSC pharmacy contracts including, but not limited to, New York EPIC, Oregon Medicaid, Washington, D.C. Point-Of-Service, Virginia Medicaid Point-Of-Service and RetroDUR, Alaska Point-Of-Service and RetroDUR and Rebate, South Carolina RetroDUR, North Carolina RetroDUR, Blue Cross/Blue Shield of North Carolina, Blue Cross of Northeast Pennsylvania, Nebraska Medicaid, Healthpass, TennCare and Promark (Norton at 295-96).

44.     With respect to the RFP that PDA issued in 1995 for the PACE contract, Norton defined the technical, cost and price strategies for FHSC's bid proposal, and determined the enhancements to be added to the PACE Program (DiMarco at 59; Norton at 290-93).

45.    With respect to the RFP that PDA issued in 1995, Norton wrote and/or edited each section of FHSC's bid proposal (DiMarco at 59; Norton at 290-93).

46.    With respect to the RFP that PDA issued in 1995, Norton determined FHSC's price for both the capitation and non-capitation proposals that were required by the RFP (DiMarco at 59; Norton at 290-93).

47.    In his capacity as senior vice president of FHSC's pharmacy business unit, Norton was intimately involved with the preparation of all the bid proposals submitted by the pharmacy business unit including, but not limited to, the technical and cost proposals of FHSC's 1995 bid proposal for the PACE contract, and FHSC's cost proposal for the 1998-2000 PACE contract extension (DiMarco at 56-57, Norton at 290-93, 296-98, 399-400, 565).

48.    In his capacity as senior vice president of FHSC's pharmacy business unit, Norton knew of FHSC's margins on the PACE Program with respect to FHSC's cost proposals for the 1995 PACE contract and the 1998-2000 contract extension  (Norton at 293, 297).

49.    In his capacity as senior vice president of the FHSC's pharmacy business unit, Norton gained an intimate knowledge of FHSC's costs, pricing and profit margins, and helped FHSC win numerous bids for government-funded pharmacy benefit programs including, but not limited to, bids pertaining to the PACE Program and the New York EPIC Program (DiMarco at 57-59; Norton at 292-93, 296-98, 399).

50.    Norton prepared the technical and cost proposal strategies with respect to FHSC's bid for the New York EPIC contract; more specifically, Norton determined the takeover cost for FHSC's takeover cost proposal (DiMarco at 58-59; Norton at 297-98).

51.    In his capacity as senior vice president of FHSC's pharmacy business unit, Norton had overall management authority of FHSC's takeover of the New York EPIC Program, which included a takeover of some of the incumbent contract administrator's staff (Norton at 296-97; 562-63).

52.    In his capacity as a First Health employee, Norton learned and understood, in great depth, PDA's needs and preferences for the management and administration of the PACE Program (DiMarco at 56, 59-60; Norton at 288; Snedden deposition at 21-22).

**F.    Norton's October 1, 1997 Employment Agreement With First Health**

53.    On or about October 1, 1997, Norton and First Health executed an Employment Agreement (the "Agreement") (DiMarco at 61-62; Norton at 298; P-14).

54.    Norton executed the Agreement and, in return, received the following consideration: (i) a guarantee of one-year of employment, with successive automatic renewals (unless the Agreement was terminated), (ii) participation in First Health's management incentive plan, and (iii) stock options (DiMarco at 62; P-14).

55.    I find as a fact that the Agreement governs, among other things, the terms of Norton's employment with First Health (more particularly, FHSC's pharmacy management and benefits programs), and the Agreement delineated certain contractual obligations that Norton agreed to honor (P-14).

56.    I find as a fact that the Agreement is clear and unambiguous, and that Section 7 of the Agreement entitled, "Confidentiality", states:

> [Norton] agrees not to directly or indirectly use or disclose,
> for the benefit of any person, firm or entity other than [First
> Health] and its subsidiary companies, the Confidential Business
> Information of [First Health].  Confidential Business Information
> means information or material which is not generally available
> to or used by others or the utility or value of which is not generally
> known or recognized as a standard practice, whether or not the

11

underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding [First Health's] past, present, and prospective clients and their particular needs and requirements, and their own confidential information.

Upon termination of employment, with or without cause, [Norton] agrees to return to [First Health] all policy and procedure manuals, records, reports, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in [Norton's] possession and/or control which relate to (i) the Confidential Business Information of [First Health], (ii) [Norton's] Employment with [First Health], or (iii) the business activities or facilities of [First Health] or its past, present, or prospective clients.

(P-14 at Section 7) (emphasis added).

57.    I find as a fact that the Agreement is clear and unambiguous, and that Section 8 of

the Agreement, entitled "Restrictive Covenant", states in pertinent part:

For a period of one year after termination of employment, with or without cause, [Norton] will not directly or indirectly, for the purpose of selling services provided or planned by [First Health] at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of [First Health]. An actual customer, for purposes of this Section, is any customer to whom [First Health] has provided services within one year prior to [Norton's] termination. A prospective customer, for purposes of this Section, is any prospective customer to whom [First Health] sought to provide services within one year prior to the date of [Norton's] termination and [Norton] has knowledge of and was involved in such solicitation. For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of [Norton's] obligation hereunder.

(P-14 at Section 8) (emphasis added).

58.    I find as a fact that the meaning and purpose of Section 8 of the Agreement, as

intended by the parties, was to preclude Norton from calling upon, soliciting or diverting,

directly or indirectly, First Health's actual or prospective customers.

59.     I find as a fact that Section 8 of the Agreement would permit, however, Norton to assist a new employer prepare a response to an unsolicited RFP issued by a government agency or government contractor (DiMarco at 63-64, 111-12, 134-35).

60.     I find as a fact that the meaning and purpose of the last sentence of Section 8 of the Agreement, as intended by the parties, was not to supercede the language in Section 8 that prohibits calling upon or soliciting First Health's actual or prospective customers, or the other restrictive covenants set forth in the Agreement (DiMarco at 64).

61.     I find as a fact that the Agreement is clear and unambiguous, and that Section 9 of the Agreement, entitled "Non-Solicitation of Employees", states:

> [Norton] further agrees that for a period of one year from the date of [Norton's] termination, with or without cause, [Norton] shall not directly or indirectly solicit or hire any person who is currently or was an employee of [First Health] at any time during the twelve months prior to [Norton's] termination.

(P-14 at Section 9).

62.     I find as a fact that the Agreement is clear and unambiguous, and that Section 10 of the Agreement, entitled "Remedies", states:

> In the event [Norton] breaches or threatens to breach Section 7, 8 or 9 of this Agreement, [First Health] shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach. [Norton] acknowledges that [First Health's] remedy at law is inadequate and that [First Health] will suffer irreparable injury if such conduct is not prohibited.

> [Norton] and [First Health] agree that, because of the difficulty of ascertaining the amount of damages in the event that [Norton] breaches Section 9 of this Agreement, [First Health] shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's salary of the employee(s) solicited to leave [First Health's] employ.  The parties further agree that the existence of this remedy will not preclude [First Health] from seeking or receiving injunctive relief.

> [Norton] further agrees that the covenants contained in Sections 7, 8 or

13

9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by [Norton] against [First Health] shall not constitute a defense to the enforcement by [First Health] of either of these paragraphs.

(P-14 at Section 10) (emphasis added).

63.     Norton agreed to be bound legally by the terms and conditions set forth in Sections 7 (confidentiality), 8 (customer non-solicitation), 9 (employee non-solicitation) and 10 (remedies) of the Agreement (Norton at 298-99, 570).

64.     Pursuant to the terms and conditions of the Agreement, Norton was permitted to leave the employ of First Health and obtain work with a First Health competitor and, among other things, run a pharmacy or Medicaid operation, or manage an information systems development, as long as he does not violate his restrictive covenants with First Health (DiMarco at 112, 135-36).

65.     I find as a fact that the Agreement is clear and unambiguous, and that Section 6 of the Agreement, entitled, ""Termination", subsection (a) states:

Either party may terminate this Agreement at any time following the Initial Term, without cause and without any liability to [First Health], upon no less than one hundred and twenty (120) day's [sic] prior written notice.  In such event, [Norton] if requested by [First Health], will continue to render Employee Services and be paid [Norton's] regular compensation up to the date of termination in accordance with [First Health's] then-current payroll policies and procedures.

(P-14 at Section 6).

66.     Norton agreed to the terms and conditions of Section 6 (termination) of the Agreement (Norton at 298).

14

**G.      Norton Leaves First Health And Immediately Attempts To Secure
Consulting Work With Respect To PDA's 1999 RFP For The PACE Contract**

67.      In late 1998, DiMarco requested Norton take a position with FHSC that was

slightly different than his position of senior vice president of FHSC's pharmacy business unit.

More specifically, DiMarco asked Norton to take on the responsibilities for FHSC's pharmacy

information systems, while retaining responsibility for the contract to manage and administer the

PACE Program (DiMarco at 65-66).

68.      Norton refused DiMarco's request, and asked First Health for a severance

agreement (DiMarco at 65-66).

69.      DiMarco relayed Norton's request for a severance agreement to Edward Wristen

("Wristen") of First Health.  Wristen and DiMarco wanted to keep Norton due to his significant

talents and abilities (particularly in the areas of systems development and operations), and

offered Norton a position with First Health; Norton would be responsible for analyzing the

feasibility of certain system development for First Health's workers' compensation division

(DiMarco at 66).

70.      Norton accepted First Health's offer to transfer from his position in FHSC's

pharmacy business unit to FHSC's parent company, First Health, and assumed responsibility for

the feasibility analysis and subsequent system development for First Health's workers'

compensation division (DiMarco at 66, 123-24).

71.      In or around March, 1999, Norton decided that he planned to leave his

employment with First Health (Norton at 407).

72.      In or around April, 1999, Norton met Snedden for dinner in Harrisburg and,

during their visit, Norton told Snedden that they would not be able to speak for a period of time,

15

until completion of the 1999 PACE re-procurement.  (Norton at 407-08; Snedden deposition at 23, 27-28, 77-78).

73.    In May, 1999, Norton (while still employed and working for First Health) and Richard Hofheimer ("Hofheimer"), a former First Health executive, met Snedden for dinner in Harrisburg and discussed, among other things, the potential impact of an outpatient prescription drug benefit under Medicare on state-funded pharmacy assistance programs, such as PACE (Norton at 408; Snedden deposition at 72-73; DiMarco at 197-98).

74.    In or around June, 1999, Norton requested to leave his employment with First Health (DiMarco at 65).

75.    I find as a fact that Norton voluntarily decided to terminate his employment with First Health, and that he was not fired or laid-off.

76.    I find as a fact that the Agreement is clear and unambiguous, and that Section 6 of the Agreement entitled. "Termination", provides in subsection (a), that either First Health or Norton may terminate the employment relationship prior to the end of its term by giving 120-days notice (P-14).

77.    On June 7, 1999, First Health sent a letter to Norton that (i) described his severance package, (ii) stated that the effective date of his employment termination was October 28, 1999, and (iii) reminded him to adhere to the restrictive covenants set forth in the Agreement (DiMarco at 66-67; Norton at 299; P-24).

78.    While Norton completed most of his work for First Health in June, 1999, First Health reserved the right to require Norton provide additional consulting or services for long as he was being paid by First Health (DiMarco at 197-98).

79.     Between June, 1999 and November, 1999, Norton and Hofheimer marketed themselves to various companies as consultants interested in (i) assisting a vendor prepare and submit a successful bid proposal for the PACE Contract, and (ii) maintaining an ongoing business relationship with the successful vendor (Norton at 365-66).

80.     Consultec Incorporated, a company that Norton approached for the purpose of providing consulting services with respect to the preparation and submission of a successful bid proposal for the PACE Contract, expressed to Norton its concern that Norton was not able to provide such consulting services without violating the restrictive covenants in his Agreement with First Health (Norton at 363-64).  Despite Consultec's concern, Norton continued to seek consulting work with other companies with respect to the 1999 RFP.

**H.     PDA's 1999 RFP For The PACE Contract**

81.     On or about September 14, 1999, before the effective termination date of Norton's employment with First Health, PDA forwarded the RFP (the "1999 RFP") for the contract to manage and administer the PACE Program for the period commencing July 1, 2000 (the "PACE Contract") to FHSC and other potential bidders (P-53).

82.     Norton was not on PDA's list of potential bidders for the PACE Contract (Norton at 367).

83.     Norton did not receive a copy of the 1999 RFP from PDA (Norton at 367).

84.     The 1999 RFP required all bid proposals to include, among other things, a technical proposal that sets forth (i) a statement of understanding, management summary, work plan (addressing the three separate tasks of program takeover, operation and turnover), bidder's experience and personnel (collectively the "technical proposal"); (ii) a proposal to include

Socially/Economically Restricted Businesses ("SERB"), and (iii) a cost and price proposal (P-53; DiMarco at 51-54).

85.    The 1999 RFP required that all bidders address not only the PACE Program, but also the PACE Needs Enhancement Tier ("PACENET") program and certain related ancillary programs, such as Chronic Renal Disease, Cystic Fibrosis, Spina Bifida, PKU (a metabolic disorder in children) and a special program for AIDS patients within the Commonwealth of Pennsylvania's Department of Welfare (P-53; DiMarco at 36-37).

**I.    Norton Violates Section 8 Of His Agreement With First Health By Approaching NPA For The Specific Purpose Of Providing Consulting Services With Respect To NPA's 1999 Bid Proposal For The PACE Contract**

86.    On November 15, 1999, Norton, who was "somewhat desperate" for employment, telephoned Richard Ullman ("Ullman"), President of NPA, for the specific purpose of offering to assist NPA in the preparation and submission of NPA's 1999 bid proposal for the PACE Contract (Norton at 299-300).

87.    On November 17, 1999, Norton attended an in-person interview with NPA senior management representatives Ullman, Allan Zimmerman (NPA's general manager) and Steven Nicoletos (NPA's vice president of finance), for the purpose of discussing Norton's ability to assist NPA in the preparation and submission of its 1999 bid proposal for the PACE Contract, and whether or not NPA wanted to retain him as a consultant (Norton at 300; Nicoletos at 499).

88.    During his November 17, 1999 interview with NPA, Norton stated that he was out of work and could help NPA prepare its 1999 bid proposal for the PACE Contract, which Norton believed was more "winnable" now than it was in 1995 (Nicoletos at 499; Norton at 566).

18

89.     During his November 17, 1999 interview with NPA, Norton described his prior employment at First Health, and his intimate knowledge of, and experience with, the PACE Program (Norton at 30, 565-66).

90.     During his November 17, 1999 interview with NPA, Norton stated that he had been intimately involved in preparing FHSC's 1995 bid proposal for the PACE Program (Norton at 565-66).

91.     During his November 17, 1999 interview with NPA, Norton stated that Snedden was his "good friend" (Norton at 566).

92.     During his November 17, 1999 interview with NPA, Norton stated that he could provide NPA with insights, and an understanding of PDA's needs and requirements for the PACE Program that NPA could not glean from the 1999 RFP (Nicoletos at 500-01).

93.     NPA assumed that Norton, as a result of his PACE experience with FHSC, could provide information about the PACE Program that NPA did not already possess from the 1999 RFP, FHSC's 1995 bid proposal for the PACE Program and the current PACE contract (Nicoletos at 501-02).

94.     During his interview on November 17, 1999 with NPA, Norton revealed that he had executed an employment agreement with First Health that contained certain restrictive covenants (Norton at 300).

95.     Yet, during his interview with NPA on November 17, 1999, Norton only provided NPA with a single-page document (which he prepared) that purported to set forth Section 7 (confidentiality) and Section 8 (customer non-solicitation) of his Agreement with First Health. The single-page document did not set forth Section 9 (employee non-solicitation) of the Agreement, or the remainder of the Agreement (Norton at 301, 400-02). Moreover, the single-

19

page document highlighted and bolded only those portions of Section 7 and Section 8 to which Norton wanted attention paid (P-79).

96.  NPA hired Norton as a consultant only three weeks before PDA required NPA to submit its 1999 bid proposal for the PACE Contract (Greiger at 486-87; Norton at 575).

97.  On or about November 17, 1999, Norton and NPA entered into a consulting agreement (the "Consulting Agreement") (P-23; Norton at 309-10; Testimony of Allen Langjahr ("Langjahr") at 531).[6]

98.  The specific purpose of the Consulting Agreement was for Norton to provide NPA with consulting services with respect to the preparation and submission of NPA's 1999 bid proposal for the PACE Contract (P-23).

99.  Langjahr drafted the Consulting Agreement for Norton's execution without first reviewing or examining (i) the single-page document submitted to NPA by Norton during the interview on November 17, 1999, or (ii) Section 7 (confidentiality), Section 8 (customer non-solicitation) or Section 9 (employee non-solicitation) from Norton's Agreement with First Health, or any other part of the agreement (Langjahr at 532-33; P-79).

100.  The Consulting Agreement contains a confidentiality provision that precludes Norton from disclosing NPA's "trade secrets", as that term is defined in the agreement, and a restriction against soliciting employees (Norton at 310; Langjahr at 531; P-23).

101.  NPA expects Norton to abide by the confidentiality and employee non-solicitation restrictions set forth in the Consulting Agreement (Langjahr at 532).

102.  Norton acknowledges that he is bound by the confidentiality restrictions in the Consulting Agreement (Norton at 310-11).

---

[6] Mr. Langjahr, NPA's general counsel, testified on May 24, 2000 (Langjahr at 532-33).

103.    As part of his Consulting Agreement with NPA, Norton, in the course of preparing and presenting NPA's bid proposal for the PACE Contract, could utilize the services of Hofheimer as needed or required (P-23).

104.    Norton recommended that NPA retain Hofheimer because Norton believed that Hofheimer could provide valuable assistance to NPA with respect to the drafting and editing of the "Management Summary" portion of NPA's 1999 bid proposal for the PACE Contract (Norton at 303).

105.    NPA retained Hofheimer in mid-November 1999 (Nicoletos at 516).

106.    Between the November 17, 1999 interview with NPA and NPA submitting its 1999 bid proposal for the PACE Contract on December 10, 1999, Norton did not discuss the restrictive covenants in his First Health Agreement with anyone at NPA (Norton at 305, 549; Langjahr at 533-34).

107.    Between the November 17, 1999 interview with Norton and NPA submitting its bid proposal for the PACE Contract on December 10, 1999, Norton did not receive anything in writing from NPA that cautioned him to adhere to the restrictive covenants in his First Health Agreement (Norton at 305, 549).

108.    Before retaining Norton as a consultant for purpose of working on NPA's 1999 bid proposal for the PACE Contract, NPA did not request any references from Norton, and Norton did not provide any references to NPA (Norton at 570).

109.    Between the November 17, 1999 interview with Norton and NPA submitting its bid proposal for the PACE Contract in December, 1999, NPA did not contact or communicate with anyone at First Health concerning NPA's hiring of Norton to assist in the preparation and submission of NPA's 1999 bid proposal for the PACE Contract (Norton at 571).

**J.     Norton's Role In The Preparation And Submission Of
        NPA's 1999 Bid Proposal For The PACE Contract**

    **a.     NPA's 1990 And 1995 Bid Proposals For The Contract To Manage
        And Administer The PACE Program**

110.     NPA submitted bid proposals for the PACE contract in 1990 and 1995 (Snedden at 36-37, 39-40; Greiger at 458-59).

111.     NPA was not awarded the PACE contract in 1990 because PDA's bid proposal evaluation committee gave NPA's technical and cost proposals scores that were significantly lower than the scores given to FHSC (Snedden deposition at 36-38).

112.     At the debriefing session for NPA's 1990 bid proposal, Snedden, the Director of the PACE Program and a member of PDA's bid proposal evaluation committee, advised NPA that PDA considered NPA's bid proposal to have been poorly prepared (Snedden deposition at 37).

113.     Peter Greiger, an NPA employee, primarily wrote NPA's 1995 bid proposal for the PACE contract (Greiger at 458-59).

114.     PDA did not award NPA the PACE contract in 1995 because NPA's bid price was too high (several millions of dollars higher than FHSC's bid price) (Greiger at 459).

115.     PDA did not award NPA the PACE contract in 1995 because NPA's bid proposal was poorly written (Greiger at 459-460)

116.     PDA did not award NPA the PACE contract in 1995 because PDA considered NPA's technical proposal to be a mere regurgitation of the information set forth by PDA in its 1995 RFP and, therefore, was deemed to have been poorly prepared (Snedden deposition at 39-41).

117.    In its 1995 bid proposal, NPA bid a price for the entire PACE contract that was approximately twenty-five percent (25%) higher than the price proposed by FHSC (DiMarco at 61).

118.    At a debriefing session for NPA's 1995 bid proposal, Snedden told NPA that its 1995 bid proposal was poorly prepared (Snedden deposition at 39-40; Greiger at 459-60).

**b.    NPA Had Limited Access To Documents In The Public Domain While Preparing Its 1999 Bid Proposal**

119.    The only materials, outside of materials available at NPA, that NPA possessed while preparing its 1999 bid proposal for the PACE Contract were the 1995-98 PACE contract, the 1998-2000 contract extension, the RFP and its exhibits (Greiger at 442-43; 460).

120.    In November, 1999, during a visit to PDA scheduled at NPA's request, PDA allowed NPA representatives to review FHSC's 1995 bid proposal for the PACE Program (Greiger at 442-43; Sampson deposition at 39-41).

121.    During their visit to PDA in November, 1999, NPA representatives took notes from FHSC's 1995 bid proposal (Greiger at 443, 478-79; P-64; P-69).

**c.    Norton's Preparation Of NPA's 1999 Technical Proposal**

122.    Plaintiff Exhibit 130 is a working draft of NPA's 1999 bid proposal for the PACE Contract (hereafter "NPA's October 1999 draft bid proposal"). NPA's October 1999 draft bid proposal contains individual sections that were last modified on October 7, 12, 19, 25 or 27, 1999, respectively. NPA did not retain Norton to provide consulting services with respect to its 1999 bid proposal until November 17, 1999 (P-130; Norton at 331-32, 398; Greiger at 455-56; DiMarco at 253; P-23).

123.   Norton, while working on NPA's 1999 bid proposal, met with Zimmerman on a weekly basis to discuss Norton's recommendations for, and preparation of, NPA's 1999 bid proposal (Norton at 322-34, 567; P-72; P-73; P-80; P-81).

124.   Norton's written notes from his meeting with Zimmerman on November 23, 1999, state that (i) Norton will prepare a spreadsheet with his estimates of the costs to administer the PACE Program, including an estimate of the takeover costs based on current PACE contract percentages, and (ii) Norton considered NPA's technical proposal to be "okay", but that the operations section "could be weakest due to being NPA specific; I have not reviewed as yet." (Norton at 323-24; P-81).

125.   Norton's written notes from his meeting with Zimmerman on November 29, 1999, state that Norton will (i)  follow-up with Paragon Systems; (ii) add management staffing and takeover section; (iii)  add one extra third-party liability coordinator "above and beyond First Health's requirement, to obtain more dollars." These notes state further, with respect to the executive summary, that NPA is "dedicated to PBM, unlike First Health which has RX as part of its overall government business." (Norton at 322-23; P-72).

126.   Norton's written notes that he prepared while working on NPA's 1999 bid proposal for the PACE Contract state that Norton will (i) read the "new" NPA takeover section, (ii) add, into NPA's work plan, "recruit and hire staff" and "milestones" for hiring managers, supervisors and operations, and (iii) add, into NPA's work plan, "notify switch vendors." (Norton at 323; P-73).

127.   Norton drafted and/or edited portions of NPA's 1999 technical proposal and, as a member of NPA's "red team" of bid proposal reviewers, "touched" every page of NPA's 1999 bid proposal (Norton at 305-06).

**d.    NPA Proposes Norton As The Officer-In-Charge And Hiring FHSC's Entire PACE Staff**

128.    I find as a fact that NPA's final 1999 bid proposal for the PACE Contract, unlike NPA's October 1999 draft bid proposal, sets forth NPA's intention to hire and place Norton as the officer-in-charge of the PACE Program, and NPA's intention to recruit and hire FHSC's entire current PACE staff (P-54 (takeover work plan at 5, 17-19, 56-57, 59-60, 141-42); P-17; P-131; P-133; Norton at 311-13, 332-35; Greiger at 476-77; DiMarco at 142).

129.    Norton recommended to NPA that it propose him as the officer-in-charge of the PACE Program (Norton at 567).

130.    NPA's 1999 bid proposal calls for Norton, as the officer-in-charge of the PACE Program, to be intimately involved in the recruiting and hiring of FHSC's current PACE staff (Norton at 311-13, 321, 324-25, 573-75; D-11; P-45 at 30; P-54 (takeover work plan at 16); P-17).

131.    I find as a fact that Norton recommended to NPA that NPA propose, in its 1999 bid proposal for the PACE Contract, the recruitment and hiring of FHSC's entire current PACE staff.

132.    FHSC's current PACE staff comprises approximately seventy-five to eighty employees based in FHSC's Harrisburg, Pennsylvania office (DiMarco at 196).

133.    In PDA's answers to the bidders' questions pertaining to the 1999 RFP, PDA stated that it would react "affirmatively" to a bidder proposing to hire many of FHSC's current PACE staff (P-109; DiMarco at 105; Sampson deposition at 89). PDA did not contemplate or approve of a bidder proposing the takeover of key managerial employees of FHSC's PACE operation (P-109 at 30; DiMarco at 250-51; Snedden at 21).

134.    PDA assumes in all instances that bidders will act lawfully in responding to an RFP, and PDA does not sanction a bidder who proposes any unlawful conduct (Sampson deposition at 61-62; Snedden at 21).

135.    Before NPA submitted its 1999 bid proposal for the PACE Contract, FHSC did not object or protest PDA's position that it would view "affirmatively" another bidder's proposal to hire many of FHSC's current PACE staff because (i) FHSC believed that it would be premature to file an objection or protest before knowing precisely what another bidder proposed with respect to hiring FHSC's current PACE staff, and (ii) FHSC did not believe that PDA, in stating its affirmative response, was sanctioning a bidder who proposed an unlawful course of action or conduct (DiMarco at 106-07).

136.    I find as a fact that FHSC was not in a position to file a letter or other document that objected or protested PDA's statement that it would react "affirmatively" to another bidder proposing to hire FHSC's current PACE staff, unless and until FHSC knew the full scope of such proposal in the actual bid submitted (Snedden at 21).

137.    The PACE staff represents a core asset of First Health with respect to its management and administration of public entitlement programs for senior citizens. First Health's PACE staff possess certain skills, experience and knowledge that First Health has successfully (as in New York EPIC and a contract in the State of New Jersey) marketed, and will continue to market, to secure other pharmacy benefit management contracts (DiMarco at 107-09, 140, 152-53, 196).

138.    First Health has invested considerable resources in its PACE employees and their expertise and, if the PACE Contract ultimately goes to NPA, First Health has a retention program through which it will deploy these employees in other capacities (DiMarco at 107-09).

26

**e.    Norton's Preparation Of NPA's 1999 Cost Proposal**

139.    In part, NPA hired Norton because he could work on NPA's cost proposal full-time (Nicoletos at 511).

140.    Norton provided Nicoletos with considerable assistance in preparing NPA's 1999 cost proposal for the PACE Contract (Nicoletos at 510).

141.    Nicoletos spent very little time with Norton, and does not know what information Norton used in preparing NPA's 1999 cost proposal for the PACE Contract (Nicoletos at 512).

142.    Norton prepared several iterations of NPA's cost proposal (Nicoletos at 510).

143.    Norton prepared an Excel spreadsheet with preliminary cost numbers and established a methodology for assigning those costs to the ancillary programs that are part of the RFP (Nicoletos at 506-07; Norton at 302).

144.    Norton developed the takeover cost number for NPA's 1999 cost proposal for the PACE Contract (Norton at 302; Nicoletos at 508-09).

145.    In the cost buildup that he prepared for NPA's 1999 cost proposal, he also prepared estimated costs for staffing, travel, equipment, supplies, general operating expenses, turnover, direct labor, other direct costs and the cost for the maintenance of imaging equipment). (Norton at 302; Nicoletos at 506-07, 509-510).

146.    Norton discussed with Zimmerman whether NPA's price for each year of the PACE Contract should be between eight and eight-and-a-half million dollars, and approved the ultimate price set forth in NPA's 1999 cost and price proposal (Norton at 302-03; 568-69).

147.    Nicoletos did not modify the cost figures that Norton provided for the use of professional staff and travel costs (Nicoletos at 507-08; Norton at 302).

148.    For its 1999 bid proposal, NPA contends that, early on, its pricing strategy was to estimate FHSC's price for the first year of the PACE Contract, and then to bid a price that was ten percent less (Nicoletos at 502, 515-16, 519, 522).

149.    In its attempt to estimate FHSC's price for the first year of the PACE Contract, NPA reviewed portions of FHSC's cost proposal for the 1995-98 contract term, FHSC's total price for the 1998-2000 contract extension, and a March 31, 1997 Dun & Bradstreet report for a company called Health Care Compare ("HCC") (now known as First Health Group Corp.) (Greiger at 442; Nicoletos at 493, 502-03).

150.    NPA, in preparing its 1999 bid proposal for the PACE Contract, did not review FHSC's separate cost proposal for the 1998-2000 extension for the current PACE contract (Greiger at 458; Snedden at 23-24).

151.    I find as a fact that NPA, in preparing its 1999 bid proposal for the PACE Contract, did not have access to FHSC's profit margin for the either the first, or the last (and current) year of the 1998-2000 extension of the PACE contract.

152.    Nicoletos understood FHSC's 1995 cost proposal to reflect a ten percent (10%) profit margin for each year FHSC operated the PACE Program (Nicoletos at 495, 521).

153.    Nicoletos understood the March 31, 1997 Dun & Bradstreet report to reflect figures for sales and net income before taxes that provided FHSC had a fifty percent (50%) margin (Nicoletos at 503-04; P-97).

154.    In preparing NPA's 1999 cost proposal for the PACE Contract, Nicoletos determined that FHSC's current profit margin on the PACE contract was between the ten percent (10%) margin set forth in FHSC's 1995 cost proposal, and the fifty percent (50%) margin set forth in the March 31, 1997 Dun & Bradstreet report (Nicoletos at 522).

155.   None of the figures in the March 31, 1997 Dun & Bradstreet report for sales and net income before taxes relate to or include FHSC's operations (Nicoletos at 504).

156.   Nicoletos, at the time he reviewed the March 31, 1997 Dun & Bradstreet report for the purpose of developing NPA's price strategy for its 1999 bid proposal, assumed that HCC and FHSC were the same company (Nicoletos at 504-05).

157.   At the time he was preparing NPA's price strategy for the 1999 bid proposal, Nicoletos had access to First Health's March 1999 Form 10-K report (Nicoletos at 505-06).

158.   First Health's March 1999 Form 10-K report states that HCC did not complete its acquisition of FHSC until July 1, 1997 (Nicoletos at 506; P-152).

159.   On December 8, 1999, just two days before NPA submitted its final 1999 bid proposal for the PACE Contract, NPA had not yet developed a price that was ten percent (10%) less than First Health's current price (P-82, Nicoletos at 516).

160.   I find as a fact that NPA did not develop its pricing strategy of estimating FHSC's price for the first year of the PACE Contract, and then bidding a price that was ten percent (10%) less, until two days before the deadline of December 10, 1999 for the submission of bid proposals for the PACE Contract to PDA.

161.   First Health's total price for the 1998-2000 PACE contract extension was $17,691,376.00, or $8,845,688 per year (P-91).

162.   The total price bid by First Health (operating through FHSC) in 1999 for the PACE Contract was $47,458,112.00 (P-111).

163.   I find as a fact that the average yearly price bid by First Health (operating as FHSC) in 1999 for the PACE Contract, over the five (5) years of that contract, equals $9,502,565.00.

29

164.    I find as a fact that the compound annual growth rate of First Health's price from the end of the current contract extension through the five (5) years of the new PACE Contract is approximately 2.246% -- which is a modest inflationary price increase over its prior "low ball" price which it was being paid to manage and administer the PACE Program.

165.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 cost proposal for the PACE Contract, FHSC's current profit margin on the PACE Contract.

166.    I find as a fact that NPA could not have bid a competitively lower price than First Health for the PACE Contract without Norton having disclosed and used First Health's (operating as FHSC) confidential and proprietary costing and pricing strategies, and margins.

167.    In a letter to Zimmerman dated December 13, 1999, before PDA's announcement of the bid outcome, Norton stated that "[w]e met our objective of submitting a credible technical proposal for taking over First Health's PACE system at a very competitive (and winning) price." (Norton at 319; P-38).

## K.    First Health's Confidential And Proprietary Business Information For The PACE Program

168.    Although the 1999 RFP sets forth some of PDA's general requirements pertaining to the management and administration of the PACE Program, FHSC, as the incumbent, would have access to and may know preferences of PDA for the PACE Program that are not set forth in the 1999 RFP (Snedden at 22).

169.    While the RFP articulates PDA's requirements for the management and administration of the PACE Program, precisely how a bidder proposes to address and accomplish those requirements is unique to that bidder. The distinguishing characteristics that a bidder brings to "how" it proposes to manage and administer the PACE Program is not set forth in the 1999 RFP (Snedden at 22).

170.    I find as a fact that First Health (operating through FHSC), in preparing and submitting its bid proposals for government-funded pharmacy benefit programs, such as the PACE Program, developed and implemented certain costing, pricing, marketing, management and other bidding strategies all of which are proprietary to and owned by First Health – not PDA (DiMarco at 33-36, 44-45, 49-51; 154-55; 203; Snedden at 25-26).

171.    I find as a fact that First Health (operating through FHSC), in preparing and submitting its bid proposals for government-funded pharmacy benefit programs, such as the PACE Program, developed and implemented the following costing, pricing and marketing strategies that First Health considers to be its confidential and proprietary business information:

    a.    FHSC's pricing strategy of proposing a takeover cost of approximately $700,000 (P-125; DiMarco at 69-71);

    b.    FHSC's pricing strategy of proposing a turnover cost of zero dollars (DiMarco at 99-100);

    c.    FHSC's marketing strategy of using certain incentives to take over an incumbent contractor's personnel (DiMarco at 71-72);

    d.    FHSC's calculation of a labor overhead rate (DiMarco at 119-20);

    e.    FHSC's PACE employee salary structure (DiMarco at 72-73, 193-94).

172.    I find as a fact that First Health (operating through FHSC), in its management and administration of the PACE Program, applies certain methods and processes that it has developed and implemented, independent of PDA. First Health's unique methods and processes (i) tie together the basic components of the PACE Program, (ii) enable the program to operate effectively, and (iii) reflect the proprietary "stamp" that First Health places on the PACE

31

Program. The removal of one of these "ties" may render the operation of the PACE Program

more difficult (Snedden at 20, 27-28; DiMarco at 103-04, 203-05).

173.    I find as a fact that First Health (operating through FHSC), in its management and

administration of the PACE Program, has developed and implemented the following unique

methods, practices and processes that constitutes its confidential and proprietary business

information:

    a.    FHSC's use of Paragon Systems, Inc. ("Paragon") as the provider

        of equipment, software and maintenance for the

        PACE Program's imaging system (DiMarco at 68-69);

    b.    FHSC's license of the imaging operating system used in the

        PACE Program from Kodak (DiMarco at 84-87);

    c.    FHSC's business relationship and use of certain

        switch vendors, namely NDC, Envoy and QS1

        (DiMarco at 73-75);

    d.    FHSC's use of PC-SAS software as part of its statistical

        analysis approach and research services, and how FHSC uses

        PC-SAS to accomplish certain outcomes (DiMarco at 75-77);

    e.    FHSC's emphasis on evaluating results in the implementation and

        operation of its surveillance utilization review system (SURS)

        for the PACE Program, and taking certain actions based on those

        results (Norton at 347-48);

    f.    FHSC's extensive disaster recovery and back-up plan

        (Norton at 337-39);

g.    FHSC's division of the administrative functions of the manufacturers'

rebate program between FHSC's business/financial and

and clinical utilization review departments (Norton at 345-46);

h.    as a management tool, FHSC's use of on-line reporting

with respect to the weekly status reports (DiMarco at 80-81);

i.    meeting with PDA to determine new initiatives for

the PACE Program and the ancillary programs that should be

included in the provider training sessions (DiMarco at 90-92;

Norton at 343-44; Greiger at 469-70);

j.    working with PDA and the pharmacy association

to determine if continuing education credits may be

given to those pharmacists who attend provider

training sessions (DiMarco at 91-92; Greiger at 470);

k.    initiating contacts with hotels and Commonwealth agencies to

arrange for convenient meeting places for provider

training sessions (Greiger at 470-71);

l.    integrating the documentation and procedures for the

imaging system with the cardholder services procedure

manual (DiMarco at 95-96);

m.    enabling providers to receive their remittance advices via

electronic media (DiMarco at 97-99);

n.    placing the software and processes currently used in

the preparation of weekly remittance advices in the provider

33

relations unit (DiMarco at 97-99).

174.    I find as a fact that none of the costing, pricing, marketing, management and other bidding strategies of First Health (operating through FHSC) set forth in paragraph 171 above, and none of First Health's unique methods and processes described in paragraph 173 above, are readily discernable from a review of any publicly available documents; more specifically, such information is not set forth in the 1999 RFP or its appendices, FHSC's 1995 bid proposal for the PACE contract, the current PACE contract, or PDA's answers to the bidders' questions with respect to the 1999 RFP (P-53; P-109; DiMarco at 68, 75-77, 81, 86-87, 95-96, 98, 234-36, 246-47).

175.    I find as a fact that First Health (operating through FHSC) and its former and current PACE staff (including Norton), as a result of their involvement with the PACE program, have gained intimate working knowledge of the needs and preferences of PDA with respect to the procurement, management and administration of the PACE Program, separate and apart from the needs and preferences set forth in the request for proposals issued by PDA or any other publicly available document or information (Snedden at 22; Snedden deposition at 21-22; DiMarco at 56, 59-60; Norton at 288).

176.    I find as a fact that PDA's needs and preferences for the PACE Program that Norton learned as a result of his tenure as a First Health employee include, but are not limited to, the following:

      a.    PDA's preference that provider training sessions not be conducted by a SERB contractor (DiMarco at 90-91);

      b.    PDA's preference that the project director accompany the provider relations manager to the provider training sessions (DiMarco at 92);

34

   c.    PDA's preference that the PACE Program's imaging system be addressed in detail in a bidder's takeover work plan (DiMarco at 84-86);

   d.    PDA's preference that a new contract administrator use the same switch vendors as the incumbent (Snedden deposition at 86-87);

   e.    PDA's preference for having the weekly status reports on-line (Snedden at 31-32).

177.    I find as a fact that First Health considers all of PDA's needs and preferences as set forth in paragraph 176 above to be confidential and proprietary business information of First Health (P-14; DiMarco at 101-02, 104).

178.    I find as a fact that none of PDA's preferences described in paragraph 176 above with respect to the procurement, management and administration of the PACE Program are readily discernable from a review of publicly available documents; more specifically, PDA's preferences are not set forth in the 1999 RFP or its appendices, FHSC's 1995 bid proposal for the PACE contract, the current PACE contract, or PDA's answers to the bidders' questions with respect to the 1999 RFP (P-53; P-109; DiMarco at 91, 92, 86).

179.    In order to maintain the confidential and proprietary nature of its information pertaining to the administration and management of the PACE Program (including, costing, pricing, margins, marketing, and the highly specialized procedures, processes, policies, systems and methods of operation, as well as PDA's particular needs, preferences and requirements for that program), FHSC (i) requires all of its employees including, but not limited to, its PACE staff, to execute employment agreements that contain clear and precise obligations of confidentiality (DiMarco at 45); (ii) limits access to its cost proposals to FHSC's senior management in charge of the PACE contract, the financial manager of the PACE contract, and

FHSC's financial staff (DiMarco at 46-47); (iii) limits the number of individuals who prepare, review or have access to FHSC's technical proposals to FHSC's key management personnel in Harrisburg and FHSC's proposal preparation staff in Richmond, Virginia; (iv) stores its technical proposals in a locked library, access to which is limited to certain employees during and after preparation of the proposals (DiMarco at 46); (v) maintains a computerized financial system, access to which is limited to FHSC's vice president of finance and his staff at FHSC's Richmond, Virginia headquarters, and FHSC's parent, First Health (DiMarco at 47); (vi) limits access to its computer mainframe through an information systems manager and the mandatory use of passwords and identification numbers (DiMarco at 48); (vii) enters into contracts with customers that restrict access to FHSC's proprietary software (DiMarco at 48-49); and (viii) includes in its bid proposals a statement that the material set forth in the bid proposal is confidential and proprietary business information of FHSC (DiMarco at 46).

**L.    Norton Violates Section 7 Of His Agreement With First Health, And Norton And NPA Unlawfully Misappropriate First Health's Trade Secrets, In Preparing And Submitting NPA's 1999 Bid Proposal For The PACE Contract**

      **a.    First Health's Use Of Paragon**

180.    FHSC uses an extensive and sophisticated imaging system to support the cardholder application and provider enrollment processes.  The imaging system for the PACE program, as developed and implemented by First Health (operating through FHSC), images the cardholder and provider application documents, and routes and tracks the resulting images as part of the operation for cardholder eligibility and provider services (DiMarco at 205).

181.    NPA does not presently use imaging with respect to claims processing, determining cardholder eligibility or routing work flow of documents (Greiger at 457-58).

182.    The current imaging system used by the PACE Program differs from the imaging systems in place at the time of the 1995 re-procurement and FHSC's 1995 bid proposal (DiMarco at 68).

183.    FHSC's 1995 bid proposal to manage and administer the PACE Program does not contain a takeover work plan, because First Health (operating through FHSC) was the incumbent contractor (DiMarco at 72).

184.    NPA, in the takeover work plan of its 1999 bid proposal for the PACE Contract, states that First Health uses Paragon as the hardware and software integrator, and maintenance vendor, for FHSC's Program imaging system (P-15; P-132; DiMarco at 68-69).

185.    Paragon did not become the hardware and software integrator, and maintenance vendor, for FHSC's PACE imaging system until after First Health (operating through FHSC) was awarded the PACE contract in 1995 (DiMarco at 68).

186.    Norton, during his tenure as a First Health employee, was responsible for the development of FHSC's business relationship with Paragon as it pertains to the PACE Program and the New York EPIC Program (DiMarco at 68; Norton at 307, 360-61).

187.    Paragon is not mentioned in NPA's October 1999 draft bid proposal (Norton at 329-31).

188.    The fact that Paragon was familiar with and provided upgrades to FHSC's operation and management of FHSC's imaging system for the PACE Program is not public knowledge (Greiger at 462).

189.    Although Paragon's Internet web-site lists "First Health Harrisburg, VA and Albany, NY" as a customer, it does not state that FHSC uses Paragon as the hardware and software integrator, and maintenance vendor, for the PACE Program, or that Paragon was familiar with and provided upgrades to FHSC's management and operation of the imaging system for the PACE Program (DiMarco at 171-72).

190.    Norton was the source of NPA's statement in its 1999 bid proposal for the PACE Contract that FHSC uses Paragon as the hardware and software integrator and maintenance vendor for the PACE Program's imaging system (Norton at 306, 322, 403).

191.    On NPA's behalf, Norton contacted Paragon to discuss the prospect of Paragon providing imaging integration services for NPA with respect to NPA's 1999 bid proposal for the PACE Contract and, for inclusion in NPA's 1999 bid proposal, Norton drafted a letter for Paragon to sign that explains the imaging support that Paragon was prepared to offer (Norton at 403-04; P-123).

192.    Snedden, in evaluating the technical portion of NPA's 1999 bid proposal, found NPA's knowledge of Paragon's involvement with First Health's imaging system for the PACE Program and NPA's proposed use of Paragon, "comforting." (Snedden at 82-83).

193.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, that First Health (operating through FHSC) uses Paragon as the hardware and software integrator, and maintenance vendor, for the PACE Program's imaging system.

**b.    First Health's Use Of Kodak**

194.    NPA's 1999 bid proposal for the PACE Contract states that the software used for the imaging operating system for the PACE Program (i.e., the program's hardware and software

38

configuration) "is licensed from the vendor – in this case, it is licensed from Kodak – and is available on the open market." (P-15; DiMarco at 84-87; Norton at 361-63).

195.    I find as a fact that Norton, as a result of his tenure as a First Health employee, knew that FHSC licenses the software used for the imaging operating system from Kodak (DiMarco at 86-87).

196.    Unlike the final version of NPA's 1999 bid proposal for the PACE Contract, neither NPA's 1995 bid proposal, nor its October 1999 draft bid proposal, contain any reference to the fact that FHSC licenses the software used for imaging operating system from Kodak (P-130; P-134; P-135; DiMarco at 86; Greiger at 461).

197.    NPA's 1995 bid proposal does not contain any description of the imaging system then in place for the PACE Program (Greiger at 463-64).

198.    The RFP does not state that First Health licenses the software for the imaging system for the PACE Program from Kodak (DiMarco at 86-87).

199.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, that First Health (operating through FHSC) licenses the software used in the PACE Program's imaging operating system from Kodak (DiMarco at 86-87).

### c.    First Health's Pricing Strategy For Takeover

200.    The cost FHSC proposed for takeover of the New York EPIC Program, which Norton prepared for FHSC, totaled $734,702, before adding figures for corporation allocation and profit margin (P-22; DiMarco at 70-71, 214-17; Norton at 563).

201.    In its 1995 bid proposal for the PACE Program, NPA bid approximately $1.5 million dollars in takeover costs (DiMarco at 70-71).

202.    The cost NPA proposed in 1999 for takeover of the PACE Program, as developed by Norton in NPA's cost proposal, totaled approximately $680,812, excluding corporate overhead and profit margin (DiMarco at 70, 214-17; Nicoletos at 508; P-125).

203.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, the fact that First Health (operating through FHSC) successfully bid a takeover cost of approximately $700,000 in connection with the New York EPIC Program.

### d.    First Health's Pricing Strategy For Turnover

204.    Unlike its 1995 bid proposal for the PACE contract, in which it bid $759,000.00 as its cost for turnover, NPA bid zero dollars as its cost for turnover in its 1999 bid proposal for the PACE Contract (P-54 (cost and price proposal at 1); DiMarco at 99-100).

205.    NPA did not review First Health's cost proposal for the two-year (1998-2000) PACE contract extension, and First Health's 1998-2000 cost proposal with respect to turnover is not mentioned in the RFP or PDA's answers to the bidders' questions (Greiger at 458; Snedden at 23-24).

206.    Greiger's handwritten notes from his review of FHSC's 1995 bid proposal for the PACE contract do not mention FHSC's turnover costs (P-64; P-69; Greiger at 478-79).

207.    Norton, as a result of his tenure as a First Health employee, knew that FHSC had a pricing strategy of bidding zero dollars as the cost of turnover in response to proposals to manage and administer government-funded entitlement programs (DiMarco at 100).

208.    As part of his work on NPA's 1999 bid proposal, Norton participated in NPA's decision to bid zero dollars as its cost for turnover (Nicoletos at 509).

40

209.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, First Health's (operating through FHSC) pricing strategy of bidding zero dollars as the cost of turnover in response to proposals to manage and administer a government-funded pharmacy benefits program.

**e.    First Health's PACE Staff Salary Structure**

210.    NPA's 1999 bid proposal states that NPA's salaries are equivalent, if not higher, than FHSC's salaries for its PACE staff (D-6; P-54 (operations work plan at 274); DiMarco at 73, 193-94;).

211.    Norton, as a result of his tenure as a First Health employee, had intimate knowledge of FHSC's salary structure, particularly with respect to FHSC's PACE staff (DiMarco at 73; Norton at 287-88).

212.    First Health's salary structure for its PACE employees is not publicly available, is not contained in FHSC's 1995 bid proposal for the PACE Program, and is considered by First Health to be its confidential and proprietary business information (Dimarco at 73).

213.    I find as a fact that, during the preparation of NPA's 1999 bid proposal for the PACE Contract, Norton disclosed to NPA, and NPA used in formulating its 1999 bid proposal for the PACE Contract, information pertaining to FHSC's salary structure for its PACE staff that enabled NPA to state in its bid proposal the contention that its salaries were equivalent, if not higher, than the salaries of FHSC.

**f.    First Health's Use Of Incentives In Taking Over An Incumbent's Personnel**

214.    As part of NPA's plan to manage the PACE Program., NPA's 1999 bid proposal for the PACE Contract proposes that it will recruit and hire FHSC's current PACE staff in the event that it is the successful bidder (P-54 (takeover work plan at 5, 17-19, 56-57, 59-60, 141-42); P-17; Greiger at 476-77).

41

215.  NPA's October 1999 draft bid proposal, unlike NPA's final 1999 bid proposal for the PACE Contract, does not propose recruiting and hiring FHSC's entire current PACE staff (P-131, P-133, P-134, Norton at 332-35).

216.  In its 1995 bid proposal for the PACE contract, NPA merely stated that its philosophy is to "encourage" the incumbent's staff to remain in the event of a takeover of a contract, but NPA did not propose to takeover First Health's PACE staff, or any specific recruiting and hiring strategy with respect to that staff (Greiger at 430-31, 467).

217.  Norton advised Peter Greiger of NPA that the use of incentives to retain FHSC's current PACE staff would be a "good selling point" (Greiger at 464).

218.  Norton recommended to NPA that it should propose hiring incentives with respect to FHSC's current PACE managers, supervisors and operational personnel (Greiger at 465-66; Norton at 322-23, 567-68; P-72; P-73).

219.  Norton, as a result of his tenure as a First Health employee, had intimate knowledge of FHSC's marketing strategy of using incentives to takeover an incumbent contractor's personnel as a result of his involvement with FHSC's successful bid proposal for a government-funded entitlement program in the State of New Mexico  (DiMarco at 71-72, 219-20).

220.  Norton recommended two of the personnel retention incentives that are proposed in NPA's 1999 bid proposal for the PACE Contract: (i) retaining the respective anniversary dates of FHSC's PACE employees, and (ii) offering FHSC's PACE employees money to join NPA's operations of the PACE Program (Norton at 307-08).

221.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, First Health's marketing strategy of using incentives as part of its takeover proposal that addresses recruiting and hiring an incumbent's staff.

**g.    First Health's Switch Vendors**

222.    NPA, in its 1999 bid proposal for the PACE Contract, states that NPA has links to the same switch vendors as FHSC, namely NDC, Envoy and QS1 (P-21; DiMarco at 74-75).

223    In NPA's October 1999 draft bid proposal, there is no reference to switch vendors (Norton at 344-45; P-130, P-143).

224.    Neither the 1999 PACE RFP nor FHSC's 1995 bid proposal for the PACE Program identified the name of FHSC's specific switch vendors (DiMarco at 75).

225.    Norton prepared the statement in NPA's 1999 bid proposal for the PACE Contract that NPA has links to the same switch vendors as FHSC, namely NDC, Envoy and QS1 (Norton at 308-09, 323).

226.    In the event of a takeover, PDA prefers, for the sake of program continuity, that the switch vendors used by FHSC be used by the new contract administrator (Snedden at 86-87).

227.    Snedden, in evaluating NPA's 1999 bid proposal, felt that NPA's reference to and proposed continued use of First Health's switch vendors was important (Snedden at 86-87).

228.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, that First Health (operating through FHSC) has links to certain switch vendors, namely NDC, Envoy and QS1.

**h.    First Health's Use Of PC-SAS**

229.    NPA, in its 1999 bid proposal for the PACE Contract, states (i) that PC-SAS should be used as part of a statistical analysis, and (ii) how PC-SAS should be used as a tool for researching and evaluating heath care and program outcomes (P-126; Norton at 359-60).

43

230.   NPA's October 1999 draft bid proposal, prepared before NPA retained Norton as a consultant, does not propose or mention the use or application of PC-SAS (P-130, P-148; Norton at 359-60; DiMarco at 76).

231.   NPA's 1995 bid proposal for the PACE contract did not propose or mention the use or application of PC-SAS (Greiger at 457; DiMarco at 76).

232.   FHSC's 1995 bid proposal for the PACE Program does not mention PC-SAS (DiMarco at 76-77).

233.   Of the many software approaches to choose from for a statistical analysis, FHSC, after it was awarded the PACE contract in 1995, started using PC-SAS as a tool for researching and evaluating health care and program outcomes (DiMarco at 76-77, 205-06, 225).

234.   I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, that First Health (operating through FHSC) uses PC-SAS as part of its statistical analysis, and how FHSC uses PC-SAS for evaluation and research.

### i.   First Health's Surveillance Utilization Review System ("SURS")

235.   I find as a fact that FHSC, in its management and administration of the PACE Program, focuses on the evaluation of SURS analysis results and takes actions that are responsive to those results, as opposed to simply generating batch reports based on pre-set criteria (Norton at 358-59).

236.   With respect to the use of SURS, NPA's October 1999 draft bid proposal focuses on generating batch reports based on pre-set criteria, but NPA's final 1999 bid proposal for the PACE Contract sets forth FHSC's emphasis on the evaluation of SURS analysis results and taking actions that are responsive to those results, as part of its proposed management and administration of the PACE Program, (P-146, P-147; Norton at 346-47, 356-59).

44

237.    I find as a fact that Norton, as a result of his intimate knowledge of the manner in which First Health manages and administers the PACE Program (and, more specifically, its clinical drug utilization programs), was at all material times aware of the fact that First Health (operating through FHSC) emphasizes the evaluation of SURS analysis results and taking actions that are responsive to those results, and not generating reports based on pre-set criteria.

238.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, that First Health (operating through FHSC), in its management and administration of the PACE Program, emphasizes the evaluation of SURS analysis results and taking actions that are responsive to those results, as opposed to generating reports based on pre-set criteria.

**j.    First Health's Disaster Recovery And Back-Up System**

239.    As the officer-in-charge of the PACE Program during his tenure at First Health, Norton was responsible for all disaster recovery and back-up procedures (Norton at 338).

240.    NPA's disaster recovery and back-up plan was upgraded from the version set forth in NPA's October 1999 draft bid proposal to a more expanded final version that is contained in the 1999 bid proposal that NPA submitted to PDA (Norton at 337-39; P-138, P-139).

241.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, information pertaining to First Health's extensive disaster recovery and back-up plan for the PACE Program.

**k.    First Health's Manufacturers' Rebate Administration**

242.    FHSC divides the administrative functions of PACE's manufacturers' rebate program between FHSC's business/financial and utilization review departments, using financial staff and clinical staff (Norton at 346).

45

243.    NPA's October 1999 draft bid proposal is silent on where the functions that support the administration of the manufacturers' rebate program should reside and what types of staff (financial and clinical) should perform the duties.  The final version of NPA's 1999 bid proposal, however, divides these functions between NPA's business/financial and utilization review departments (Norton at 345-46; P-144; P-145).

244.    Norton, as a result of his tenure as a First Health employee, established FHSC's method of dividing the functions that support the administration of the manufacturers' rebate program between its business/financial and utilization review departments, in order to maximize the recovery of rebates for the client (Norton at 346).

245.    For the purpose of preparing NPA's 1999 bid proposal, Norton admits that he recommended to NPA that it divide the functions that support the manufacturer's rebate program between NPA's business/financial and utilization review departments (Norton at 346, 393).

246.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, that First Health (operating through FHSC) divides the functions that support the administration of the manufacturers' rebate program between FHSC's business/financial and utilization review departments; as a result, NPA proposed in its 1999 bid proposal that it would divide the functions that support the administration of the manufacturers' rebate program between NPA's business and utilization review departments (P-14).

**l.    First Health's Use Of On-Line Weekly Status Reports**

247.    NPA, in its 1999 bid proposal for the PACE Contract, recommended that, as a management tool, the weekly status reports be placed on-line (P-127; DiMarco at 80-81).

248.    FHSC, in its management and administration of the PACE Program, implemented the use of on-line reporting for the weekly status reports  (DiMarco at 81; Snedden deposition at 87).

249.    PDA's 1999 RFP does not require that weekly status reports be provided on-line (P-53; DiMarco at 81, 234-36; Snedden at 31-32).

250.    FHSC's 1995 bid proposal for the PACE contract does not refer to or propose that weekly status reports be provided to PDA on-line (DiMarco at 81).

251.    Norton recommended to NPA that it propose the use of on-line weekly status reports in its 1999 bid proposal for the PACE Contract (Norton at 306).

252.    Snedden considered it a "plus" that NPA proposed on-line weekly status reports, a feature that (i) he wanted before First Health implemented it, and (ii) is a PDA preference (Snedden deposition at 87-88; Snedden at 31-32).

253.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, that First Health (operating through FHSC) uses on-line weekly status reports as a project management tool.

**m.    PDA's Preference That The Imaging System
Be Addressed In The Takeover Work Plan**

254.    NPA, in the takeover work plan section of its 1999 bid proposal for the PACE Contract, describes in detail (including flowcharts and operational processes) First Health's existing imaging system that is part of the PACE Program's operations, and specifically how the imaging system is deployed in the performance of cardholder eligibility functions (P-15).

255.    PDA's 1999 RFP for the PACE Contract does not instruct the bidder to address the current imaging system or how it would be deployed in the takeover work plan of the bidder's proposal  (P-53; DiMarco at 86).

256.    PDA, with respect to bid proposals submitted for the PACE Contract, preferred to have the PACE Program's imaging system and how it is used in the performance of critical cardholder eligibility determinations addressed in detail in the takeover work plan (DiMarco at 86).

257.    Norton, as a result of his tenure as a First Health employee, knew the importance that PDA places importance on imaging and, thus, that a bid proposal should address the PACE Program's current imaging system and how it is used to perform critical cardholder eligibility functions in a takeover work plan (DiMarco at 86).

258.    I find as a fact that NPA could not have found a detailed description of the existing imaging system and how it is used in the cardholder area that is part of the PACE Program's operation in FHSC's 1995 bid proposal to manage and administer the PACE Program, because (i) the current imaging system was not in place at that time, and (ii) FHSC's 1995 bid proposal did not contain a takeover work plan because FHSC was the incumbent.

259.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, PDA's preference that a bid proposal address the PACE Program's current imaging system in a takeover work plan (DiMarco at 86).

**n.    First Health's Approach To Provider Training**

260.    Norton, as a result of his tenure as a First Health employee, had an in-depth knowledge of how FHSC performs the function of provider training for the PACE Program and PDA's preferences for how provider training is to be conducted (DiMarco at 90-93).

261.    NPA, in its 1999 bid proposal for the PACE Contract, states that, as part of performing provider training, it will hold meetings with PDA to determine the new initiatives for the PACE Program and ancillary programs that should be included in provider training presentations (P-19).

262.    NPA's 1995 bid proposal for the PACE contract and October 1999 draft bid proposal do not mention any meetings between NPA and PDA to determine new initiatives that should be part of provider training presentations (Greiger at 469-70; 476; P-125; P-140).

263.    Norton recommended to NPA that it propose, as part of its plan for provider training, that it meet with PDA to determine new initiatives that should be included in provider training presentations (Greiger at 468-69).

264.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, that First Health (operating through FHSC) met with PDA to determine new initiatives that should be included as part of provider training presentations.

265.    NPA, in its 1999 bid proposal for the PACE Contract, states that it will conduct the provider training (P-19).

266.    PDA's preference that the primary contractor, and not a SERB subcontractor, perform the function of provider training, is not in the RFP (DiMarco at 91; P-53).

267.    In its 1995 bid proposal and its October 1999 draft bid proposal, NPA proposed the use of a SERB for provider training (DiMarco at 90-92; Norton at 339-40).

268.    I find as a fact that Norton, as a result of his tenure as officer-in-charge of the PACE Program and senior vice president of FHSC's pharmacy business unit, knew that PDA preferred that the primary contractor, rather than a SERB subcontractor, perform the function of provider training (Norton at 339-40).

269.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, PDA's preference that the primary contractor, rather than a SERB subcontractor, perform the function of provider training.

270.    NPA, in its 1999 bid proposal for the PACE Contract, states that the project director will accompany the provider relations manager to the provider training sessions (P-19; Norton at 341).

271.    In its 1995 bid proposal and its October 1999 draft bid proposal, NPA does not propose that the project director will attend provider training sessions (DiMarco at 92-93; Norton at 340; P-140).

272.    PDA prefers that the project director for the PACE Program attend provider training sessions (DiMarco at 92).

273.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, PDA's preference that the project director accompany the provider relations manager to the provider training sessions.

274.    NPA, in its 1999 bid proposal for the PACE Contract, states that it will work with PDA and the pharmacy association to determine if continuing education credits can be given to those pharmacists who attend provider training sessions (P-19).

275.    FHSC's concept and approach of working with PDA and the pharmacy association to determine if continuing education credits can be given to those pharmacists who attend provider training sessions is not set forth in NPA's 1995 bid proposal or its October 1999 draft bid proposal (Greiger at 476; P-140).

276.    Norton recommended to NPA that it work with PDA and the pharmacy association to determine if continuing education credits can be given to those pharmacists who attend the provider training sessions (Greiger at 470).

277.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract,  First Health's (operating through FHSC) concept and approach of working with PDA and the pharmacy association to determine if continuing education credits can be given to those pharmacists who attend provider training sessions.

278.    NPA, in its 1999 bid proposal for the PACE Contract, states that it will initiate contacts with hotels and Commonwealth agencies to arrange for convenient meeting places for provider training sessions. (P-19).

279.    NPA's proposal to contact hotels and Commonwealth agencies to arrange for convenient meeting places for provider training sessions is not set forth in NPA's October 1999 draft bid proposal (P-140; Greiger at 470-71).

280.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, First Health's (operating through FHSC) concept and approach of contacting hotels and Commonwealth agencies to arrange for convenient meeting places for provider training sessions.

### o.    First Health Integrates The Imaging Documentation And Procedures With The Cardholder Services Procedures Manual

281.    NPA, in its 1999 bid proposal for the PACE Contract, states that it "presumes" that the imaging documentation and procedures for the PACE Program are integrated with the cardholder services procedure manual (P-16).

282.    The fact that the imaging documentation and procedures for the PACE Program are integrated with the cardholder services procedure manual is not set forth in the 1999 RFP, any previous FHSC bid proposal, or NPA's 1995 bid proposal (DiMarco at 95-96; Greiger at 462-63).

283.    Norton, as a result of his tenure as a First Health employee, knew of the methods and processes utilized by First Health (operating through FHSC) for management and administration of the PACE Program including, but not limited to, the fact that FHSC, after the 1995 RFP for the PACE contract, integrated the imaging documentation and procedures with the cardholder services procedure manual (DiMarco at 95-96, 243-44).

284.    Greiger was not the author of the statement in NPA's 1999 bid proposal for the PACE Contract that NPA "presumes" that the imaging documentation and procedures for the PACE Program are integrated with the cardholder services procedure manual (Greiger at 464).

285.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, First Health's (operating through FHSC) integration of the imaging documentation and procedures with the cardholder services procedure manual.

**p.    Some Providers Elect To Receive Their Remittance Advices Via Electronic Media**

286.    NPA, in its 1999 bid proposal for the PACE Contract, states that providers sometimes elect to receive their remittance advices via electronic media (P-55).

287.    In its 1995 bid proposal for the PACE contract and its October 1999 draft bid proposal, NPA does not state that providers may receive their weekly remittance advices electronically (Greiger at 456; P-130).

288.    The 1999 RFP does not require that remittance advices be delivered to providers via electronic media (DiMarco at 98).

289.    FHSC's 1995 bid proposal for the PACE Program does not state that providers sometimes elect to receive their weekly remittance advices via electronic media (DiMarco at 98).

290.    The election by providers to receive their remittance advices via electronic media is a new development in FHSC's PACE operation since 1995 (DiMarco at 98).

291.    Norton, as a result of his tenure as a First Health employee, knew that providers sometimes elect to receive their remittance advices via electronic media (DiMarco at 98).

292.    Greiger did not author the statement in NPA's 1999 bid proposal for the PACE Contract that some providers elect to receive their remittance advices via electronic media (Greiger at 473).

293.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, that providers sometimes elect to receive their remittance advices via electronic media.

294.    NPA, in its 1999 bid proposal for the PACE Contract, states that the software and processes currently used in the preparation of weekly remittance advices are located in the providers relations unit (P-55).

295.    The fact that the software and processes currently used in the preparation of weekly remittance advices are located in the provider relations unit was not publicly available to NPA when it prepared its 1999 bid proposal for the PACE Contract (Greiger at 473; DiMarco at 246-47).

296.    Norton, as a result of his tenure as a First Health employee, knew that the software and processes currently used by First Health in the preparation of weekly remittance advices are located in the provider relations unit (DiMarco at 98-99).

297.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, that the software and processes currently used by First Health in the preparation of weekly remittance advices are located in the providers relations unit.

q.    **First Health's Labor Overhead Rates**

298.    NPA's 1999 cost proposal set forth a labor overhead rate that was one percentage point (1%) less than the labor overhead rate of FHSC (DiMarco at 119-20).

299.    In its 1995 bid proposal, NPA's labor overhead rate was equal to, or higher than, the labor overhead rate of First Health (DiMarco at 119-20, 186).

300.    Norton, during his tenure as a First Health employee, prepared the budgets for FHSC's pharmacy division (Norton at 561).

301.    Norton, as a result of his tenure as a First Health employee, knew of FHSC's labor overhead rate (DiMarco at 119-20, 182-83; Norton at 561-62).

302.    Labor overhead costs were included in both FHSC's 1995 cost proposal for the PACE contract and FHSC's cost proposal for the 1998-2000 contract extension (Norton at 562).

303.    Norton was involved in the preparation of FHSC's 1995 cost proposal for the PACE contract and FHSC's cost proposal for the 1998-2000 contract extension (Norton at 290-93).

304.    Norton was involved in the development of NPA's 1999 cost proposal, including developing costs for direct labor (Nicoletos at 509).

305.    I find as a fact that Norton disclosed to NPA, and NPA used in preparing its 1999 bid proposal for the PACE Contract, FHSC's labor overhead rates.

306.    I find as a fact that Norton's testimony, that he did not "have a clue" about First Health's labor overhead rates, is not credible (Norton at 552).

307.    I find as a fact that Greiger's statement, in his February 22, 2000 unsworn declaration under penalty of perjury, that the information used in preparing NPA's 1999 bid proposal for the PACE Contract was obtained before Norton was retained by NPA as a consultant (P-68 at ¶ 2), is not credible.

**M.    Inevitable Disclosure Of First Health's Confidential
          And Proprietary Business Information By Norton And
          First Health's PACE Staff**

309.    As described above, Norton, due to his tenure as a First Health employee and,
more specifically, his tenure as FHSC's officer-in-charge of the PACE Program and senior vice
president of FHSC's pharmacy business unit, has intimate knowledge of First Health's business
and operations pertaining to, among other things, the PACE Program and other government-
funded pharmacy benefit programs (DiMarco at 114-15).

310.    I find as a fact that, if Norton serves as NPA's officer-in-charge of the PACE
Program, he will inevitably disclose and/or use First Health's confidential and proprietary
business information pertaining to (i) the unique methods and processes that First Health utilizes
to tie together the basic components of PACE and similar programs, (ii) the specific needs and
preferences of the PDA and other FHSC clients for the management and administration of their
programs, and (iii) costing, pricing and marketing strategies with respect to government-funded
pharmacy benefit programs.  Norton became aware and learned all such information while
employed by First Health.

311.    The PACE staff of First Health (operating through FHSC), as a result of their
tenure as First Health employees, have intimate knowledge of First Health's confidential and
proprietary business information pertaining to (i) the unique methods and processes that First
Health utilizes to tie together the basic components of the PACE Program and that enable First
Health to operate that program, (ii) the specific needs and preferences of the PDA for the
management and administration of the PACE Program, and (iii) costing, pricing and marketing
strategies with respect to government-funded pharmacy benefit programs (DiMarco at 116).

312.    I find as a fact that First Health's PACE staff, if recruited and hired by NPA to work for NPA's PACE operations, will inevitably disclose and/or use First Health's confidential and proprietary business information pertaining to (i) the unique methods and processes that First Health utilizes to tie together the basic components of the PACE Program and that enable First Health to operate that program, (ii) the specific needs and preferences of the PDA for the management and administration of the PACE Program, and (iii) costing, pricing and marketing strategies with respect to government-funded entitlement programs.

**N.    NPA Pays Norton For Work On NPA's 1999 Bid Proposal**

313.    On or about December 10, 1999, NPA submitted its bid proposal for the PACE Contract to PDA (Norton at 549).

314.    Over a three-week period that Norton consulted with NPA about PACE, Norton billed NPA a total of one hundred and seventy seven hours (177), or an average of sixty (60) hours per week, for the work that he performed in preparing and submitting NPA's 1999 bid proposal for the PACE Contract. (Norton at 575).

315.    For the services that he rendered in connection with preparing NPA's bid proposal for the PACE Contract, and before NPA's oral interview with PDA, NPA paid Norton approximately fifteen thousand dollars ($15,000.00) (Norton at 318-19; P-37; P-38).

316.    For the services that he rendered in connection with preparing NPA's bid proposal for the PACE Contract, NPA paid Hofheimer approximately five thousand dollars ($5,000.00) (Norton at 320-21).

**O.    PDA's Evaluation And Scoring Of The Bid Proposals Submitted By First Health And NPA**

317.    Pursuant to the 1999 RFP, and answers by PDA to questions submitted by bidders, PDA evaluated bid proposals on the basis of three categories: Technical Proposal –

60%; Participation of Socially-Economically Restricted Businesses (SERB) – 10%; and Costs – 30%. As provided for in Part III "Criteria for Selection" of the RFP, PDA's evaluation committee would recommend for selection the proposal that most closely met the requirements of the RFP and satisfied the needs of the PDA, taking into consideration criteria set forth in that Part III. The "Criteria for Selection" included subsections that addressed contractor qualifications, and professional and managerial personnel (P-53).

318.    With respect to NPA's 1999 bid proposal for the PACE Contract, PDA had not previously reviewed a bid proposal by a new prospective contractor that suggested recruiting and hiring former key managerial personnel (Norton and Meissel) who had worked with PACE, and retaining the current PACE staff of the incumbent contractor (FHSC). PDA believed that, if NPA could execute such a proposal, NPA could takeover the PACE Program without interrupting the program's operations to the detriment of its cardholders, providers and pharmacies (Snedden deposition at 56-62; Snedden at 21, 24-25; Norton at 325).

319.    Snedden, in evaluating a bid proposal, focuses on whether a bidder communicates a sense of familiarity with the PACE Program's operations, and looks for a sense of comfort and confidence that the bidder will be able to execute on its proposal (Snedden deposition at 29-31).

320.    According to Snedden, NPA's intention to hire Norton, whom Snedden considers the best officer-in-charge in the history of the PACE Program, as NPA's officer-in-charge, was a dramatic improvement over NPA's 1995 bid proposal, and made NPA's 1999 bid proposal for the PACE Contract most intriguing and attractive (Snedden deposition at 64-65; Snedden at 24-25; P-106 at 14).

321.    According to Snedden, the Director of the PACE Program and a member of PDA's bid proposal evaluation committee, Norton greatly advantaged NPA in the preparation of NPA's 1999 bid proposal for the PACE Contract (Snedden at 25-27; Snedden deposition at 171-73).

322.    In fact, Snedden credited the major improvements in NPA's 1999 bid proposal for the PACE Contract, in large measure, to Norton's involvement in the preparation of the bid proposal (Norton at 325).

323.    Snedden believes that NPA's 1999 bid proposal for the PACE Contract is immeasurably different if Norton is not the officer-in-charge and NPA is unable to recruit and hire FHSC's entire current PACE staff (Snedden at 25).

324.    According to Snedden, it is "hard to believe" that Norton did not share First Health's margins on the PACE Program with NPA when NPA prepared its 1999 cost proposal for the PACE Contract (Snedden deposition at 171-74).

325.    According to Snedden, Norton, as a result of his First Health experience and knowledge of what it costs to operate the PACE Program, greatly advantaged NPA in the preparation of its 1999 cost proposal for the PACE Contract (Snedden at 26).

326.    Norton evaluates his own contributions to NPA's 1999 bid proposal for the PACE Contract as providing a significant augmentation (Norton at 569).

**P.      Norton Violates Section 8 Of His Agreement With First Health By Conducting NPA's February 2, 2000 Oral Interview With PDA**

327.    On February 2, 2000, with respect to NPA's 1999 bid proposal for the PACE Contract, Norton called upon PDA for the purpose of serving as NPA's primary representative at an oral interview (Norton at 313; Sampson deposition at 47; Snedden deposition at 55-56).

328.    On behalf of NPA, Meissel (a former FHSC employee who developed software systems for PACE), attended the oral interview on February 2, 2000, and NPA paid Meissel one thousand four hundred dollars ($1,400.00) for his appearance (Norton at 319-20; P-39).

329.    Meissel did not see NPA's 1999 bid proposal for the PACE Contract until the day of NPA's oral interview with PDA on February 2, 2000.  At that time, Norton brought Meissel up-to-date about what precisely NPA had proposed in its 1999 bid proposal (Norton at 396-97).

330.    Norton was NPA's primary spokesperson at the oral interview on February 2, 2000 with PDA (Norton at 313).

331.    Snedden, during the oral interview with NPA, requested a complete copy of Norton's employment agreement with First Health; instead, Norton only provided a single-page document that he prepared that that purported to set forth Sections 7 and 8 of the Agreement – the same incomplete document that Norton had provided to NPA at his initial interview; this document bolded and highlighted only that language to which Norton wanted attention paid (Snedden deposition at 94-95; P-79).

332.    During the oral interview with PDA, Norton repeatedly emphasized and discussed NPA's plans to hire all of FHSC's PACE staff (P-106 at 5, 7, 18, 20).

333.    Despite the assurances given by Norton and NPA at the oral interview, Snedden continued to be concerned about the legal and practical viability of NPA's proposal to hire Norton, Meissel and First Health's entire PACE staff (Snedden deposition at 92-94; 105, 109-111).

334.    On February 2, 2000, after NPA's oral interview, PDA completed its scoring of the technical proposals submitted by FHSC and NPA, and then added (i) the SERB scores (which were calculated by the Department of General Services' Bureau of Contract Administration and

Business Development) and (ii) the scores for the cost proposals (Sampson deposition at 48-49, 59-60; Snedden deposition at 79).

335.    On or about February 3, 2000, PDA informed NPA that it had received the highest score in the evaluation of the bid proposals (Sampson deposition at 74; Snedden deposition at 89).

336.    PDA did not receive a complete copy of Norton's employment agreement with First Health until after PDA completed the scoring of the bid proposals (Sampson deposition at 53).

### Q.    Norton Violates Section 9 Of His Agreement With First Health By Soliciting Robert Howells, A First Health Employee

337.    In his role as NPA's proposed officer-in-charge of the PACE Program, Norton would recruit and hire FHSC's current PACE staff (Norton at 312-13).

338.    On February 3, 2000, Norton telephoned Robert Howells ("Howells"), a First Health employee and current officer-in-charge of the PACE Program (Norton at 314; Testimony of Howells at  261-62).[7]

339.    During their conversation, Norton told Howells that NPA intended to recruit and hire FHSC's current PACE staff  (Howells at 263).

340.    During his conversation with Norton on February 3, 2000, Howells asked Norton if Howells was included in the list of FHSC PACE staff that NPA intended to recruit and hire. Norton responded by stating "sure", and that Howells did not "have anything to worry about." (Howells at 263-64; Norton at 314; P-150; P-26).

---

[7] Mr. Howells testified on May 16, 2000.

341.    Howells interpreted Norton's affirmative response and statement that Howells did not "have anything to worry about" to mean, among other considerations, that Howells would receive an offer of employment from NPA (Howells at 264-65).

342.    According to Norton's notes of his February 3, 2000 telephone conversation with Howells, Howells "asked if staffing included him, I said sure.  We talked about others." (Norton at 314; P-26).

**R.    First Health's Bid Protest**

343.    On February 9, 2000, pursuant to the Field Procurement Handbook of the Commonwealth of Pennsylvania Department of General Services, First Health filed a bid protest with PDA that objects to the award of the PACE Contract to NPA.  This administrative appeal is currently pending before the PDA (Snedden at 19).

**S.    Irreparable Harm**

344.    First Health's costing, pricing and marketing strategies with respect to the PACE Program, First Health's unique methods and detailed operational processes for the management and administration of the PACE Program, First Health's cost structure and profit margin on the current PACE contract, and First Health's knowledge and understanding of PDA's needs and preferences for the management and administration of the PACE Program (at a depth far beyond what is set forth in PDA's PACE RFP), collectively constitute First Health's competitive advantage with regard to the management and administration of government-funded pharmacy benefit programs.  As a result of Norton disclosing such confidential and proprietary information to NPA and NPA using it in the preparation of its 1999 bid proposal for the PACE Contract, (i) First Health's competitive advantage is severely weakened, (ii) NPA's 1999 bid proposal for the PACE Program possesses an air of credibility that NPA's 1990 and 1995 bid proposals, and its

61

October 1999 draft bid proposal did not exhibit and (iii) PDA awarded the PACE Contract to

NPA (DiMarco at 101-104).

Respectfully submitted,

Scott L. Vernick, Esquire
Jeffrey D. Hutton, Esquire
Fox, Rothschild, O'Brien & Frankel, LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103-3291
(215) 299-2000

Attorneys for Plaintiff
FIRST HEALTH GROUP CORP.

Date: July 3, 2000

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,                :
                                         :
                              Plaintiff, :
                                         :
            v.                           :      NO. 1:00-CV-312
                                         :
NATIONAL PRESCRIPTION                    :
ADMINISTRATORS, INC. and                 :
DAVID W. NORTON,                         :
                                         :
                             Defendants. :

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I served a copy of plaintiff, First Health

Group Corp.'s proposed findings of fact on the person identified below, via federal express mail:

> Thomas B. York, Esquire
> Dilworth Paxson LLP
> 305 N. Front Street, Ste. 403
> Harrisburg, PA 17101-1236
> (717) 236-4812
> Attorney for Defendants,
> National Prescription Administrators, Inc. and
> David W. Norton

_____
SCOTT L. VERNICK, ESQUIRE

Date: July 3, 2000