## ORIGINAL

### IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP., :
3200 Highland Avenue :
Downers Grove, IL  60515-1282, :
 :
 Plaintiff, : CIVIL ACTION NO.
 : 1:00-CV-312
 :
 v. :
 :
NATIONAL PRESCRIPTION :
ADMINISTRATORS, INC., :
711 Ridgedale Avenue :
East Hanover, NJ  07936 :
 :
 And :
 :
DAVID W. NORTON, :
1220 Whitby Road :
Richmond, VA  23277, :
 :
 Defendants :

### DEFENDANTS' BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY

### INJUNCTION

## TABLE OF CONTENTS

**Statement of Facts**                                                          **Page numbers**

A.  DEPARTMENT OWNS THE PACE PROGRAM                                            1

B.  OCTOBER DRAFTS OF NPA'S PROPOSAL                                            2

C.  THE "CONFIDENTIAL NINETEEN"                                                 3
    (1)       PARAGON                                               3

    (2)       PRICING OF TAKEOVER COST                              4

    (3)       FIRST HEALTH'S EMPLOYEE SALARY AND COST               4
              STRUCTURE AND TAKEOVER INCENTIVES

    (4)       RELATIONSHIP WITH SWITCH VENDORS                      5

    (5)       USE OF PC-SAS                                         6

    (6)       FIRST HEALTH'S TELEPHONE SYSTEM                       6

    (7)       ON-LINE STATUS REPORTING                              7

    (8)       CLINICAL FOCUS AND MEETING                            7
              AND EXCEEDING REQUIREMENTS

    (9)       FIRST HEALTH'S OPERATIONS AND                         8
              PROCESSES

    (10)     PDA'S PREFERENCE FOR NO                               8
              DISRUPTION

    (11)     ADDRESSING OF IMAGING SYSTEM                          8
              IN TAKEOVER WORK PLAN

    (12)     PREFERENCE THAT A SUBCONTRACTOR                       9
              NOT CONDUCT PROVIDER
              TRAINING

    (13)     PREFERENCE THAT PROVIDER                              9
              RELATIONS MANAGER ATTEND
              PROVIDER TRAINING

    (14)     PREFERENCE FOR  HIGH-QUALITY                          10
              INQUIRY TRACKING SYSTEM

16784-1                                        i

(15)   PREFERENCE THAT CARDHOLDER ISSUES          11
       BE THOROUGHLY ADDRESSED

(16)   IMAGING INTEGRATED INTO                     11
       CARDHOLDER SERVICES MANUAL

(17)   ACCESSING PROVIDER FILES                    12
       FROM FIRST HEALTH'S SYSTEM

(18)   SOME PROVIDERS ELECT ELECTRONIC REMITTANCE  13
       ADVICES

(19)   REMITTANCE ADVICES IN PROVIDER              13
       RELATIONS UNIT

D. ISSUES NOT REVEALED BY PLAINTIFF IN DISCOVERY   13
   (1) LABOR OVERHEAD                              13

   (2) TURNOVER COSTS                              14

   (3) LOW PRICE                                   14

   (4) TIES AND UNIQUE STAMPS                      15

E. ACTUAL METHOD FOR COMPUTING NPA'S PRICE         16

F. CONFIDENTIAL INFORMATION NOT NECESSARY TO DEFENDANTS   17

G. NON-SOLICITATION OF FIRST HEALTH'S CUSTOMERS    18

H. NON-SOLICITATION OF FIRST HEALTH'S EMPLOYEES    18

**Argument**

I.     REQUIREMENTS FOR A PRELIMINARY INJUNCTION   21
       HAVE NOT BEEN MET.

II.    NORTON'S RESTRICTIVE COVENANTS ARE NOT REASONABLE.   22

III.   NORTON HAS NOT BREACHED AND WILL NOT BREACH  23
       HIS CONTRACT.

IV.    NORTON AND NPA HAS NOT MISAPPROPRIATED       23
       ANY TRADE SECRETS.

V.     NO BREACH OR INDUCEMENT TO BREACH ANY        25
       FIDUCIARY DUTY.

VI.    THERE HAS BEEN NO TORTIOUS INTERFERENCE.     29

VI.     FIRST HEALTH HAS BROUGHT THIS ACTION WITH          29
        "UNCLEAN HANDS".

**Conclusion**                                                      30

## TABLE OF AUTHORITIES

                                                           **Page numbers**

Campbell Soup Co. v. Conagra, Inc., 977 F.2d 86, 90-91 (3d Cir. 1992)          22

Radio Hanover, Inc. v. United Util., Inc., 273 F. Supp. 709 (M.D. Pa. 1967)          22

Madison Square Garden Corp. v. Braddock, 90 F.2d 924  (3d Cir. 1937)          22

McRand, Inc. v. Beelan, 486 N.E. 2d 1306 (1985)          22

Image Supplies, Inc. v. Hilmert, 390 N.E. 2d 68  (1979)          22

Aristocrat Window Co. v. Randell, 206 N.E. 2d 545 (1965)          22

Jefco Lab., Inc. v. Caroo, 483 N.E. 2d 999 (1985)          23, 24

Serv. Centers of Chicago, Inc. v. Minogue, 535 N.E. 2d 1132 (1989)          23

Glenn Matthews and Maint. Supply Co. v. Unisource WorldWide, Inc.,          23
748 A.2d 219 (Pa Super. 2000)

ILG Ind., Inc v. Scott, 273 N.E. 2d 393 (1971)          24

Packard Inst. Co. v. Reich, 412 N.E. 2d 617 (1980)          24

Smith Oil Corp. v. Viking Chem. Corp., 468 N.E. 2d 797 (1984)          24

Spring Steels, Inc. v. Molloy, 162 A.2d 370 (Pa. 1960)          24

Envirotest Partners v. Comm. Of Pa, Dept. of Transportation, 664 A. 2d          25, (fn. 4)
208, 214-215 (1995)

PepsiCo., Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995)          25

Air Products and Chem., Inc. v. Johnson, 442 A.2d 1114 (Pa. Super. 1981)          25

Teradyne, Inc. v. Clear Communications Corp.,          25
707 F. Supp. 353 (N.D. Ill. 1989)

AMP, Inc. v. Fleischhaker, 823 F.2d 119 (7th Cir. 1987)          25

Comedy Cottage, Inc. v. Berk, 495 N.E. 2d 1006 (1986)          25

Smith, Waters, Kuehn, Burnett & Hughes, Ltd. V. Burnett,          26
548 N.E. 2d 1331 (1989)

Nobelpharma USA, Inc. v. The Straumann Company, 1993 Mass. Super.                26
Lexis 245 (1993)

Aetna Building Maint. Co., Inc. v. West, 246 P.2d 11 (Ca. 1952)                  26

Cronshaw v. Phillips Medical Systems, Inc., 1994 WL 622173 *5 (N.D. Ill.)        26

Morgan's Home Equip. Corp.v. Martucci, 136 A.2d 838 (Pa. 1957)                   26

ABC Trans Nat'l Transport, Inc. v. Aeronautics Forwarders, Inc.,                 26
413 N.E. 2d 1299 (1980)

Perfect Subscription Co. v. Kavaler, et al.,                                     27
427 F. Supp. 1289 (E.D. Pa. 1977)

Carl A. Colteryahn Dairy, Inc., 203 A.2d 469  (Pa. 1964)                         27

Graphic Management Assoc., Inc. v. Steckel and Harris Graphics Corp.,            27
1986 WL 9723 *7 (E.D. Pa.)

George S. May Int'l Co. v. Int'l Profit Assoc., 628 N.E. 2d 647 (1994)           27

Mettler-Toledo, Inc. v. Todd R. Acker, d/b/a/ Precision Instrument Serv.,        28
908 F. Supp. 240 (M.D. Pa. 1995)

Nat'l Risk Management, Inc. v. Bramwell, 819 F. Supp. 417                        29
(E.D. Pa. 1993)

McMorris v. Williamsport Hosp., 597 F. Supp. 899 (M.D. Pa. 1984)                 29

Glazer v. Chandler, 200 A.2d 416 (Pa. 1964)                                      29

Salomon Smith Barney, Inc. v. Vockel, 2000 WL 558580 *3 (E.D. Pa.)              30

Monsanto Co. v. Rohm & Haas Co., 456 F.2d 592 (3d Cir. 1972)                     30

*  All Depositions are cited by last name and page number.

## Introduction

The Plaintiff, First Health Group Corporation (First Health), has built its case upon one unfounded assumption after another unfounded assumption. First Health seemingly ignores the fact that it has voluntarily chosen to participate in a public contracting process where its alleged confidential information has become public. The Defendants, National Prescription Administrators, Inc. (NPA) and David W. Norton, have not used or disclosed any confidential information of First Health. The Defendants also have not violated any restrictive covenants between Norton and First Health.

## Statement of Facts
### A. DEPARTMENT OWNS THE PACE PROGRAM

The contract between First Health and the Department states:

> The Department maintains full ownership rights to the administrative and operating system.... [A]ll computer programs, manual procedures, operating plans and procedures, documentation, data, records and related items developed by contractor or used by contractor in the administration of the PACE program (except for contractors' or any subcontractors' proprietary software, proprietary software leased or licensed by the contractor or any subcontractors and those items directly related) are owned without qualification by the department.... Any enhancements to, changes in or augmentation or creation of any such elements...shall be owned by the department without qualification.
> ***
> In the event contractor or subcontractor proprietary software utilities (programs) are utilized in the operation of the system, contractor agrees upon request by the department to grant to the department at the end of [this agreement] a non-exclusive, non-transferable license for three years to use the programs required to operate the PACE system subject to the following conditions: the programs shall only be used by the department or the department successor, PACE contractor or contractors to operate the PACE system....
> ***
> All computer files, computer programs and related items developed by the contractor for the program shall be owned fully and without restriction by the department....

(May 16 at 202, 207, 212; D-5, pp. 17, 18). DiMarco has told Snedden about particular confidential items which she believes were used by NPA. (Snedden at 182).[1] Snedden

---

[1] DiMarco verified factual statements that were not accurate. For example: She knew that Norton made an oral presentation on February 2, 2000 after his employment had terminated with First Health. She, however, verified an overly broad statement that the "presentation took place sometime between the issuing of the RFP on September 14, 1999 and February 3, 2000." (May 15 at 156-157). She verified that Norton "met with representatives of the department as early as May 1999" and "engaged in solicitation activity on behalf of a direct competitor that violated his contractual obligations to First Health." This was a mere suspicion, or yet another unfounded assumption, based

16763-1                                                     1

commented: [B]ut that's one of the areas where I think I quickly disabused her of this misinformation. That, you know, virtually everything in the program is public.(Snedden at 183).

NPA went to the procurement library to view the 1995 First Health proposal before Norton even began work for NPA. From the Pennsylvania Department of Aging (PDA), NPA received the cost or prices of First Health's 1995 proposal and 1998-1999 extensions. (May 18 at 442-443; May 24 at 493). Susan Sampson, of the PDA, stated that under the "Right-To-Know Law" anything referenced in an executed contract with the Commonwealth is available to the public. (Sampson at 43). Snedden stated: "That I believe [legislation] now requires us to release these documents on contracting." (Snedden at 41-42). Snedden had been "advised by Commonwealth attorneys that if we're ever put to the test we are going to have to give it up." (Snedden at 165). After reviewing P-69, Grieger's notes from his visit to the procurement library at PDA, Snedden stated: "Well, I have to say from reviewing the dollar numbers in here that it would appear that they saw the '95, '98 proposal." (Snedden at 174-175). Snedden further explained that it doesn't make any difference whether NPA got the cost proposal of First Health "because I can't necessarily protect it by the rules that the Commonwealth makes me operate under." (Snedden at 175-176). At the time Steven Nicoletos, a Senior Vice President of NPA, prepared NPA's cost proposal, he had access to the PACE contract price for First Health's 1998 and 1999 extension. (May 24 at 493).

## B. OCTOBER DRAFTS OF NPA'S PROPOSAL

The Plaintiff relies upon a comparison of drafts of NPA's proposal which are dated October of 1999 with the final proposal submitted by NPA in 1999. The false implication intended by the Plaintiff is that all changes made after the October drafts were due to

---

on the fact that Norton had dinner with Snedden. She admitted on cross-examination, that she did not even know what was discussed at that meeting and she did not know if any solicitation occurred. (May 15 at 162-164). She verified that "NPA hired Norton prior to the effective date of his termination as an employee of First Health." Once again, DiMarco assumed an earlier employment date by NPA of Norton than actually occurred. She admits that "[a]t the time we did not know specifically when Mr. Norton began." (May 15 at 165).

16763-1                                    2

involvement of Norton. When DiMarco refers to NPA's most recent draft, she is in actuality referring to October drafts of NPA's proposal. (May 15 at 88). DiMarco assumed that these "drafts" were "well along the way in terms of completing their response." (May 15 at 130). The October drafts were in actuality, as testified to by Norton, "just a laydown of the 1995 proposal basically" that still included references to individuals no longer employed at NPA. (May 16 at 331, 388). The October drafts are, according to Peter Grieger, a Senior Vice President for NPA, essentially the 1995 proposal. (May 18 at 418). There is no evidence to support that Norton by himself made all the changes to the proposal in the very few weeks he had from November 17 to when the bid was submitted on December 10, 1999.

## C. THE "CONFIDENTIAL" NINETEEN

In response to interrogatories, the Plaintiff identified nineteen (19) items that allegedly demonstrated the use of First Health's confidential and proprietary information:

## (1) PARAGON

DiMarco does not know if NPA has an ongoing relationship with Paragon; she acknowledges that Paragon's Web site does list First Health-Harrisburg services as a client. Norton accessed that information. (May 15 at 171; May 17 at 375). She imagines that Paragon would provide, if asked, information on how First Health uses Paragon. (May 15 at 172).[2] Robert R. Howells, the officer in charge of the PACE program for First Health, stated that First Health's business relationship with Paragon is not confidential and proprietary to First Health. (May 16 at 282; Howells at 85-88). Norton called Paragon after leaving his employment at First Health and Paragon provided the information that was included in the NPA proposal. (May 17 at

---

[2] The contract between the Department and First Health requires that First Health grant a three-year license to use its imaging system. (May 16 at 207; D-5, p. 18). Also, First Health is required to document to the Department the identity of its software vendors (e.g. Paragon) and related information. (May 16 at 207-209; D-5, pp. 18-22). Consequently, even if not known before the bids, the winning bidder would quickly learn of and have access to the allegedly secret Paragon information.

16763-1                                     3

374-375). Norton testified that the relationship of Paragon with First Health is not confidential or proprietary to First Health. (May 17 at 175-176).

## (2) PRICING OF TAKEOVER COST

DiMarco alleges that the "NPA cost proposal shows a total cost for takeover of in the neighborhood of $700,000, which is remarkably similar to First Health's takeover costs of $734,000 as it made its proposal to the EPIC program." (May 15 at 70). She admits that it is "possible that the takeover costs by NPA [were] obtained from some other source completely unrelated to the takeover costs of the EPIC contract." (May 16 at 214). DiMarco incorrectly compares the $734,702 figure from the EPIC contract (P-22) and the $718,388 figure from the NPA proposal (P-125). (May 16 at 214-216). The $734,702 does not include corporate allocation/general overhead or markup/profit, but the $718,388 does include these items. If overhead and profit are added to the EPIC number, the actual comparison would be $962,912 for takeover costs in EPIC and $718,388 for takeover costs in NPA. Norton specifically states that he did not use the EPIC takeover costs in preparing the NPA bid proposal. (May 24 at 556). Nicoletos explained how the takeover costs were computed by NPA without reference to any First Health takeover costs. (May 24 at 496). Nicoletos never had, saw, or used any information from First Health's EPIC contract. (May 24 at 497).

## (3) EMPLOYEE SALARY AND COST STRUCTURE AND TAKEOVER INCENTIVES

DiMarco claims that NPA "said that [its] salary structure ... is virtually the same, if not better than First Health's salary structure." (May 15 at 73). NPA actually stated:

> Based on information included in the RFP and NPA's experience, NPA's salaries are equivalent, if not higher, to the incumbent's and are competitive for both the greater New York City and Harrisburg markets.

(May 16 at 194). We only have an assumption by DiMarco, without any factual support, that this statement was based upon confidential information from First Health.

Norton referred in his notes to his preparation of a spreadsheet for cost as "guesstimates." (May 16 at 324). He guessed at the costs for staffing and it was refined by Nicoletos. He states

16763-1                                                                 4

that NPA did not use any confidential information from First Health. (May 17 at 370). He "just used [his] general knowledge of what like a clerical position or professional position or systems person generally would make." (May 17 at 370). Howells stated: "I had asked my financial manager to take a look at both cost proposals and see if there were any similarities. And he was unable to find any." (Howells at 90). DiMarco does not know if incentives to attract employees are typical in the government contract situation or if other companies use similar incentives. (May 16 at 217-218). The only specific similarities DiMarco could note between First Health's New Mexico proposal and NPA's PACE proposal was "the continuation of service date [anniversary date] and the payment of bonuses in order to come from the incumbent contractor." (May 16 at 219-220). DiMarco never provided a copy of the New Mexico proposal to allow a comparison of the similarity or dissimilarity of the incentives. Allowing employees to keep the same anniversary date and rewarding them financially are hardly unique concepts owned by First Health. Howells agrees that the use of incentives is not something that is confidential or proprietary. (Howells at 90-91).

(4) RELATIONSHIP WITH SWITCH VENDORS

DiMarco agrees that the switch vendors are "commonly known in this business" and that NPA would quickly become aware of the specific switch vendors being used if they were awarded the PACE contract. (May 16 at 222). Norton stated that the identity of switch vendors is not confidential information. (May 17 at 376). The three switch vendors named in NPA's proposal "are the three major switch vendors that most PBM's use, including NPA. (May 17 at 376-377). "[S]witch vendors sell their services and would freely give the information that they were connected to First Health if you would ask them." (May 17 at 377). Grieger testified that First Health's relationship with the three named switch vendors is "common to the industry." (May 18 at 431). NPA has 50,000 pharmacies in its network and knows the common switch

vendors. (May 18 at 420). First Health's officer in charge of PACE, agrees that First Health's relationship with switch vendors is not confidential and proprietary. (Howells at 91).

(5) USE OF PC-SAS

DiMarco does not know if NPA had previously used PC-SAS and does not even know if PC-SAS is commonly used and generally available in the pharmacy reimbursement kind of business. (May 16 at 224-225). She concedes that the mention of SAS possibly could lead someone to PC-SAS. (May 16 at 225). Grieger was aware of PC-SAS even before the 1999 bid proposal was prepared. Approximately five years ago, Grieger looked at and evaluated PC-SAS as a tool. (May 18 at 420). "PC-SAS is an off-the-shelf product that anyone can purchase for the purpose of doing statistical analysis of various data." (May 18 at 433). Howells does not believe that the use of PC-SAS by First Health is confidential and proprietary information. (Howells at 91). In fact, he points out that the RFP addresses SAS. (Howells at 91). Mr. Snedden says such information is public. (May 17 at 15).

(6) FIRST HEALTH'S TELEPHONE SYSTEM

NPA proposed during the takeover to "evaluate the incumbent's telephone system" (May 15 at 78; P-20). DiMarco assumes the use of confidential information by stating: "Norton knows from his prior experience of directing the PACE program that the telephone system…is in need of replacement or can benefit from upgrading." (May 15 at 78-79). Even if Norton was so aware, there is no evidence that this information was shared with NPA or was used in drafting NPA's proposal. In fact, it was Grieger who determined what telephone system to propose and he stated that "the telephone system is fairly well delineated in the RFP." (May 18 at 433). DiMarco agrees that First Health has a commercially available telephone system. (May 16 at 225). Howells also testified that there was information on First Health's telephone system in the RFP and the proposal library. (May 16 at 269; D-3, p. 34). Howells also noted that "the concept of a tracking system is not confidential." (Howells at 91). He stated: "The system that NPA proposed was a response to the RFP requirements." (Howells at 92). Howells specifically stated

that the system proposed by NPA would not be a use of the confidential and proprietary information of First Health. (Howells at 92). Similarly, Snedden stated the telephone system information was available to the public. (May 17 at 16).

(7) <u>ON-LINE STATUS REPORTING</u>

First Health also assumes that on-line status reporting is only included in the NPA proposal because Norton suggested that it be included. (May 15 at 81). The RFP itself has many references to requirements for on-line reporting. (May 16 at 229-231; D-3, pp.37, 40). In the RFP, under Provision of Information, Routine Management Reports for All Programs, it states: "<u>All reporting must be available online</u>, as well as on paper." (May 16 at 234; D-3, p. 54) (emphasis added). Howells agreed that the RFP contained information on on-line status reporting. (May 16 at 269). Norton stated that the "RFP clearly stated a preference to having all the reports on-line." (May 17 at 374). Such on-line status reporting was not, according to Norton, confidential and proprietary information of First Health because having paperless processing is required by the RFP. (May 17 at 374). Grieger testified that NPA already has its own on-line status reporting system which is in a beta testing stage. (May 18 at 474). Howells testified that the use of on-line status reporting is not confidential and proprietary to First Health. (Howells at 93).

(8) <u>CLINICAL FOCUS AND MEETING AND EXCEEDING REQUIREMENTS</u>

Grieger points out that "NPA's keystone marketing strategy is its clinical focus." (May 18 at 421). Grieger stated: "[I]t is not unique to any one company to emphasize its clinical programs. NPA again uses the clinical programs as the cornerstone to its marketing strategies." (May 18 at 434). It was Grieger who decided to expand the clinical focus from the 1995 proposal to the 1999 proposal. (May 18 at 421-422). Howells testified that the concept of clinical focus is not confidential. (Howells at 94).

First Health also claims an exclusive right to the use of "meet and exceed" language. (May 15 at 82). The Defendants demonstrated at trial that "meet and exceed" language was used

16763-1                                                7

by NPA in proposals that preceded Norton's involvement with NPA. (May 18 at 434; D- 10).

Grieger notes that "meet and exceed is something that NPA uses routinely in all its proposals."

(May 18 at 434). Howells confirmed that emphasizing "meeting and exceeding" client

requirements is not confidential and proprietary to First Health. (Howells at 94).

(9) <u>FIRST HEALTH'S OPERATIONS AND PROCESSES</u>

At deposition, DiMarco testified that the examples supporting this category were items

ten (10) through nineteen (19), which Defendants address below.

In further response, the Defendants note that the operations and processes of the PACE

program are owned by the Department. Even Howells notes that: "If they were developed

specifically for the PACE program, then they basically are the Department of Aging's."

(Howells at 95). Howells did not know of any situation where NPA used any of First Health's

operations and processes not owned by PDA. (Howells at 95).

(10) <u>PDA'S PREFERENCE FOR NO DISRUPTION</u>

DiMarco disingenuously claims that NPA would not have been aware of "exactly how

much of an issue this would be for the Commonwealth and how extensively they would have to

address that issue and concern in a takeover plan." (May 15 at 83). It was Grieger who decided

to emphasize continuing the program without disruption. (May 18 at 435). Any person with

common sense, and especially those who work in the area of prescription programs, would know

that this was important. Even Howells honestly recognized that "PDA's preference that a bid

proposal emphasize continuing the existing program operations without disruption while

implementing enhancements and improvements" was not confidential and proprietary

information. (Howells at 95). Also, Snedden confirmed that this "preference" would be

something the PDA would make public. (May 17 at 14).

(11) <u>ADDRESSING OF IMAGING SYSTEM IN TAKEOVER WORK PLAN</u>

The RFP itself requires that a bidder's system at a minimum "electronically store all

correspondence regarding the income verification on the imaging system." (May 16 at 230-231;

D-3, p. 39). DiMarco admits that imaging was mentioned in the RFP. (May 16 at 239). The RFP

states: "Digital application document imaging capability must be included in any consideration

of the operations of the network." (May 16 at 240; D-3, p. 31). The RFP also contains detailed

design specifications and a summary description of the document imaging system. (May 16 at

240; D-3, p. 36). The use of imaging is dictated by the RFP in substantial detail. (D-4,

Appendices C and Q). Grieger stated: "[R]eading the RFP and having had the opportunity to

review the 1995 proposal for First Health, it became evident that imaging was a major

component of the customer service, client services area. It was an integral part." (May 18 at

436). Grieger stated that NPA's mail service pharmacy currently uses an imaging system

developed in-house approximately four years ago. (May 18 at 423).

DiMarco <u>assumes</u> that only Norton would know to discuss the takeover of the imaging

system. (May 15 at 86). Howells testified that "knowing that the imaging system was not a part

of the assets that would go to the state necessarily, it should have been assumed that it was to be

addressed in the takeover portion." (May 16 at 271). Howells stated: "I think the understanding I

have of this is that the takeover plan from anyone other than the incumbent would be expected to

have to address the imaging system because it is one the few items that are not a state asset. And

no, it's not confidential." (Howells at 96). Snedden agreed that this information was not

confidential by noting that it was something the Department would make public. (May 17 at 14).

(12) <u>PREFERENCE THAT SUBCONTRACTOR NOT CONDUCT PROVIDER TRAINING,</u>
(13) <u>AND PREFERENCE THAT PROVIDER RELATIONS MANAGER ATTEND</u>
     <u>PROVIDER TRAINING</u>

Although DiMarco claims that the Department has "a preference... for the contractor to

do those functions [provider services training]," she admits that Snedden never told her a

subcontractor should not be used. (May 16 at 241). Howells, however, was not aware if PDA

objects to the use of a subcontractor. (Howells at 97). Snedden testified that this was not an

important consideration and he thought NPA was going to use a subcontractor. (May 16 at 241-242; Snedden at 84).

First Health's counsel claims that the October draft does not mention a provider relations manager but the final proposal does refer to a provider relations manager. (May 16 at 340-341). To the contrary, the October 7 draft mentions that each seminar for provider training is conducted by the provider relations manager. (May 18 at 469). In any case, Norton stated that the reference in 1999 to the provider relations manager does not reflect his insider knowledge when he was working for First Health. (May 16 at 341). Norton said that there was no use of confidential and proprietary information from First Health. (May 17 at 392). Norton notes that the "whole provider training requirement in the RFP is under the provider relations area of the RFP, so it makes sense the provider relations manager would be involved with provider training." (May 17 at 392). The involvement of the provider relations manager in provider training "speaks to logic" according to Grieger. "It would make good management sense to have the head of that department have direct contact with that function...." (May 18 at 437). Grieger made the decision to use the provider relations manager in this manner. (May 18 at 437). Howells does not view this alleged preference as confidential. (Howells at 96-97). Howells admitted that PDA would volunteer the information if asked. (Howells at 97-98). Mr. Snedden agreed that this information would be public. (May 17 at 14).

(14)   PREFERENCE FOR HIGH-QUALITY INQUIRY TRACKING SYSTEM
The RFP itself specifies cardholder services in detail. (May 16 at 229-231; D-3, p. 37, 39). Howells testified that the requirements of high quality cardholder and provider inquiry call tracking system are contained in the RFP. (May 16 at 272). Howells also noted that this "preference" is not confidential to First Health. (Howells at 99). NPA's Cardholder Information Tracking System (CITS) is mentioned at least 17 times in the 1999 October draft and a similar number of times in the 1995 NPA Proposal. (May 16 at 181, P-130). DiMarco cannot even state

the similarities, if any, between First Health's Management Information Tracking System (MITS) and NPA's CITS.  (May 16 at 226).  Snedden testified that the proposal of a CITS was not a significant factor in evaluating NPA's bid proposal and that such systems are "an industry standard these days."  (May 16 at 233; Snedden 85).  Snedden admitted that any preference for a tracking system would be public.  (May 17 at 14).  The RFP itself refers to the MITS and specifically states under Policies and Procedures that the bidder is required to assume the current policies or procedures including MITS.  (May 16 at 227-228; D-3, pp. 27-28). Grieger notes that the need for a provider inquiry call tracking system "came out in the specifications in the RFP." (May 18 at 438).  It was Grieger, not Norton, who proposed the CITS in both 1995 and 1999. (May 18 at 429, 438).

(15)  <u>PREFERENCE THAT CARDHOLDER ISSUES BE THOROUGHLY ADDRESSED</u>
        The Plaintiff failed to provide any significant evidence to show such a preference, that Norton revealed such a preference or that such a preference was confidential or proprietary. Grieger commented that "the RFP was very specific in stating that what was asked for in that regard, and logic would dictate that you have to be very thorough in your response."  (May 18 at 438).  It was Grieger who decided to thoroughly address cardholder issues.  (May 18 at 438). First Health's officer in charge for PACE does not believe this "preference" to be confidential and proprietary.  (Howells at 62).  Even more telling is his comment:

> "[O]n our review of the NPA proposal, it was determined by my staff, who reviewed it, that the 1994 [1995] proposal from NPA addressed cardholder issues <u>more thoroughly</u> than the 1999 proposal."

(Howells at 99) (emphasis added).   Also, Snedden agrees that this "preference" would be available to the public.  (May 17 at 14).

(16)  <u>IMAGING INTEGRATED INTO CARDHOLDER SERVICES MANUAL</u>
        DiMarco takes a simple statement by NPA that it presumes cardholder services include imaging documentation and procedures, and she leaps to a claim that "[t]he fact that NPA demonstrates that they believe that the imaging documentation and procedures are part of the

16763-1                                    11

cardholder services manual again is inside information." (May 15 at 95). She concedes that it is a "small detail" that NPA knows "exactly" where the imaging documentation procedures are referenced. (May 15 at 95-96). DiMarco testified that the integration of imaging documentation and procedures into the cardholder procedure manual was after 1995. The Defendants believe that the integration occurred after Norton's work on PACE so it would not have been known to him. (May 16 at 244). At deposition, DiMarco was asked to identify the date of implementation. (May 16 at 244). She then appeared at trial and still did not know the date of implementation. (May 16 at 244). Since this information is within the unique control of First Health, the Court should reject this claim by DiMarco because it has no proper foundation.

NPA noted that an imaging system exists in the cardholder services area even in its 1995 proposal. (May 18 at 461-464). Grieger, in preparing the 1999 proposal, made "an assumption here that since imaging is an integral part of customer service, it was repeatedly mentioned in the RFP as a part of customer service…, that one could logically assume that the imaging documentation would be part of the customer service operations manual." (May 18 at 439). Grieger stated: "I think the RFP clearly indicates that imaging documentation… and procedures is a part of cardholder services." (May 18 at 462). Howells does not view this information as confidential and proprietary to First Health. (Howells at 99-100). And Snedden does not view it as confidential because it is available to the public. (May 17 at 14-15).

(17) ACCESSING PROVIDER FILES FROM FIRST HEALTH'S SYSTEM

The RFP states that provider information is to be "communicated between computers" which clearly implies such accessibility. (May 16 at 240; D-4, p. 36). Howells stated that the fact that PDA is capable of accessing such information is not confidential and proprietary to First Health. (Howells at 100). Snedden stated that "we would make that public." (May 17 at 15). Grieger explained that "the fact that the imaging system was described in the cardholder services area as one that needs to be integrated with various PC platforms, both at the department level

and the PACE office level, leads one to believe that the requirement of the imaging system would ask you to have that access." (May 18 at 439). It was Grieger who "deduced that from reading the RFP." (May 18 at 440).

(18)  SOME PROVIDERS ELECT ELECTRONIC REMITTANCE ADVICES
Grieger testified that NPA currently uses electronic remittance advices in its administration of its prescription programs. (May 18 at 419, 440). NPA already has a number of network providers which have elected to receive remittance advices electronically as opposed to hard copy. NPA had been using electronic remittance advices for at least a decade. (May 18 at 419). Even Howells from First Health admits that the "concept that some providers prefer electronic media is not confidential." (Howells at 100-101). Snedden says this "preference" is public. (May 17 at 15).

(19) REMITTANCE ADVICES IN PROVIDER RELATIONS UNIT
The RFP specifically refers to "weekly preparing remittance advices...and electronically (EFT) transmitting the provider's reimbursement." (May 16 at 247; D-3, p. 42). Most importantly, this reference to remittance advices is contained in the section of the RFP entitled "Provider Relations Activity." (May 16 at 248; D- 3, p. 42). Grieger testified that it "can be inferred from that fact that the software and processes would be in the provider relations units." (May 18 at 473). Mr. Snedden says such information would be public. (May 17 at 15).

D. ISSUES NOT REVEALED BY PLAINTIFF IN DISCOVERY
(1) LABOR OVERHEAD
DiMarco provided hearsay testimony that "the percentages for labor overhead rates that NPA proposed in its 1999 proposal were 1 percentage point under First Health's." (May 15 at 117-120). She could not identify any proof that Norton had used First Health's overhead numbers in helping to prepare NPA's bid. (May 16 at 184-185). Again, she assumed he used First Health's overhead. (May 16 at 185). Howells, as previously stated, had instructed his staff to compare the cost proposals of NPA and First Health and his staff was unable to find any similarities. (Howells at 90). DiMarco could not state with any certainty how the labor overhead

16763-1                                                        13

numbers were computed to compare First Health and NPA proposals. (May 16 at 186-188). As a result, this hearsay testimony should be given little or no weight by the Court. Nicoletos explained that there is a difference between labor and labor overhead.   (May 24 at 497-498). The alleged similarity in labor overhead percentages does not lend even minimal support to Plaintiff's claims.  Nicoletos based NPA's overhead on one of the companies NPA owns in Pennsylvania.  Nicoletos did not know First Health's labor overhead. (May 24 at 498). Nicoletos addressed the alleged one percent difference:

> I don't think it is significant at all.  I think if you looked at a broad range of companies, that their labor overhead is going to be somewhere between 20 and 25 percent of the labor costs, I mean because you have got payroll taxes, which are statutory, everyone has those, and then you have employee benefit costs, which, you know, on a per head basis really doesn't vary that much from company to company assuming that they are offering benefits.

(May 24 at 498). Although First Health claims that Norton revealed labor overhead costs from First Health, Norton testified that he did not "have a clue" as to First Health's labor overhead costs. (May 24 at 552).

### (2)  TURNOVER COSTS

The bidding of zero or no cost for turnover activity is allegedly "a pricing strategy that is typically used by First Health." (May 15 at 100). Even DiMarco admitted that First Health's 1995 proposal that contained a zero, or near to zero, bid for turnover cost was shared with NPA. (May 16 at 190-191).  NPA's proposal explains that "the period of the turnover is parallel to the last few months of the operations and explains that if we should put a cost there, that would be duplicating staff…, and that would be double dipping, and so there was really no cost associated with that period of time for turnover…."  (May 24 at 558-559).  Snedden confirmed this zero price for turnover would be information that is public. (May 17 at 16).

### (3) LOW PRICE

Norton confirmed the obvious that bidding a low price is not a confidential, proprietary, or trade secret of First Health.  (May 17 at 369).  Grieger explained why NPA bid a low price:

There are several reasons for that. The staff or the individual who had priced the '95 proposal had a different pricing philosophy…. [W]e have become more aggressive in our pricing strategies, not just strictly for PACE but throughout the entire book of business. … Secondly, NPA has been very committed to Pennsylvania…we have lost a major contract in Pennsylvania, and subsequent to that we have decided as a corporate strategy to become very aggressive to try to maintain our position in Pennsylvania…. We also learned from the debriefing in the 1995 proposal what it would take to have a successful bid.

(May 18 at 423). Grieger stated: "I think that that's a strategy [low price] that's used universally by just about every company on the face of this earth." (May 18 at 444).

(4) TIES AND UNIQUE STAMPS

First Health refers to "ties" or "unique stamps" that it claims are confidential. (May 16 at 203). It does not describe with any specificity what are these alleged "ties" or "unique stamps." Grieger is not aware of any "ties" or "unique stamps" that are confidential and proprietary to First Health. (May 18 at 451). Norton is also not aware of any such "ties" or "unique stamps" that were used or will be used by NPA. (May 24 at 560). Snedden stated that "the way in which First Health ties the basic components or principal parts of the PACE program together and the unique stamp that it places on that program…is not something that is owned by the Department of Aging." (May 17 at 20). Snedden did not state that such items were confidential proprietary to First Health, rather he said they were not owned by PDA. Snedden does not believe there are any "ties" or "unique stamps" of First Health that are necessary to operate the PACE Program. (May 17 at 28). Also, Snedden stated that he was not aware of any "ties" or "unique stamps" owned by First Health and not by PDA that were used by NPA in preparing its bid or proposal. (May 17 at 28). "NPA's proposal, if it had a weakness, it was that they don't know the intricacies and the nuances of running these programs…." (Snedden at 63) (emphasis added). "But it's a weakness that I would anticipate…." (Snedden at 63-64). Consequently, Snedden not only did not notice that NPA had used any "ties" and " unique stamps" of First Health, but he scored NPA lower because those things were missing from NPA's proposal just as he would have anticipated.

Snedden noted that the could <u>not</u> agree that the NPA proposal had the "smell, touch and feel" of a First Health proposal.  (Snedden at 66-67).

### E. ACTUAL METHOD FOR COMPUTING NPA'S PRICE

First Health repeatedly implies that NPA's price proposal was based upon confidential information taken from First Health. An explanation of NPA's pricing strategy will further demonstrate how NPA did not use any confidential information from First Health.

Nicoletos worked on NPA's 1999 cost proposal.  He helped develop the cost strategy and pricing.  At the time he prepared the proposal, he had access to the contract price for First Health's 1998 and 1999 extension which is an exhibit to the request for proposal from the Department of Aging.  (May 24 at 492-493).  In order to come up with a pricing strategy for NPA's proposed contract price, Nicoletos met with Richard Ullman, NPA's President, and Grieger. (May 24 at 493).  "We had made a decision that we were going to price this very aggressively and that we were going to try and basically use the First Health price that they charged in those final two years as a basis for us formulating our price and formulating a competitive price."  (May 24 at 493-494). To come up with the final bid amount, Nicoletos explained:

> Well, we had decided that in order to get the Department of Aging to take a good look at our proposal that we really needed to price under what we thought First Health would come in at.  So when I looked at those two year numbers, I then took 10 percent off of that, …and then applied the inflation factor of 3 percent, so hopefully that would give us a bid price of 10 percent less than First Health would come in at.

(May 24 at 495).  First Health publicly claimed in prior proposals a 10 percent profit each year. (May 24 at 495).  The fact that Dun & Bradstreet showed a 50 percent profit margin for First Health gave Nicoletos a "comfort level" that NPA's price would not be so low as to not at least make some profit.  (May 24 at 496).  Nicoletos was not concerned that NPA's price was too low. "… NPA is a privately held company.  We have kind of an entrepreneurial spirit, if you will.  It's just an assumption that we would have a lower overhead cost than a publicly traded company

like First Health." (May 24 at 495-496). <u>Nicoletos had no knowledge as to what price First Health was going to bid.</u> (May 24 at 495). Nicoletos was very specific that <u>he</u> "came up with the total contract price that we ultimately bid." (May 24 at 512). Norton never verified any price margins or profit margins for NPA. The cost estimate he gave for imaging was based on work for another company, not First Health, in September and October of 1999. (May 24 at 559). Norton prepared an EXCEL spreadsheet with preliminary cost numbers for personnel and travel; these numbers were reviewed <u>and modified</u> by Nicoletos. (May 24 at 506-507). As pointed out by Nicoletos, "the man hours, were provided in the RFP, so we had a pretty good idea of what the head count had to be." (May 24 at 507). Nicoletos confirmed that Norton's spreadsheet "did not drive the final number." (May 24 at 524). Norton verified that he did not use First Health's marketing strategy or costing strategy in helping to prepare the 1999 NPA bid proposal. (May 24 at 576). Norton only learned of NPA's final price proposal three or four days before its submission. (May 24 at 548).

### F. CONFIDENTIAL INFORMATION NOT NECESSARY TO DEFENDANTS

DiMarco admits that it is possible that NPA could have pulled together a competitive bid proposal without using confidential and proprietary information from First Health. (May 15 at 160). She claims that "it would be difficult, if not impossible, for him [Norton] to be officer in charge... without violating other confidential business information of First Health." (May 15 at 115). Even if it may be difficult, there is no restriction under his employment agreement that would prohibit such work. Norton testified that NPA never asked him to reveal any confidential, proprietary, or trade secret information. He also never revealed such information. (May 24 at 550). Norton stated that he could perform his duties as officer in charge of PACE under NPA without revealing confidential, proprietary, or trade secret information possessed by First Health. (May 24 at 559-560). He also believes that other First Health employees could continue their duties at PACE under NPA without revealing such information. (My 24 at 560). Grieger is not

16763-1                                        17

aware of any confidential or proprietary information that was revealed by Norton. (May 18 at

451). Nicoletos stated that Norton never provided any confidential, proprietary or trade secret

information from First Health. (May 24 at 498, 524).

### G. NON-SOLICITATION OF FIRST HEALTH'S CUSTOMERS

DiMarco claims that the last sentence of section 8 should be interpreted as follows:

> [O]ne senior manager requested that, you know, <u>so as he could work in the future potentially after his retirement</u>, that this simple act of if he were to go to work for a competitor...that the simple act of helping his company respond to some specific aspect of an unsolicited RFP, that it would allow him to do that... <u>but it was absolutely never meant to override anything else above it</u> relative to calling on, diverting or soliciting our clients or prospective clients. Essentially it - - <u>it's a very narrow exception that would allow Mr. Norton to work on</u>, you know, <u>some technical aspect of a proposal</u> that his company might be making that was totally unsolicited by him.

(May 15 at 64; P-14) (emphasis added). Nothing in Section 8 says it is so limited. Allegedly,

Section 8 of Norton's employment agreement was violated simply because he was suggested as

officer in charge by NPA and he led NPA's presentation at the "orals." (May 15 at 110-111).

Absurdly, DiMarco claims that "PDA thinks very highly of Mr. Norton... that by virtue of him

being proposed as the officer in charge that would be very attractive to PDA and in my view, in

the company's view, solicitous." (May 15 at 111). Even DiMarco admits that "the request for

proposal by PDA was not solicited by NPA." (May 15 at 124-125). She acknowledges that

"Norton did not solicit that RFP on a personal level." (May 15 at 126). To her knowledge,

Norton did not seek work from NPA until after NPA had already received the RFP and had

already begun work on its proposal. (May 15 at 127). If DiMarco is correct in her interpretation,

the exception of "responding to an unsolicited request for proposal... of a government agency"

would be rendered in large part meaningless.

### H. NON-SOLICITATION OF FIRST HEALTH EMPLOYEES

DiMarco admits that at the pre-proposal conference on October 8 the Department

answered yes to whether it would "react favorably to hiring these people [First Health

employees] under a new contractor." (May 15 at 143-144). On October 25, 1999, First Health

16763-1                                          18

also received written notice that the Department would view "affirmatively" a proposal by a bidder to hire First Health employees. (May 15 at 148-149, D-2). First Health did nothing to object, protest, or question these statements. Snedden testified that the questions and answers became part of the contract. (May 15 at 45). Susan Sampson, the supervisor of the Grants and Contracts Unit of PDA, confirmed that the questions and answers become "part and parcel" of the RFP. (Sampson 64-65). By failing to notify PDA that First Health objected to the hiring of its employees, First Health allowed bidders to be instructed that they could propose hiring First Health employees when First Health knew it would challenge any successful bid that contained such a proposal. Sampson stated that if any bidders see a potential problem raised by the questions and answers they should make a written objection. She also confirmed that First Health could have filed a bid protest if it was objecting to any of the questions and answers. (Sampson at 88-90). As to whether First Health correctly waited to protest the questions and answers when it knew it would object to any other bidder hiring its staff, Snedden stated:

> I'm not saying that they should necessarily wait. What I'm saying is that they probably did not realize the implications of this until they became aware of a bid that was going to do exactly that. <u>You know, I don't think anybody at First Health thought that they were going to lose the contract or lose the bid.</u>

(May 17 at 29). The fact that First Health believed it could not lose the bid, does not excuse it from its obligation to timely object and file a protest. Snedden confirmed that there is a mechanism in place to raise the aforementioned issue at the "bidders conference" and that there is a bid protest process available. (May 17 at 31).

DiMarco claims that Norton is "listed as directly responsible for recruiting, hiring the staff" and that this is somehow solicitation by Norton. (May 15 at 104). In actuality, NPA's proposal does not say Norton is responsible for recruiting and hiring but instead only says "NPA's officer in charge and the project director will arrange and schedule interview sessions." (May 17 at 379, P-17). The NPA proposal does not require the officer in charge to participate in

16763-1                                    19

the interviews or in the hiring decision. Furthermore, Norton has not even arranged and scheduled any interview sessions. (May 17 at 378). Norton has not solicited any First Health employees. (May 17 at 379). The NPA proposal provides that the Assistant Project Director, not the officer in charge, is to "recruit and hire management" and "recruit and hire supervisory staff," and other NPA managers, not the officer in charge, are to "recruit and hire operation staff." (May 17 at 378-379). The recruiting section of NPA's proposal states: "NPA's project director begins the process of recruiting and hiring the incumbent key management staff...." (May 18 at 446; D-11). Also, "NPA's project director and assistant project director begins the process of recruiting and hiring the incumbent's supervisory staff...." (May 18 at 447; D-11). The project director is Peter Grieger, not David Norton. (May 18 at 447). DiMarco claims that Norton suggested the hiring of First Health employees by NPA because "the October drafts do not propose this hiring of First Health personnel lock, stock and barrel." (May 15 at 142). She falsely claims: "In fact NPA's October draft proposal proposes that NPA's own staff be used and that they hire all new staff in the Harrisburg area." (May 15 at 142). The October draft actually contains the following language:

> Notwithstanding an active recruiting and training effort, it is NPA's philosophy to encourage existing staff members to remain with the program. We believe that this policy will minimize the trauma and disruption of the personal lives of the people who are currently employed and will enhance the smooth transition to a new administrator.

(May 17 at 389-390; P-136). Also, contrary to the claim of First Health, the 1995 NPA proposal included an identical reference to hiring First Health employees. (May 18 at 431).

DiMarco falsely claims that "Mr. Norton solicited Mr. Robert Howells for employment by NPA." (May 15 at 104). She claims that "Mr. Howell's comment to me was that essentially Mr. Norton offered me [him] a job." (May 15 at 105). On cross-examination, however, she admitted that she did not even know whether it was Howells or Norton who brought up the subject of working for NPA. (May 15 at 158-159). Howells testified that he asked Norton if he

was included in NPA's plan to "take on" First Health staff. (May 16 at 263). Howells stated that he did not tell DiMarco or anyone else that Norton had solicited him to come to work for NPA. (May 16 at 277). At his deposition he stated: "I don't believe Mr. Norton was offering me a job." (May 16 at 277). He was certain that Norton did not ask him to solicit any First Health employees on behalf of Norton or on behalf of NPA. (May 16 at 277). Norton confirmed that he never solicited Howells to come to work for NPA and that it was Howells who raised the possibility of employment with NPA. (May 12 at 315; May 24 at 55; P-40).

Howells does not believe that his employment agreement would prohibit him from working for NPA. (May 16 at 280-281; Howells at 56-57). DiMarco states that it is "remotely possible" that First Health employees would not have to disclose confidential and proprietary information of First Health in working for NPA. (May 15 at 154). The employees of First Health should not be prohibited from accepting employment with NPA because DiMarco believes it would be difficult for them to honor their employment agreements.[3]

DiMarco admits that Norton stopped having responsibility for the PACE program in late 1998. (May 15 at 123). In fact, Norton stopped working on PACE in July of 1998 and performing work for First Health by June of 1999. (May 16 at 197-198). The June 7, 1999 letter from First Health to Mr. Norton advised him that he could accept other employment. Section 9 only applies to "a period of one year from the date of Employee's termination." (P-14). As a result, Norton is prospectively free to solicit First Health employees.

## Argument

### I. REQUIREMENTS FOR A PRELIMINARY INJUNCTION HAVE NOT BEEN MET .
As reiterated by the Third Circuit:

In order to support a preliminary injunction, plaintiff must show both a likelihood of success on the merits and a probability of irreparable harm. Additionally, the district

---

[3] Although First Health claims that its employees cannot be hired by a successor, First Health admits, however, that it has hired the "front line staff" of the EPIC program in New York from the incumbent. (May 15 at 109-110).

court should consider the effect of the issuance of a preliminary injunction on other interested persons and the public interest.

Campbell Soup Co.v. Conagra, Inc., 977 F. 2d 86, 90-91 (3d Cir. 1992) (citations omitted). Furthermore, a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a 'clear showing of *immediate* irreparable harm.' 977 F. 2d at 91(citation omitted) (Cir. 1994). As stated in Radio Hanover, Inc. v. United Util., Inc., 273 F. Supp. 709 (M.D. Pa. 1967):

> Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.''

273 F. Supp. at 713. "[U]pon an application for a preliminary injunction to doubt is to deny." Madison Square Garden Corp. v. Braddock, 90 F. 2d 924, 927 (3d Cir. 1937).

The Statement of Facts demonstrates that the Plaintiff has failed to show that it is at all likely to prevail on the merits. The claims of the Plaintiff are mere assumption without factual foundation. The Plaintiff has also failed to meet its burden of showing immediate irreparable harm. The Plaintiff has not shown that adequate compensatory relief would not be available if they should ever prevail. If a preliminary injunction is granted, other interested persons and the public will be adversely impacted. NPA will be denied its opportunity to benefit from its successful bid. Norton will lose his opportunity for gainful employment. The public will be forced to continue paying higher amounts of money to operate the PACE program.

## II. NORTON'S RESTRICTIVE COVENANTS ARE NOT REASONABLE.

The question of whether a restrictive covenant is enforceable is one of law and depends upon the reasonableness of its terms. McRand, Inc., v. Beelan, 486 N.E. 2d 1306, 1311 (1985). Illinois courts favor fair competition in business and do not encourage restraints of trade, so restrictive covenants are closely scrutinized. Image Supplies, Inc. v. Hilmert, 390 N.E. 2d 68, 70

(1979). Agreements not to compete must not be injurious to public interest and must not be in restraint of trade. <u>Aristocrat Window Co. v. Randell</u>, 206 N.E. 2d 545, 551-552 (1965). "[A] court will ensure that the covenant's intended effect is not to restrict competition per se." <u>Jefco Lab., Inc.v. Caroo</u>, 483 N.E. 2d 999, 1001 (1985). First Health would essentially convert restrictive covenants into a general non-compete clause to restrict competition per se. A confidentiality agreement which essentially amounts to a post employment covenant not to compete and which essentially defines confidential information as all information provided by employer in any way relating to services offered by it is unreasonable. <u>Serv. Centers of Chicago, Inc. v. Minogue,</u> 535 N.E. 2d 1132, 1136 (1989) (citation omitted). First Health claims that its confidentiality agreements do not just prohibit Norton, and its other employees, from divulging confidential information, but prohibit them completely from working for a competitor. This essentially amounts to a post-employment covenant not to compete that is unrestricted in duration. Although not authorized by any language of the employment agreements, First Health unlawfully seeks a blanket exclusion of all its employees from employment with NPA.

## III. NORTON HAS NOT BREACHED AND WILL NOT BREACH HIS CONTRACT.

"To prevail on a breach of contract claim, a plaintiff must establish that there was an agreement which the defendant breached, thereby causing damages to the plaintiff." <u>Glenn Matthews and Maint. Supply Co., v. Unisource Worldwide, Inc.</u>, 748 A. 2d 219, 221 (Pa Super. 2000) (citation omitted). The Plaintiff has failed to establish facts to demonstrate a breach of the restrictive covenants.

## IV. NORTON AND NPA HAS NOT MISAPPROPRIATED ANY TRADE SECRETS.

According to the Illinois Trade Secrets Act:

> Trade Secret means information… that (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

IL. St. Ch. 765 § 1065/2 (d). Referring to the Restatement of Torts, the Supreme Court of Illinois identified factors that are significant in determining the existence of a trade secret:

> (1) [T]he extent to which the information is known outside of [plaintiff's] business; (2) the extent to which it is known by employees and others involved in [plaintiff's] business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others

ILG Ind., Inc. v. Scott, 273 N.E. 2d 393, 396 (1971) quoting Restatement of Torts, § 757, Comment b, p. 6. As described in the Statement of Facts, any information used by NPA was not confidential or a trade secret. Regardless of any restrictive covenant, an employee may "take with him general skills and knowledge acquired during his former employment." Packard Inst. Co. v. Reich, 412 N.E. 2d 617 (1980). Against any interest of an employer to protect its information "is the right of an individual to follow a particular occupation, which is a fundamental right, and 'one who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge, and expertise acquired through his experience'." Jefco Lab., 483 N.E. 2d at 1002 (1985), quoting Smith Oil Corp. v. Viking Chem. Corp., 468 N.E. 2d 797 (1984). The Supreme Court of Pennsylvania has held that a man's aptitude, skill, dexterity, mental and manual ability, and other subjective knowledge obtained while in the course of his employment belong to the employee. Spring Steels, Inc. v. Molloy, 162 A.2d 370, 373 (Pa.1960). First Health has claimed items were confidential that have no apparent economic value. Furthermore, the information that the Plaintiff claims is confidential is available to the public and is generally known. By participating in a public contracting process, any confidential information related to the contract becomes publicly available.[4] Also, much of the "confidential" information is, in actuality, the general skills and knowledge of Mr. Norton.

---

[4] The Commonwealth of Pennsylvania has ruled that the contract between the successful bidder and the Department of Transportation to perform an emissions inspections program and the documents included therein by reference (i.e., the proposal) was a public record for purposes of the Right to Know Act. "It is not to protect the business

## INEVITABLE DISCLOSURE

For the elements of inevitable disclosure First Health cites <u>PepsiCo, Inc. v. Redmond</u>, 54 F. 3d 1262 (7th Cir. 1995) and <u>Air Products and Chem., Inc. v. Johnson</u>, 442 A. 2d 1114 (Pa. Super 1981). The <u>PepsiCo</u> Court stated: "All that is alleged, at bottom, is that defendants <u>could</u> misuse plaintiff's secrets, and plaintiffs <u>fear</u> they will. This is not enough." <u>PepsiCo, Inc.</u>, 54 F.3d. at 1268, 1269 (quoting <u>Teradyne, Inc. v. Clear Communications Corp.</u>, 707 F. Supp. 353,357 (N.D. Ill. 1989) (emphasis added). DiMarco admits that it is possible, even though "very difficult," for Norton to work for NPA without disclosing confidential information of First Health. Therefore, DiMarco is merely alleging the possibility and fear of such disclosure, which falls short of stating a viable claim. "The mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose... trade secret information' so as to 'demonstrate irreparable injury'." <u>PepsiCo, Inc.</u>, 54 F. 3d at 1269 (quoting <u>AMP, Inc. v. Fleischhaker,</u> 823 F. 2d 1199,1207 (7th Cir. 1987)). "The <u>Teradyne</u> and <u>AMP</u> plaintiffs could do nothing more than assert that skilled employees were taking their skills elsewhere...." <u>PepsiCo, Inc.</u>, 54 F.3d at 1269. First Health has failed to identify any particularized plan or processes that are confidential to First Health which it is seeking to protect. The extraordinary remedy of a preliminary injunction is not appropriate where there is only mere suspicion or apprehension by DiMarco that confidential information will be used by Norton and NPA.

## V. NO BREACH OR INDUCEMENT TO BREACH ANY FIDUCIARY DUTY.

"An officer of a corporation owes a fiduciary duty of loyalty to his corporate employer" "to disavow any corporate opportunity where the officer's private interest would conflict with those of the corporation." <u>Comedy Cottage, Inc. v. Berk</u>, 495 N.E. 2d 1006, 1011 (1986) (citation omitted). The fiduciary duty of an employee only applies to matters begun during his or

---

secrets of private companies who voluntarily enter into a contract containing such 'secrets' with a public agency subject to the provisions of the Act." <u>Envirotest Partners v. Commonwealth of Pennsylvania, Dep't of</u>

her employment. 495 N.E. 2d at 1011. Because all of Mr. Norton's conduct involving NPA occurred after his employment at First Health had terminated, there is no fiduciary duty issue to be decided.

## SOLICITATION

Under Illinois law, the term "solicit" has been held to 'impl[y] personal petition and importunity addressed to a particular individual to do some particular thing.' <u>Smith, Waters, Kuehn, Burnett & Hughes, Ltd. v. Burnett</u>, 548 N.E. 2d 1331, 1336 (1989) (quoting Blacks Law Dictionary 1249 (5th Ed. 1979). The mere possibility of solicitation is not enough to support a preliminary injunction. <u>Nobelpharma USA, Inc. v. The Straumann Company</u>, 1993 Mass. Super. Lexis 245 (1993). "Merely informing customers of one's former employer of a change of employment, without more, is not solicitation. Neither does the willingness to discuss business upon invitation of another party constitute solicitation on the part of the invitee." <u>Aetna Building Maint. Co., Inc. v. West</u>, 246 P.2d 11 (Ca. 1952). Mr. Norton has not personally petitioned or importuned any First Health employee to work for NPA.

The question then arises when the one year period runs for purposes of Norton's solicitation clauses. "[A]n employee who receives severance pay in the form of remaining on the active payroll loses his employment status at the date of termination notwithstanding his payroll status." <u>Cronshaw v. Philips Medical Systems, Inc.</u>, 1994 WL 622173 *5 (N.D. Ill.) (citations omitted). Mr. Norton's employment ended in June of 1999, and, therefore he is no longer prohibited from soliciting First Health employees.

## CORPORATE RAIDING

First Health relies on two cases: <u>Morgan's Home Equip. Corp. v. Martucci</u>, 136 A.2d 838 (Pa. 1957) and <u>ABC Trans Nat'l Transport, Inc. v. Aeronautics Forwarders, Inc.</u>, 413 N.E. 2d 1299 (1980).

---

<u>Transportation</u>, 664 A. 2d 208, 214-5 (Pa. Commw. 1995).

> The systematic inducing of employees to leave their present employment and take work with another *is unlawful when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employees.* So, also, when the inducement is made for the purpose of having the employees commit wrongs....

Morgan's Home Equip. Corp., 136 A.2d at 847 (citations omitted) (emphasis added). NPA is not proposing to hire First Health PACE employees to cripple and destroy First Health's business or to steal any of First Health's confidential information. It has proposed to hire First Health employees merely to facilitate the continuity of the PACE Program and to accommodate persons who might not otherwise have jobs. By suggesting that the First Health PACE employees continue their employment with the PACE Program, NPA has not induced First Health employees to leave their current employment. Their employment with NPA would not begin until after First Health's contract with PDA has ended. "Inducing an employee to terminate an employment at will is not illegal provided the only purpose is to secure the services of that employee." Perfect Subscription Co. v. Kavaler, et al., 427 F. Supp. 1289, 1294 (E.D. Pa. 1977) (citations omitted). "It is clear that an employee, absent an agreement to the contrary, has no duty not to compete with a former employer upon severance of their relationship . . ." Carl A. Colteryahn Dairy, Inc., 203 A.2d 469, 471 (Pa. 1964) citing Restatement (2d), Agency, § 396. A company "cannot be punished for hiring competent, experienced employees." Graphic Management Assoc., Inc. v. Steckel and Harris Graphics Corp., 1986 WL 9723 *7 (E.D. Pa.). NPA has a valid interest in these employees and First Health has not shown them to be indispensable.

CONFIDENTIALITY OF A "UNIFIED PROCESS"

In George S. May Int'l Co. v. Int'l Profit Assoc., 628 N.E. 2d 647 (1994), the Defendant argued that individual components of its manuals, financial formulas, and software were trade secrets. The Defendant also argued that "its method as a whole was 'unique' and not commonly used." George S. May Int'l Co., 628 N.E. 2d at 654. The Court found that the items did not

amount to trade secrets. The Court found that the Defendants did not show that the information was outside the 'realm of general skills and knowledge.' 628 N.E. 2d at 654. "Although Drebin characterized several of May's mathematical formulas as 'not commonly known or used', there was no testimony that they could not readily be duplicated by anyone with some accounting or finance knowledge who sought to achieve ends similar to those of May. Merely being the first or only one to use particular information does not in and of itself transform otherwise general knowledge into a trade secret." 628 N.E. 2d at 654 (citations omitted).

> Our society is extremely mobile and our free economy is based upon competition. One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience…. Restraints cannot be lightly placed upon his right to compete in the area of his greatest worth.

628 N.E. 2d at 654 (citation omitted).

First Health claims a protectible interest in the way it "ties" things together and as to its "unique stamp" but it has failed to show that this information is outside the realm of general skills and knowledge. The Plaintiff has not shown that its "ties" or "unique stamps," which were never clearly identified, could not be readily duplicated by people familiar with the prescription benefit business area. First Health would force Norton to erase all his general skills, knowledge and expertise, and to not work in the area of his greatest worth.

In Mettler-Toledo, Inc. v. Todd R. Acker, d/b/a Precision Instrument Serv., 908 F. Supp. 240 (M.D. Pa. 1995). The Court found:

> All that he took with him is the accumulated knowledge obtained over his seven year period with the company. Mettler-Toledo has no protectible interest in the customer information at issue. A good deal of the information can be obtained from sources available to the public generally, such as telephone directories, university and hospital directories. The remainder can be readily obtained by contacting the entities listed in such directories and making inquiries as to who should be contacted…. All of this can be accomplished with relative ease and some perseverance by Acker or any one else familiar enough with the industry….
>
> ***
>
> Granting Mettler-Toledo the relief which it seeks would give it the functional equivalent of a non-compete agreement… Acker did not sign a non-compete agreement. There is, therefore, nothing which legally bars him from competing directly against it in his former

*territory and it would be improper for this court to bring about that result. He is entitled to use all of the skills, knowledge, and business acumen he acquired over the years he was employed at Mettler-Toledo. So long as he uses no trade secrets of confidential information of the company, he is free to compete aggressively against it.*

Metler-Toledo, Inc., 908 F. Supp. at 247,248 (emphasis added). The Defendants have shown that all the allegedly confidential information of First Health can be obtained from sources available to the public or can be readily obtained by contacting the appropriate entities. First Health is seeking the functional equivalent of a non-compete agreement, but Norton, and First Health employees, did not sign a non-compete agreement.

The Plaintiffs in Nat'l Risk Management argued that "they are seeking not to protect the 'pieces' of the puzzle, but rather, the 'method' for putting the pieces together into a cohesive picture. It is this 'method' however, that is disclosed to potential clients in plaintiffs' proposal book and explained to clients when plaintiff makes a presentation." Nat'l Risk Management, Inc. v. Bramwell, 819 F. Supp. 417, 433 (E.D. Pa. 1993). Thus, the court denied the plaintiffs the requested protection. Similarly, the alleged "ties" or "unique stamps" of First Health, if any, are revealed through the RFP and related documents, and are not protectible.

## VI. THERE HAS BEEN NO TORTIOUS INTERFERENCE.

Under Pennsylvania law, there are the following elements to a tort claim for interference with contractual relations: "The plaintiff must demonstrate the existence of present or prospective contractual relations, an intent on the part of the defendants to harm the plaintiff by interfering with those contractual relations, the absence of a privilege or justification for the interference and damages." McMorris v. Williamsport Hosp., 597 F. Supp. 899, 917 (M.D. Pa. 1984) (citing Glazer v. Chandler, 200 A. 2d 416 (Pa. 1964) "(stating that 'numerous cases' emanating from Pennsylvania courts comport with this definition of the tortious interference claim)" (and citing Restatement (Second) of Torts § 766). As to tortious interference of NPA in the employment contract of Norton, the Plaintiff has not shown an intent to harm on NPA's part and has not shown any breach of the restrictive covenants. As to tortious interference in First

Health's prospective economic advantage, there is no prospective economic advantage in a contract which has not yet been awarded to First Health. There is, in essence, no contract to interfere with. Any alleged interference in an alleged economic advantage of First Health, is justified by the Commonwealth's invitation to bid.

## VII. FIRST HEALTH HAS BROUGHT THIS ACTION WITH "UNCLEAN HANDS"

"[B]efore a Complainant can have a standing in Court he must first show that not only has he a good and meritorious cause of action, but he must come into Court with clean hands." Salomon Smith Barney, Inc. v. Vockel, 2000 WL 558580 *3 (E.D. Pa.). 'The governing principle is that whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the Court will be shut against him in limine'." 2000 WL 558580 *3 (E.D. Pa.) (quotation citation omitted). See also Monsanto Co. v. Rohm & Haas Co., 456 F. 2d 592, 598 (3d Cir. 1972), cert. denied , 407 U.S. 934 (1972) (The doctrine of unclean hands "is far more than a mere banality. It is a self-imposed ordinance that closes the doors to a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.") The failure of the Plaintiff to note its objection to the Department's position, that First Health employees can be proposed to be hired by bidders, results in "unclean hands" in seeking injunctive relief.[5]

### Conclusion

The request by First Health for a preliminary injunction should be denied.

---

[5] The Field Procurement Handbook states that a bidder, such as First Health, who is "aggrieved in connection with the solicitation" of a contract may file a protest within seven (7) days of knowing "of the facts giving rise to the protest." The Handbook refers to protests "before bid opening" and "before award." Chapter 58, A-D. First Health waived any right to protest the hiring of its employees by not following this procedure.

16763-1                                                    30

Respectfully Submitted,

Thomas B. York
Christine D. Consiglio
Dilworth Paxson LLP
305 N Front Street, Suite 403
Harrisburg, PA  17101
(717) 236-4812

July 3, 2000

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via facsimile, electronic mail and first class mail this 3rd day of July 2000 to:

Scott L. Vernick, Esq.
Jeffrey D. Hutton, Esq.
Fox, Rothschild, O'Brien & Frankel LLP
2000 Market Street, Tenth Floor
Philadelphia, PA  19103-3291
(215) 299-2150
svernick@frof.com


Thomas B. York


July 3, 2000


16245-1