ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT
OF PENNSYLVANIA

| | |
|---|---|
| FIRST HEALTH GROUP CORP.,<br>3200 Highland Avenue<br>Downers Grove, IL 60515-1282,<br><br>       Plaintiff,<br><br>       v.<br><br>NATIONAL PRESCRIPTION<br>ADMINISTRATORS, INC.,<br>711 Ridgedale Avenue<br>East Hanover, NJ 07936<br><br>       And<br><br>DAVID W. NORTON,<br>1220 Whitby Road<br>Richmond, VA 23277,<br><br>       Defendants | CIVIL ACTION NO.<br>1:00-CV-312<br><br>FILED<br>HARRISBURG, PA<br><br>JUL 1 4 2000<br><br>MARY E. D'ANDREA, CLERK<br>Per _____<br>    Deputy Clerk |

**DEFENDANTS' RESPONSE TO THE MEMORANDUM OF LAW OF
PLAINTIFF FIRST HEALTH GROUP CORP.**

16817-1

# TABLE OF CONTENTS

|  | | Page Numbers |
|---|---|---|
| **Introduction** | | 2 |
| **Statement of Facts** | | 2 |
| **Argument** | | 9 |
| A. | **The Availability and Appropriateness of Injunctive Relief** | 9 |
| B. | **First Health Does Not Prevail on the Merits** | 10 |
| **Conclusion** | | 15 |

# TABLE OF AUTHORITIES

| | Page Numbers |
|---|---|
| A.M. Skier Agency, Inc. v. Gold, 747 A.2d 968 (Pa. Super. 2000) | 9 |
| IDS Financial Services, Inc. v. Smithson, 843 F. Supp. 415 (N.D. Ill. 1994) | 9 |
| PepsiCo, Inc. v. Redmond, 54 F.3d, 1262, 1268-1269 (Pa. Super. 1981) | 10 |
| Air Products and Chemicals, Inc., 442 A.2d 1114 (Pa. Super. 1982) | 10,11 |
| Computer Care v. Services Systems Enterprises, Inc., 982 F.2d 1063, 1074-1075 7th Cir. 1992) | 11 |
| Stewart & Stevenson Services, Inc. v. Serv-Tech, Inc., 879 S.W. 2d 89 (Tex. App. 14 Dist. 1994) | 11 |
| Triangle Sheet Metal Works, Inc. v. Silver, 222 A.2d 220 (Conn. 1966) | 11 |
| C & F Packing Co., Inc. v. IBP, Inc., 1998 WL 1147139 *6 (N.D. Ill.) | 11 |
| Computer Associates Intern-Inc. v. Alta, Inc., 982 F.2d 693, 718 (2d Cir. 1992) | 11 |
| Rohm and Haas Co. v. Adco Chemical Co., 689 F.2d 424, 431 (3d Cir. 1982) | 11 |
| Fabkom, Inc. v. R.W. Smith & Associates, Inc., 1996 WL 531873 *12 (S.D.N.Y. 1996) | 11 |
| Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 838 (Pa. 1957) | 12 |

|  | **Page Numbers** |
|---|---|
| ABC Trans Nat. Transport, Inc. v. Aeronautics Forwarders, Inc., 90 Ill. App. 3d 817, 413 N.E. 2d 1299 (Ill. App. 1 Dist. 1980) | 12,13 |
| RUDOLF CALLMAN, THE LAW OF UNFAIR COMPETITION TRADEMARKS AND MONOPOLIES § 9.03 (4th ed. 1999) | 13 |

## Introduction

The Plaintiff alleges that the Defendants have engaged in unfair competition. (Plaintiff's Memorandum at 1). The evidence, however, demonstrates that the Plaintiff does not seek fair competition but rather seeks to eliminate competition per se. The Plaintiff requests that Mr. Norton and all First Health's employees be forbidden to work on the PACE Program even though there is no evidence that any confidential or proprietary information of First Health has been or ever will be disclosed or used. First Health seeks to snatch away the PACE contract from the winning bidder by falsely alleging violations of clauses prohibiting solicitation of clients and employees. The goal of First Health is nothing more than an impermissible restraint on trade and an interference with the lawful right of individuals to seek gainful employment. First Health is asking the Court to create an arbitrary and artificial environment in which it would have an insurmountable advantage and where no other company could ever successfully compete for the PACE contract.

## Statement of Facts

The Court should refer to Defendants' Proposed Findings Of Fact and Defendants' Counter Proposal For Findings Of Fact.

The Plaintiff's Memorandum is largely a reiteration of the "facts" contained in Plaintiff's Proposed Findings of Fact. The Defendants have addressed many of the misrepresentations made by the Plaintiff in Defendants' Counter-Proposal For Findings Of Fact and will not repeat those comments here. A few additional items were raised in Plaintiff's Memorandum which are addressed below.

16817-1          2

Allegedly, "Norton embarked on a path designed to undercut First Health's status as the PACE Program's administrator." (Plaintiff's Memorandum at 3). The evidence, however, only describes Mr. Norton's effort to obtain employment in an area where he possessed great expertise. Without any basis in fact, the Plaintiff claims that "Norton maintained his long-standing relationship with Snedden to market himself as a 'consultant' to companies that were likely bidders for the PACE Contract." (Plaintiff's Memorandum at 3). Since Mr. Norton and Mr. Snedden are friends, this assumption by First Health is inappropriate. Furthermore, Mr. Norton is free to maintain a relationship with anyone who he chooses, whether or not they may later be of benefit in his work.

The evidence does not support the claim that "Norton sought out NPA... for the sole purpose of helping NPA prepare its bid proposal and take the management of the PACE Program from First Health." (Plaintiff's Memorandum at 4). Norton worked for NPA because he wanted to be gainfully employed.

The Plaintiff mischaracterizes the interview by NPA of Mr. Norton as "perfunctory." (Plaintiff's Memorandum at 4). There is nothing of record to show that the interview was impersonal, apathetic or indifferent.

Although NPA never contacted First Health "to disclose that NPA had retained Norton's consulting services" (Plaintiff's Memorandum at 5), NPA had no obligation to do so.

First Health exaggeratedly proclaims, without citation to the record and without factual support, that there was a "hasty retention of Norton" and there was "a single-minded agenda - - to secure every advantage, whether lawful or not, that Norton offered."

16817-1                                3

(Plaintiff's Memorandum at 5). There is no evidence of record that Mr. Norton's hiring was "hasty" or that NPA ever intended or committed any unlawful acts.

Allegedly, "Norton displays a startling lack of credibility about the scope and significance of his contributions to NPA's 1999 bid proposal." (Plaintiff's Memorandum at 5). The Plaintiff, however, cannot cite to any misrepresentations by Mr. Norton. Instead, the Plaintiff asks the Court to assume a lack of credibility.

Mr. Norton did not state "that he was involved in drafting and editing many portions of NPA's entire technical proposal." (Plaintiff's Memorandum at 7). He only confirmed that he "helped edit or write portions of the work plan." (May 16 at 305-306). Again, the Plaintiff overstates the testimony.

Allegedly, Mr. Norton "weakens his credibility by giving inconsistent testimony." (Plaintiff's Memorandum at 6, n. 5). Mr. Norton honestly stated that he could not recall if "NPA's current proposal" stated that the officer-in-charge was to participate in the interviewing and recruiting of First Health's staff. (May 16 at 311-312). It was not inconsistent to later acknowledge that the officer-in-charge and the project director were to arrange and schedule interviews. (May 16 at 312). The evidence actually shows that direct interviewing and recruiting was assigned to other persons, not to the officer-in-charge. (See Defendants' Proposed Findings Of Fact). Nothing cited by the Plaintiff causes any doubt as to the credibility of Mr. Norton.

Allegedly, "First Health has invested seventeen (17) years of time, money and resources in its relationship with PDA." (Plaintiff's Memorandum at 8). A more accurate description would be that PDA invested the money and resources for First

16817-1                                   4

Health to create a PACE Program that is owned by the Commonwealth of Pennsylvania and it's taxpayers.

Allegedly, "NPA knew or should have known that the information in question… was First Health's confidential and proprietary business information." (Plaintiff's Memorandum at 10). Since none of the information was confidential and proprietary, this claim has no merit.

First Health refers to (1) meeting with PDA to discuss new initiatives, (2) working to obtain continuing education credits for pharmacists, and (3) initiating contacts with hotels, and claims without foundation that "First Health currently implements all of these unique approaches." (Plaintiff's Memorandum at 15). There is no testimony or other evidence, not even the testimony of Ms. DiMarco that these items are unique to First Health.

Allegedly, Mr. Norton was "intimately" involved in NPA's decision to "bid zero dollars for turnover." (Plaintiff's Memorandum at 20). The testimony cited only says the turnover number was discussed with Mr. Norton and that Mr. Norton did not decide this number independently. (May 24 at 509). The Plaintiff goes too far to claim this testimony means Mr. Norton was "intimately" involved.

First Health's attorney again attempts to testify when he claims that "Mr. Nicoletos refused to acknowledge that his pricing 'strategy' had little, if any, financial integrity, unless he was prepared to make certain assumption about FHSC's current costs… in order to formulate a bid price of 10% less than FHSC's likely bid price." (Plaintiff's Memorandum at 22). Certainly, Mr. Nicoletos' testimony does not support this claim. Mr. Nicoletos explains that he did not have to make certain assumptions

16817-1                                                        5

<u>because NPA had First Health's price</u> from recent contracts and you do not need to assume anything when you do a "top down pricing strategy." (May 24 at 519-522). It cannot be emphasized enough that having public access to a competitor's previous contract prices is a tremendous help in formulating a competitive bid without any assumption and without confidential information. It should be noted that First Health did not provide any testimony, such as from a financial or business expert, to support its claim that Mr. Nicoletos' pricing strategy had "little, if any, financial integrity." Essentially, Mr. Vernick is testifying as to his opinion and the Court should reject any testimony by legal counsel.

Similarly, First Health refers to the deficiencies of Nicoletos' pricing strategy when there is no testimony to support such a claim. (Plaintiff's Memorandum at 22).

Mysteriously, in regard to Section 8 of Mr. Norton's employment agreement, First Health claims: "More important, NPA did not initiate hiring Norton, and then, once employed, required him to work on some discreet part of its 1999 proposal." (Plaintiff's Memorandum at 24). Section 8 does not limit Mr. Norton to working on "discreet portions" of any unsolicited government RFP.

Contrary to assertions by the Plaintiff, the participation in an oral presentation after the bids are submitted as required by the RFP is not "calling upon" an existing and prospective First Health customer to divert PDA's contract away in violation of Section 8. (Plaintiff's Memorandum at 25). Section 8 allows Norton's participation in unsolicited government RFP's such as the 1999 PACE RFP. It does not prohibit a personal appearance in working on the RFP as contrasted with writing the RFP. The arbitrary distinction suggested by the Plaintiff has no merit.

16817-1                                                    6

The Plaintiff claims that NPA "fails to acknowledge the value of these employees [First Health's PACE staff] to First Health." (Plaintiff's Memorandum at 26). To the contrary, NPA acknowledges the value of these employees but denies that First Health owns them to the exclusion of every other potential employer. First Health is free to ask these employees to remain with First Health in another capacity, and these employees are free to seek employment with another employer as long as they do not violate their employment agreements.

First Health alleges that "it has invested considerable resources in its PACE employees." (Plaintiff's Memorandum at 27). The considerable investment of resources was by PDA.

First Health definitively claims that it "will deploy these employees in other capacities." (Plaintiff's Memorandum at 27). The record does not support this claim. The Plaintiff may be looking for positions, but the reality is that these positions may not be developed or located and these employees may not want the positions proposed by First Health. Some employees may be without employment or may be forced to move a great distance.

The Plaintiff incorrectly claims that "First Health could not have waived a claim with respect to its management personnel because PDA's affirmative response to a bidder proposing the takeover of the current PACE staff specifically excluded, First Health's managerial personnel." (Plaintiff's Memorandum at 27). Because one question, proposed by one bidder, does not include "management" does not negate other questions, suggested by other bidders, that clearly include all employees. (P-109 at 30). First Health cannot selectively look at just one question and ignore the other questions. Also, the

16817-1                                                  7

single question cited by the Plaintiff does not "specifically exclude" the hiring of managerial staff but rather the question essentially does not ask about management, because it was probably not important to that particular bidder who submitted the question. Also, although Plaintiff cites to Mr. Snedden, Mr. Snedden was conveniently never asked and he never provided an opinion that hiring of First Health staff was meant to exclude management. (May 17 at 21). Contrary to the implication by Plaintiff, Mr. Snedden does not state that he supports First Health's position.

The Plaintiff claims that its "expectation" of securing the PACE Contract was "particularly strong in light of the fact that NPA's two previous bids were evaluated as substantially insufficient and priced (25%) or more higher than First Health's price." (Plaintiff's Memorandum at 29). The Plaintiff has no right to assume that NPA's bid will stay the same as in 1995. Certainly, this assumption by First Health does not rise to the level of creating a legally recognizable and protectible expectation. This explains why First Health lost the contract: because it underestimated the competition.

The Plaintiff claims that "money damages cannot realistically compensate First Health for the continuing threat that NPA poses to its business. (Plaintiff's Memorandum at 29). There is no citation to the record to support this claim.

Any alleged "frontal assault on First Health's ability to bid in the future on other contracts" is mere speculation on Plaintiff's part. The Plaintiff has not shown that such alleged injury is immediate or likely.

16817-1                                                               8

## Argument

A. <u>The Availability and Appropriateness Of Injunctive Relief</u>

The Defendants do not dispute that injunctive relief may be granted where they have not used the information at issue <u>if</u> in fact the information is confidential and <u>if</u> there is a sufficient likelihood, or a substantial threat that they will use the information in the future. (Plaintiff's Memorandum at 2). In the cases cited by the Plaintiff, the defendants had printed copies of directories and photocopied files. In those cases, files were found missing and the defendant in the one case even drafted a letter to his clients informing them that the office was moving but did not mention his intention to leave his present company for another (competing) company. See <u>A.M. Skier Agency, Inc. v. Gold</u>, 747 A.2d 936 (Pa. Super. 2000) and <u>IDS Financial Services, Inc. v. Smithson</u>, 843 F. Supp. 415 (N.D. Ill. 1994). Those cases are quite opposite to the situation at bar, where Norton did not steal any information from First Health. Norton merely brought his general knowledge and skills to NPA, <u>not</u> any trade secrets or confidential information. As explained in Defendants' Revised Brief in Opposition to Motion for Preliminary Injunction, it is appropriate for one to use their general skills and knowledge acquired at one place of employment in another place of employment. (Defendants' Revised Brief at 10-12). Norton and NPA have not used any confidential and proprietary information of First Health. Thus, there is <u>no</u> likelihood or substantial threat that any of First Health's confidential information will be used by Norton or NPA.

Citing the <u>PepsiCo</u> and <u>Air Products</u> cases, First Health requests that the Court "issue an injunction to neutralize the threat that Norton and NPA pose, among others, with respect to future misappropriation of First Health's confidential and proprietary

16817-1                                              9

business information." (Plaintiff's Memorandum at 3). As stated by the PepsiCo Court and as stated by the Defendants in their Revised Brief (at 13-14), fear of a potential misuse of confidential information is not enough to justify a preliminary injunction. PepsiCo, Inc. v. Redmond, 54 F. 3d, 1262, 1268-1269 (Pa. Super. 1981). '[A] trade secret will not be protected by the extraordinary remedy of injunction of mere suspicion or apprehension of injury. There must be a substantial threat of impending injury before an injunction will issue.' Air Products and Chemicals, Inc., 442 A. 2d 1114 (Pa. Super. 1982) (citations omitted). The Plaintiff has failed to demonstrate more than mere suspicion or mere apprehension of injury.

A.  **First Health Does Not Prevail on the Merits**

Citing the Thermodyne, Computer Care, and SmokEnders cases, First Health argues that the "combination or customization of these methods, processes and preferences into a single, unified approach" is a First Health trade secret. (Plaintiff's Memorandum at 8). The Defendants do not dispute that a trade secret can exist in a combination of components. However, the Defendants dispute that such a combination exists here and that Norton and/or NPA used any such combination if it does exist. As stated by the ComputerCare Court:

> The *SmokEnders* principle is sound, but we do not believe it applies here.
> * * *
> By contrast, Computer Care's system does not take its individual features and transform them into something that is itself secret – that is, not generally known or easily duplicated by the industry. All the individual features discussed above are either sufficiently obvious that anyone entering the reminder letter business would be likely to incorporate them into his system, or easily duplicated by anyone with legitimate, publicly available knowledge of Computer Care's business. Moreover, unlike the *SmokEnders* system, Computer Care's system is readily replicable by anyone who has been exposed to its various components; one need not also have knowledge of a special formula or technique for

combining those components. Computer Care has therefore failed to establish that it has a protectible trade secret in its Profit Builder System as a whole.

Computer Care v. Services Systems Enterprises, Inc., 982 F. 2d 1063, 1074-1075 (7th Cir. 1992). First Health's alleged "combination of components" are generally known or are easily duplicated by the industry. There is no need for a special formula to combine the components of the PACE Program.

Citing the Stewart, Air Products, and Triangle Sheet Metal Works cases, First Health states that "[c]ourts have recognized bidding processes or strategies as confidential and proprietary information." (Plaintiff's Memorandum at 9, n. 9). The cited cases, however, do not address public bidding or public contracting where bid proposals become available to the public after a contract is awarded. See Stewart & Stevenson Services, Inc. v. Serv-Tech, Inc., 879 S.W. 2d 89 (Tex. App. 14 Dist. 1994), Air Products and Chemicals, Inc., 442 A. 2d 1114, and Triangle Sheet Metal Works, Inc. v. Silver, 222 A. 2d 220 (Conn. 1966). The public bidding environment does not, and should not, lend itself to keeping bidding processes or strategies secret. To the extent any bidding processes or strategies of First Health are revealed in the RFP and other public documents, First Health has lost any claim of confidentiality.

First Health claims that "NPA knew or should have known that the information in question… was First Health's confidential and proprietary business information." For such proposition, First Health cites C & F Packing Co., Inc. v. IBP, Inc., 1998 WL 1147139 *6 (N.D. Ill.) (citing Computer Associates Intern-Inc. v. Alta, Inc., 982 F. 2d 693, 718 (2d Cir. 1992); Rohm and Haas Co. v. Adco Chemical Co., 689 F. 2d 424, 431 (3d Cir. 1982); and Fabkom, Inc. v. R.W. Smith & Associates, Inc., 1996 WL 531873 *12 (S.D.N.Y. 1996)). Since there is no information used by Norton or NPA that is

16817-1                                11

confidential and proprietary to First Health, the issue of constructive knowledge does not arise. The information must truly be confidential and proprietary before one can have actual or constructive knowledge that it is confidential and proprietary.

First Health's accusation is that "Norton will get a key portion of First Health's knowledge and experience for the management and administration of government-funded pharmacy benefit programs for the elderly" and that such a plan is "unlawful." (Plaintiff's Memorandum at 26). First Health cites Morgan's Home Equip. Corp. v. Martucci, 136 A. 2d 838 (Pa. 1957); ABC Trans Nat. Transport, Inc. v. Aeronautics Forwarders, Inc., 90 Ill. App. 3d 817, 413 N.E. 2d 1299 (Ill. App. 1 Dist. 1980); and RUDOLF CALLMAN, THE LAW OF UNFAIR COMPETITION TRADEMARKS AND MONOPOLIES § 9.03 (4th ed. 1999) for this proposition. (Plaintiff's Memorandum at 26, n. 17). The Defendants have addressed these cases in their post-hearing revised brief at pages 17-19. In addition, the Defendants note that in the Morgan's Home Equip. case, the Supreme Court found that the defendant did engage in the systemic enticement of plaintiff's employees for the purpose of disrupting the plaintiff's business and obtaining the plaintiff's confidential customer information. Morgan's Home Equip. Corp., 136 A. 2d at 841. In the Morgan's Home Equip. case, employees left one company and moved to a competitor. "They then began to solicit and serve the customers of Morgan [their former employer] on their former routes on behalf of Variety [their new employer]. Other collector-salesmen, all of whom had been former employees of Morgan were hired by Variety and actively solicited the patronage of Morgan's customers." 136 A. 2d at 841. In contrast, Mr. Norton has not solicited any of First Health's customers in any manner proscribed by his employment agreement.

16817-1                                   12

With respect to the ABC case, over thirty employees left ABC to work for Aeronautics. The plaintiff alleged that the defendants "conspired to effectuate the massive departure and subsequent losses to ABC." ABC Trans Nat. Transport, Inc., 413 N.E. 2d at 1303. In the ABC case, the defendants organized a competing company, Aeronautics, and planned to walk out en masse from their current company, ABC. Major customers switched over to Aeronautics and various customer files had been removed from ABC. The Court stated:

> Defendants were key management employees of ABC who were actively promoting the interests of Aeronautics while still employed by ABC. The injury to ABC was the sudden, potentially crippling loss of half of its business and major customers, as well as substantial numbers of its personnel. The cause of this injury was defendants' well organized plan and their conduct in furtherance of the plan before they departed from ABC.

ABC Trans Nat. Transport, Inc., 413 N.E. 2d at 1306 (emphasis added). In contrast, Mr. Norton did not work for NPA before his employment (and severance pay) ended with First Health. Also, Mr. Norton has not solicited any First Health employees to leave. Also, NPA will only solicit First Health employees after First Health has already lost the PACE contract. Obviously, ABC is factually distinguishable from the circumstances of the NPA bid proposal on PACE. Mr. Norton did not conspire with other employees of First Health, and certainly not while he was at First Health, to cause First Health any losses. The ABC case is inapplicable to the case at bar.

In addition, the section of RUDOLF CALLMAN, THE LAW OF UNFAIR COMPETITION TRADEMARKS AND MONOPOLIES cited by the Plaintiffs explains that inducing an employee to terminate a contract at will is not unlawful if it is for the purpose to recruit a skilled employee. See CALLMAN at § 9.03.

16817-1                                  13

> Nobody has ever thought ... that in the absence of some monopolistic purpose everyone has not the right to offer better terms to another's employee, so long as the latter is free to leave. The result to the contrary would be intolerable, both to such employers as could use the employee more effectively and to such employees as might receive added pay. It would put an end to any kind of competition.

CALLMAN at § 9.03 (citation omitted). "But in the absence of trade secret misappropriation, the employee has the right to exploit, to full advantage, his particular skills or abilities, even though such may prove disastrous to the former employer." CALLMAN at § 9.03 (citations omitted). First Health seeks a monopolistic situation where its employees may only work for First Health. First Health's employees have a right to consider employment with another company even if First Health is resultantly harmed.

First Health claims that the issue whether First Health waived any claim is "not relevant to whether First Health's claim for unfair competition is timely under the applicable statutes of limitations." First Health cites the statues of limitations for ITSA (765 ILCS 1065/7), for breach of contract under Illinois law (735 ILCS 5/13-205), and for intentional interference with contract and intentional interference with prospective contractual relations under Pennsylvania law (42 Pa. C.S.A. §5524 (7). (Plaintiff's Memorandum at 27, n. 18). The Plaintiff ignores the crux of Defendants' argument. As stated in Defendants' Revised Brief In Opposition To Motion For Preliminary Injunction at page 25, because First Health brought these claims to Federal Court with "unclean hands", the Plaintiff does not have standing in Federal Court to seek equitable relief. First Health was fully aware of NPA's proposal to hire First Health staff. Yet, it chose not to object or take any action against such proposal. The Plaintiff should not now be

16817-1                                    14

heard to seek disqualification of a bidder because the competitor suggested hiring First Health staff.

### Conclusion

The Court should deny Plaintiff's request for a preliminary injunction.

Respectfully Submitted,

*Thomas B. York*
Thomas B. York
Christine D. Consiglio
Dilworth Paxson LLP
305 N Front Street, Suite 403
Harrisburg, PA 17101
(717) 236-4812

July 14, 2000

16817-1  15

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via electronic mail and overnight delivery this 14th day of July 2000 to:

>Scott L. Vernick, Esq.
>Jeffrey D. Hutton, Esq.
>Fox, Rothschild, O'Brien & Frankel LLP
>2000 Market Street, Tenth Floor
>Philadelphia, PA  19103-3291
>Svernick@frof.com

Thomas B. York

July 14, 2000

16815-1