# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,
3200 Highland Avenue
Downers Grove, IL  60515-1282,

     Plaintiff,

     v.

NATIONAL PRESCRIPTION
ADMINISTRATORS, INC.,
711 Ridgedale Avenue
East Hanover, NJ  07936

     And

DAVID W. NORTON,
1220 Whitby Road
Richmond, VA  23277,

     Defendants

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.
1:00-CV-312

FILED
HARRISBURG, PA

JUL 1 4 2000

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## DEFENDANTS' PROPOSED FINDINGS OF FACT

16804-1

# TABLE OF CONTENTS

**Page Numbers**

DEPARTMENT OWNS THE PACE PROGRAM ........... 2

PROCUREMENT LIBRARY FOR BIDDERS ........... 5

OCTOBER DRAFTS OF NPA'S PROPOSAL ........... 7

THE "CONFIDENTIAL" NINETEEN ........... 9

    (a)    PARAGON ........... 10

    (b)    PRICING OF TAKEOVER COST ........... 12

    (c)    FIRST HEALTH'S EMPLOYEE SALARY AND COST STRUCTURE AND TAKEOVER INCENTIVES ........... 13

    (d)    RELATIONSHIP WITH SWITCH VENDORS ........... 16

    (e)    USE OF PC-SAS ........... 18

    (f)    FIRST HEALTH'S TELEPHONE SYSTEM ........... 19

    (g)    ON-LINE STATUS REPORTING ........... 21

    (h)    MARKETING TECHNIQUE OF CLINICAL FOCUS AND EMPHASIS ON MEETING AND EXCEEDING REQUIREMENTS ........... 23

    (i)    FIRST HEALTH'S OPERATIONS AND PROCESSES ........... 24

    (j)    PDA'S PREFERENCE FOR NO DISRUPTION ........... 25

    (k)    PDA'S PREFERENCE THAT IMAGING SYSTEM BE ADDRESSED IN TAKEOVER WORK PLAN ........... 26

    (l)    ALLEGED PREFERENCE OF PDA THAT A SUB-CONTRACTOR NOT CONDUCT PROVIDER TRAINING ........... 28

    (m)    PDA'S PREFERENCE THAT THE PROVIDER RELATIONS MANAGER WOULD ATTEND PROVIDER TRAINING ........... 28

    (n)    PDA'S PREFERENCE FOR A HIGH-QUALITY CARE-HOLDER AND PROVIDER INQUIRY TRACKING SYSTEM ........... 31

i

**PageNumbers**

    (o)    PDA'S PREFERENCE THAT CARDHOLDER ISSUES BE    33
               THOROUGHLY ADDRESSED

    (p)    IMAGING DOCUMENTATION INTEGRATED INTO    35
               CARDHOLDER SERVICES PROCEDURE MANUAL

    (q)    PDA IS CAPABLE OF ACCESSING PROVIDER FILES    36
               FROM FIRST HEALTH'S SYSTEM

    (r)    SOME PROVIDERS ELECT ELECTRONIC REMITTANCE    37
               ADVICES

    (s)    SOFTWARE AND PROCESSES FOR REMITTANCE    38
               ADVICES IN PROVIDER RELATIONS UNIT

MISCELLANEOUS ISSUES NOT REVEALED BY PLAINTIFF IN    39
DISCOVERY

    (a)    LABOR OVERHEAD    42

    (b)    TURNOVER COSTS    42

    (c)    LOW PRICE    43

    (d)    TIES AND UNIQUE STAMPS    44

ISSUES WITHOUT SUPPORTING TESTIMONY    46

    (a)    DISEASE MANAGEMENT    47

    (b)    DISASTER RECOVERY    47

    (c)    TRAINING PLANNING    48

    (d)    RESIDENCE OF REBATE    48

    (e)    DRUG UTILIZATION REVIEW    49

    (f)    ADDING A TPL COORDINATOR    50

ACTUAL METHOD FOR COMPUTING NPA'S PRICE    51

CONFIDENTIAL INFORMATION NOT NECESSARY TO DEFENDANTS    56

|                                                      | **Page Numbers** |
|------------------------------------------------------|:----------------:|
| NON-SOLICITATION OF FIRST HEALTH'S CUSTOMERS         | 57               |
| NON-SOLICITATION OF FIRST HEALTH EMPLOYEES           | 60               |
| NPA LETTERS SEEKING AMICABLE RESOLUTION              | 69               |

# DEPARTMENT OWNS THE PACE PROGRAM

1.    The contract between First Health and the Pennsylvania Department of Aging (the

Department or PDA), states:

> The Department maintains full ownership rights to the administrative and
> operating system.   The contractor understands and agrees that all computer
> programs, manual procedures, operating plans and procedures, documentation,
> data, records and related items developed by contractor or used by contractor in
> the administration of the PACE program (except for contractors' or any
> subcontractors' proprietary software, proprietary software leased or licensed by
> the contractor or any subcontractors and those items directly related) are owned
> without qualification by the department and that such ownership of these elements
> shall continue and remain in the PACE program unimpaired during the term of
> and subsequent to termination of this agreement.  Any enhancements to, changes
> in or augmentation or creation of any such elements during the term of this
> agreement shall be owned by the department without qualification.  It shall be a
> fundamental duty of the contractor to ensure department ownership of such
> elements in such manner and at such times as herein provided.

(May 16 at 202, D-5, p.17).

2.    The contract also states:

> In the event contractor or subcontractor proprietary software utilities (programs)
> are utilized in the operation of the system, contractor agrees upon request by the
> department to grant to the department at the end of [this agreement] a non-
> exclusive, non-transferable license for three years to use the programs required to
> operate the PACE system subject to the following conditions:  the programs shall
> only be used by the department or the department successor, PACE contractor or
> contractors to operate the PACE system....

(May 16 at 207; D-5, p. 18).

3.    Even Ms. DiMarco[1] agrees that this language would  allow NPA to use even First

Health's proprietary software system.  (May 16 at 209).

---

[1]    Ms. DiMarco verified factual statements that were not accurate.  For example:  She knew that Mr.
Norton made an oral presentation of February 2, 2000, after his employment had terminated with First
Health.  She, however, verified an overly broad statement that the "presentation took place sometime
between the issuing of the RFP on September 14, 1999 and February 3, 2000."  (May 15 at 156-157).  She
verified that Mr. Norton "met with representatives of the department as early as May 1999" and "engaged
in solicitation activity on behalf of a direct competitor that violated his contractual obligations to First
Health."  This was a mere suspicion, or yet another unfounded assumption, based on the fact that Mr.

16804-1                                    2

4.  Ms. DiMarco agrees that the contract requires First Health to deliver to the department a "description of all manual procedures" which would include "copies of the programs, the instruction manuals or the procedure manuals that are used." (May 16 at 210).

5.  Also, Ms. DiMarco concedes that the contract requires First Health to provide documentation for proprietary software directly affecting the PACE program including "the name of the software vendor, the method of acquisition, the identification of the party responsible for maintenance… warranties applicable to the software and the software contract or lease." (May 16 at 210-211).

6.  The contract also states: "All computer files, computer programs and related items developed by the contractor for the program shall be owned fully and without restriction by the department…." (May 16 at 212).

7.  The contract itself requires the Plaintiff to provide information which might otherwise be considered confidential and proprietary to First Health.

8.  Thomas Snedden, the Director of PACE,[2] stated that, other than proprietary software, there is nothing else related to the PACE program and its operation that is not owned by the Pennsylvania Department of Aging. (May 17 at 6).

---

Norton had dinner with Mr. Snedden. She admitted on cross-examination, that she did not even know what was discussed at that meeting and she did not know if any solicitation occurred. (May 15 at 162-164). She verified that "NPA hired Norton prior to the effective date of his termination as an employee of First Health." Once again, Ms. DiMarco assumed an earlier employment date by NPA of Mr. Norton than actually occurred. She admits that "[a]t the time we did not know specifically when Mr. Norton began." (May 15 at 165). The Court should view any claims by Ms. DiMarco in support of First Health with suspicion. She has demonstrated a willingness to make unfounded assumptions which does not reflect well on her credibility.

[2]     If anything, Mr. Snedden is biased against NPA. He admits: "The last thing I want to see is a takeover, personally…. I don't want the takeover headache." (Snedden at 172-173). He further stated that he would "[j]ust as soon run NPA out of here" to avoid a new provider for PACE. (Snedden at 171-172).

9.    Ms. DiMarco has told Mr. Snedden about particular confidential items which she

believes were used by NPA.  (Snedden at 182).  Snedden commented:

> [B]ut that's one of the areas where I think I quickly disabused her of this
> misinformation.  That, you know, virtually everything in the program is public.
> You know, she may have said that early on.  I haven't heard it recently.  So I
> thought perhaps she understood that.

(Snedden at 183).  Mr. Snedden explained this comment at trial as follows:

> Well, I think very generally the conversation that I had recollected with Ms.
> DiMarco related to just general ownership issues of the program processes and
> software, and my recollection is that she was under a mistaken impression that the
> Commonwealth did not have ownership interest in those items…. And once I
> made the statement that I believed that the Commonwealth had the ownership,
> there really wasn't any further discussion of it.  I thought she pretty much dropped
> it with me.

(May 17 at 13).

10.    Snedden speaks with DiMarco on a weekly basis.  (Snedden at 180).

Snedden has told DiMarco:

> I think Ms. DiMarco had some misconceptions about the nature of the program
> here, the ownership of the program assets and systems and what not.  The
> uniqueness of the product.  The individuality of the people involved.  The idea
> that these are the only people that can do the program.
>
> And so, you know, relative to the protest, that's the kind of discussion that I have
> had with her.  I'm trying to – I'm trying to give her a flavor for the fact that we
> have very limited latitude here in what we can do, or how much of an advantage
> we can give an incumbent like First Health, as much as we would like to.

(Snedden at 181-182).

11.    Mr. Snedden also commented:  "You know, when you have a program in which

the Commonwealth virtually owns lock, stock and barrel, anything that is not

biological…."  (Snedden at 61-62).

12.    Even the Director of PACE believes that Ms. DiMarco's claims are based on

misconceptions.

13.     Any discussion of what information is confidential and proprietary to First Health must be in the context of the public contracting environment.  When a party provides services under a public contract in Pennsylvania, the information surrounding the provision of services including the cost to the Commonwealth is a matter of public record.  First Health was aware that very little, if any, information or procedures involving the PACE program would be confidential or proprietary.

## PROCUREMENT LIBRARY FOR BIDDERS

14.     Mr. Grieger and two other representatives of NPA went to PDA's procurement library to view the 1995 First Health proposal.  (May 18 at 442).  They went to the procurement library before Mr. Norton began work for NPA.  (May 18 at 443).

15.     From the PDA, NPA received the cost or prices of First Health's 1995 proposal and 1998-1999 extensions.  (May 18 at  442-443; May 24 at 493).

16.     Susan Sampson, of the PDA, confirmed that NPA visited the procurement library.  (Sampson at 36-37).  Ms. Sampson stated that under the "Right-To-Know Law" anything referenced in an executed contract with the Commonwealth is available to the public.  (Sampson at 43).  As a result, NPA had available all the materials maintained by the Department related to the PACE contract being implemented by First Health.

17.     Mr. Snedden stated that in 1995, if NPA wanted to review bid proposals submitted either by First Health or EDS in 1990, that those materials probably would not have been available to NPA. "It was our policy." (Snedden at 41).  The policy has since changed.  He stated:  "I believe there was legislation passed in '99 that required that the Department of General Services to update,  revamp the procurement management system for the Commonwealth.  That I believe now requires us to release these documents on

16804-1                                             5

contracting, which I am not in favor of personally and never have been. (Snedden at 41-42). Mr. Snedden had been "advised by Commonwealth attorneys that if we're ever put to the test we are going to have to give it up." (Snedden at 165).

18.    Mr. Snedden, at first, stated that he is not aware of NPA reviewing the cost proposal while reviewing documents at PDA. After reviewing P-69, Mr. Grieger's notes from his visit to the procurement library at PDA, Snedden stated:

> Okay. Well, I have to say from reviewing the dollar numbers in here that it would appear that they saw the '95, '98 proposal. It doesn't appear as though they got the '99, 2000 proposal. See, the original award of this contract in '95 was only for three years. Commonwealth unilaterally extended it from '98 to 2000 in '98. So, evidently, for the '95, '98. They did not get the current proposal.

(Snedden at 174-175).

19.    Snedden further explained that it doesn't make any difference whether NPA got the cost proposal of First Health "because I can't necessarily protect it by the rules that the Commonwealth makes me operate under." (Snedden at 175-176).

20.    Mr. Snedden specifically confirmed that giving NPA any earlier bid proposals by First Health would not be a reason to disqualify NPA or be a reason to rescore the bids. (Snedden 46-49). The fact that NPA had earlier bid proposals by First Health would not have given NPA an unfair advantage according to Mr. Snedden. (Snedden at 46-49). Mr. Snedden stated: "I also don't think it's uncommon for businesses, either in trying to do business with the Commonwealth or anywhere else in the world, to go look at a competitor's blueprints, if you will." (Snedden at 46-49).

21.    The material which First Health claims as confidential was actually publicly available.

## OCTOBER DRAFTS OF NPA'S PROPOSAL

22.    The Plaintiff places a great deal of reliance upon a comparison of drafts of NPA's proposal which are dated October of 1999 with the final proposal submitted by NPA in 1999.  The implication intended by the Plaintiff is that all changes made after the October drafts were due to involvement of Mr. Norton.  This comparison is flawed for several reasons:

(a)    When Ms. DiMarco refers to NPA's most recent draft, she is in actuality referring to October drafts of NPA's proposal.  (May 15 at 88).[3]  Ms. DiMarco again assumed that these "drafts" were "well along the way in terms of completing their response."  (May 15 at 130).  The October drafts were in actuality, as testified to by Mr. Norton, "just a laydown of the 1995 proposal basically."  (May 16 at 331).[4]  "[I]t was just a laydown of the '95 to become a starting point, to become a working draft."  (May 16 at 332).  Upon reviewing the October drafts, Mr. Norton noted "numerous references to 1995."  (May 17 at 388).  Further proof that the October drafts were a "laydown" of the 1995 proposal is that they contained names of persons no longer employed by NPA.  (May 17 at 388).  The October drafts do not represent NPA's final product before any involvement by Mr. Norton.

---

[3]    During discovery at her deposition, just a few weeks before the hearing, Ms. DiMarco testified as First Health's corporate designee under Federal Rule of Civil Procedure 30(b)(6), but did not provide any information concerning the October "drafts" to support her claims.  This failure was essentially an attempt to "ambush" the Defendants.  Defendants were never advised prior to the hearing of Plaintiff's factual claims that were based upon these "drafts."

[4]    Mr. Snedden confirmed that a comparison of the 1995 and 1999 bids of NPA was not appropriate.  He stated: "Well, it's five years later.  You know, it's dated material.  It's just not relevant."  (Snedden at 129).

(b)    Mr. Norton was not personally responsible for every change between the October "drafts" and the final proposal. (May 17 at 373). The October drafts are, according to Peter Grieger,[5] essentially the 1995 proposal. (May 18 at 418). "[T]he team used the 1995 proposal as a template." (May 18 at 419). Although Mr. Norton "touched every page" of NPA's 1999 proposal, he only made sure words were consistent and did not necessarily change anything or add anything. (May 17 at 373). There is no evidence to demonstrate that Mr. Norton is responsible for all the changes in NPA's proposal after October of 1999.

(c)    The assumption that the only changes from the October drafts were supplied by Mr. Norton is not supported by any evidence.[6] There is no reason to believe that NPA would be nearing completion of its bid proposal only a very few weeks after the RFP was released. There is no reason to assume that no changes were made between October and November 17, when Mr. Norton arrived. There is no evidence to support that Mr. Norton by himself made all the changes to the proposal in the very few weeks he had before the bid was submitted on December 12, 1999. The Plaintiff, however, inappropriately chose to make such baseless assumptions.

---

[5]    Peter Grieger has experience with the prescription management industry since the seventies, including work on the PACE program itself. (May 18 at 414-415). He is a senior vice president for utilization management with NPA. (May 18 at 416). Mr. Grieger was the primary author of NPA's 1995 proposal. (May 18 at 417). The cost section for the 1995 proposal was contributed by a former senior executive vice-president. (May 18 at 417). Mr. Grieger was the team leader for putting together the 1999 NPA proposal. (May 18 at 417). The 1999 proposal was prepared by his team which included four technical writers and contributions from various department heads. (May 18 at 417).

[6]    It should be noted that the Plaintiff never inquired during discovery as to exactly what these October drafts were or as to who made specific changes from October on. If the Plaintiff had so inquired, it would have learned that these October drafts were far from final and that there were many subsequent revisions, even before Mr. Norton began consultation on November 17, but later drafts were not maintained by NPA. Instead, First Health chose to strangely assume that there would have been virtually no change to what was essentially the 1995 proposal unless Mr. Norton made the changes.

16804-1                                         8

## THE "CONFIDENTIAL" NINETEEN

23.     The pertinent provisions of Mr. Norton's Employment Agreement related to confidential business information, are set forth below:

> Confidentiality.  Employee agrees not to directly or indirectly use or disclose, for the benefit of any person, firm or entity other than Company and its subsidiary companies, the information or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedure, reports, client lists, review criteria and methods, financial methods and practices, plans, pricing and marketing techniques as well as information regarding Company's past, present and prospective clients and their particular needs and requirements, and their own confidential information.

(P-14 at Section 7).

24.     Ms. DiMarco betrays her true goal, which is different from the restrictions of Mr. Norton's employment agreement, when she states:  "[I]t is our view that he cannot work on the PACE contract or any similar program to the PACE contract because of the confidential business information that he maintains and in this case we believe has disclosed that could be applied to other similar contracts."  (May 15 at 136) (emphasis added).  Ms. DiMarco is essentially requesting a non-compete clause.  If that was the intent of the employment agreement, it would have been a simple task to just so state.  Instead, First Health chose language that only prohibits the use of its confidential information by its former employees and does not prohibit employment on the PACE contract or similar programs. [7]

---

[7]     Mr. Norton stopped working on PACE in July of 1998 after Teresa DiMarco, the new President of First Health announced that he would no longer be running the pharmacy benefit management unit at First Health.  (May 24 at 545).  In March of 1999, Mr. Norton had not had any work for three months at First Health and he thought "that they weren't going to have any work for me, I knew it was time for me to separate myself from First Health."  (May 24 at 547).  Thomas Snedden, the Director of PACE for the Department of Aging, confirmed that Mr. Norton hinted that he was not happy with his new assignment

16804-1                                         9

25.    Ms. DiMarco claims that "there are many areas where NPA's 1999 proposal contains First Health's proprietary business information." (May 15 at 68). In response to interrogatories, the Plaintiff identified nineteen (19) items that allegedly demonstrated the use of First Health's confidential and proprietary information. An examination of these nineteen items demonstrate that there is no merit to Plaintiff's claims:

(a) PARAGON

(1)   Allegedly, the "use of Paragon Systems to provide integration support of the imaging system as well as software maintenance, et cetera, that's confidential business information of First Health." (May 15 at 68).[8] DiMarco does not know if NPA has an ongoing relationship with Paragon. (May 15 at 171). She acknowledged that Paragon's Web site "does list First Health services as a client." (May 15 at 171). She imagines that Paragon would provide, if asked, information on how First Health uses Paragon. (May 15 at 172).

(2)   The only advantage identified by Ms. DiMarco to NPA referring to Paragon is "it makes it appear to PDA that NPA is providing an approach that gives continuity, stability and minimizes the takeover risks that are associated with their bid." (May 15 at 173). She admits that "Paragon itself isn't necessarily attractive to PDA." (May 15 at 173).

---

and told Mr. Snedden "that he [Norton] just didn't have anything to do and that he [Norton] would likely be leaving the company." (Snedden at 28). Mr. Norton felt compelled to leave First Health.

[8]    As previously noted, the contract between the Department and First Health requires that First Health grant a three-year license to use its imaging system. (May 16 at 207; D-5, p. 18). Also, First Health is required to document to the Department the identity of its software vendors (e.g. Paragon) and related information. (May 16 at 207-209; D-5, pp. 18-22). Consequently, even if not known before the bids, the winning bidder would quickly learn of and have access to the allegedly secret Paragon information.

(3)    Robert R. Howells, the officer in charge of the PACE program for First
Health,[9] stated that First Health's business relationship with Paragon is not confidential
and proprietary to First Health. (May 16 at 282; Howells at 85-88).

(4)    Mr. Norton testified that Mr. Howells selected and engaged Paragon.
(May 16 at 307). Mr. Norton called Paragon after leaving his employment at First Health
and Paragon provided the information that was included in the NPA proposal. (May 17
at 374-375). Paragon did not consider the information confidential. (May 17 at 374).

(5)    The Web site for Paragon lists First Health as a client and Mr. Norton
accessed this information. (May 17 at 375).

(6)    Mr. Norton testified that the relationship of Paragon with First Health is
not confidential or proprietary to First Health. (May 17 at 175-176). He noted that
Paragon would not consider the relationship to be confidential as "they would not want to
be limited to what they could do or who they could do it with." (May 17 at 376).[10]

---

[9]    Ms. DiMarco concedes that Robert Howells "may have a more in-depth knowledge" of
operational procedures of the PACE program. (May 15 at 121). Also, she agrees that Mr. Howells has a
"more in-depth understanding" of the particular details of the PACE contract "as it relates to all the
detailed requirements." (May 15 at 121). Mr. Howells also has a "more in-depth knowledge" of
potentially competitive salary structures in the Harrisburg area. (May 15 at 122). Mr. Howells has been
the officer in charge of the PACE program since July 1, 1995 and is "responsible for the day-to-day
operations" of PACE. (May 16 at 261-262). This is a familiarity with PACE that must be far greater than
that of Ms. DiMarco.

Allegedly, Mr. Howells is not an authority as to what is confidential and proprietary. (May 16 at
249). However, as officer in charge he would need to advise other people on the PACE staff as to what to
keep confidential. Mr. Howells states that he gave his personal opinions as to what is confidential and
proprietary but he did not testify that the rendering of such opinions is outside the scope of his employment.
(May 16 at 266-267). As officer-in-charge of the PACE program, Mr. Howells would need to know what
items must be held confidential. Since such decisions would be within the scope of his employment, Mr.
Howell's opinions are admissions against First Health. (See Argument VIII of Defendants' revised brief).

[10]    The Plaintiff essentially asks for a ruling by this Court that would limit the availability and use of
a service provider, i.e., Paragon. Since any ruling by this Court could impair the interests of Paragon to
conduct its business, Paragon is a "person" needed for a just adjudication. Fed. R. Civ. P. 19(a). No relief
should be granted to First Health that limits Paragon's business without its participation in the proceedings.

(7)    The reference to Paragon by NPA does not demonstrate a disclosure or use of any confidential or proprietary information of First Health. The Paragon information is publicly known.

(b) PRICING OF TAKEOVER COST

(1) Ms. DiMarco alleges that the "NPA cost proposal shows a total cost for takeover of in the neighborhood of $700,000, which is remarkably similar to First Health's takeover costs of $734,000 as it made its proposal to the EPIC program." (May 15 at 70). She admits that it is "possible that the takeover costs by NPA [were] obtained from some other source completely unrelated to the takeover costs of the EPIC contract." (May 16 at 214).

(2) Ms. DiMarco incorrectly compared the $734,702 figure from the EPIC contract (P-22) and the $718,388 figure from the NPA proposal (P-125). (May 16 at 214-216). The $734,702 does not include corporate allocation or general overhead but the $718,388 does include this item. Also, the $734,702 does not include markup or profit but the $718,388 does include this item. In actuality, the takeover costs proposed for EPIC and proposed for NPA are much more dissimilar than Ms. DiMarco claims.

(3) If overhead or profit is added to the EPIC numbers, the actual comparison would be $962,912 for takeover costs in EPIC and $718,388 for takeover costs in NPA. These numbers hardly demonstrate that NPA used EPIC's takeover costs in any manner.

(4) Mr. Norton explained how the EPIC contract was not similar to the NPA proposal in several important ways. (May 24 at 555-556). For example, the EPIC effort "came to over 4,800 person days" while the NPA effort was only "a little over 2,100

person days." (May 24 at 556).  As a result, there would be no reason to use the EPIC

takeover costs for the NPA takeover costs.

(5)   Additionally, Mr. Norton specifically stated that he did not use the EPIC

takeover costs in preparing the NPA bid proposal.  (May 24 at 556).

(6)   To determine takeover costs, Steven Nicoletos[11] explained:

[W]e based the total program costs based on taking the First Health two-year extension numbers, cutting that by 10 percent and adding 3 percent each year for an inflation factor, that was the total price, including the takeover costs. So the takeover costs were based on man hours, incremental man hours, that we thought that we would have to spend there, some consulting costs and some travel costs.

(May 24 at 496).

(7)   Mr. Nicoletos never had, saw, or used any information from First Health's

EPIC contract.  (May 24 at 497).

(8)   The comparison of First Health's EPIC proposal and NPA's PACE proposal

demonstrates the desperation of First Health to support its claims.  Not only are these

numbers significantly dissimilar but the fact that these are the only figures cited by the

Plaintiff is very revealing.  Out of numerous cost items in NPA's proposal to administer

to the PACE Program for over $47,000,000 over five years, Ms. DiMarco is only able to

cite one alleged "similarity" to First Health's takeover costs in an unrelated program.

(9)   The Plaintiff has not met its burden of demonstrating that its confidential

costs were in any manner used by NPA.

(c) FIRST HEALTH'S EMPLOYEE SALARY AND COST STRUCTURE AND
    TAKEOVER INCENTIVES

---

[11]     Steven Nicoletos is the senior vice-president of finance and administration at NPA. He's been with NPA since 1984 in various capacities, first as director of finance and later as vice-president of finance. Mr. Nicoletos is a CPA by profession. (May 24 at 492). At the time NPA's 1999 PACE bid proposal was prepared, Mr. Nicoletos was the senior vice-president of finance administration. (May 24 at 492).

(1)    Ms. DiMarco claims that NPA "said that [its] salary structure … is virtually the same, if not better than First Health's salary structure." (May 15 at 73). She claims that "the only way they can make that statement is if they know what First Health's salary structure is." (May 15 at 73). Ms. DiMarco, who failed in her direct testimony to cite the specific language, admitted on cross-examination that NPA stated:

> Based on information included in the RFP and NPA's experience, NPA's salaries are equivalent, if not higher, to the incumbent's and are competitive for both the greater New York City and Harrisburg markets.

(May 16 at 194).

(2)    NPA's proposal indicates that any statement as to employee salaries was based on the RFP and on NPA's experience. Again, we only have an assumption by Ms. DiMarco, without any factual support, that this statement was based on confidential information from First Health.

(3)    Mr. Norton referred in his notes to his preparation of a spreadsheet for cost as "guesstimates" and refers to "prorate based on current contract percentages." (May 16 at 324). He explained that "I guessed it [costs for staffing for takeover and estimates for costs of supplies] based on the buildup or actually the work plan and GANTT chart that we had in our proposal" and it was refined by Steve Nicoletos. (May 17 at 370).

(4)    Mr. Norton did not use any confidential information from First Health. (May 17 at 370). He "just used [his] general knowledge of what like a clerical position or professional position or systems person generally would make." (May 17 at 370).

(5)    His comment that the NPA proposal was a good price was based on a comparison to the First Health contract price which was part of the RFP. (May 17 at 371).

16804-1                                    14

(6)   Mr. Norton had "no idea" what First Health was going to bid in 1999.  (May 17 at 371).

(7)   Mr. Norton added that he did not know "what strategies Miss DiMarco would change in respect to any of the proposal they would do after I left there in August of '98."  (May 17 at 400).

(8)   The evidence shows that the salary and cost structure of First Health was not used by the Defendants.

(9)   Mr. Howells, the officer in charge for First Health's Pace program, personally did not perform any comparisons between First Health's employee salary and cost structure and NPA's proposal.  (Howells at 89-90).  Mr. Howells instructed his staff to compare the cost proposal of NPA and First Health and the staff was unable to find any similarities (Howells at 90).  "I had asked my financial manager to take a look at both cost proposals and see if there were any similarities.  And he was unable to find any." (Howells at 90.).  Even the Plaintiff's own staff could not find any similarities between the NPA's proposal and First Health's employee salary and cost structure.

(10)   Instead of relying on a factual basis, the Plaintiff seeks to distort a general statement from NPA's proposal to claim it implies knowledge of confidential information.

(11)   Allegedly, the "specific use of takeover incentives is something that First Health has used before." (May 15 at 71).  Ms. DiMarco claims ownership of such basic concepts as "retaining the anniversary date for their staff, their salary increase dates, their specific monetary incentives, bonuses essentially for coming over." (May 15 at 71).

(12)   Ms. DiMarco, however, does not even know if incentives to attract employees are typical in the government contract situation.  (May 16 at 218). She does not even know if other companies use similar incentives. (May 16 at 217-218).

(13)   The only specific similarities Ms. DiMarco could note between First Health's New Mexico proposal and NPA's PACE proposal was "the continuation of service date [anniversary date] and the payment of bonuses in order to come from the incumbent contractor." (May 16 at 219-220).

(14)   DiMarco never provided a copy of the New Mexico proposal to allow comparison of the similarity or dissimilarity of the incentives.

(15)   Allowing employees to keep the same anniversary date and rewarding them financially are hardly unique concepts owned by First Health.  The Court takes judicial notice that these incentives are used in many businesses and do not constitute proprietary information of First Health.

(16)   Not surprisingly, Mr. Howells agrees that the use of incentives is not something that is confidential or proprietary. (Howells at 90-91).

(17)   No one cited any specific takeover incentives that would be so unique to First Health as to constitute a confidential or proprietary interest in these incentives. The Plaintiff has failed to show that NPA's proposed incentives were taken from First Health.

(d)  RELATIONSHIP WITH SWITCH VENDORS

(1)   First Health claims that "the fact that NPA has knowledge here of which specific switch vendors  First Health uses and calls them all by name accurately is not information that's otherwise publicly available." (May 15 at 74).  Ms. DiMarco agrees that the switch vendors are "commonly known in this business" and that NPA would

quickly become aware of the specific switch vendors being used if they were awarded the PACE contract. (May 16 at 222).

(2)   Mr. Norton stated that the identity of switch vendors is not confidential information. (May 17 at 376).

(3)   The three switch vendors named in NPA's proposal "are the three major switch vendors that most PBM's use, including NPA." (May 17 at 376-377).

(4)   "[S]witch vendors sell their services and would freely give the information that they were connected to First Health if you would ask them." (May 17 at 377).

(5)   Mr. Grieger stated that there are certain common switch vendors that are used in the pharmacy reimbursement area. (May 18 at 419-420). Mr. Grieger testified that First Health's relationship with certain switch vendors is "common to the industry" and the three switch vendors mentioned by NPA "are the common switch vendors used in our industry." (May 18 at 431).

(6)   NPA has 50,000 pharmacies in its network and in order to be tied into the electronic claims adjudication networks NPA must have a relationship with the common switch vendors. (May 18 at 420).

(7)   First Health's officer in charge of PACE, agrees that First Health's relationship with switch vendors is not confidential and proprietary. (Howells at 91).

(8)   First Health is required by the PACE Contract to document to the Department this software, and this software is subject to a three-year license by the PDA and NPA at the end of the agreement. (See D-5 at 18-19, 22).

(9)   The Plaintiff has failed to establish that the identity of three switch vendors is confidential or proprietary information.

16804-1                                     17

(e) USE OF PC-SAS

(1)  First Health's President claims that the "fact that First Health uses PC-SAS, which is a statistical analysis package that runs on a personal computer level, the fact... that NPA is going to use PC-SAS and that that's the same product that First Health uses, that demonstrates that they have had confidential information of First Health disclosed to them." (May 15 at 76).  Ms. DiMarco does not know if NPA had previously used PC-SAS and does not even know if PC-SAS is commonly used in the pharmacy reimbursement kind of business.  (May 16 at 224).

(2)   Ms. DiMarco admits that SAS is specifically mentioned in the RFP.  (May 16 at 224).  She concedes that the mention of SAS possibly could lead someone to PC-SAS.  (May 16 at 225).

(3)   Ms. DiMarco notes that PC-SAS is generally available on the market.  (May 16 at 225).[12]

(4)   Ms. DiMarco's own testimony does not establish that PC-SAS is confidential or proprietary to First Health.

(5)   Mr. Grieger was aware of PC-SAS even before the 1999 bid proposal was prepared.  (May 18 at 420).  Approximately five years ago, Mr. Grieger looked at and evaluated PC-SAS as a tool.  (May 18 at 420).

(6)   PC-SAS is "an off-the-shelf product that anyone can purchase for the purpose of doing statistical analysis of various data."  (May 18 at 432-433).

---

[12]     One must again question whether the maker of PC-SAS is a "necessary party" under Fed. R. Civ. P. 19(a) if First Health is claiming a proprietary interest in PC-SAS that would prohibit others from using this product.

(7)     The evidence does not support a claim that PC-SAS is confidential and proprietary to First Health.

(8)     Mr. Howells does not believe that the use of PC-SAS by First Health is confidential and proprietary information.  (Howells 91).  In fact, he points out that the RFP addresses SAS.  (Howells 91).

(9)     Mr. Snedden says such information is public. (May 17 at 15).

(10)    The evidence establishes that PC–SAS is within the realm of general knowledge possessed by the public.

(f)  FIRST HEALTH'S TELEPHONE SYSTEM

(1)     NPA proposed during the takeover to "evaluate the incumbent's telephone system to ensure that it meets current PACE / PACENET program requirements and the performance standards required by NPA"  and "NPA replaces or upgrades the equipment and provides pre operations test results and walk-throughs to ensure the department that it meets the program's requirements."  (May 15 at 78, P-20).  Nothing in these statements by NPA shows the use of any information that was confidential or proprietary to First Health.   These statements evidence good business practice to verify that an existing system meets the standards of NPA and the Department.  Nowhere does NPA state that it knows the current system used by First Health to be inadequate or needing improvement.

(2)     Ms. DiMarco, however, again assumes the use of confidential information by stating:  "Mr. Norton knows from his prior experience of directing the PACE program that the telephone system has now got a few years on it and is in need of replacement or can benefit from upgrading…."  (May 15 at 78-79).  Even if Mr. Norton was so aware,

16804-1                                    19

there is no evidence that this information was shared with NPA or was used in drafting NPA's proposal.

(3)     In fact, it was Mr. Grieger who determined what telephone system to propose and he stated that "the telephone system is fairly well delineated in the RFP." (May 18 at 433).

(4)     Ms. DiMarco agrees that First Health has a commercially available telephone system.  (May 16 at 225).

(5)     Ms. DiMarco also agrees that the RFP itself provides general specifications for the telephone system.  (May 16 at 228-229; D-3, p. 34).

(6)     Mr. Howells also testified that there was information on First Health's telephone system in the RFP and the proposal library.  (May 16 at 269).

(7)     Mr. Howells also noted that "the concept of a tracking system is not confidential" but that the "specific product that First Health developed I would consider confidential."  (Howells at 91).

(8)     Mr. Howells agreed that if NPA used the specific product, he would consider that confidential, but not if they used a similar system.  (Howells at 91-92).  He stated:   "The system that NPA proposed was a response to the RFP requirements." (Howells at 92).  The following colloquy occurred:

> Q. So the system they proposed would or would not be a use of the confidential and proprietary information of First Health?
>
> ***
>
> A. No.
>
> Q. So it would not be?
>
> A. Correct.

(Howells at 92).

(9)    Similarly, Mr. Snedden stated the telephone system information was available to the public.  (May 17 at 16).

(10)    As a result, even First Health's officer in charge for PACE and the Department's PACE Director do not believe the Defendants violated any confidentiality of First Health.

(11)    The evidence demonstrates that NPA did not use any confidential information when suggesting a review of the current PACE telephone system.

(g) ON-LINE STATUS REPORTING

(1)    First Health also assumes that on-line status reporting was only included in the NPA proposal because Mr. Norton suggested that it be included.  (May 15 at 81). The RFP itself requires that "on-line information shall be available at a minimum for the following" which included an "audit trail for all contacts made via telephone or by written correspondence."  (May 16 at 229; D-3, p. 37).

(2)    The RFP also requires a bidder to maintain an on-line appeal system which includes an "audit trail."  (May 16 at 230; D-3, p. 37).

(3)    The RFP also states that "[u]pon assigning provider identification numbers and after being assured there are no duplicate providers, computerized online files on the data shall be created and continually maintained."  (May 16 at 23; D-3, p. 40) (emphasis added).

(4)    Also, the RFP states: "Information from the hard copies or facsimile … of all provider records, which contain enrollment and re enrollment forms, correspondence,

records of status changes and the original provider agreement shall be maintained online for a minimum period of 24 months." (May 16 at 231; D-3, p. 40).

(5)   In the RFP, under Provision of Information, Routine Management Reports for All Programs, it states:  "All reporting must be available online, as well as on paper." (May 16 at 234; D-3, p. 54) (emphasis added).

(6)   Numerous references to on-line state reporting in the RFP show there was no need to use confidential information of First Health to be aware of this concept.

(7)   Mr. Howells agreed that the RFP contained information on on-line status reporting.  (May 16 at 269).

(8)   Mr. Norton stated that the "RFP clearly stated a preference to having all the reports on-line."  (May 17 at 374).  Such on-line status reporting was not, according to Norton, confidential and proprietary information of First Health because having paperless processing is required by the RFP.  (May 17 at 374).

(9)   Mr. Grieger testified that NPA has its own on-line status reporting system which is in a beta testing stage. (May 18 at 474).

(10)   This evidence demonstrates that NPA was aware of on-online status reporting before Mr. Norton worked on NPA's 1999 PACE proposal.

(11)   Mr. Howells testified that the use of on-line status reporting is not confidential and proprietary to First Health.  (Howells at 93).

(12)   Mr. Snedden testified that the proposal by NPA to have on-line status reporting was "not of any consequence."  (May 16 at 236; Snedden at 87).

(13)   The evidence is contrary to the claim of First Health that on-line status reporting is confidential or proprietary.

(h) MARKETING TECHNIQUE OF CLINICAL FOCUS AND EMPHASIS ON MEETING AND EXCEEDING REQUIREMENTS

(1)     First Health implies that clinical focus is its unique marketing strategy. Mr. Grieger disagrees and points out that "NPA's keystone marketing strategy is its clinical focus." (May 18 at 421). Mr. Grieger stated: "[I]t is not unique to any one company to emphasize its clinical programs. NPA again uses the clinical programs as the cornerstone to its marketing strategies." (May 18 at 434).

(2)     It was Mr. Grieger who decided to expand the clinical focus from the 1995 proposal to the 1999 proposal. (May 18 at 421-422).

(3)     NPA did not need any confidential information of First Health to continue its emphasis on clinical focus.

(4)     Mr. Howells testified that the concept of clinical focus is not confidential. (Howells at 94).

(5)     Mr. Howells and First Health did not provide any specific marketing strategy or specific clinical contents that were of a unique nature to First Health that could arguably be confidential. Therefore, the general use of a clinical focus in a proposal is not the use of any First Health confidential and proprietary information.

(6)     First Health also claims an exclusive right to the use of "meet and exceed" language. Ms. DiMarco claims that "[t]his is standard First Health language that we use in most, if not all, of our proposals, and it's now language that certainly didn't exist by NPA's idea." (May 15 at 82). Ms. DiMarco admits that this was language chosen by Mr. Hofheimer, and not by Mr. Norton. (May 15 at 84).[13]

---

[13]     The record is devoid of any evidence that Mr. Hofheimer violated any restrictive covenant in any employment agreement with First Health. The Plaintiff has not even placed Mr. Hofheimer's employment

(7)    There is no basis in fact to support an ownership of "meet and exceed" language. The Court takes judicial notice that "meet and exceed" is used generally in the business community, and often even by legal counsel, and is not confidential to First Health.

(8)    The Defendants demonstrated at trial that "meet and exceed" language was used by NPA in proposals that preceded Mr. Norton's involvement with NPA. (May 18 at 434; D-10).

(9)    Mr. Grieger notes that "meet and exceed is something that NPA uses routinely in all its proposals." (May 18 at 434).

(10)    The "meet and exceed" language is no more confidential to First Health than it is to NPA, or virtually any other entity.

(11)    Mr. Howells confirmed the common sense position that emphasizing "meeting and exceeding" requirements is not confidential and proprietary to First Health. (Howells at 94). This admission demonstrates that "meet and exceed" is not confidential to First Health.

(i)    FIRST HEALTH'S OPERATIONS AND PROCESSES

(1)    At deposition, Ms. DiMarco testified that the examples supporting this category were items ten (10) through nineteen (19), which Defendants address below.

(2)    In further response, the Defendants note that the operations and processes of the PACE program are owned by the Department.

(3)    Even Mr. Howells notes that: "If they were developed specifically for the PACE program, then they basically are the Department of Aging's." (Howells at 95.)

---

agreement in evidence. First Health has also not shown that Mr. Hofheimer even knew that First Health used "meet and exceed" language, let alone showing such language was confidential.

(4)     Mr. Howells did not know whether NPA used any of First Health's operations and processes not owned by PDA. (Howells at 95).

(5)     Once again, there is a lack of any proof that any confidential information of First Health was used by the Defendants.

(j)  PDA'S PREFERENCE[14] FOR NO DISRUPTION

(1)     Although Ms. DiMarco admits that "[o]bviously no program wants to have disruption when they have a change in vendor, that certainly is obvious," she disingenuously claims that NPA would not have been aware of "exactly how much of an issue this would be for the Commonwealth and how extensively they would have to address that issue and concern in a takeover plan." (May 15 at 83).

(2)     It was Mr. Grieger who decided to emphasize continuing the program without disruption. (May 18 at 435).

(3)     Any person with common sense, and especially those who work in the area of prescription programs, would know that this was important.

(4)     Even Mr. Howells honestly recognized that "PDA's preference that a bid proposal emphasize continuing the existing program operations without disruption while implementing enhancements and improvements" was not confidential and proprietary information. (Howells at 95).

(5)     Also, Mr. Snedden confirmed that this "preference" would be something the PDA would make public. (May 17 at 14).

---

[14]     Mr. Grieger explained that NPA was able to determine the preferences of PDA because they "came out very clearly in the specifications of the RFP." (May 18 at 425). "It is very detailed when you combined the RFP language with the exhibits that were submitted." (May 18 at 425) "The second method or second clue to the preferences for the department came from the actual 1995 First Health proposal which we had the opportunity to review the descriptions of the various processes and departments within that

(6)    The preference to avoid disruption of the PACE program is not confidential information.

## (k) PDA'S PREFERENCE THAT IMAGING SYSTEM BE ADDRESSED IN TAKEOVER WORK PLAN

(1)    First Health apparently claims a monopoly to imaging scanning where it complains that NPA "proposes to begin scanning these documents [provider documentation] or their electronic equivalence and maintaining the information data as an image." (May 15 at 96). The Court takes judicial notice that imaging scanning is a relatively recent technological development that is not owned by, and is not confidential to, First Health.

(2)    The RFP itself requires that a bidder's system at a minimum "electronically store all correspondence regarding the income verification on the imaging system." (May 16 at 230-231; D-3, p. 39).

(3)    Ms. DiMarco admits that imaging was mentioned in the RFP but she claims that it was not a requirement of the takeover plan. (May 16 at 239). This arbitrary distinction does not convert the imaging system into proprietary information owned by First Health.

(4)    Ms. DiMarco also agreed that imaging hardware and software are commercially available. (May 16 at 239).

(5)    The RFP states: "Digital application document imaging capability must be included in any consideration of the operations of the network." (May 16 at 240; D-3, p. 31).

---

document ...." (May 18 at 425). As a result, PDA's preferences were not a secret as alleged by First Health.

(6)     The RFP also provides:

All applications, corresponding documentation and all other correspondence regarding cardholder issues are to be maintained on a digitized image record or displayed on a video screen, reproduced on a printer and communicated between computers.... Detailed design specifications and a summary description of the document imaging system are contained at Appendix Q.

(May 16 at 240; D-3, p. 36).

(7)     The use of imaging is dictated by the RFP in substantial detail. (D-4, Appendices C and Q). Appendix C contains a "hundred pages or so of detailed documentation of the imaging process for the department... including the forms and how it works out, ties together, how it fits together...." (May 24 at 554). Appendix Q is similar and also provides a schematic on the imaging process. (May 24 at 555).

(8)     The imaging system is clearly specified in the RFP and related documents.

(9)     Mr. Grieger stated: "[R]eading the RFP and having had the opportunity to review the 1995 proposal for First Health, it became evident that imaging was a major component of the customer service, client services area. It was an integral part. That came out very clear, and that was a message that we took to heart." (May 18 at 436). Mr. Grieger was the source of this information. (May 18 at 436).

(10)    Mr. Grieger stated that NPA's mail service pharmacy currently uses an imaging system developed in-house approximately four years ago. (May 18 at 423).

(11)    The use of imaging systems and the communication between computers is not a concept that is confidential and proprietary to First Health. It is part of the new technology that is now generally known and which is generally available.

(12)    Ms. DiMarco assumes that only Mr. Norton would know to discuss the takeover of the imaging system. (May 15 at 86). She also claims that "NPA in this

proposal describes our exact hardware and software configuration, a new configuration." (May 15 at 86).

(13)   Mr. Howells testified that "knowing that the imaging system was not a part of the assets that would go to the state necessarily, it should have been assumed that it was to be addressed in the takeover portion." (May 16 at 271).  So, Mr. Howells was not surprised that NPA would know to address the imaging system in the takeover.

(14)   Mr. Howells stated:  "I think the understanding I have of this is that the takeover plan from anyone other than the incumbent would be expected to have to address the imaging system because it is one the few items that are not a state asset.  And no, it's not confidential." (Howells at 96).

(15)   Mr. Snedden agreed that this information was not confidential when he noted that it was something the Department would make public. (May 17 at 14).

(16)   Mr. Norton testified that the NPA proposal does not set out a configuration of the hardware and software system that First Health uses for imaging but rather only talks "about taking over the current imaging system as it lay with First Health." (May 16 at 307).

(17)   In summary, the proposal by NPA which discussed imaging in the takeover plan was common sense and did not require any confidential or proprietary knowledge.

(l) ALLEGED PREFERENCE OF PDA THAT A SUBCONTRACTOR NOT CONDUCT PROVIDER TRAINING
-AND-
(m) PDA'S PREFERENCE THAT THE PROVIDER RELATIONS MANAGER WOULD ATTEND PROVIDER TRAINING

(1)    Ms. DiMarco states: "It's our belief, and Mr. Norton would have known, that PDA would have known, that PDA would not have found terribly responsive the subcontracting of an important and vital function as pharmacy training." (May 15 at 91-92).  She also claims a proprietary right to the PACE project director accompanying the provider relations manager to pharmacy training sessions.   (May 15 at 92).   She exaggeratedly claims this is "again another instance whereby our detailed processes are now known by and disclosed to NPA and used to advantage their proposal." (May 15 at 93).

(2)    Although she claims that the Department has "a preference... for the contractor to do those functions [provider services training]," she admits that Mr. Snedden never told her a subcontractor should not be used. (May 16 at 241).

(3)    Surprisingly, if Ms. DiMarco were correct, Mr. Howells was not aware if PDA objects to the use of a subcontractor.  (Howells at 97).

(4)    Mr. Snedden testified that this was not an important consideration and he thought NPA was going to use a subcontractor. (May 16 at 241-242; Snedden at 84).  He specifically stated that "[i]t doesn't make any difference to me" and "I really don't care who from the contractor, the subcontractor does it." (May 16 at 242; Snedden at 84).

(5)    Consequently, Ms. DiMarco was apparently mistaken that this was a preference of  PDA and such alleged knowledge of the preference would have no economic value.

(6)    It was Mr. Grieger, not Mr. Norton, who decided to not use a subcontractor to do the provider training. (May 18 at 437).

(7)     Mr. Howells did not view this alleged preference not to use a subcontractor for provider training as confidential. (Howells at 96-97).

(8)     Clearly, NPA did not use any confidential information from First Health in suggesting that NPA, not a subcontractor, would conduct provider training.

(9)     First Health's counsel claims that the October draft does not mention a provider relations manager but the final proposal does refer to a provider relations manager. (May 16 at 340-341). To the contrary, the October 7 draft mentions that each seminar for provider training is conducted by the provider relations manager. (May 18 at 469).

(10)    Mr. Norton stated that the reference in 1999 to the provider relations manager does not reflect his insider knowledge when he was working for First Health just because First Health used a provider relations manager. (May 16 at 341).

(11)    Mr. Norton said that there was no use of confidential and proprietary information from First Health. (May 17 at 392).

(12)    Mr. Norton notes that the "whole provider training requirement in the RFP is under the provider relations area of the RFP, so it makes sense the provider relations manager would be involved with provider training." (May 17 at 392). The involvement of the provider relations manager in provider training "speaks to logic" according to Mr. Grieger. "It would make good management sense to have the head of that department have direct contact with that function...." (May 18 at 437).

(13)    Mr. Grieger made the decision to use the provider relations manager in this manner. (May 18 at 437).

(14)    A reasonable person would expect the provider relations manager to be involved in provider training.

(15)    Mr. Howells was uncertain as to where NPA may have learned of the alleged preference, but he admitted that PDA would volunteer the information if asked. (Howells at 97-98).

(16)    Mr. Snedden agreed that this information would be public.  (May 17 at 14).

(17)    As pointed out above, NPA did not need to know of the "preference" to propose the use of the provider relations manager in this manner, and, in any case, the information was publicly available.

(n) PDA'S PREFERENCE FOR A HIGH-QUALITY CARDHOLDER AND PROVIDER INQUIRY TRACKING SYSTEM

(1)    Ms. DiMarco claims "considerable detail" in NPA's description of cardholder services and she assumes "that this had been disclosed by Mr. Norton in the process of putting this bid together."  (May 15 at 93-95).  The RFP itself specifies that "cardholder correspondence shall be logged, handled professionally and accurately and responded to within two business days of receipt."  (May 16 at 229-230; D-3, p. 37). Performance standards for cardholder services are contained in Appendix F of the RFP. (May 16 at 230).

(2)    The RFP specifically states:  "Systems and subsystems necessary to maintain accurate tracking and support all cardholder application processes must be maintained and periodically enhanced."  (May 16 at 230; D-3, p. 37).

(3)    The RFP also requires:

> The contractor will be responsible for maintaining a system that will track special individual income verification requests to cardholders. They system should at a minimum be able to log the date the initial notification was sent to the cardholder, the date a response is received, electronically store all correspondence regarding the income verification on the imaging system, log cancellation date, and track financial recoupment statements.

(May 16 at 230-231; D-3, p. 39).

(4)     The "considerable detail" in describing cardholder services is derived from the RFP itself, and not from any confidential information.

(5)     Ms. DiMarco admits that there is reference to cardholder issues in the RFP.  (May 16 at 243).

(6)     Mr. Howells testified that the requirements of high quality cardholder and provider inquiry call tracking system are contained in the RFP.  (May 16 at 272).

(7)     Mr. Howells also noted that this "preference" is not confidential to First Health. (Howells at 99).

(8)     Apparently, any reasonable person would have surmised that there was a "preference" for a "high-quality" tracking system.

(9)     Ms. DiMarco states that "First Health has an MITS system that is an inquirer tracking system that tracks the inquiries of cardholders and providers" and she assumes that is why "NPA now proposes this new system CITS."  (May 15 at 79-80). Ms. DiMarco claims that the CITS is not significantly mentioned in the October draft. (May 16 at 181-182).  In reality, the CITS is mentioned at least 17 times in the 1999 October draft. (May 16 at 181; P-130).

(10)    Ms. DiMarco cannot even state the similarities, if any, between First Health's MITS and NPA's CITS.  (May 16 at 226).

(11)   Ms. DiMarco has no factual basis to claim NPA's CITS was based upon First Health's MITS. (May 16 at 226).

(12)   She does not even know when NPA began development of CITS. (May 16 at 226).

(13)   Tom Snedden testified that the proposal of a CITS was <u>not</u> a significant factor in evaluating NPA's bid proposal. (May 16 at 233; Snedden at 85).

(14)   Mr. Snedden stated that such systems are "an industry standard these days." (May 16 at 233; Snedden at 85). Mr. Snedden admitted that preference for a tracking system would be public. (May 17 at 14).

(15)   The RFP itself refers to the Management Information Tracking Systems (MITS) and specifically states under Policies and Procedures that the bidder is required to assume the current policies or procedures including MITS. (May 16 at 227-228; D-3, pp. 27-28).

(16)   Mr. Grieger notes that the need for a provider inquiry call tracking system "came out in the specifications in the RFP." (May 18 at 438).

(17)   It was Mr. Grieger, not Mr. Norton, who proposed the CITS in both 1995 and 1999. (May 18 at 429, 438).

(18)   The CITS system was not the result of any confidential information from First Health.

(19)   The proposal by NPA to use a CITS system does not in any manner support the claim that confidential and proprietary information of First Health was used.

(o) PDA'S PREFERENCE THAT CARDHOLDER ISSUES BE
     THOROUGHLY ADDRESSED

16804-1                              33

(1)     The testimony and evidence at trial fail to support this claim. The Plaintiff failed to provide any significant evidence to show such a preference, that Mr. Norton revealed such a preference to NPA, or that such a preference was confidential or proprietary to First Health.

(2)     The RFP obviously addresses cardholder issues and any reasonable person would know to respond to the RFP. Mr. Grieger commented that "the RFP was very specific in stating that what was asked for in that regard, and logic would dictate that you have to be very thorough in your response." (May 18 at 438).

(3)     It was Mr. Grieger, not Mr. Norton, who decided to thoroughly address cardholder issues. (May 18 at 438).

(4)     The Plaintiff has not met its burden of proof in regard to this item.

(5)     In any case, First Health's officer in charge for PACE does not believe this "preference" to be confidential and proprietary. (Howells at 62). Even more telling is his comment:

> "[O]n our review of the NPA proposal , it was determined by my staff, who reviewed it that the 1994 proposal from NPA addressed cardholder issues <u>more thoroughly</u> than the 1999 proposal."

(Howells at 99) (emphasis added). So the fact that NPA thoroughly addressed cardholder issues in its 1999 proposal would not support a claim that confidential information of First Health was used when NPA did an even more thorough job in the 1995 proposal. Apparently, Mr. Norton did nothing to call NPA's attention to this alleged "preference" and did not reveal any confidential information.

(6)     Also, Mr. Snedden agrees that this "preference" would be available to the public. (May 17 at 14). This alleged "preference" was not confidential to First Health.

(p) IMAGING DOCUMENTATION INTEGRATED INTO CARDHOLDER SERVICES PROCEDURE MANUAL

(1)    Ms. DiMarco takes a simple statement by NPA that it presumes cardholder services include imaging documentation and procedures, and she leaps to a claim that "[t]he fact that NPA demonstrates that they believe that the imaging documentation and procedures are part of the cardholder services manual again is inside information." (May 15 at 95). She concedes that it is a "small detail" that NPA knows "exactly" where the imaging documentation procedures are referenced. (May 15 at 95-96).

(2)    Ms. DiMarco testified that the integration of imaging documentation and procedures into the cardholder procedure manual was after 1995. The Defendants believe that it occurred after Mr. Norton's work on PACE so it would not have been known to him. (May 16 at 244). At deposition, Ms. DiMarco was asked to find out the date of implementation. (May 16 at 244). She then appears at trial and still does not know the date of implementation. (May 16 at 244). Since this information is within the unique control of First Health, and its President failed to provide any date that would make this information relevant to the issues, the Court rejects this claim by Ms. DiMarco because it has no proper foundation. Once again, Mr. DiMarco asks this Court to accept her assumption that Mr. Norton divulged confidential information when she has not even shown that Mr. Norton had such information available to him.

(3)    Furthermore, Ms. DiMarco admits that "there is not necessarily an advantage" to knowing that the imaging documentation and procedures are under the cardholder services procedure manual. (May 16 at 245). This is not the type of information with economic value that rises to the level of confidential or proprietary.

16804-1                                35

(4)    NPA noted that an imaging system exists in the cardholder services area even in its 1995 proposal. (May 18 at 461, 464).

(5)    Mr. Grieger, in preparing the 1999 proposal, made "an assumption here that since imaging is an integral part of customer service, it was repeatedly mentioned in the RFP as a part of customer service and particularly the application processing, that one could logically assume that the imaging documentation would be part of the customer service operations manual." (May 18 at 439).

(6)    Mr. Grieger explained that "the fact that the imaging system was described in the cardholder services area as one that needs to be integrated with various PC platforms, both at the departmental level and the PACE office level, leads one to believe that the requirement of the imaging system would ask you to have that access." (May 18 at 439). It was Mr. Grieger who "deduced that from reading the RFP." (May 18 at 440).

(7)    Mr. Grieger stated:  "I think the RFP clearly indicates that imaging documentation... and procedures is a part of cardholder services." (May 18 at 462).

(8)    Mr. Howells, the officer in charge of PACE, did not even know if this was important to PDA.  (Howells at 100).  In any case, Mr. Howells does not view this information as confidential and proprietary to First Health.  (Howells at 99-100).

(9)    Mr. Snedden does not view it as confidential because it is available to the public. (May 17 at 14-15).

(10)    Addressing imaging in the context of customer service is not a confidential matter.

(q) PDA IS CAPABLE OF ACCESSING PROVIDER FILES FROM FIRST HEALTH'S SYSTEM

(1)     Ms. DiMarco complains that NPA knew that PDA can access provider documents on its imaging work stations. (May 15 at 96-97).  Ms. DiMarco obviously must admit that Mr. Snedden and others at PDA are aware of this.  (May 16 at 245).  Certainly, the PDA would share this information with anyone who would ask.

(2)     The RFP also refers to provider information being "communicated between computers" which clearly implies such accessibility.  (May 16 at 240; D-4, p. 36).

(3)     The concept of information being available to a client on-line is not confidential and proprietary.

(4)     Mr. Howells stated that the fact that PDA is capable of accessing such information is not confidential and proprietary to First Health.  (Howells at 100).

(5)     Mr. Snedden stated that "we would make that public, but that currently doesn't exist." (May 17 at 15).

(6)     Mr. Grieger explained that "the fact that the imaging system was described in the cardholder services area as one that needs to be integrated with various PC platforms, both at the department level and the PACE office level, leads one to believe that the requirement of the imaging system would ask you to have that access." (May 18 at 439). It was Mr. Grieger who "deduced that from reading the RFP." (May 18 at 440).

(7)     The PDA capability to access provider files is not confidential information.

(r) SOME PROVIDERS ELECT ELECTRONIC REMITTANCE ADVICES

(1)     Ms. DiMarco also alleges that it is confidential information that "some providers elect to receive their RA's, RA's meaning remittance advice, via electronic

media." (May 15 at 98). Mr. Grieger testified that NPA currently uses electronic remittance advices in its administration of its prescription programs. (May 18 at 419, 440).

(2)   NPA already has a number of providers in its provider network which have elected to receive remittance advices electronically as opposed to hard copy. (May 18 at 419).

(3)   NPA had been using electronic remittance advices for at least a decade. (May 18 at 419).

(4)   There is no basis for holding that any entity possesses ownership of the concept of electronic remittance advices.

(5)   Even Mr. Howells from First Health admits that the "concept that some providers prefer electronic media is not confidential." (Howells at 100-101). He believes that which specific providers prefer electronic media may be confidential but he acknowledges that NPA did not state any specific providers. (Howells at 100-101).

(6)   Mr. Snedden says the fact that some providers elect to receive remittance advices by electronic media is public. (May 17 at 15).

(7)   Consequently, there is no evidence that NPA possessed or used any confidential information of First Health.

(s) SOFTWARE AND PROCESSES FOR REMITTANCE ADVICES IN PROVIDER RELATIONS UNIT

(1)   First Health also objects that NPA refers to "software and processes currently used to distribute those electronic RA's are maintained in the provider relations unit." (May 15 at 98). She claims that "it's unusual that this kind of function would be handled in a provider relations unit." (May 15 at 99). Ms. DiMarco could not even

16804-1                                       38

identify any advantage to NPA in knowing that the "software and processes currently used in the preparation of weekly remittance advice are contained in the provider relations unit. (May 16 at 246-247).

(2)     The RFP specifically refers to "weekly preparing remittance advices with provider messages and electronically (EFT) transmitting the provider's reimbursement." (May 16 at 247; D-3, p. 42).

(3)     Most importantly, this reference to remittance advices is contained in the section of the RFP entitled "Provider Relations Activity."  (May 16 at 248; D-3, p. 42).

(4)     Mr. Grieger testified that it "can be inferred from the fact that the software and processes would be in the provider relations units." (May 18 at 473).

(5)     Consequently, NPA did not need confidential information to know that the remittance advice process comes under the provider relations unit.  It is specifically evidenced in the RFP itself.

(6)     Mr. Howells did not know if such information was confidential and proprietary to First Health.  (Howells at 101-102).

(7)     Mr. Snedden says such information would be public.  (May 17 at 15).

(8)     Consequently, neither the officer-in-charge or the Director of PACE support the position of First Health.

## MISCELLANEOUS ISSUES NOT REVEALED BY PLAINTIFF IN DISCOVERY

26.     A number of issues were raised at the hearing that were not revealed in Plaintiff's answers to interrogatories or in the deposition of Ms. DiMarco as examples of alleged use of confidential or proprietary information of First Health.

(a) LABOR OVERHEAD

(1)     Over the objection of Defendants' counsel who was denied an opportunity during discovery to inquire into labor overhead costs,[15]   DiMarco provided hearsay testimony that "the percentages for labor overhead rates that NPA proposed in its 1999 proposal were 1 percentage point under First Health's." (May 15 at 117-120).

(2)     At her deposition, Ms. DiMarco could not recall overhead costs for PACE and for First Health. (May 16 at 184).  She also could not identify any proof that Mr. Norton had used First Health's overhead numbers in helping to prepare NPA's bid.  (May 16 at 184-185).  Again, she assumed he used First Health's overhead only because NPA's bid proposal was lower in cost in 1999 than it was in 1995.  (May 16 at 185).

(3)     Ms. DiMarco could not state with any certainty how the labor overhead numbers were computed to compare First Health and NPA proposals.  (May 16 at 186-188).[16]

(4)     As a result, this hearsay testimony is to be given little or no weight by the Court.

(5)     Mr. Nicoletos explained that there is a difference between labor and labor overhead. He stated:

> ...Labor I would define as gross salaries, and labor overhead I would define as costs in incidental to that payroll, payroll taxes, employee welfare benefits, 401 (k) matching, things that are directly correlated to the payroll.

(May 24 at 497-798).

---

[15]     At deposition, Ms. DiMarco revealed that some type of review of labor overhead costs for the NPA proposal and for the First Health PACE operation to make a comparison performed by First Health's chief financial officer. The Plaintiff's counsel denied a request to depose this individual.

[16]     Mr. Howells, as previously stated, had instructed his staff to compare the cost proposals of NPA and First Health, and his staff was unable to find any similarities. (Howells at 90).

(6)     It should be noted that the Plaintiff is not even comparing labor costs between the NPA proposal and First Health's experience, rather it only alleges a similarity between <u>labor overhead percentages</u>. The Plaintiff had to go to great lengths to find any alleged similarity in cost between NPA and First Health.

(7)     Obviously, there are very few, if any, costs that are similar between the NPA proposal and First Health's business operations which severely weakens any claim that NPA used any confidential information of First Health in preparing NPA's 1999 proposal.

(8)     Even the alleged similarity in labor overhead percentages does not lend support to Plaintiff's claims. Mr. Nicoletos gave a percentage to compute overhead for the 1999 proposal. (May 24 at 498). He based it on one of the companies NPA owns in Pennsylvania, for that is what their labor overhead costs were as a percentage of their payroll. (May 24 at 498).

(9)     Mr. Nicoletos did not know First Health's labor overhead. (May 24 at 498).

(10)    The following testimony by Mr. Nicoletos is revealing:

Q.  Is it significant to you that it's been alleged that NPA's overhead was 1 percent less than First Health's labor overhead?

A.  No, I don't think it is significant at all. I think if you looked at a broad range of companies, that their labor overhead is going to be somewhere between 20 and 25 percent of the labor costs, I mean because you have got payroll taxes, which are statutory, everyone has those, and then you have employee benefit costs, which, you know, on a per head basis really doesn't vary that much from company to company assuming that they are offering benefits.

(May 24 at 498).

(11)    Consequently, it is not surprising that NPA's labor overhead percentage cost is somewhat similar to First Health's, as would probably be the case for many other companies.  The fact that the labor overhead of NPA and First Health may be 1 percent apart is so insignificant that it demonstrates how weak the Plaintiff's claims must be to cite such a figure.

(12)    Although First Health claims that Mr. Norton revealed labor overhead costs from First Health, Mr. Norton testified that he did not "have a clue" as to First Health's labor overhead costs.  (May 24 at 552).  Again, First Health only assumed he was the source of this information.

(b)  TURNOVER COSTS

(1)    The bidding of zero or no cost for turnover activity is allegedly "a pricing strategy  that is typically used by First Health."  (May 15 at 100).  Ms. DiMarco claims that "First Health in prior bids to the PACE program we have bid nearly 0 as a turnover price."  (May 15 at 100).  Even Ms. DiMarco admitted that First Health's 1995 proposal that contained a zero, or near to zero, bid for turnover cost was shared with NPA by the Department.  (May 16 at 190-191).  Consequently, there was no confidential information used by NPA in its bid proposal.

(2)    Apparently, First Health is seeking an unfair advantage in winning the bid by claiming that NPA must include turnover costs in its proposal when public documents show that First Health does not include turnover costs in its proposal.

(3)    NPA's proposal explains that "the period of the turnover is parallel to the last few months of the operations and explains that if we should put a cost there, that would be duplicating staff that's already there, and that would be double dipping, and so

there was really no cost associated with that period of time for turnover as such." (May 24 at 558-559).

(4)    Consequently, there is a logical reason why NPA did not bid any turnover cost which is unrelated to any confidential information from First Health.

(5)    Mr. Snedden confirmed that zero price for turnover would be information that is public. (May 17 at 16).

(6)    Zero cost for turnover is not confidential to First Health.

(c) LOW PRICE

(1)    First Health repeatedly implies that it is its marketing strategy to bid a low price. Mr. Norton confirmed the obvious that bidding a low price is not a confidential, proprietary, or trade secret of First Health. (May 17 at 369).

(2)    The Court takes judicial notice that bidding a low price is not confidential and proprietary to First Health.

(3)    First Health continuously assumes that NPA's 1999 bid was lower as to proposed cost than NPA's 1995 bid only because of alleged confidential information provided by Mr. Norton. Mr. Grieger explained the difference as follows:

> There are several reasons for that. The staff or the individual who had priced the '95 proposal had a different pricing philosophy than the individual who priced the 1999 proposal. Since the '95 proposal we have become more aggressive in our pricing strategies, not just strictly for PACE but throughout the entire book of business. ... Secondly, NPA has been very committed to Pennsylvania, and as everyone may know, we have lost a major contract in Pennsylvania, and subsequent to that we have decided as a corporate strategy to become very aggressive to try to maintain our position in Pennsylvania....
>
> We also learned from the debriefing in the 1995 proposal what it would take to have a successful bid.

(May 18 at 423).

16804-1                                        43

(4)     Mr. Grieger stated: "I think that that's a strategy [low price] that's used universally by just about every company on the face of this earth." (May 18 at 444).  (5)

(5)     NPA knew to bid a low price without the need for any confidential information from First Health.

(6)     First Health refers to memorandum by Mr. Norton which refers to the NPA proposal as containing "a very competitive (and winning) price." (May 17 at 380). Mr. Norton's statement was "based on we want our objective to have a good price, and it was less than First Health [for previous years]." (May 17 at 380).  It was "a little puff to puff up Zimmerman that his staff did a good job." (May 17 at 381).  At that time, he "had no idea if we would have a winning bid or a winning price." (May 17 at 381).  The memorandum by Mr. Norton referring to a winning price does not demonstrate the use of First Health's confidential information.

(d)     TIES AND UNIQUE STAMPS

(1)     First Health refers to "ties" or "unique stamps" that it claims are confidential and proprietary.  (May 16 at 203). It does not describe with any specificity what are these alleged "ties" or "unique stamps."

(2)     As a result, the Plaintiff has not met its burden of establishing any disclosure and use of confidential and proprietary information.

(3)     Mr. Grieger is not aware of any "ties" or "unique stamps" that are confidential and proprietary to First Health. (May 18 at 451).

(4)     (4) Mr. Norton is also not aware of any such "ties" or "unique stamps" that were used or will be used by NPA. (May 24 at 560).

16804-1                              44

(5)     Mr. Snedden stated that "the way in which First Health ties the basic components or principal parts or the PACE program together and the unique stamp that it places on that program in terms of its management and administration is not something that is owned by the Department of Aging." (May 17 at 20). Mr. Snedden did not state that such items were confidential and proprietary to First Health, rather he said they were not owned by PDA. Mr. Snedden merely agreed that the Department had no right to claim ownership of the way First Health "ties" things or the way it places its "unique stamp."

(6)     The Plaintiff did not have Mr. Snedden identify any such "tie" or "unique stamp" so again the Court is left without any guidance as the exactly what First Health's counsel was referring to.

(7)     Consequently, Mr. Snedden's testimony does not support Plaintiff's claim that "ties" and "unique stamps" are confidential.

(8)     Mr. Snedden does not believe there are any "ties" or "unique stamps" of First Health that are necessary to operate the PACE program. <u>Also, Mr. Snedden stated that he was not aware of any "ties" or "unique stamps" owned by First Health and not by PDA that were used by NPA in preparing its bid or proposal.</u> (May 17 at 28). So even if there are such "ties" and "unique stamps," which the Plaintiff has never clearly identified, the Director or PACE is not aware that any were used by NPA. Again, the Plaintiff fails to meet its burden of proof.

(9)     Mr. Snedden stated: "I thought that the NPA proposal was weak relative to First Health's proposal, and scored it accordingly." (Snedden at 62). Snedden explained that he would expect that the incumbent, who's been with PDA with the inception of the

16804-1                                45

PACE programs, would have a stellar proposal. (Snedden at 63). "NPA's proposal, if it had a weakness, it was that they don't know the <u>intricacies and the nuances</u> of running these programs, which are significant." (Snedden at 63) (emphasis added). "But it's a weakness that I would anticipate…." (Snedden at 63-64). Consequently, Mr. Snedden not only did not notice that NPA had used any "ties" and " unique stamps" of First Health, but he scored NPA lower because those things were missing from NPA's proposal as he would have anticipated.

(10)    Mr. Snedden noted that the could <u>not</u> agree that the NPA proposal had the "smell, touch and feel" of a First Health proposal. (Snedden at 66-67).

(11)    The evidence demonstrates that NPA did not use any confidential "ties" or "unique stamps" of First Health.

<center>ISSUES WITHOUT SUPPORTING TESTIMONY</center>

27.    A number of issues are raised by First Health's counsel by a cursory comparison of the October drafts of NPA's proposal with the final proposal by NPA in December. The false implication, as previously pointed out, is that the changes from October to December were all made by Mr. Norton based upon confidential information taken from First Health. It should be noted that there is no testimony that most of these items were supplied by Mr. Norton nor is there any testimony that any of these items are confidential and proprietary to First Health. Consequently, all these items should be rejected due to a failure of proof by the Plaintiff. A review of these items also reveals that they are meritless in supporting any of Plaintiff's claims.

(a)    DISEASE MANAGEMENT

(1)    First Health's counsel pointed out that the October 12 draft of NPA's proposal did not mention disease state management as an initiative but the final proposal does refer to a catastrophic disease management program.   (May 16 at 335-336). Although not asked by First Health's counsel as to who suggested this change, Mr. Norton testified that this was added by Mr. Grieger and was added before Norton even arrived at NPA. (May 17 at 390).

(2)    Mr. Norton also confirmed that no confidential and proprietary information of First Health was used in making this addition. (May 17 at 390).

(3)    Disease state management was recommended by Mr. Grieger. (May 18 at 429).   Mr. Grieger acknowledged that he suggested the disease management program directed to the senior population. (May 18 at 449).

(4)    It was Allan Zimmerman of NPA who suggested the catastrophic disease management program. (May 18 at 449).

(5)    Mr. Snedden stated that disease state management initiatives were public. (May 17 at 16).

(6)    Consequently, any reference to disease management by NPA was not based upon confidential information from First Health.

(b)    DISASTER RECOVERY

(1)    First Health's counsel claims that the October draft proposal does not contain as "expanded" a discussion of disaster recovery as contained in the final proposal. (May 16 at 337-338).   Mr. Norton testified that disaster recovery was added by Mike Perry, NPA's chief information officer, or by Mr. Perry's staff.  (May 17 at 391).

(2)     Mr. Norton verified that no confidential or proprietary information was used, and that it was a response to a requirement in the RFP. (May 17 at 391).

(3)     There is no evidence of record to dispute Mr. Norton's statements and, therefore, the Plaintiff has not met its burden of proving that confidential information was used by NPA.

(c) TRAINING PLANNING

(1)     First Health's counsel points out that the October drafts do not contain references to meeting with PDA to develop training topics, procedures for establishing training sites, logging registration by telephone, keeping attendance logs, using evaluation forms to solicit feedback, and "new initiatives." (May 16 at 343-344). Mr. Norton testified that he did not add these items to NPA's proposal. (May 17 at 392).

(2)     These items were not confidential and proprietary to First Health and were "generally expected based on requirements of the RFP." (May 17 at 392).

(3)     Again, there is no evidence of record to show that this item was confidential to First Health or that it was revealed by Mr. Norton to NPA.

(d) RESIDENCE OF REBATE

(1)     Counsel for First Health alleges that the October draft does not state "where the functions supporting the manufacturer rebate processes should reside" but the final proposal divides them between the business and utilization review departments just as at First Health. (May 16 at 345-346). Mr. Norton pointed out how he suggested this "just because it made sense to split out the fiscal practices with someone that knows accounting and those people that deal with the manufacturers to deal with the dispute resolution part which would make sense to me." (May 17 at 393).

(2)    The following testimony was provided by Mr. Norton:

Q.  Did you need to use any confidential or proprietary information of First Health to make that split?

A.  No, I don't consider using confidential information to make that split, it just makes sense to me.

(May 17 at 393).

(3)    Mr. Norton was merely exercising good management and business judgment which, despite First Health's claims, is not owned by First Health. Note that no witness testified that this division of labor was confidential to First Health. There is no evidence of record to support the claims that this item is confidential to First Health.

(e)  DRUG UTILIZATION REVIEW

(1)    Counsel for First Health alleges that from the October draft to the final proposal "NPA has shifted the emphasis of its surveillance utilization review process to focus on first establishing criteria and clinical analysis, and then from there taking certain required actions." (May 17 at 357).  Mr. Norton points out that "that only normally makes sense" and "[y]ou have to prepare the norms before you can go against them." (May 17 at 357).

(2)    Mr. Norton goes on to clarify that "I think that's pretty good practice that NPA has advised me that that's what they do" and "I didn't write this section.... I'm just going on what I heard during the preparation of the proposal."  (May 17 at 359). (emphasis added).

(3)    The record does not establish any facts to show that this item was confidential to First Health or that it was provided by Mr. Norton.

(4)    It should be also be noted that First Health's 1995 contract, which Ms. DiMarco admits was available to NPA, refers to enhancing the drug utilization review system and to enhancing the manufacturer's rebate program. (May 16 at 201, D-5). As a result, NPA knew that this was an area to be addressed in some detail.

(5)    The 1999 NPA proposal addresses the "development of DUR criteria and the use of nationally recognized medical compendia to develop those criteria. (May 18 at 424; D- 8). This section was written by Peter Grieger. (May 18 at 424).

(6)    Mr. Grieger testified that this DUR language is the type routinely used by NPA. (May 18 at 424). The NPA RetroDur requires that relevant medical criteria be developed. (May 18 at 424).

(7)    Retrospective DUR was Mr. Grieger's recommendation in both '95 and '99. (May 18 at 429).

(8)    NPA did not need insider information from First Health to know the importance of drug utilization review.

(f) ADDING A TPL COORDINATOR

(1)    Mr. Norton suggested adding an extra TPL coordinator. (May 16 at 322). Mr. Norton stated that the reference to a TPL is contained in NPA's 1995 proposal. (May 24 at 553; D-15, p. 151).

(2)    There was also a reference to a TPL coordinator in the October NPA draft of the 1999 proposal before Mr. Norton began his consultation with NPA. (May 24 at 553).

(3)    NPA did not need confidential information to know about the TPL coordinator.

## ACTUAL METHOD FOR COMPUTING NPA'S PRICE

28.     First Health repeatedly implies that NPA's price proposal was based upon confidential information taken from First Health. Remarkably, despite many different costs contained in NPA's proposal, First Health can only cite to four items it claims demonstrate the use of confidential information in formulating NPA's price: (1) takeover costs; (2) employee salaries and takeover incentives; (3) labor overhead; and (4) turnover costs. As previously stated, the facts do not support any finding that NPA used confidential First Health information in developing its price for any of these items.

29.     Since the Plaintiff has not met its burden of proof, no further explanation is necessary to deny its claims. An explanation of NPA's pricing strategy, however, will further demonstrate how NPA did not use any confidential information from First Health:

        (a)     With respect to the 1999 NPA proposal, Mr. Nicoletos worked on the cost proposal. (May 24 at 492). He helped develop the cost strategy and pricing. (May 24 at 492, 493).

        (b)     At the time Mr. Nicoletos prepared the proposal, he had access to the contract price for First Health's 1998 and 1999 extensions. Those extensions "were exhibits to the proposal, the request for proposal from the Department of Aging." (May 24 at 493).

        (c)     The contract price of First Health was not confidential.

        (d)     Mr. Nicoletos identified D-12 as "a printout of the items that were contained on the CD ROM supplied by PDA which is Exhibit 13, that's the label of the CD ROM provided by the PDA and also the list of the files that were contained on that

CD ROM." (May 24 at 493). D-12 and D-13 contain the contract amounts for the 1998 and 1999 extensions. (May 24 at 493).

(e)    In order to come up with a pricing strategy for NPA's proposed contract price, Mr. Nicoletos met with Mr. Ullman and Mr. Grieger. (May 24 at 493). "We had made a decision that we were going to price this very aggressively and that we were going to try and basically use the First Health price that they charged in those final two years as a basis for us formulating our price and formulating a competitive price." (May 24 at 493- 494).

(f)    Mr. Nicoletos took the two year extension price plus some of the subsequent amendments and divided that by two to come up with an average. Then, he applied an inflation factor of 3 percent for each year of the contract. (May 24 at 494). To come up with the final bid amount, Mr. Nicoletos explained:

> Well, we had decided that in order to get the Department of Aging to take a good look at our proposal that we really needed to price under what we thought First Health would come in at. So when I looked at those two year numbers, I then took 10 percent off of that, off of their two years number, and then applied the inflation factor of 3 percent, so hopefully that would give us a bid price of 10 percent less than First Health would come in at.

(May 24 at 495).

(g)    First Health claimed a 10 percent profit each year. (May 24 at 495). First Health's Dun & Bradstreet Report, however, showed a 50 percent margin for their company. (May 24 at 495). With respect to the 10 percent margin, Mr. Nicoletos reasoned: "First Health's price would not be substantially different than it was in the two year extension in the previous years because, you know, they had a 10 percent margin, so if they are going to cut costs out of the proposal, I didn't see that they had a lot of room to

come down in their price. And I didn't see that they would go up very much in their price, probably just an inflation factor." (May 24 at 495).

(h)     Mr. Nicoletos agreed that as a pricing strategy, he estimated First Health's price for the first year of the contract and then bid a price 10 percent lower. Mr. Nicoletos agreed that to determine First Health's price, he relied upon First Health's 1995 proposal, First Health's two year contract extension, and the Dun & Bradstreet, all of which were publicly available. (May 24 at 502).

(i)     The fact that Dun & Bradstreet showed a 50 percent margin, gave Mr. Nicoletos a "comfort level" that NPA's price would not be so low as to not at least make some profit. (May 24 at 496).

(j)     With respect to the Dun & Bradstreet, P-97, Mr. Nicoletos agreed at trial that the report was dated May of 1997 and it was already on his computer system in the fall of 1999. (May 24 at 503). He agreed that the D & B contained information as of May 1997. (May 24 at 503). He also agreed that the D & B indicated a margin of 50 percent. (May 24 at 503-504). While the numbers are actually numbers of a company named Health Care Compare, Mr. Nicoletos explained that Health Care Compare is a successor or purchaser to The Computer Company. (May 24 at 504). At the time, Mr. Nicoletos thought the numbers were for the entity that had the PACE contract. (May 24 at 504-505).

(k)     Even if Mr. Nicoletos was mistaken as to whether the D & B report covered the PACE contract, the pricing strategy of NPA was clearly not based upon confidential information of First Health.

(l) First Health seeks to imply that the 10% strategy was still not in place just two days before NPA submitted its bid because Mr. Hofheimer wrote a memorandum stating he still wanted to see the price for NPA come in at 10 percent under current price. (May 24 at 516; P-82). Mr. Nicoletos explained that "Mr. Hofheimer didn't know what price we were submitting. I never discussed price with Mr. Hofheimer." (May 24 at 516).

(m) As a result, Mr. Hofheimer's memorandum does not establish, as Plaintiff claims, that the 10 percent strategy was implemented only a day or two before the bids were submitted.

(n) Mr. Nicoletos was not concerned that NPA's price was too low. ". . . NPA is a privately held company. We have kind of an entrepreneurial spirit, if you will. It's just an assumption that we would have a lower overhead cost than a publicly traded company like First Health." (May 24 at 495-496).

(o) <u>Mr. Nicoletos had no knowledge as to what price First Health was going to bid</u>. (May 24 at 495).

(p) Mr. Nicoletos was very specific that <u>he</u> "came up with the total contract price that we ultimately bid." (May 24 at 512).

(q) At his deposition, Mr. Snedden stated "that Mr. Norton shared with NPA First Health's margins for the PACE program." (May 17 at 26). Mr. Snedden only assumed that the margins were shared with NPA because First Health is a "low ball contractor" and "[t]his time they were completely priced out of the market." (Snedden at 179). He admitted, however, that he did not know of any direct evidence that First Health's margins were shared with NPA. (Snedden at 179). At trial, Mr. Snedden stated:

I wish I could take it back, but, ...he helped advantage NPA in terms of the cost proposal. I'd like to actually, as I said, withdraw my statement about margins, and that's probably too specific a term, but Mr. Norton certainly knows what it takes in terms of costs to run this activity.

(May 17 at 26).

(r)     Consequently, Mr. Snedden has no proof that Mr. Norton revealed First Health's margins. Instead, Mr. Snedden merely assumed that Mr. Norton's great knowledge somehow advantaged NPA. This statement by Mr. Snedden does not establish that NPA and Mr. Norton used any confidential information of First Health.

(s)     Mr. Norton never verified any price margins or profit margins for NPA. (May 24 at 559). The cost estimate he gave for imaging was based on work for another company, not First Health, in September and October of 1999. (May 24 at 559).

(t)     Mr. Norton prepared an EXCEL spreadsheet with preliminary cost numbers for personnel and travel. (May 24 at 506-507). These numbers were reviewed and modified by Mr. Nicoletos. (May 24 at 507). As pointed out by Mr. Nicoletos, "the man hours, were provided in the RFP, so we had a pretty good idea of what the head count had to be." (May 24 at 507). Mr. Nicoletos confirmed that Mr. Norton's spreadsheet "did not drive the final number" for the final total price of NPA's PACE proposal. (May 24 at 524).

(u)     Mr. Norton verified that he did not use First Health's marketing strategy or costing strategy in helping to prepare the 1999 NPA bid proposal. (May 24 at 576).

(v)     Mr. Norton only learned of the final price proposal on December 6 or 7, just a few days before its submission. (May 24 at 548).

(w)     There is no substantial evidence of record that NPA used any confidential or proprietary information of First Health in calculating its price for the 1999 PACE

16804-1                                    55

proposal. Instead, First Health merely relies upon assumptions that NPA must have used its confidential information because NPA bid a lower amount. Such assumptions are not sufficient to meet Plaintiff's burden of proof.

## CONFIDENTIAL INFORMATION NOT NECESSARY TO DEFENDANTS

30.     Ms. DiMarco admits that it is possible that NPA could have pulled together a competitive bid proposal without using confidential and proprietary information from First Health. (May 15 at 160). She, however, chooses to assume otherwise. Her assumptions do not meet Plaintiff's burden of proof.

31.     First Health claims that "it would be difficult, if not impossible, for him [Norton] to be officer in charge… without violating other confidential business information of First Health." (May 15 at 115). Also, Ms. DiMarco is concerned that "Mr. Norton's experience would add significant credibility to NPA's corporate resume" and "would help in bidding on other public entitlement pharmaceutical programs." (May 15 at 155).

32.     Even if it may be difficult, there is no restriction under his employment agreement that would prohibit such work. Also, the employment agreement does not, and legally could not, prohibit Mr. Norton from working just because he adds credibility to another organization.

33.     Ms. DiMarco admits that she does not know for certain whether Richard Hofheimer has revealed any confidential or proprietary information possessed by First Health. (May 15 at 168).[17] At her deposition, Ms. DiMarco admitted that she did not

---

[17]     Any ruling that might find Mr. Hofheimer in violation of his employment agreement with First Health cannot be rendered without his participation in this case. Mr. Hofheimer would be a person needed to be joined for a just adjudication. Fed. R. Civ. P. 19 (a).

know what confidential information had come from Mr. Hofheimer as the source. (May 16 at 199).

34.     There is, therefore, no basis for finding that Mr. Hofheimer has used or will use confidential information of First Health.

35.     Mr. Norton testified that NPA never asked him to reveal any confidential, proprietary, or trade secret information. (May 24 at 550). He also never revealed such information. (May 24 at 550).

36.     Mr. Norton stated that he could perform his duties as officer in charge of PACE under NPA without revealing confidential, proprietary, or trade secret information possessed by First Health. (May 245 at 559-560).

37.     Mr. Norton also believes that other First Health employees could continue their duties at PACE under NPA without revealing such information. (My 24 at 560).

38.     Mr. Grieger is not aware of any confidential or proprietary information that was revealed by Mr. Norton. (May 18 at 451).

39.     Mr. Nicoletos stated that Mr. Norton never provided any confidential, proprietary or trade secret information from First Health. (May 24 at 524).

40.     Mr. Nicoletos does not believe that NPA used any confidential information of First Health in preparing it's bid proposal. (May 24 at 498).

41.     The evidence demonstrates that Mr. Norton did not use or disclose any confidential and proprietary information of First Health and that he is not likely to do so in the future.

## NON-SOLICITATION OF FIRST HEALTH'S CUSTOMERS

16804-1                                    57

42.    Ms. DiMarco claims that the last sentence of Section 8 should be interpreted as

follows:

> [O]ne senior manager requested that, you know, <u>so as he could work in the future</u>
> <u>potentially after his retirement</u>, that this simple act of if he were to go to work for
> a competitor at let's say that the simple act of helping his company respond to
> some specific aspect of an unsolicited RFP, that it would allow him to do that
> without violating the agreement... <u>but it was absolutely never meant to override</u>
> <u>anything else above it</u> relative to calling on, diverting or soliciting our clients or
> prospective clients. Essentially it - - <u>it's a very narrow exception that would</u>
> <u>allow Mr. Norton to work on</u> , you know, <u>some technical aspect of a proposal</u> that
> his company might be making that was totally unsolicited by him.

(May 15 at 64) (emphasis added).

43.    Section 8 specifically states:

> For the purposes of this section responding to an unsolicited request for proposal
> by a customer or prospective customer which is a government agency or
> government contractor will not constitute a violation of employee's obligation
> hereunder.

(May 15 at 132).

44.    There is absolutely no language to even imply that Section 8 applies only to

retirees, that it was not meant to "override" situations that might otherwise be violations,

or that the exception was to be narrowly applied only to some technical aspect. Ms.

DiMarco inappropriately seeks to rewrite Section 8 more to her liking.

45.    Allegedly, Section 8 of Mr. Norton's employment agreement was violated simply

because he was suggested as officer in charge by NPA and he led NPA's presentation at

the "orals." (May 15 at 110-111). Ms. DiMarco claims that "violates the part of the

restrictive covenant that talks about calling upon and soliciting First Health's customers

and prospective customers." (May 15 at 111). Absurdly, Ms. DiMarco claims that "PDA

thinks very highly of Mr. Norton... that by virtue of him being proposed as the officer in

charge that would be very attractive to PDA and in my view, in the company's view, solicitous." (May 15 at 111).

46.     Even Ms. DiMarco admits that "the request for proposal by PDA was not solicited by NPA," although it was necessary to refresh her memory with her deposition testimony. (May 15 at 124-125). She acknowledges that "Norton did not solicit that RFP on a personal level." (May 15 at 126).

47.     To her knowledge, Norton did not seek work from NPA until after NPA had already received the RFP and had already begun work on its proposal. (May 15 at 127).

48.     If Ms. DiMarco was correct in her interpretation, the exception of "responding to an unsolicited request for proposal… of a government agency" would be rendered in large part meaningless.

49.     "Responding" reasonably includes making an oral presentation if it is part of the necessary response.

50.     There is no prohibition to later working for the company which later succeeds in winning the bid. Ms. DiMarco's interpretation would drastically alter the obligations of Mr. Norton under his agreement.

51.     The Court rejects Ms. DiMarco's invitation to rewrite the employment agreement to change the legal obligations of Mr. Norton.

52.     Ms. DiMarco renders an opinion that the exception to Section 8 is not applicable because (1) "Norton sought out this opportunity" and allegedly "Mr. Norton solicited this opportunity" and (2) allegedly Mr. Norton was limited to "let's say running an operation, running a pharmacy operation or some component, some contract that they

may have …, he may help his company write some aspects of a proposal, unsolicited proposal to a government entity." (May 15 at 111-113).

53. Mr. Norton never solicited the RFP. Mr. Norton is not prohibited from soliciting employment of himself with any company. NPA is not a customer of First Health and is not in any manner covered by the employment agreement's restrictive covenant not to solicit customers. The employment agreement does not limit Mr. Norton's work to "running an operation" or to writing only "some aspects" of a proposal. These limitations are the unilateral creation of Ms. DiMarco and have no basis in reality.

54. Ms. DiMarco claims that NPA hired Norton "solely for the purpose of pursuing the PACE contract" and "it's not as if NPA were hiring Mr. Norton to handle some aspect of their operation," and that somehow this is unlawful. (May 15 at 113). There is no prohibition to hiring Mr. Norton to help in the ongoing pursuit of the PACE contract by NPA. Because Ms. DiMarco is displeased does not make it unlawful.

55. First Health agrees that Mr. Norton was entitled to obtain other employment even before his severance pay from First Health had ended. (May 15 at 161-162, P-24).

56. Section 8 of his employment agreement allows Mr. Norton to "respond" to an unsolicited RFP of the type issued by PDA.

57. Mr. Norton has not violated any restrictive covenant prohibiting solicitation of First Health's customers.

<u>NON-SOLICITATION OF FIRST HEALTH EMPLOYEES</u>

58. Ms. DiMarco admits that at the pre-proposal conference on October 8 the Department answered yes to whether it would "react favorably to hiring these people [First Health employees] under a new contractor." (May 15 at 143-144). In fact, First

Health was advised that the Department would "facilitate such an approach by requiring that the incumbent permit interviews with its employees." (May 15 at 144).

59.     Despite this notice to First Health that bidders may seek to hire its employees, First Health did nothing to question the Department's position.

60.     On October 25, 1999, First Health received written notice that the Department would view "affirmatively" a proposal by a bidder to hire First Health employees. (May 15 at 148-149, D-2). First Health was also advised in writing that the Department would require the incumbent to permit interviews with its employees. (May 15 at 148-149, D-2).

61.     Again, First Health did nothing to object, protest, or question these statements.

62.     Mr. Howells verified that fourteen (14) First Health representatives attended this conference but none of them expressed any concern to PDA about the proposal to hire First Health employees. (May 16 at 278-279).

63.     Although aware of the PDA's advice to bidders that it would affirmatively react to the hiring of First Health's staff, remarkably First Health did not "see that as creating an obligation on First Health's part" to do anything to advise PDA that this was not acceptable to First Health. (May 15 at 105-107).

64.     Ms. DiMarco refers to the hiring of her staff by a successful bidder as "raiding" and "unlawful activity" but she felt no need to so advise PDA or other bidders. (May 15 at 107).

65.     She claims that First Health staff are "core assets" to First Health and their loss would "cripple" First Health", but First Health made not even the slightest objection or

protest, formally or informally, when they were advised on at least two occasions that bidders could propose hiring First Health staff. (May 15 at 107-108).

66.    Mr. Howells notes that Mr. Snedden had always supported the use of current First Health staff to promote continuity. (May 16 at 274; Snedden at 48-49). Mr. Snedden confirmed that this has always been his preference. (May 17 at 9).

67.    Despite this fact, and despite the claim that First Health is so sensitive to honoring PDA's preferences, First Health, if you believe its interpretation of confidentiality provisions,  apparently attempted to prevent its employees from ever working for a successor operator of the PACE program. Ms. DiMarco states that "[a]ll employees sign an agreement that specifies that the confidential and proprietary information of the company be maintained as confidential." (May 15 at 45). First Health attempts to prevent its employees from continuing work on PACE in defiance of the known preferences of the Department.

68.    Susan Sampson, the supervisor of the Grants and Contracts and Contract Unit of PDA, confirmed that the questions and answers become "part and parcel" of the RFP. (Sampson at 64-65).

69.    Mr. Snedden testified that the questions and answers actually became part of the contract. (May 17 at 6).

70.    Ms. Sampson stated that if any bidders see a potential problem raised by the questions and answers they should make a written objection. (Sampson at 88-90). She also confirmed that First Health could have filed a bid protest if it was objecting to any of the questions and answers. (Sampson at 88-90).

71.     The failure to notify PDA that First Health objected to the hiring of its employees, and by never sharing the employment agreements with PDA, First Health allowed bidders to be instructed that they could propose hiring First Health employees when First Health knew it would challenge any successful bid that contained such a proposal. First Health did not timely object and did not timely file a protest that would have allowed all bidders to be advised as to any possible objections to the hiring of First Health employees. It is inappropriate and unfair to allow First Health to challenge a bid that contains terms that were approved by the PDA with the knowledge and without the objection of First Health.

72.     As to whether First Health correctly waited to protest the questions and answers when it knew it would object to any other bidder hiring its staff, Mr. Snedden stated: "I'm not saying that they should necessarily wait. What I'm saying is that they probably did not realize the implications of this until they became aware of a bid that was going to do exactly that. You know, I don't think anybody at First Health thought that they were going to lose the contract or lose the bid." (May 17 at 29).

73.     The fact that First Health was so confident that it believed it could not lose the bid, does not excuse it from its obligation to timely object and file a protest. A timely objection could have resolved or avoided any dispute over the hiring of First Health employees. Instead, First Health seeks to disrupt and void the entire bid process due to a situation it allowed to exist. NPA should not be penalized for suggesting the hiring of First Health employees, especially when the Department supported such hiring, just because First Health failed to note a timely objection.

74.     Mr. Snedden confirmed that there is a mechanism in place to raise the aforementioned issue at the "bidders conference." (May 17 at 31).  He also confirmed that there is a bid protest process available. (May 17 at 31).  First Health chose not to timely raise the issue using available mechanisms.

75.     Allegedly, Mr. Norton violated Section 9 of his employment agreement "by working with NPA to propose the First Health's entire staff lock, stock and barrel be recruited and taken over by NPA after potential award of the contract." (May 15 at 104).[18]  Ms. DiMarco claims that Norton is named as officer in charge and "he's listed as directly responsible for recruiting, hiring the staff" and that this is somehow solicitation by Norton. (May 15 at 104).  In actuality, NPA's proposal does not say Mr. Norton is responsible for recruiting and hiring but instead only says "NPA's officer in charge and the project director will arrange and schedule interview sessions." (May 17 at 379, P-17).

76.     The NPA proposal does not require the officer in charge to participate in the interviews or in the hiring decision.  Furthermore, Mr. Norton has not even arranged and scheduled any interview sessions.  (May 17 at 378).

77.     Mr. Norton has not solicited any First Health employees. (May 17 at 379).

78.     The NPA proposal provides that the Assistant Project Director, not the officer in charge, is to "recruit and hire management" and "recruit and hire supervisory staff," and other NPA managers, not the officer in charge, is to "recruit and hire operation staff."

---

[18]     The NPA proposal never states such a broad intention.  This is Ms. DiMarco's exaggerated interpretation.  NPA never assumed that all of the First Health employees would continue their work on the PACE program.  NPA's proposal stated: "NPA intends to hire the current contractor's Harrisburg based management, but has proposed fully qualified in-house staff in the event that some current managers leave the program." (May 18 at 445; D-11).  NPA also sated: "NPA has the appropriate contacts and personnel staff to supplement any vacancies in the operations staff for shortfalls in the incumbent staff if the incumbent staff elects not to join NPA." (May 18 at 445; D-11).  NPA also noted: "Those employees who choose not to remain under NPA management will be replaced through the recruiting, hiring and training efforts of our SERB qualified subcontracted employment agency."" (May 18 at 446; D-11).

(May 17 at 378-379). The recruiting section of NPA's proposal states: "NPA's project director begins the process of recruiting and hiring the incumbent key management staff...." (May 18 at 446; D-11). Also, "NPA's project director and assistant project director begins the process of recruiting and hiring the incumbent's supervisory staff...." (May 18 at 447; D-11). The project director is Peter Grieger, not David Norton. (May 18 at 447).[19]

79.    Ms. DiMarco claims that Mr. Norton suggested the hiring of First Health employees by NPA because "the October drafts do not propose this hiring of First Health personnel lock, stock and barrel." (May 15 at 142). She falsely claims: "In fact NPA's October draft proposal proposes that NPA's own staff be used and that they hire all new staff in the Harrisburg area." (May 15 at 142). To support this false claim, First Health's counsel asked Mr. Norton if the October draft contained "any reference to the takeover of First Health staff by NPA," but Mr. Norton was shown only a selected portion of the draft which did not contain such language. (May 17 at 388-389). As later pointed out by Defendants, another section of the same draft, shown to Mr. Norton in relation to this question, contains the following language:

> Notwithstanding an active recruiting and training effort, it is NPA's philosophy to encourage existing staff members to remain with the program. We believe that this policy will minimize the trauma and disruption of the personal lives of the people who are currently employed and will enhance the smooth transition to a new administrator.

(May 17 at 389-390; P-136). Consequently, NPA, contrary to Ms. DiMarco's assumption, did not state an intention to hire all new staff. Also, contrary to the claim of

---

[19]    Mr. Snedden noted that it was not essential for Mr. Norton to be involved in the recruitment and hiring of First Health employees for NPA's implementation of the PACE contract. (Snedden at 113-114, 148).

First Health, the 1995 NPA proposal included an identical reference to hiring First Health employees. The 1995 proposal stated:

> Notwithstanding an active recruiting and training effort, it is NPA's philosophy to encourage existing staff members to remain with the program.

(May 18 at 431). Consequently, it was not Mr. Norton who first suggested to NPA that it propose hiring First Health staff.

80.    Ms. DiMarco's unique theory of "indirect solicitation" of employees has no factual basis. She strangely claims that the "solicitation" occurred "[a]t the time Mr. Norton worked with NPA to write the proposal and to develop this approach, that is the time that that solicitation took place." (May 15 at 139). Apparently the "solicitation" took place even before First Health employees knew that Norton was proposed as officer in charge, and before NPA was even awarded the contract, even though no contact was made with First Health employees. Ms. DiMarco claims "solicitation" occurs even when those being solicited are unaware of the "solicitation".

81.    Ms. DiMarco falsely claims that "Mr. Norton solicited Mr. Robert Howells for employment by NPA." (May 15 at 104). She claims that "Mr. Howell's comment to me was that essentially Mr. Norton offered me [him] a job." (May 15 at 105). On cross-examination, however, she admitted that she did not even know whether it was Howells or Norton who brought up the subject of working for NPA. (May 15 at 158-159).

82.    Mr. Howells testified that he asked Mr. Norton if he was included in NPA's plan to "take on" First Health staff. (May 16 at 263). Norton told him "you have nothing to worry about." (May 16 at 263).

83.    Ms. DiMarco had no basis for claiming that Mr. Norton offered Mr. Howells a job.

84.     Mr. Howells noted that it would not be unusual for Mr. Norton to telephone him and have a personal conversation because they are friends.  (May 16 at 275).  Mr. Howells admitted that he was excited to receive a telephone call from Mr. Norton stating: "Yes, I'm always glad to hear from Mr. Norton."  (Howells at 41).  First Health inappropriately attempts to turn a telephone call between friends into a "solicitation" for employment.

85.     It is no surprise that Howells inquired as to employment because he thought he might be losing his job at First Health.  (May 16 at 275).  Mr. Howells stated that he did not tell Ms. DiMarco or anyone else that Mr. Norton had solicited him to come to work for NPA.  (May 16 at 277).

86.     At his deposition he stated that "I don't believe Mr. Norton was offering me a job."  (May 16 at 277).

87.     Mr. Howells initially "for a while" thought he had not been solicited, but after conversation with "people" he thought it was one of three possibilities:

    (1)  He would have no trouble finding a new job;

    (2)  He would be placed by First Health somewhere else; or

    (3)  He would be included with those First Health employees who would be considered by NPA.

(May 16 at 264-265, 277).  Consequently, Mr. Howells did not at first think there was any possibility he was solicited, but First Health convinced him it was one of several possibilities.

88.     Mr. Howells was certain that Mr. Norton did not ask him to solicit any First Health employees on behalf of Norton or on behalf of NPA.  (May 16 at 277).

89.     On redirect by First Health's counsel, Mr. Howells stated: "The only thing that was said to me was I didn't have anything to worry about, and I did not take that as a job offer." (May 16 at 284).

90.     Mr. Norton confirmed that he never solicited Mr. Howells to come to work for NPA and that it was Howells who raised the possibility of employment with NPA. (May 12 at 315; P-40). Mr. Norton definitively stated that he did not solicit Bob Howells to work for NPA. (May 24 at 551).

91.     The evidence demonstrates that Mr. Norton did not solicit Mr. Howells for employment.

92.     Mr. Norton explained why he did not carry with him Section 9 of his employment agreement. "Nine had to do with soliciting First Health employees, and as an independent consultant, I didn't feel that I would ever have a need to or ever be in a situation where that would be a requirement or need or whatever to hire any employees." (May 17 at 372). There was no intention to secret Section 9. (May 17 at 372). Any implication or claim that Mr. Norton hid Section 9 from prospective employers is inaccurate.[20]

93.     Mr. Howells does not believe that his employment agreement would prohibit him from working for NPA. (May 16 at 280-281; Howells at 56-57). This statement does not support First Health's claim that its employees cannot work for NPA.

94.     Ms. DiMarco admits that there is currently no other place in the Harrisburg area for First Health employees to work. (May 15 at 152). She claims that "it would be very difficult, if near impossible, for them to perform the same work or very similar work at

---

[20]     Mr. Snedden does not believe that the delay in Mr. Norton producing a copy of Section 9 should disqualify NPA or Mr. Norton from the bidding process. (Snedden at 117). This, however, is a matter to be addressed by the bid protest.

NPA as they do for First Health without violating the confidentiality restrictions in their employment agreement." (May 15 at 153). She states that it is "remotely possible" that First Health employees would not have to disclose confidential and proprietary information of First Health in working for NPA. (May 15 at 154).

95.    The employees of First Health should not be prohibited from accepting employment with NPA because Ms. DiMarco believes it would be difficult for them to honor their employment agreements.[21]

96.    Ms. DiMarco is not aware that these employment agreements with First Health employees were ever provided to the Department prior to the contract award in February of 2000. (May 15 at 156). However, prior to the recent bid award to NPA, Mr. Howells is not sure that First Health ever shared any employment agreements for PACE personnel with the PDA. (May 16 at 280). In fact, he does not believe these employment agreements were ever brought to the attention of PDA. (Howells at 56).

97.    Ms. DiMarco admits that Mr. Norton stopped having responsibility for the PACE program in late 1998. (May 15 at 123). In fact, Mr. Norton stopped performing work for First Health in June of 1999. (May 16 at 197-198). The June 7, 1999 letter from First Health to Mr. Norton advised him that he could accept other employment. Section 9 only applies to "a period of one year from the date of Employee's termination." (P-14). As a result, Mr. Norton is prospectively free to solicit First Health employees.

## NPA LETTERS SEEKING AMICABLE RESOLUTION

---

[21]    Although First Health claims that its employees cannot be hired by a successor, First Health admits, however, that it has hired the "front line staff" of the EPIC program in New York from the incumbent. (May 15 at 109-110).

16804-1                                69

98.     First Health refers to two letters authored by Alan Langjahr, General Counsel to

NPA, in an attempt to imply that Mr. Norton did not act appropriately.  (P-29, P-34).  Mr.

Norton confirmed that he never advised Mr. Langjahr or anyone else that he had

breached his employment agreement.  (May 17 at 379).

99.     Mr. Langjahr identified P-29 as a letter dated February 10, written by himself.

(May 24 at 525).  He identified P-24 as a second letter dated February 10th, signed by

Richard Ullman, written by himself.  (May 24 at 525).  Mr. Langjahr drafted P-29 and P-

34 in response to PDA's request for an explanation with respect to Mr. Norton's failure to

provide a complete employment agreement at the oral presentation and in response to a

letter from Susan Smith, general counsel for the parent company of First Health.  (May

24 at 525, 526).

100.    Referring to Ms. Smith's letter, Mr. Langjahr stated:  "In that particular letter she

had expressed some concerns about the confidentiality issues and stated in her letter that

Mr. Norton had been soliciting First Health employees in plural, and said that his most

recent contact in this regard had been with Mr. Bob Howells, the man who testified in

this proceeding."  (May 24 at 526).  Mr. Langjahr explained that Ms. Smith's factual

representation, as learned through discovery in this matter, was not accurate.  (May 24 at

527).  The only contact Mr. Norton had with any First Health employees was with Mr.

Howells.  (May 24 at 526, 527).  If Ms. Smith had accurately represented the facts, Mr.

Langjahr would have undoubtedly responded differently.

With respect to P-29, Mr. Langjahr explained why he wrote "NPA desires to resolve this

matter in an amicable fashion and believes that we will be able to satisfy any substantive

concerns that First Health Group Corp. may have."  (May 24 at 527).  First, PDA had

requested that NPA and First Health resolve any concerns amongst themselves. (May 24 at 527). Second, Mr. Langjahr wanted to respond to Smith in a conciliatory fashion without resorting to litigation. (May 24 at 527, 528).

101.    With respect to P-29 Langjahr explained why he wrote "Mr. Norton has advised us that he did not intend to breach the non-solicitation provision cited in your letter." (May 24 at 528). Mr. Langjahr explained that at that point in time he thought "simply to respond to the parent company's general counsel and say that there was no breach whatsoever would be regarded by First Health as inflammatory rather than conciliatory, and I simply wanted to address the point with them that there was no breach or that there was no intent to breach at that point in time." (May 24 at 528). Mr. Norton never told Mr. Langjahr that he breached his agreement. ". . . [W]hat he had said to me was really that his impression was that Bob Howells was trying to get a job." (May 24 at 528, 529).

102.    With respect to P-34, Mr. Langjahr explained why he wrote "Mr. Norton has assured us that he did not intend to violate Section 9 and was not aware of the provision until after our presentation on February 2 and the PDA's request at the meeting when he focused on his employment agreement." (May 24 at 529). Mr. Langjahr explained that he believed PDA's concern was Mr. Norton's failure to provide the entire employment agreement at orals and PDA was interested in learning the circumstances surrounding that. Mr. Norton had advised Mr. Langjahr that he had previously had some consulting work and the non-solicitation section had not been relevant due to the nature of that work. So while, he retyped other sections of his agreement to carry along with him, he did not have that particular section with him. (May 24 at 529, 530).

16804-1                                       71

103.    Mr. Langjahr testified that at the time he made the statement that Mr. Norton didn't disclose any confidential information, NPA could not identify any potentially confidential information of First Health that might have been used or disclosed in the proposal. "And . . . we haven't been able to do that since." (May 24 at 535 – 537).  He also pointed out that NPA is used to working with employees who may have restrictions on their use of confidential information, and in the case of Mr. Norton the senior management of NPA didn't believe that there would be a problem in terms of Mr. Norton being able to work on the proposal." (May 24 at 533).

104.    The attempt to use these conciliatory letters against NPA is not supported by the evidence.  These letters are no more than a reasonable attempt to reach an amicable resolution before litigation is filed.  These letters are not an admission that Mr. Norton violated any restrictive covenants in his employment agreement with First Health.

Respectfully Submitted,
Dilworth Paxson LLP

Thomas B. York
Christine D. Consiglio
Dilworth Paxson LLP
305 N Front Street, Suite 403
Harrisburg, PA  17101
(717) 236-4812

July 14, 2000

16804-1                                      72

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via electronic mail and overnight delivery this 14th day of July 2000 to:

Scott L. Vernick, Esq.
Jeffrey D. Hutton, Esq.
Fox, Rothschild, O'Brien & Frankel LLP
2000 Market Street, Tenth Floor
Philadelphia, PA  19103-3291
Svernick@frof.com

_Thomas B. York_
Thomas B. York

July 14, 2000

16815-1

## CERTIFICATE OF SERVICE

The Defendants have petitioned the Court to serve the foregoing on July 26, 2000. Unless directed otherwise by the Court, the foregoing will be served via electronic mail and via overnight mail on the 26th of July 2000 to:

> Scott L. Vernick, Esq.
> Jeffrey D. Hutton, Esq.
> Fox, Rothschild, O'Brien & Frankel LLP
> 2000 Market Street, Tenth Floor
> Philadelphia, PA  19103-3291
> svernick@frof.com

Thomas B. York

July 14, 2000

16245-1