● **ORIGINAL** ●

# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,    :
3200 Highland Avenue          :
Downers Grove, IL 60515-1282, :
                          :
     Plaintiff,          :    CIVIL ACTION NO.
                          :    1:00-CV-312
     v.                 :
                          :
NATIONAL PRESCRIPTION     :
ADMINISTRATORS, INC.,      :
711 Ridgedale Avenue       :
East Hanover, NJ 07936     :
                          :
     And              :
                          :
DAVID W. NORTON,        :
1220 Whitby Road          :
Richmond, VA 23277,       :
                          :
     Defendants       :
                          :

**FILED
HARRISBURG, PA**

**JUL 1 4 2000**

MARY E. D'ANDREA, CLERK
PER_____
DEPUTY CLERK

## DEFENDANTS' COUNTER-PROPOSAL FOR FINDINGS OF FACT

AND NOW, come the Defendants, by their attorneys, and respond to the following numbered paragraphs of the Proposed Findings Of Fact Of Plaintiff First Health Group Corp., with this counter-proposal for findings of fact[1]:

27.n.4. Although not a part of the record, the Plaintiff alleges that PDA has "extended the current PACE contract to December 31, 2000." Even if true, this matter requires a prompt ruling by the Court. NPA proposed approximately four months to

---

[1] The Defendants disagree with most of the "facts" stated by the Plaintiff. Defendants' Proposed Findings of Fact provide an accurate statement of the facts and the Defendants rely on that document to counter Plaintiff's proposed findings. There are, however, many facts alleged by the Plaintiff which mischaracterize the record or which are inaccurate, and the Defendants attempt to highlight those items in this document.

16806-1                        1

implement a takeover of the PACE program with the management of the program to commence at the end of that four month period. Under this schedule, NPA must begin the takeover process by August 31, 2000, to avoid an additional extension of the contract and further losses to NPA. Any delay in ruling on this matter is a de facto grant of a temporary restraining order against NPA because the PDA is awaiting the ruling by this Court to award the contract and to begin the transition to NPA.

46. Contrary to the Plaintiff's assertion that Mr. Norton "determined" FHSC's price for the 1995 RFP, the testimony actually states that Mr. Norton "assisted with the costing," "was involved as part of the team in setting the price," and "was part of the team that would recommend the price." (May 16 at 290-293). The Plaintiff inappropriately implies that Mr. Norton made the determination of price by himself, when a team of individuals worked on pricing.

67. The testimony of Ms. DiMarco that she offered Mr. Norton a job change that "retain[ed] responsibility for the contract to manage and administer the PACE Program" is contradicted by other testimony. Mr. Norton stated that "she had offered me a job within First Health to run the pharmacy system unit there, which was not associated with what I was running before.... Unlike her testimony though, I don't recall her ever asking me to take over the PACE unit.... That would have probably weighed on my decision what I would have done." (May 18 at 545-546). The Court finds Mr. Norton to be credible on this point and finds Mr. Norton's statements to be logically consistent with an imposed change in his position at First Health in that he would not maintain all his prior duties.

72.     The Plaintiff states that "Norton told Snedden that they would <u>not be able</u> <u>to speak for a period of time, until completion</u> of the 1999 PACE Re-procurement." (emphasis added).  Mr. Norton explained that what he meant was that "at some point after my severance or at some point where I would not be able to talk to him because of my employment agreement." (May 17 at 408).  Mr. Norton was anticipating the end of his severance period.  (May 17 at 408).

74.     With respect to Plaintiff's assertion that Norton requested to leave First Health's employment in or around June 1999, Mr. Norton explained: "so that was about now the <u>end of March</u>, and I really hadn't done anything for three months, and I knew it was time, that they weren't going to have any work for me, I knew it was time for me to separate myself from First Health.  And I called Ed Wristen and asked if we could work out some kind of arrangement so I could get out of my employment agreement." (May 18, 24 at 547).

77.     The October 28, 1999 date was when Mr. Norton's severance pay ended, not when his employment terminated.  This is further evidenced by the fact that Mr. Norton was advised: "If you are employed by another company prior to October 28, 1999, or serve in a consulting capacity, you are not specifically required to notify First Health...." (P-24).  Also, there is no proof of record that Mr. Norton performed any work for First Health after June of 1999.

78.     <u>See</u> para. 74 above.  Mr. Norton further explained: "I fired that up and put it into a report and sent it to him [Ed Wristen] before the end of the year in 1998.  From that point on I didn't hear from him." (May 18, 24 at 546-547).

16806-1                                    3

80.    The testimony does not support First Health's claim that "Consultec Incorporated... expressed to Norton its concern that Norton was not able to provide such consulting services [for a bid for the PACE contract] without violating the restrictive covenants in his Agreement with First Health." The actual testimony was that Consultec did not want to wait until October 28 to receive such consulting services. (May 17 at 363-364). The Court finds that First Health is falsely implying that Consultec would not approve the type of work that Mr. Norton performed for NPA. To the contrary, the Court finds that if Consultec had been willing or able to wait until October 28, it would have accepted Mr. Norton's consultation just as NPA accepted such consultation.

88.    Mr. Norton's comment that the 1999 RFP was more "winnable" than the 1995 RFP was not based on any confidential information. Mr. Norton explained, but First Health neglects to mention, that the "reason being there was no capitation requirement" in 1999, which "was a dreadful thing to try to swallow in terms of writing a proposal." Also, the 1999 RFP included the prices but the 1995 RFP did not. (May 18 at 566-567). The Court finds that First Health falsely implied that Mr. Norton used insider information to proclaim the 1999 RFP as more winnable. Instead, the Court finds that the more winnable opinion is based on matters that are clearly identified when comparing the 1995 and 1999 RFP's.

89.    During the November 17, 1999 interview of Mr. Norton by NPA, Mr. Norton did not reveal any confidential or proprietary information or trade secret information of First Health to NPA. In fact, Mr. Norton told NPA at the interview that he "would not divulge any confidential information related to anything that First Health had done." (May 17 at 368). The Court finds that there is no evidence that Mr. Norton

revealed or volunteered to reveal any confidential information of First Health at the interview.

90. As to whether or not Mr. Norton told NPA that he was intimately involved in preparing FHSC's 1995 bid proposal for the PACE Program, Mr. Norton stated that he didn't remember if he talked about that or not. He told them that he was "involved with the PACE operations as the PACE officer in charge." (May 18, 24 at 566).

92. Contrary to the assertion of First Health, Mr. Nicoletos never said that "Norton stated that he could provide NPA with insights, and an understanding of PDA's needs and requirements for the PACE Program that NPA could bot glean from the 1999 RFP." In fact, Mr. Nicoletos specifically stated: "I don't know that he used those words." Mr. Nicoletos only agreed that Mr. Norton "most definitely could add insights that we did not have." (May 18 at 499-501). There is no evidence that Mr. Norton said he could provide insights that could not be gleaned from the 1999 RFP. Those are the words of First Health's counsel that were never accepted by the witness. The Court rejects testimony by legal counsel.

93. First Health's counsel again attempts to testify in place of Mr. Nicoletos when he claims that "NPA assumed that Norton... could provide information about the PACE Program that NPA did not already possess from the 1999 RFP, FHSC's 1995 bid proposal... and the current PACE contract." Mr. Nicoletos specifically stated: "I don't know that he [Norton] said that explicitly." Mr. Nicoletos merely acknowledged that he "assumed that he could certainly add something we did not know." (May 18 at 501-502). The Court finds that this vague reference to adding something does not demonstrate the addition of confidential information from First Health.

128.    The Plaintiff incorrectly claims that the "October 1999 draft bid proposal" does not indicate "NPA's intention to recruit and hire FHSC's entire current PACE staff." (See Defendants' Proposed Findings of Fact, hereinafter referred to as "Defendants' Findings," at para. 79).

130.    The Plaintiff falsely alleges that "NPA's bid proposal calls for Norton…to be intimately involved in the recruiting and hiring of FHSC's current PACE staff." Plaintiff's citations do not support this claim. Norton testified that he did not remember if he was "to participate in the interviewing and recruiting." (May 16 at 311-313). The remaining citations by Plaintiff do not state that Norton will be intimately involved. In fact, the NPA 1999 bid proposal assigns hiring and recruiting to other individuals than the officer-in-charge. ( See Defendants' Findings at paras.78).

131.    There is no evidence of record, and Plaintiff does not cite to any such evidence, that "Norton recommended to NPA that NPA propose…the recruitment and hiring of FHSC's entire current PACE staff." To the contrary, the evidence shows that NPA proposed hiring First Health's staff as early as 1995, long before Mr. Norton came to NPA. (See Defendants' Findings at paras. 79).

133.    Mr. Snedden did not state that "PDA did not contemplate or approve of a bidder proposing the takeover of key managerial staff." First Health's counsel never asked this question of Mr. Snedden or any other representative of the PDA. The Court rejects the self-serving statement of Ms. DiMarco as to what she assumed the PDA contemplated or approved.

136.    There is no sound basis to "find as a fact" that "FHSC was not in a position to file a letter or other document that objected or protested PDA's statement that

it would react "affirmatively" to another bidder proposing to hire FHSC's current PACE staff, unless and until FHSC knew the full scope of such proposal in the actual bid submitted." Mr. Snedden only stated: "I would tend to agree with you, yes." (May 17 at 21). Mr. Snedden does not state it to be a fact. Since First Health knew it would object no matter what the scope, whether just one or all of their staff were proposed, there was no need to wait. Mr. Snedden actually later explained that the delay in objecting was probably only due to the fact that First Health thought it was going to win the bid. (See Defendants' Findings at paras. 72-73). Claiming you must wait to see if you won the contract is not only unfair but defeats the purpose of the protest procedure. Also, this alleged fact is disputed by Ms. Sampson. (See Defendants' Findings at para. 70).

140.    There is no testimony that "Norton provided Nicoletos with considerable assistance in preparing NPA's 1999 cost proposal." That is merely First Health's subjective characterization of the assistance provided by Norton. "Mechanically" preparing the spreadsheets and inserting numbers is not "considerable" assistance if that term is meant to imply that Norton was in any manner instrumental in reaching NPA's final bid price. (See May 18 at 510).

141.    The Plaintiff's citation to the record does not support the statement that Nicoletos "does not know what information Norton used in preparing NPA's 1999 cost proposal." (May 18 at 512).

145.    Any cost numbers provided by Norton were characterized as "preliminary" (May 18 at 506-507). Mr. Nicoletos did not rely on Mr. Norton's numbers for professional staff and travel costs. (May 18 at 507). Mr. Nicoletos modified the salaries suggested by Mr. Norton. (May 18 at 507) Mr. Norton did not suggest turnover

costs. (May 18 at 509). Mr. Norton's numbers for direct labor costs were modified by NPA. (May 18 at 509). Some of Mr. Norton's spreadsheet numbers were supplied by NPA. (May 18 at 509-510). Consequently, Plaintiff's proposed finding is an overstatement.

146.    The citations to the record <u>do not</u> support a claim that "Norton discussed with Zimmerman whether NPA's price for each year of the PACE contract should be between eight and eight-and-a-half million dollars, and approved the ultimate price." Mr. Norton never "approved" the ultimate price but rather, when presented with the final bid price, he merely commented that "that was a good price." (May 16 at 302-303). Also, the only mention of eight or eight-and-a-half million resulted in Mr. Norton saying: "I don't know if I mentioned any figures specifically" and "I don't remember that conversation." (May 18 at 568-569.) First Health's characterization assumes far too much from the testimony.

147.    First Health misrepresents the record when it claims "Nicoletos did not modify the cost figures that Norton provided for use of professional staff and travel costs." The testimony cited from Norton actually says he "initiated" or "started" those costs, clearly implying that there was later alteration. (May 16 at 302). The testimony cited for Nicoletos specifically states: "I made changes to them" and "I did modify the salaries." (May 18, 24 at 507-508).

159-160. First Health takes a December 8 memorandum from Mr. Hofheimer, a person not involved in the pricing decision at NPA and who "didn't know what price we [NPA] were submitting," that refers to how he would "still like to see our price come in 10% under the current price," and assumes that NPA did not yet have a pricing strategy

and had not yet "developed a price that was ten percent (10%) less than First Health's current price. (See May 18 at 516). Mr. Nicoletos confirmed that he never discussed price with Mr. Hofheimer. (May 18 at 516). It is a fantastic assumption by First Health that NPA did not have a price computed just a day before its bid had to be sent out to meet the December 10 deadline and there is no evidence to support this claim. In fact, this assumption is contrary to credible testimony as to how NPA's price was actually computed. (See Defendants' Findings at paras. 28-29). The Court refuses to accept First Health's assumption that the price proposed by NPA was computed just a day or two before submission.

163.   The Plaintiff does not provide a citation for the allegation that the average yearly price bid by First Health in 1999 "equals $9,502,565.00." The Court should not accept this number without explanation as to how it was calculated. $47,458,112 divided by five years results in $9,491,622.40, not $9,502,565.

164.   There is no testimony to support that the annual growth rate of First Health's price through the five years is approximately 2.246%. The Plaintiff has not described how this calculation was performed so the claimed number should be rejected. Also, there is absolutely no evidence cited that First Health had a prior "low ball" price. In fact, the contract extensions for the last few years were not competitively bid and may not have been a "low ball" price.

165.   There is no basis in the record, except assumptions by Ms. DiMarco or others, that Norton disclosed or that NPA used FHSC's current profit margin on the PACE Contract.

166.    There is no basis in the record, other than assumption by First Health, "that NPA could not bid a competitively lower price than First Health…without Norton having disclosed and used First Health's…confidential and proprietary costing and pricing strategies, and margins."

167.    Mr. Norton testified that he had "[n]o idea" what First Health was going to bid in 1999.  (May 17 at 371).

170.    First Health claims, without clearly identifying, that it has "certain costing, pricing, marketing, management and other bidding strategies all of which are proprietary to and owned by First Health."  The items it vaguely identifies are as innocuous as:

a. thoroughly understanding the RFP (May 15 at 34-35)
b. interviewing prospective clients to understand their needs and requirements (May 15 at 34-35, 44-45)
c. emphasizing the combination and integration of clinical skills (May 15 at 35)
d. emphasizing business and financial management skills (May 15 at 35)
e. emphasizing systems and operations skills (May 15 at 35)
f. proposing enhancements (May 15 at 50)
    (1) internet, web-based system for "improved communications between all the participants" (May 15 at 50)
    (2) expand drug utilization review (May 15 at 50-51)
    (3) expand third-party liability (May 15 at 51)

None of these items are unique to First Health and all of them would be generally known to business persons, especially in the prescription reimbursement industry.  It is common sense that anyone intending to bid on an RFP would try to "thoroughly understand" it. Similarly, any good business person would try to understand the needs and requirements of its clients.  Emphasizing clinical skills is not proprietary to First Health and the evidence shows that NPA has emphasized clinical skills before Mr. Norton provided

consultation.  (Defendants' Findings at paras. 25 (h) (1) – (3) ).  Emphasizing business and financial skills, or emphasizing systems and operations, is not the sole province of First Health.  Proposing enhancements is just good business practice and the concept is not a monopoly of First Health.  Certainly, First Health is not the first company to consider using the internet to improve communication.  "Drug utilization review" is a concept familiar to the prescription reimbursement industry and was already known to NPA before Mr. Norton's involvement.  (Defendants' Findings at paras. 27 (e) (1)-(8).  There was no testimony as to why "third party liability" was a concept owned by First Health to the exclusion of all other prescription reimbursement companies (and insurance companies).  The Court finds that First Health did not identify or explain any "strategies" with enough specificity to demonstrate any proprietary right in those "strategies" or that NPA had in any manner improperly used these "strategies" in violation of any alleged proprietary rights.

171.   First Health may "consider" certain "strategies" to confidential and proprietary, but the evidence does not support this belief.  (See Defendants' Findings).

172.   The Plaintiff has failed to specifically identify any "unique methods and processes" to "tie" together the PACE Program or that "reflect the proprietary 'stamp'" of First Health.  Mr. Snedden was not aware of any ties or unique stamps owned by First Health and not by PDA that were used by NPA in preparing NPA's bid proposal.  (May 17 at 28).  Ms. DiMarco was unable to describe these "ties" or "unique stamps" with any specificity.  (May 15 at 103-104; May 16 at 203-205).  The Court finds that the record does not establish any "ties" or "unique stamps" that were owned solely by First Health.

16806-1                                   11

173.    The evidence does not support a finding that any of the listed items are "unique" or "confidential and proprietary" to First Health. (See Defendants' Findings).  A few additional points should be covered:

e.    The only citation to the record to support the claim regarding "FHSC's emphasis on evaluating results... of its surveillance utilization review system (SURS)" is the testimony of Mr. Norton.  Mr. Norton only stated in response to questions by Scott Vernick, Esquire, that he did not know if "NPA's approach to surveillance utilization review relies heavily on the production of batch reports" and he did not know whether "NPA's approach to surveillance utilization review... is a much stronger focus on the development of clinically sound criteria." (May 16 at 346-348).  The Plaintiff takes a tremendous leap to claim that this means that SURS is confidential and proprietary to First Health.  The Court rejects any such leap by the Plaintiff as a distortion of the record.

f.    First Health cites the testimony of Mr. Norton to support its claim that disaster recovery planning is somehow confidential and proprietary to First Health.  Mr. Norton merely testified that the 1999 proposal significantly expanded the section on disaster recovery, that he was responsible for "disaster recovery testing" at First Health and that he learned the "common sense" desire of PDA to have disaster recovery methods tested on a regular basis while at First Health. (May 16 at 337-339).  There is no testimony, from Norton or anyone else, that disaster recovery planning is confidential and proprietary to First Health.  The Court finds that the Plaintiff has not met its burden in establishing that disaster recovery is confidential and proprietary to First Health.

g.    Similarly, the testimony of Mr. Norton cited by First Health does not support a claim that "FHSC's division of... the manufacturers' rebate program between FHSC's business/financial and clinical utilization review departments" is confidential and proprietary to First Health.  (May 16 at 345-346). Mr. Norton did not state that this item was confidential and proprietary to First Health. The Court finds that the Plaintiff has not met its burden on this point.  Also, Mr. Norton stated that the division between departments just "made sense." (May 16 at 346). Mr. Norton stated that "it made sense to split out the fiscal practices with someone that knows accounting and those people that deal with the manufacturers to deal with the dispute resolution part which would make sense to me." (May 17 at 393).  First Health, despite its claims, does not own Mr. Norton's logic and good business judgement.   First Health ignores the fact that Mr. Norton specifically stated he did not use any confidential or proprietary information of First Health to make the split between departments. (May 17 at 393).

i.    There is no evidence that First Health has a proprietary right to "meeting with PDA to determine new initiatives."  The cited testimony of Ms. DiMarco

does not discuss such meetings. (May 15 at 80-81). The cited testimony of Mr. Norton only confirms that NPA suggested meeting with PDA to develop "initiatives." (May 16 at 343-344). There is no testimony that this is confidential and proprietary to First Health. The cited testimony of Mr. Grieger merely confirms that such a reference to meeting with PDA does not appear in the "October draft" of the NPA proposal. (May 18 at 469-470). The Court finds that First Health has not established that this item is confidential and proprietary to First Health.

j.      Ms. DiMarco did not discuss continuing education credits in her testimony so Plaintiff's citation to the record for this point is inappropriate. (May 15 at 91-92). Mr. Grieger only testified that the idea of continuing education credits for pharmacists originated with Mr. Norton. (May 18 at 470). <u>The Court finds that there is absolutely no evidence that this idea was confidential or proprietary to First Health.</u> The Court does not condone factual allegations that have no basis in the record.

k.      Similarly, Mr. Grieger only testified that the "October draft" did not refer to establishing training sights <u>at a hotel</u>, but the 1999 NPA proposal did so refer. (May 18 at 470-471). The Court finds it to be a gross exaggeration to claim this limited testimony means that First Health had a confidential and proprietary interest in "initiating contacts with hotels and Commonwealth agencies to arrange for convenient meeting places for provider training."

174.    The cited testimony does <u>not</u> state that all the items listed in paragraphs 171 and 173 are not "readily discernible from a review of any publicly available documents." Several of these items are not mentioned by Ms. DiMarco as being publicly unavailable. (For example, <u>see</u> paragraph 173 above). Furthermore, the few items that were self-servingly testified to by Ms. DiMarco as being unavailable publicly have been shown to be publicly available. (<u>See</u> Defendants' Findings).

176. d.  Mr. Snedden did not testify that Mr. Norton knew of any alleged PDA preference to use the same switch vendors. (Snedden at 86-87).

e.  Mr. Snedden did not testify that Mr. Norton knew of any alleged PDA preference to have weekly status reports on-line (May 17 at 31-32).

177.    The evidence of record does not support a finding that all the items in paragraph 176 are confidential and proprietary. (<u>See</u> Defendants' Findings). The

citations to the record by the Plaintiff do not state that each of these items are confidential and proprietary to First Health.  (P-14; May 17 at 101-102, 104).

192.    To say that Snedden found the use of Paragon to be "comforting" is an overstatement.  When asked if the fact NPA had contracted Paragon had any impact on him, he responded:

> No, not really.  My sense was that they [NPA] had some working relationship with Paragon anyway.  There was... the fact that they [NPA] had contracted them [Paragon]... to insure that they could maintain the existing system.  I guess, if anything, made me a little more comfortable. ...it's not a paramount importance, because it's an ancillary system.... It's kind of like overnight delivery and electronic mail.  We can do without it, but it's really great to have it.

(Snedden at 82-83).  The Court finds that Mr. Snedden did not place much significance on NPA's reference to Paragon.  The Court also finds that First Health does not have proprietary right to Paragon the same as it has no proprietary right to overnight delivery or electronic mail.

193.    The Plaintiff does not cite to any testimony or exhibit that supports its claim that Mr. Norton "disclosed" to NPA that First Health uses Paragon as the hardware and software integrator, and maintenance vendor, for the PACE Program's imaging system.  The use of the word "disclosed" inappropriately implies release of confidential information of First Health.  The record demonstrates that the Paragon information did not come from First Health, was available to the public, and was not confidential to First Health.  (Defendants' Findings at para.25(a)).

199.    There is no citation to the record that Mr. Norton "disclosed" the use of Kodak except for Ms. DiMarco's self-serving assumption.  (May 17 at 86-87).  Also, there is no evidence, other than Ms. DiMarco's self-serving statement, that the use of

Kodak is confidential information to First Health. Ms. DiMarco does not identify any economic value to the use of the name of Kodak and does not establish that First Health has a proprietary right to refer to Kodak.

203.   There is no basis in the record to conclude that Mr. Norton "disclosed" that First Health "successfully bid a takeover cost of approximately $700,000" in the EPIC Program. The Court finds that the takeover costs between NPA's bid and the EPIC bid are so dissimilar as to not support such an assumption. (See Defendants' Findings at para. 25 (b)).

209.   There is no citation to the record to support the claim that Mr. Norton "disclosed" First Health's pricing strategy of bidding zero dollars for turnover. The only testimony is that NPA's turnover number was discussed with Mr. Norton and that Mr. Norton did not decide independently "to put in the number 0 for NPA's turnover number." (May 18 at 509). Ms. DiMarco merely assumed that Mr. Norton revealed the zero pricing for turnover by First Health. The Court finds that the bidding of zero price for turnover was publicly revealed in First Health's 1995 proposal. (See Defendants' Findings at para.26 (b)).

213.   There is no evidence of record that Mr. Norton "disclosed" to NPA any information pertaining to FHSC's salary structure for its PACE staff." Instead, there is only Ms. DiMarco's assumption that there was such a disclosure simply because Norton allegedly knew the salary structure and NPA said that its salaries "are equivalent, if not higher." The Defendants have explained how they made this statement without using confidential information of First Health. (Defendants' Findings at para. 25 (c)). The Court rejects Plaintiff's unfounded assumption on this point.

215.    At the hearing, the Plaintiff's counsel misrepresented that the October drafts did not refer to NPA hiring First Health staff. (Defendants' Findings at _____ ). Despite the evidence exposing the misrepresentation, the Plaintiff continues to falsely allege that the October 1999 drafts did not refer to hiring FHSC's staff. Also, as the testimony demonstrates, the final NPA proposal did not, as claimed by Plaintiff, propose hiring FHSC's "entire staff," but rather referred to "most" of First Health's staff. (May 16 at 332-335).

216.    The Plaintiff incorrectly cites to the testimony of Mr. Grieger to support a claim that "NPA did not proposed to takeover (sic) First Health's PACE staff, or any specific recruiting and hiring strategy with respect to that staff." Mr. Grieger did not say that the 1995 bid proposal was not proposing to take over most of First Health's staff. (May 18 at 430-431). In fact, the language implies such a proposal. (May 18 at 431). Mr. Grieger only testified that hiring incentives were not used in 1995, not that there was no specific recruiting or hiring strategy. (May 18 at 467). The Plaintiff again overstates the facts.

217.    The testimony is that hiring incentives were "discussed as a group" and Mr. Norton "may have" "brought that [it was a good selling point] up." (May 18 at 464).

219.    Mr. Norton testified that he did not know if he wrote incentives for the New Mexico proposal. He stated: "I just haven't seen it, and it's [an] area I wouldn't write and don't remember even having that incentive in that proposal." (May 18, 24 at 557).

221.   The Court finds that "hiring incentives" are not confidential and proprietary information of First Health and that, therefore, there was nothing to be "disclosed" by Mr. Norton. (Defendants Findings at paras. 25(c)(11)-(17).

228.   The names of commonly used and generally known switch vendors is not confidential to First Health and, therefore, there was nothing to be "disclosed" by Mr. Norton. (Defendants' Findings at para.25 (d)).

234.   The use of PC-SAS is not confidential to First Health and, therefore, there is nothing to be "disclosed" by Norton. (Defendants' Findings at para.25 (e)).

235-238.   The testimony cited by the Plaintiff does not say the "FHSC… focuses on evaluation of SURS analysis results and takes actions that are responsive to those results, as opposed to simply generating batch reports based on pre-set criteria." The cited pages only have Mr. Norton acknowledging that First Health, along with NPA prior to Mr. Norton's involvement, "focus[es] in the first instance on developing clinically sound criteria for performing the utilization review." (May 17 at 358-359). The Court finds that the Plaintiff takes too much liberty in adding to the testimony of this witness. There is no evidence of record as to exactly what First Health does or does not do, and there is not evidence that the focus of any SURS analysis is confidential or proprietary to First Health. There is no evidence that FHSC even had an "emphasis on the evaluation of SURS analysis results and taking actions that are responsive to those results" or did not generate "reports based on pre-set criteria." Plaintiff's counsel is improperly attempting to testify himself as to these alleged facts. The Court finds that there is no demonstration of a confidential right to "emphasizing the evaluation of SURS analysis results and taking actions that are responsive."

16806-1                                    17

241.    The Court rejects the assumption by Plaintiff that Mr. Norton "disclosed" any "information pertaining to First Health's extensive disaster recovery and back-up plan." There is no significant evidence that such a disclosure was made by Mr. Norton and there is no evidence that such a plan is confidential or proprietary to First Health. Also, the evidence supports a finding that the disaster recovery proposed by NPA did not originate from Mr. Norton. (See Defendants' Findings at para.27 (b)).

246.    There is no testimony or other evidence that the division of "the functions that support the administration of the manufacturers' rebate program" is confidential and proprietary to First Health. As stated above, the division of functions is a sound business decision which is not the sole province of First Health.

252.    The Plaintiff again overstates the testimony by selectively mentioning that Mr. Snedden thought it was a "plus" to prepare on-line status reports. Mr. Snedden also stated: "It's not of any consequence." The exact quote is as follows: "Anything that achieves that is a plus, but I wouldn't say that this is of paramount importance." (Snedden at 87-88). Also, he stated: "[I]t's nice, but it's of relative inconsequence." (May 18 at 88). Stating that Snedden found on-line reporting a "plus," without more, dos not adequately reflect his opinion.

253.    The Court finds that on-line status reporting is not confidential and proprietary to First Health and, therefore, there was nothing to be "disclosed" by Mr. Norton. (See Defendants' Findings at para.25(g)).

254.    The Plaintiff fails to cite to any evidence of record to support the claim that NPA's description of an imaging system is First Health's existing imaging system. As a result, the Court cannot find that NPA described "in detail" the existing First Health

system. Descriptions and flowcharts were provided with the RFP as attachments C and Q.

258-259. Although a description of the current imaging system may not have been in First Health's 1995 proposal, there is no claim by Plaintiff that the RFP and information in the Procurement Library did not contain such a description. The Court finds that NPA's reference to and description of an imaging system in the takeover plan is not confidential and proprietary to First Health. (See Defendants' Findings at paras. 25 (k)).

263. The Plaintiff blatantly misrepresents the record when it claims "Norton recommended to NPA... that it meet with PDA to determine new initiatives," The testimony states that Mr. Norton did not originate that idea. (May 18 at 468-469).

264. Since the only testimony is that Norton did not originate that idea, there is not evidence to support a finding that Mr. Norton disclosed meetings with PDA on new initiatives.

268. With respect to Mr. Norton "knew that PDA preferred that the primary contractor rather than a SERB subcontractor, perform the function of provider training," Mr. Norton testified:

> A.    I may have known it then. I haven't known that for a while.
>           * * *
> A.    I don't know what time, but it's, no, I didn't know.
>           * * *
> A.    I may have known it. I don't remember ever hearing it.

(May 16 at 339-340).

269.   The Court finds that any preference of PDA that a subcontractor not be used for provider training was not confidential and proprietary to First Health. (See Defendants' Findings at para. 25 (l)-(m)).

273.   The Court finds that any preference that a project director attend provider training sessions was not confidential and proprietary to First Health. (See Defendants' Findings at paras. 25(l)-(m)).

274.   As previously stated, there is no evidence or testimony supporting a finding that working to give continuing education credits to pharmacists is confidential and proprietary to First Health. The cited testimony does not even say that this is "FHSC's concept and approach." (May 18 at 476). Plaintiff's counsel is inappropriately supplementing the record with facts he would propose.

277.   The evidence is insufficient to find that continuing education credits for pharmacists is confidential and proprietary to First Health. Only the opinion of First Health's counsel supports this claim by First Health's counsel.

278-280.   Similarly, there is no testimony or evidence of record to demonstrate that it is "First Health's concept and approach" to contact hotels and Commonwealth agencies to arrange convenient meeting places for provider training sessions. No one testified that it is First Health's "concept and approach" or that it is confidential and proprietary to First Health. Mr. Grieger merely testified that the October NPA draft did not refer to contacting hotels. (May 18 at 470-471). The Plaintiff's counsel is essentially attempting to add testimony that is his own testimony. The Court finds there is no basis to the claim that contacting hotels to arrange convenient meeting places is confidential and proprietary to First Health.

16806-1                                  20

285.    The Court finds that integrating imaging documentation and procedures into the cardholder services procedure manual is not confidential and proprietary to First Health. (See Defendants' Findings at paras. 25 (p)).

293.    The Court rejects the assumption by First Health that Mr. Norton "disclosed" that "some providers elect to receive their remittance advices via electronic media." There is no evidence to support this claim. The fact that some providers elect electronic remittance advices is not confidential and proprietary to First Health. (See Defendants' Findings at paras. 25(r)).

295.    Mr. Grieger testified that the fact that software and processes for weekly remittance advices are in the provider relations unit is not "specifically" publicly available, "but it can be inferred ... that the software and processes would be in the provider relations unit." (May 18 at 473).

297.    The Court finds that the location of software and processes for weekly remittance advances in the provider relations unit is not confidential and proprietary to First Health. (Defendants' Findings at paras.25(s)).

301.    The Plaintiff inappropriately cites to the testimony of Mr. Norton to support a claim that Norton knew First Health's labor overhead rate. Mr. Norton did not testify that he knew First Health's labor overhead. (May 24 at 561-562).

304.    Any direct labor cost numbers provided initially by Mr. Norton were modified by Mr. Nicoletos. (May 24 at 509).

305.    There is no evidence of record to demonstrate that Mr. Norton disclosed "FHSC's labor overhead costs." (See Defendants' Findings at paras.26(a)).

306-307.  The Plaintiff has not established any basis to question the credibility of Mr. Norton or Mr. Grieger.

310.    There is no evidence of record to demonstrate that Mr. Norton will inevitably disclose any confidential or proprietary information of First Health.

312.    There is no evidence of record to demonstrate that First Health's current employees will inevitably disclose any confidential or proprietary information of First Health if they later work for NPA.  It should be noted that First Health did not call as witnesses any of its employees, except Mr. Howells, to establish that confidential information would be inevitably disclosed if they continued their positions at PACE under NPA.  Even Mr. Howells testified that his employment agreement does not prohibit him from working for NPA.  (May 16 at 280-281; Howells at 56-57).  Although called by the Plaintiff, Mr. Howells never stated that First Health employees would inevitably disclose confidential information if employed by NPA in the PACE program.

321.    Mr. Snedden did agree that Mr. Norton greatly advantaged NPA, but he made clear that "that's my personal assumption."  (May 17 at 25) (emphasis added).  Mr. Snedden has no proof that NPA was "greatly advantaged" or that, even if advantaged, there was any use of First Health's confidential or proprietary information.

324.    Mr. Snedden stated that any sharing by Mr. Norton of profit margins was "speculation maybe on my part."  (Snedden at 174).  In fact, at trial, Mr. Snedden admitted he had no evidence that Mr. Norton shared any of First Health's margins.  (Defendants' Findings at para. 29 (q)-(r)).

325.    See paragraph 321 above.

326.   Mr. Norton only agreed that his contribution to the NPA 1999 bid proposal was a significant augmentation "certainly in terms of the writing effort." (May 24 at 569). He did not agree that he significantly augmented the content of the proposal.

331.   The cited testimony does not support the claim that the "document bolded and highlighted only the language to which Norton wanted attention paid." (Snedden at 94-95). The evidence shows that Mr. Norton did not hide or secret any portion of his employment agreement. (See Defendants' Findings at para. 92).

333.   Even though Mr. Snedden had a concern about Norton's employment agreement, he stated:

> After we received this copy of Exhibit 28, my recollection is that consensus was that it should not be a problem, a problem that would make us not reach a determination, or a problem that would force us to reevaluate the probability that Mr. Norton would be able to come on board with NPA as officer in charge.

(Snedden at 105-106). Contrary to Plaintiff's claim, the cited testimony does not express concern about Meissel or First Health's staff.

344.   The evidence of record does not support a finding of irreparable harm. Although Ms. DiMarco claims irreparable harm, her claims are based on mere assumptions.

Respectfully Submitted,

*Thomas B. York*

Thomas B . York
Christine D. Consiglio
Dilworth Paxson LLP
305 N. Front Street, Suite 403
Harrisburg, PA  17101
(717) 236-4812

July 14, 2000

16806-1                                   23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via electronic mail and overnight delivery this 14th day of July 2000 to:

Scott L. Vernick, Esq.
Jeffrey D. Hutton, Esq.
Fox, Rothschild, O'Brien & Frankel LLP
2000 Market Street, Tenth Floor
Philadelphia, PA 19103-3291
Svernick@frof.com

Thomas B. York

July 14, 2000

16815-1