ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NO.    1:00-CV-312

---

FIRST HEALTH GROUP CORP.,

Plaintiff,

v.

NATIONAL PRESCRIPTION ADMINISTRATORS, INC.
and DAVID W. NORTON,

Defendants.

---

**FILED**
HARRISBURG, P

JUL 2 5 2000

MARY E. D'ANDREA, C
PER _____ DEPUTY CLERK

---

PRELIMINARY INJUNCTION HEARING

MEMORANDUM OF LAW OF PLAINTIFF
FIRST HEALTH GROUP CORP. IN REPLY
TO DEFENDANTS' REVISED BRIEF

---

Scott L. Vernick, Esquire
Jeffrey D. Hutton, Esquire
FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103-3291
(215) 299-2000

Attorneys for Plaintiff
FIRST HEALTH GROUP CORP.

## TABLE OF CONTENTS

I.    INTRODUCTION………………………………………..………………………1

II.   ARGUMENT………………………………………………………..…….…..…1

    A.    The Public Interest Will Be Served If The Court
        Grants Injunctive Relief………………………..…..…………..……………...1

    B.    The Attempt By NPA And Norton To Justify Their Use Of First Health's
        Confidential And Proprietary Business Information Is Not Credible…..………….….2

    C.    NPA And Norton's Position Crumbles Under A Test Of Logic…………….…….…5

    D.    The Cases Cited By NPA And Norton Do Not Support
        Their Defenses……………………………………………………….. 7

    E.    The PACE Bid Process Does Not Extinguish First Health's Right To
        Confidential And Proprietary Business Information…………………..…………...9

    F.    First Health Does Not Seek To Convert Norton's Confidentiality Restriction
        Into A Covenant Not To Compete…………………….……………… 11

    G.    NPA Cannot Minimize The Ramifications Of Its Attempt To
        Hire First Health's Entire Harrisburg Staff…………….…………………….....11

    H.    Norton Violates The Agreement's Customer And Employee
        Non-Solicitation Restrictions………………….……………………….………13

    I.    NPA Tortiously Interferes With Norton's Agreement,
        And NPA And Norton Intentionally Interfere With First Health's
        Prospective Contract With PDA…………………….……………..…...14

    J.    PDA Is Not An Indispensable Party………………………………….…….15

III.   CONCLUSION………………………………………………………….…15

## I.    INTRODUCTION

Plaintiff, First Health Group Corp. ("First Health"), by and through its attorneys, Fox, Rothschild,

O'Brien & Frankel, LLP, files this memorandum in reply to the revised brief of defendants, National

Prescription Administrators, Inc. ("NPA") and David W. Norton ("Norton").[1]

## II.    ARGUMENT

### A.    The Public Interest Will Be Served If The Court Grants Injunctive Relief

First Health's claims against NPA and Norton seek to restore to the public contracting process a

fundamental commercial principle that NPA and Norton believe does not apply to them -- the principle of good

faith and fair competition.  Here, NPA and Norton did not serve the public interest, and the public interest will

continue not to be met.[2]  The bid process was tainted because NPA and Norton disclosed and/or used First

Health's trade secrets.  NPA did not offer PDA its best ideas and services.  NPA offered First Health's best

ideas, unique processes and services, and skilled employees.  In addition, NPA is not the most competent and

qualified bidder.  If NPA was, it would not have needed Norton, First Health's Harrisburg employees and First

Health's trade secrets for NPA's 1999 bid proposal.

Norton's preparation of NPA's 1999 bid proposal for the PACE Contract resulted in a bid proposal that

contains a veneer of credibility created by Norton's unlawful disclosure and use of First Health's confidential

and proprietary business information.  NPA's bid proposal "sells" Norton, First Health's Harrisburg staff and

First Health's operations for the PACE Program – not NPA, its management, new strategies or ideas.  The draft

bid proposal, that Norton reviewed after he was retained by NPA, required Norton to devote one hundred and

---

[1] First Health incorporates by reference its memorandum of law in support of motion for temporary restraining order and preliminary injunction, memorandum of law in support of motion for injunctive relief, proposed findings of fact, and counter-proposal for findings of fact.  As a result, in this reply memorandum, First Health discusses those factual inaccuracies and flawed arguments set forth in defendants' revised brief that are not already addressed in First Health's previous submissions.

[2] The public has a every interest in providing equitable remedies to companies doing business in the Pennsylvania who suffer the unlawful misappropriation of their trade secrets and the violation of their employment agreements.  Absent such remedies, the best businesses in a variety of market sectors will not participate in the bidding process for contracts involving public entitlement programs such as PACE, which serve to benefit the citizens of Pennsylvania.  In addition, a bidding process that is free from unfair competition ensures that the Commonwealth receives the best ideas, processes and services that each individual bidder has to offer, and ensures that the most competent and qualified bidders are awarded the Commonwealth's business.

seventy-seven (177) hours over the three week period before bid proposals were due to PDA – for the purpose

of revising and re-vamping NPA's bid proposal so that it would sound as if NPA knew the "ins and outs" of the

PACE Program, and would foster within PDA a certain confidence that NPA could manage the program as

efficiently as First Health.  Despite the proposed presence of Norton and First Health's entire Harrisburg staff,

the risk to PDA, PACE cardholders and providers, the elderly population of Pennsylvania, and the PACE

Program, is that NPA's inexperience in managing government-funded pharmacy benefit programs for the

elderly will be exposed.  NPA's infrastructure (for example, its systems, data center, standard operating

procedures) will have to meet the task of supporting the PACE operations.  NPA's potential inability to meet

this task will disrupt the program and those it serves to benefit.  Certainly, under these circumstances, the public

interest will not be served unless the Court grants the injunctive relief requested by First Health in these

proceedings.

### B.    The Attempt By NPA And Norton To Justify Their Use Of First Health's Confidential And Proprietary Business Information Is Not Credible[3]

Contrary to the way in which they testified at their respective depositions just weeks earlier, at the

preliminary injunction hearing, Norton and NPA's witnesses offered new and different "explanations" of how

First Health's confidential and proprietary business information pertaining to its operations of the PACE

Program found its way into NPA's 1999 bid proposal.  Individually and collectively, these newly created

"explanations" defy both belief and credibility.  In the examples that follow, which represent just three of many,

Norton and NPA's witnesses contradict themselves and each other in their struggle to piece together a plausible

story.

---

[3]In their revised brief, NPA and Norton improperly object, for the first time, to certain evidence that identified First Health's confidential and proprietary business information, and its misappropriation by defendants.  Defendants waived all objections to such evidence by failing to object during the hearing.  Moreover, defendants (i) state that they have responses that are allegedly sufficient to defeat First Health's claims, and (ii) concede that First Health may not have known of such evidence until shortly before the hearing.  NPA and Norton have not, by their own admission, suffered unfair prejudice as a result of the Court's admission of such evidence.

For example, Norton testified that he used the Internet web-site of Paragon Systems, Inc. ("Paragon") as the source for the statement in NPA's 1999 bid proposal that Paragon is the hardware and software integrator, and maintenance vendor for the imaging system that First Health uses in its operation of PACE (Norton at 374-75). Norton traps himself in his own testimony. Even if he used Paragon's web-site or called Paragon in some roundabout attempt to use a public source, Norton could only have known to approach Paragon (one of many companies that provide support for imaging systems) by using confidential information from First Health that he was contractually obligated not to use or disclose.[4] Further, at the preliminary injunction hearing, NPA's Peter Greiger ("Greiger") contradicted Norton's testimony, and declared that Paragon's familiarity and integration of First Health's imaging system for PACE was not public knowledge (Greiger at 462).[5]

Similarly, at the preliminary injunction hearing, Greiger testified that NPA had used electronic remittance advices for ten (10) years and, therefore, in its 1999 bid proposal, NPA had a basis, independent from Norton, to state that "[s]ome providers elect to receive their remittance advices via electronic media" (Greiger at 419; P-55). Greiger did not offer an explanation as to why NPA did not propose electronic remittance advices in 1995 or in its October 1999 draft bid proposal, all of which should be expected, if NPA had used them for ten years. Further, at the preliminary injunction hearing, Norton claimed that, on its own, NPA would have been able to identify the switch vendors used by First Health because switch vendors will "freely" respond to an inquiry about the identity of their customers (Norton at 377). This "explanation" does not make any sense because, even if switch vendors would freely disclose their customers, NPA, without the

---

[4] With respect to PACE, Norton developed First Health's relationship with Paragon (Norton at 307, 360-61). He would not have even known to access Paragon's web-site but for his knowledge of First Health's relationship with this vendor. In addition, Paragon's web-site merely identifies "First Health Harrisburg, VA, Albany, NY" as a client (Norton at 375); it does not mention Pennsylvania or the PACE Program, nor does it define the precise nature of the services that Paragon provides to First Health.

[5] Norton's credibility is further strained by his selective memory for figures. On cross-examination by First Health's counsel, Norton testified that he could not recall certain figures, such as the number of bid proposals that he prepared for First Health, or First Health's labor overhead rate. (Norton at 297, 561). Yet, on direct examination by his own counsel and while attempting to defend NPA's pricing strategy for takeover costs, Norton managed to testify that First Health's takeover of New York EPIC "came to over 4,800 person days", while NPA's 1999 bid proposal discussed a takeover of "a little over 2,100 person days." Further, if these figures were accurate, then NPA's proposed cost for takeover of PACE should have been half of First Health's takeover proposal for New York EPIC; instead, the two figures were substantially similar (DiMarco at 70-71, 214-17; Nicoletos at 508, Norton at 563; P-22; P-125).

3

benefit of Norton, would not have known in the first instance which switch vendors to ask. In any event, no evidence exists that NPA learned of the identity of First Health's switch vendors from the switch vendors themselves; in fact, Norton actually admits that he provided the identities of these vendors to NPA (Norton at 308-09, 323).

The "explanations" and their resulting frontal assault on the credibility of NPA and Norton do not stop with Norton. At the preliminary injunction hearing, NPA and Norton suddenly highlighted the many assumptions, inferences and deductions that Greiger claimed to make while preparing NPA's 1999 bid proposal -- assumptions, inferences and deductions that he was not able to make as the principal drafter of NPA's 1995 bid proposal. Yet, four years later, when PDA's RFP does not look much different that it did in 1995, Greiger pretends to have newfound insights. These new "insights" only reveal themselves in NPA's final bid proposal, after Norton's work is completed; they are conspicuously absent from the "pre-Norton" October 1999 draft bid proposal (P-130). First, in its 1999 bid proposal, NPA "presumes" that First Health integrates the imaging documentation and procedures with the cardholder services manual. Greiger maintains that his reading of the current RFP brought him to the presumption (Greiger at 439). Second, with respect to NPA being able to ascertain PDA's preference that the imaging system be addressed in the takeover workplan, Greiger claims that "reading the RFP and having had the opportunity to review the 1995 proposal for First Health, it became evident that imaging was a major component of the customer service, client services area. It was an integral part." (Greiger at 436). Third, in its 1999 bid proposal, NPA proposes to duplicate First Health's preparation of weekly remittance advices in the provider relations unit; Greiger contends that this fact can be inferred from the RFP (Greiger at 473). Fourth, defendants claim that Norton did not identify PC-SAS for use in NPA's 1999 bid proposal because Greiger evaluated PC-SAS five years ago. Yet, defendants' claim is not believable because, in its 1995 bid proposal, NPA fails to mention the use of PC-SAS for statistical analysis or describe how it would be used. If such information were publicly available, NPA surely would have used it in its 1995 bid proposal – but it did not. In short, Greiger could not and did not make these same connections when he

4

prepared NPA's bid proposal in 1995; and, before Norton joined NPA, the last draft of NPA's 1999 bid proposal (October 27, 1999) does not contain any of Greiger's new "insights". As a result, NPA's attempts at justifying its use of First Health's proprietary information defy common sense and basic truth.

### C.    NPA And Norton's Position Crumbles Under A Test Of Logic

When all is said and done, NPA and Norton cannot defend their actions with any reasoning or logic that holds together.  Try as they might, NPA and Norton cannot escape the simple fact that NPA hired Norton for only one reason – to capitalize, unfairly and unlawfully, on Norton's detailed knowledge of First Health's confidential and proprietary information for its PACE operations in its rush to win the PACE Contract.

At the preliminary injunction hearing, First Health introduced an October draft of NPA's 1999 bid proposal (P-130).  NPA made modifications to this draft on October 7, 12, 19, 25 and 27, 1999.  First Health introduced NPA's October, 1999 draft bid proposal to substantiate its position that, as part of preparing NPA's final 1999 bid proposal, Norton disclosed to NPA First Health's confidential and proprietary business information because none of that information appears in the October, 1999 draft.  (See P-130).  NPA retained Norton to prepare its 1999 bid proposal on November 17, 1999.

NPA and Norton attempt to minimize the significance of the October, 1999 draft for determining whether Norton unlawfully disclosed and/or used First Health's trade secrets.  Norton and Greiger both testified that the October, 1999 draft was a "laydown" of NPA's 1995 bid proposal to which NPA made changes (Norton at 331-32; Greiger at 455-56).   The CD-ROM provided by NPA that contains NPA's October, 1999 draft shows the last date of modification to be October 27, 1999 -- just three weeks before NPA retained Norton, and six weeks after PDA issued the 1999 PACE RFP.  Greiger maintains that NPA completed most of its 1999 bid proposal before it retained Norton (P-68 at 2).

NPA's defense lacks any internal logic, and cannot rebut Norton's testimony and other uncontested facts.  First, if the October, 1999 draft is nothing more than a "laydown" of  NPA's 1995 bid proposal and NPA's 1999 bid proposal was mostly completed by the time NPA retained Norton in mid-November, then

Greiger would have had only three weeks to prepare NPA's entire bid proposal, that is, between October 27, 1999 and November 17, 1999 -- a contention that does not even pass the "smell test". Second, if Greiger prepared most of NPA's 1999 bid proposal by November 17, 1999, why exactly did NPA retain Norton? What did NPA need Norton for? Between the time that NPA hired Norton on November 17, 1999 and it submitted its final bid proposal on December 10, 1999, what exactly did Norton spend 177 hours or, on average, 60 hours a week, doing? (Norton at 575). Why did Norton testify that he worked very hard for NPA? Why was NPA willing to pay Norton $15,000.00? (Norton at 318-19; P-37; P-38). Why would NPA pay Norton even more money to conduct NPA's oral interview before the PDA?

Third, Norton gave extensive testimony about his many contributions to NPA's 1999 technical and cost proposals (Norton at 302-03, 305-09, 322-24, 392-93, 567-69; P-72; P-73). In fact, after working with NPA for less than a week, Norton's own notes show just exactly how much work he planned to do on NPA's bid proposal (P-72; P-73; P-81). Would NPA have us disbelieve Norton? The only logical answer to the question is that Norton provided detailed and specific assistance to NPA in the preparation of NPA's 1999 bid proposal for the PACE Contract – assistance that resulted in, among other illegal acts, (i) the unlawful disclosure and use by Norton and NPA of First Health's confidential and proprietary business information, and (ii) Norton's violations of the confidentiality, customer non-solicitation and employee non-solicitation restrictions in his employment agreement with First Health. Absent these illegal acts, NPA would not have achieved a "winning" score for its 1999 bid proposal to PDA.

Finally, if, as NPA contends, Norton's knowledge of First Health's PACE operations diminished in importance after 1998, then why did NPA rush to retain Norton for the specific purpose of re-working its final bid proposal? Why did Norton market himself to Consultec Incorporated and NPA as a consultant for work on a PACE bid? Again, the answer is that NPA hired Norton to prepare its bid proposal and conduct its oral interview before PDA in a concerted effort to convince PDA that it had the "right stuff" to run PACE. But NPA does not have the right stuff. As demonstrated here and in First Health's previous submissions, without First

6

Health's Harrisburg staff, Norton, and the First Health costume that Norton draped on NPA's 1999 bid proposal, NPA saddles PDA with a bid proposal that, in reality, is little different than the substantially deficient one (Snedden deposition at 39-41, 64-65) that NPA submitted five years ago. As a result, a potential transition to NPA and an implementation of its bid proposal puts the integrity of the PACE operations, and the provision of pharmaceutical care to senior Pennsylvanians, at great risk.

**D.      The Cases Cited By NPA And Norton Do Not Support Their Defenses**

Contrary to defendants' contentions, Mettler-Toledo, Inc. v. Todd R. Acker, d/b/a Precision Instrument Serv., National Risk Management, Inc. v. Bramwell, and George S. May Intern Co. v. Intern. Profit Assoc. do not stand for the proposition that First Health does not have a proprietary rights in (i) its unique methods and processes for operating the PACE Program, (ii) its highly developed understanding of PDA's preferences and (iii) the combination or customization of these methods, processes and preferences into a single, unified approach that First Health uses to manage the PACE Program.

In Mettler-Toledo, Inc. v. Todd R. Acker, d/b/a Precision Instrument Serv., 908 F. Supp. 240 (M.D. Pa. 1995), the court held that a technician could use his former employer's customer list for a competing business because the information in the customer list was publicly available and, as a result, not a protected trade secret. The court in Mettler-Toledo distinguished those circumstances in which a company applied a unique "manner of doing business" to generate a unique customer list, noting that the company's process of creating the list, the uniqueness of the list, and the inability of others in the industry to readily or inexpensively compile the same list, made it a protected trade secret. See Mettler-Toledo, 908 F. Supp. at 247-48 (citation omitted). Here, as demonstrated in its previous memorandum, First Health developed specialized methods and processes for operating the PACE Program, invested seventeen years to learn PDA's preferences for the PACE Program's operations, and customized those methods, processes and preferences into a single, unified approach to managing PACE. With respect to PACE, First Health's customized "manner of doing business" is not readily

7

available or inexpensively duplicated by First Health's competitors such as NPA.  As a result, <u>Mettler-Toledo</u> is inapposite.

Second, in <u>National Risk Management, Inc. v. Bramwell</u>, 819 F. Supp. 417 (E.D. Pa. 1993), the court held that a company in the business of marketing a self-funded workers' compensation program did not have a protected trade secret in its program because the program, its components and operations, were fully described in the company's proposal book.  The company distributed its proposal book at trade shows, seminars and to prospective clients, and published the proposal book in trade publications and brochures.  <u>See</u> <u>National Risk</u>, 817 F. Supp. at 426, 432-33.  The court in <u>National Risk</u> held that information pertaining to the program was in the public domain and had not been properly secreted by the company.  <u>Id.</u>  Similarly, the court in <u>George S. May Intern. Co. v. Intern. Profit Assoc.</u>, 628 N.E.2d 647 (1994), denied injunctive relief to a former employer because the information that the former employer claimed was unlawfully misappropriated was generally known in the industry and/or easily duplicated.  <u>See</u> <u>George S. May Intern. Co.</u>, 628 N.E.2d at 789.  <u>National Risk</u> and <u>George S. May Intern. Co.</u> do not support NPA and Norton because, as carefully outlined in its earlier memorandum, the proprietary business information that First Health seeks to protect was not in the public domain, generally known or easily duplicated; in addition, First Health took extensive steps to protect the secrecy of its proprietary investment in PACE.

Moreover, <u>Teradyne, Inc. v. Clear Comm. Corp.</u> and <u>AMP Inc.</u> do not support defendants' position that Norton and First Health's Harrisburg staff will not inevitably disclose First Health's trade secrets related to PACE and other programs.  In <u>Teradyne, Inc. v. Clear Comm. Corp.</u>, 707 F. Supp. 353 (N.D. Ill. 1989), defendants stopped working for plaintiff in order to start a competing business in a market that their former employer contemplated entering.  <u>Teradyne</u>, 707 F. Supp. at 354-55.  Significantly, the <u>Teradyne</u> court dismissed plaintiffs' complaint for injunctive relief on defendants' motion for a more definite statement.  The decision in <u>Teradyne</u> was based, in part, on the determination that plaintiff had fallen "a little short" in pleading a claim for threatened misappropriation of trade secrets because plaintiff failed to allege facts that would

8

support a finding of inevitable disclosure, such as allegations that defendants threatened to use plaintiff's trade secrets or to disavow their confidentiality agreements, or that defendants could not perform without using plaintiff's trade secrets. Id. at 356-57. Here, unlike Teradyne, First Health's complaint sets forth all the relevant allegations and the evidence of record substantiates them. These proceedings present a record of material evidence similar to the evidence before the court in PepsiCo, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995), which found a threat of misappropriation by a former employee and issued injunctive relief.

Similarly, the court, in AMP Inc. v. Fleischaker, 823 F.2d 1199 (7th Cir. 1987), dismissed plaintiff's case because it failed to prove either actual or threatened misappropriation by the former employee. AMP, 823 F.2d at 1207. The appellate court affirmed, and held that plaintiff failed to identify the specific trade secrets at risk, and merely produced a list of general areas of information which contained unidentified trade secrets. Id. at 1206. Moreover, in AMP Inc., plaintiff failed to present evidence that defendant had disclosed or used its confidential information since he began working for his new employer. Id. at 1207. Here, First Health has specifically identified the trade secrets that Norton disclosed and used in preparing NPA's 1999 bid proposal.[6] Moreover, First Health has presented testimony that articulates the threat of continued disclosure and use of its proprietary information pertaining to operations of PACE and other programs (DiMarco at 114-16). As a result, Teradyne and AMP are distinguishable from this case.

E.    The PACE Bid Process Does Not Extinguish First Health's Rights In Its
       Confidential And Proprietary Business Information

NPA and Norton argue that, under Pennsylvania's Right to Know Act, 65 P.S. § 66.2 (the "Act"), First Health's confidential and proprietary business information pertaining to PACE becomes "publicly available" (or loses its status as a trade secret) because First Health participated in a public contracting process (Defendants'

---

[6] In addition, with respect to its claim that Norton unlawfully disclosed to NPA the current salary structure that First Health uses in its Harrisburg operations, First Health cites Gibbs v. Breed Abbott & Morgan, 2000 WL 964970 (N.Y.A.D. 1 Dept., July 13, 2000). In Gibbs, two dissatisfied partners in a law firm disclosed confidential information about the law firm's employees including, but not limited to, employee salaries, to another law firm that the partners sought to join. The court in Gibbs held that the disclosure of employee salaries (and other confidential information) constituted a breach of the partners' fiduciary duty to the partnership. 2000 WL 964970 at *4 - *6. As a result, the salaries of First Health's Harrisburg staff constitute First Health's confidential business information.

9

revised brief at 12, n 4).  NPA and Norton miss the mark.  First, regardless of whether FHSC's 1995 bid proposal is part of the current PACE contract and whether these documents constitute public records under the Act, First Health does not lose its right to protect information that is not set forth in these documents and that First Health considers "confidential and proprietary".  Norton and NPA do not cite any case for the proposition that the Act mandates that First Health's trade secrets, to the extent that they are not set forth in the current PACE contract or FHSC's 1995 bid proposal, become "public information" simply because First Health participates in the PACE bid process.  Second, the record evidence establishes that neither FHSC's 1995 bid proposal nor the current PACE contract contain the First Health trade secrets that are at issue in these proceedings.  NPA could have only obtained such information from an "non-public" source – Norton.[7]

Third, "[w]hile the [Right to Know] Act's emphasis is on disclosure of official information, the Act seeks to provide a balance between access to this information by the general public while it protects the confidential nature of specific types of information."  Bargeron v. Department of Labor and Indus., Unemployment Compensation Board of Review, 720 A.2d 500, 502 (Pa.Cmwlth. 1998) (appeals and notices of hearings to claimants listed for hearings before unemployment compensation board were not public records under the Act).  Accordingly, the Act does not give Norton and NPA carte blanche to use First Health's proprietary information pertaining to its operations for PACE.  Fourth and most important, NPA, as a foreign corporation (Complaint ¶ 4, Amended Answer of NPA ¶ 4), does not even have the right under the Act to access public documents or to appeal the denial of such disclosure.  See Statewide Bldg. Maintenance, Inc. v. Pennsylvania Convention Center Auth., 635 A.2d 691 (Pa.Cmwlth. 1993) (corporation organized in New York

---

[7] Contrary to NPA and Norton's assertion, First Health is not bound by the testimony of Robert Howells ("Howells"), First Health's current officer-in-charge of the PACE Program, on what constitutes First Health's confidential and proprietary business information.  The evidence confirms that Howells did not have the authority to speak for First Health on this issue (DiMarco at 172-73).  Further, defendants deposed Howells in these proceedings, and Howells testified at the preliminary injunction hearing, in his individual capacity – not as a corporate designee or spokesperson for First Health.  See Fed.R.Civ.P. 30(b)(6).  Finally, there is no record evidence that Howells was responsible for advising First Health's Harrisburg staff on what information is confidential and proprietary to First Health.  As a result, NPA and Norton are without evidence for their position that "the confidentiality of PACE materials are a matter within the scope of his employment as officer-in-charge of PACE", and that Howells' testimony amounts to "admissions" against First Health on the issue of confidentiality.  (Defendants' revised brief at 2, n. 1).

was not Pennsylvania citizen and had no right under Act to access certain information in bidding process).  In short, NPA cannot rely on the Act to justify its use of the First Health's trade secrets, or its access to  FHSC's 1995 bid proposal.

F.    **First Health Does Not Seek To Convert Norton's Confidentiality Restriction Into A Covenant Not To Compete**

NPA and Norton incorrectly assert that First Health seeks to convert the confidentiality restriction of Norton's October 1, 1997 employment agreement (the "Agreement") (Section 7) into a covenant not to compete (Defendants' revised brief at 6).  To the contrary, First Health's only interest is in enforcing a valid contractual obligation that Norton agreed to, and that serves to protect First Health's legitimate business interests.  More important, enforcing the confidentiality restriction does not amount to imposing a non-compete restriction on Norton.  The confidentiality restriction does not stop Norton from working for one of First Health's competitors.  Norton is permitted to work with a competitor of First Health and, among other things, run a pharmacy or Medicaid program, or manage the development of an information system (DiMarco at 112, 135-36).  In fact, only one company that Norton sought work from in 1999 was concerned about his restrictive covenants (Norton at 304-05).  If First Health sought to convert the confidentiality restriction into a covenant not to compete, then, in these proceedings, First Health would be seeking to enjoin Norton from working for any competitor of First Health in any capacity.  Clearly, First Health does not seek such relief.[8]

G.    **NPA Cannot Minimize The Ramifications Of Its Attempt To Hire First Health's Entire Harrisburg Staff**

In its revised brief, NPA attempts to minimize its scheme to recruit and hire First Health's entire Harrisburg management team and staff and, as a result, usurp for its own purposes a critical asset or resource within First Health.  Contrary to NPA's contention, its 1999 bid proposal does not merely "suggest" that First Health's Harrisburg staff "continue their employment with the PACE Program" (Defendants' revised brief at 17).  In fact, NPA's 1999 bid proposal sets forth an extensive, carefully crafted, detailed plan to recruit

---

[8] See order proposed as part of First Health's memorandum of law in support of motion for injunctive relief.

aggressively, and then hire, First Health's entire Harrisburg staff (P-54 (takeover work plan at 5, 17-19, 56-57, 59-60, 141-42; Norton at 311; 332-35; Greiger at 476-77; DiMarco at 142).   NPA's recruiting and hiring plan is a "centerpiece" of its 1999 bid proposal, and this plan had a material impact on Snedden's evaluation of the proposal (Greiger at 476-77; Snedden deposition at 56-57, 61-62).[9]   Moreover, Norton focused considerable attention on NPA's plan to recruit and hire First Health's Harrisburg staff at the oral interview (P-106 at 5, 7, 18, 20).   As a result, any attempt to characterize NPA's plan to recruit and hire First Health's Harrisburg staff as a "suggestion" simply ignores the evidence.

In addition, NPA disingenuously suggests that, out of its own benevolence, NPA is interested in the continued employment of First Health's Harrisburg staff.  NPA's motives are purely selfish.  NPA is only interested in First Health's Harrisburg staff because NPA needs them to win the PACE Contract.  Snedden stated that NPA's proposal to recruit and hire First Health's Harrisburg staff is an important element of NPA's technical proposal (Snedden deposition at 56-62; Snedden at 21, 24-25).  If NPA was truly interested in First Health's Harrisburg staff because of their skills and experience, then NPA would have recruited First Health's Harrisburg staff <u>before</u> 1999, so NPA could actually include them in its bid proposal.  Alternatively, if it was so impressed with the capabilities of First Health's Harrisburg staff, then NPA would have attempted to hire them to work for NPA in its various Pennsylvania operations.  NPA's only purpose in proposing to recruit and hire First Health's Harrisburg staff is to impress PDA, take these employees from First Health, and undermine First Health's current operations and ability to bid successfully for future contracts to manage pharmacy benefit programs.[10]

---

[9] In contrast, NPA's 1995 bid proposal and October 1999 draft bid proposal state that NPA's philosophy, in the event of a takeover, was to "encourage" an incumbent's staff to work for NPA (Greiger at 430-31, 467; P-130).  In these earlier documents, NPA did not propose to takeover First Health's Harrisburg staff, nor did NPA propose any recruiting and hiring strategy with respect to that staff.  Significantly, after NPA retained him, Norton suggested that NPA modify its draft bid proposal to include, among other things, First Health's PACE managerial personnel and staff (Norton at 323; P-73).  As a result, NPA revised its October 1999 draft bid proposal to feature an extensive, aggressive plan to recruit and hire First Health's entire PACE staff with an incentive plan that included cash bonuses and the retention of anniversary dates (P-54 (takeover work plan at 5, 17-19, 56-57, 59-60, 141-42)).

[10] In an effort to hide its true intentions, NPA states, falsely, that it proposed to hire First Health's Harrisburg staff "only after their contract with PDA has terminated and their services would no longer be needed by First Health" (Defendants' revised brief at 18).  In fact, NPA's 1999 bid proposal calls for First Health's Harrisburg staff to begin working for NPA during the takeover phase -- while

**H.**    **Norton Violates The Agreement's Customer And Employee Non-Solicitation Restrictions**

The statement by NPA and Norton that Norton did not solicit the RFP (Defendants' revised brief at 3), that Norton was not on PDA's list of bidders and did not receive the RFP from PDA misses the point, and elevates form over substance (Norton at 367). Norton violated Section 8 of the Agreement by doing indirectly what he could not do directly. Norton solicited and approached NPA for the purpose of preparing its 1999 bid proposal and, thereafter, serving as its officer-in-charge (Norton at 363-66, 299-301, 565-66). As a result, Norton engaged in affirmative and purposeful conduct that goes beyond Section 8's limited language allowing him to participate in the response to an unsolicited RFP from a government agency.[11]

NPA and Norton fail to appreciate the factual and legal significance of the Norton-Howells telephone conversation of February 3, 2000. Plainly, (i) Norton telephoned Howells to discuss PDA's announcement of the bid outcome with respect to the PACE Contract (Norton at 314; Howells at 261-62), (ii) Norton informed Howells of NPA's plan to recruit and hire First Health's Harrisburg staff (Howells at 263), and (iii) in response to Norton's statement about NPA's plan, Howells asked if he was included in the list of individuals that NPA planned to recruit and hire -- to which Norton responded "sure", and that Howells did not "have anything to worry about" (Howells at 263-64; Norton at 314; P-150; P-26). Norton's initiation of the call to Howells to discuss the hiring of First Health's staff, and then his response to Howells, constitute impermissible solicitations as defined in Section 9 of the Agreement. Again, for NPA and Norton to contend otherwise is just a refusal to see the facts for what they are.

NPA and Norton also wrongly suggest that Norton is free to solicit First Health employees as of June, 2000 (Defendants' revised brief at 17). Norton chose to exercise the termination provision in the Agreement,

---

still employed by First Health (P-54 (takeover work plan at 17-18). NPA's (i) false statement concerning when it would hire First Health's Harrisburg staff, (ii) aggressive plan to recruit and hire that staff, and (iii) intention to use Norton's First Health PACE knowledge and experience to obtain an unfair advantage in the PACE bid process, all combine to evidence NPA's intention to cripple First Health's business.

[11] As discussed in First Health's prior submissions, Norton directly violated Section 8 by calling upon PDA at the oral interview. The purpose of the oral interview was to divert PDA's business away from First Health.

and that provision required that he provide First Health with one hundred and twenty (120) days written notice (P-14 at Section 6; Norton at 298). In a letter dated June 7, 1999, First Health advised Norton that the effective date of his termination was October 28, 1999 and, until these proceedings, Norton did not contest the validity of that date (DiMarco at 66-67; Norton at 299; P-24). As a result, pursuant to the one-year period set forth in Sections 8 and 9, Norton cannot solicit First Health's actual or prospective customers, or First Health's employees, until October 28, 2000 (P-14).[12]

Finally, First Health's claim that Norton unlawfully solicited First Health's Harrisburg employees is not limited to a claim of "indirect" solicitation (that is, through NPA) that stems from Norton's knowledge that PDA would favorably respond to such a plan. Norton's direct participation in proposing to NPA that (i) its 1999 bid proposal set forth a comprehensive, detailed plan (including hiring incentives) to recruit and hire First Health's Harrisburg staff, and (ii) that, as the officer-in-charge, Norton be responsible for implementing such a recruiting and hiring plan, constitutes a threatened solicitation in violation of Section 9 that should be enjoined.

### I.    NPA Tortiously Interferes With Norton's Agreement, And NPA And Norton Intentionally Interfere With First Health's Prospective Contract With PDA

Without citing to any legal authority, NPA and Norton argue that PDA's issuance of the RFP for the PACE Contract somehow justifies NPA's interference with (i) First Health's employment agreement with Norton, and (ii) First Health's prospective contract with PDA for the PACE Contract (defendants' revised brief at 24-25). Such an argument confirms the belief held by NPA and Norton that the fundamental commercial principles of good faith and fair competition do not apply to them. The RFP does not excuse Norton's performance under the Agreement, or permit NPA to interfere with the Agreement or First Health's prospective contract with PDA. Equally unfounded is the contention by NPA and Norton that First Health has no claim for intentional interference with prospective contractual relations because First Health and PDA have not entered

---

[12] NPA and Norton cite Cronshaw v. Philips Medical Systems, Inc., 1994 WL 622173 (N.D.Ill.) (memorandum opinion) for the proposition that Norton lost his employment status "at the date of termination" even though he remained on active payroll status until October 28, 1999. The Cronshaw case is inapposite. Unlike in Cronshaw, where the employee was fired and did not have a clause that required 120 days notice of termination, Norton resigned and was, in fact, bound by the Agreement's 120 day notice clause. As a result, the applicable "termination date" would be determined under to the Agreement's termination provision.

into the PACE Contract. NPA and Norton intentionally interfered with First Health's <u>prospective</u> contract with

PDA, not an existing contract.

### J.    PDA Is Not An Indispensable Party

The joinder of PDA is not necessary for a just adjudication of First Health's claims. On May 30, 2000,

after the preliminary injunction hearing in these proceedings had concluded, Richard J. Browdie, Secretary of

PDA, issued a letter stating that he would not rule on First Health's bid protest until this Court has rendered its

decision. A true and correct copy of Secretary Browdie's letter is attached hereto as Exhibit "A". PDA has not

only known about the federal court proceedings since their institution by First Health, but it also has considered

the issue of how to protect its interests, and determined that the resolution of First Health's administrative

protest will be guided by the outcome of these proceedings. As a result, NPA will not be subject to any

inconsistent obligations, NPA and Norton have not met the criteria in Federal Rule of Civil Procedure 19(a),

and PDA is not an indispensable party.[13]

## III.    CONCLUSION

For the reasons set forth above, and those reasons set forth in First Health's previous submissions,

Health requests that this Court enter First Health's proposed order issuing injunctive relief against NPA and

Norton.

Respectfully submitted,

Date: July 26, 2000                Scott L. Vernick, Esquire, Jeffrey D. Hutton, Esquire

---

[13] In their proposed findings of fact 25(a)(6) and 25(e)(3), NPA and Norton incorrectly suggest that Paragon and PC-SAS also qualify as "indispensable parties" under Rule 19(a). Plainly, neither the rights of Paragon nor the rights of PC-SAS will be affected by the outcome of these proceedings. If First Health prevails, it will continue to use Paragon and PC-SAS, as it currently does, for First Health's PACE operations. If NPA and Norton prevail, presumably, NPA will use Paragon and PC-SAS in the manner described in NPA's 1999 bid proposal. As a result, neither Paragon nor PC-SAS are "indispensable parties".

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,                    :
                                             :
                          Plaintiff,         :
                                             :
         v.                                  :        NO. 1:00-CV-312
                                             :
NATIONAL PRESCRIPTION                        :
ADMINISTRATORS, INC. and                     :
DAVID W. NORTON,                             :
                                             :
                          Defendants.        :

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I served a copy of the memorandum of

plaintiff, First Health Group Corp. in reply to defendants' revised brief, on the person identified below,

via federal express mail:

> Thomas B. York, Esquire
> Dilworth Paxson LLP
> 305 N. Front Street, Ste. 403
> Harrisburg, PA 17101-1236
> (717) 236-4812
>
> Attorney for Defendants,
> National Prescription Administrators. Inc. and
> David W. Norton

Date:  July 26, 2000

_____
SCOTT L. VERNICK, ESQUIRE

05/30/00  TUE 11:38 FAX 7177879372    PDA LEGAL & LEG LIAISON    Received 05/30/2000 11:34 in 01:08 on line [2] for SVERNICK   Pg 1/1    ☒001



PACE - litigation



COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF AGING
555 Walnut Street, 5th Floor
HARRISBURG, PENNSYLVANIA
17101-1919

SECRETARY OF AGING                                                    (717) 783-1550

May 30, 2000

Scott L. Vernick, Esquire
Fox, Rothschild, O'Brien and Frankel
Attorneys At Law
2000 Market Street
Philadelphia, PA  19103-3291

Thomas B. York, Esquire
Dilworth Paxson, LLP
Attorneys At Law
305 North Front Street, Suite 403
Harrisburg, PA  17101-1236

Dear Messrs. Vernick and York:

Kindly be informed that I shall not respond to the 'Bid Protest' until such time as the federal Court has rendered its decision in the matter of *First Health Group Corp. v. National Prescription Administrators, Inc.*, Civil Action No. 1:00-CV-312 (M.D. Pa.).

Very truly yours,

Richard Browdie
Secretary

RB/JJW/jb

cc:    Jeffrey J. Wood, Esquire
       Thomas M. Snedden