

**ORIGINAL**

52
7/27/

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,                         :

                                    Plaintiff,    :          NO. 1:00-CV-312

                    v.                            :

NATIONAL PRESCRIPTION                             :
ADMINISTRATORS, INC.                              :
and DAVID W. NORTON,                              :

                                    Defendants.   :

**FILED**
**HARRISBURG, PA**

JUL 2 5 2000

MARY E. D'ANDREA, CLERK
PER_____
                /DEPUTY CLERK

### PRELIMINARY INJUNCTION HEARING

### COUNTER-PROPOSAL FOR FINDINGS OF FACT OF
### PLAINTIFF FIRST HEALTH GROUP CORP.

Plaintiff, First Health Group Corp. ("First Health"), by and through its attorneys, Fox,

Rothschild, O'Brien & Frankel, LLP, responds to (i) specific paragraphs of the proposed findings

of fact of defendants, National Prescription Administrators, Inc. ("NPA") and David W. Norton

("Norton"), and (ii) specific paragraphs of the counter-proposal for findings of fact of NPA and

Norton, as follows:[1]

### Response To Defendants' Proposed Findings Of Fact

7.      NPA and Norton fail to provide a citation to the record for the proposition that the

current PACE contract "requires [First Health] to provide information which might otherwise be

considered confidential and proprietary to First Health." In fact, no such provision exists.

---

[1] First Health disagrees with the majority of the proposed findings of fact and counter-proposal for findings of fact
submitted by NPA and Norton. Unless otherwise noted in this document, First Health stands by its original proposed
findings of fact that were filed with the Court on July 3, 2000. In this submission, First Health draws the Court's
attention to precise examples of how NPA and Norton mischaracterize the evidence.

8.      As demonstrated in First Health's proposed findings of fact 169, 170, and 172, Snedden testified at length with respect to the following categories of information that are owned by First Health – not PDA: (i) First Health's costing, pricing and marketing strategies; (ii) First Health's unique methods and processes for tying together the PACE Program's basic components, and (iii) the resulting proprietary "stamp" that First Health places on the PACE Program's operations.

9.      NPA and Norton mischaracterize Snedden's testimony regarding a conversation that he recalled having with DiMarco. A review of Snedden's deposition reveals that he only testified as to his "vague recollection" of a conversation in early February, 2000, during which DiMarco "may have said" something about NPA using First Health's confidential and proprietary business information (Snedden deposition at 182-83). Snedden does not state that DiMarco mentioned "particular confidential items" in NPA's bid proposal that were proprietary to First Health. NPA and Norton incorrectly imply that Snedden believes that First Health has no confidential and proprietary business information that pertains to the PACE Program. In fact, Snedden testified at the preliminary injunction hearing that (i) First Health's costing, pricing and marketing strategies are proprietary and owned by First Health – not PDA (Snedden at 25-26); (ii) First Health possesses unique methods and processes that tie together the basic components of the PACE Program, enable First Health to operate effectively, and reflect the proprietary "stamp" that First Health places on the PACE Program (Snedden at 20, 27-28), and (iii) First Health, and its former and current PACE staff (including Norton), as a result of their involvement with the PACE Program, have gained intimate knowledge of the needs and preferences of PDA with respect to the procurement, management and administration of the PACE Program, separate and apart from the needs and preferences set forth either in the request

2

for proposals issued by PDA, or any other publicly available document or information (Snedden at 22; Snedden deposition at 21-22).  In addition, Snedden testified that the removal of First Health's imaging system for PACE would render the operations of the PACE Program more difficult (Snedden at 27-28).  Plainly, NPA and Norton mischaracterize Snedden's testimony.

13.     Many of the so-called "proposed findings of fact" submitted by NPA and Norton are improperly argumentative and contain legal conclusions.[2]  Paragraph 13 is just one example.  NPA and Norton fail to cite any record evidence for the statement that information surrounding the provision of services under a public contract is a matter of public record.  Moreover, the confidentiality restriction in the October 1, 1997 employment agreement between First Health and Norton expressly includes within its definition of "confidential business information", "information or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain." (P-14 at Section 7).  In view of Section 7's definition of "confidential business information", and the reasons set forth in First Health's previous submissions to the Court, the specific categories of information at issue are not in the public domain, and are proprietary and confidential to First Health.

15.     NPA and Norton overstate the materials that NPA had access to when it prepared its 1999 bid proposal.  First, NPA merely reviewed First Health's 1995 bid proposal (see First Health's proposed finding of fact 120).  Second, NPA did not  receive First Health's cost proposal (and, therefore, First Health's cost-build-up and projected expenses) for the 1998-2000

---

[2] First Health objects to defendants' proposed findings of fact on the basis that many of their proposed findings are in fact argument, constitute legal conclusions and/or have no citations to the record (including, but not limited to, paragraphs 13, 22(c), 25(a)(7), 25(b)(9), 25(c)(2), 25(c)(9), 25(c)(17), 25(d)(9), 25(i)(9), 25(j)(6), 29(w), 57, 71, 73).  Moreover, NPA and Norton include numerous argumentative and conclusory footnotes, (including, but not limited to, footnotes 1, 6, 9, 10, 12, 13, 14, 15, 17, 18, 20).

contract extension; NPA only knew, without more, the total price for the contract extension (see First Health's proposed finding of fact 150).

22(a)-(c).      The record is replete with evidence that Norton supplied changes to NPA's October 1999 draft proposal after NPA retained him in mid-November, 1999. Norton and Greiger both testified that the October draft (P-130) was a "working" draft to which modifications were made (Norton at 331-32; Greiger at 455-56). In fact, after working with NPA for less than a week, Norton's own notes show exactly how much work he planned to do (see P-81). Despite their efforts, NPA and Norton cannot "explain away" the fact that NPA's final version of its 1999 bid proposal is dramatically different in content from NPA's October 1999 draft bid proposal. The admissions of Norton and NPA pertaining to Norton's contributions to the content of NPA's technical and cost proposals are of record (Norton at 302-03, 305-08, 322-24, 567; P-72; P-73; P-81; Nicoletos at 506-10). Indeed, the fact that Norton billed NPA one hundred and seventy-seven (177) hours for his work (an average of sixty (60) hours a week), and that NPA paid Norton fifteen thousand dollars ($15,000.00) for three-weeks of work signifies that Norton's contributions resulted in material revisions to the October 1999 draft bid proposal (Norton at 318-19, 575). Nicoletos admits that NPA hired Norton because of the insights that he could provide with respect to PDA's needs and requirements that could not be gleaned from the RFP (Nicoletos at 500-01). The evidence reveals that Norton's contributions between November 17, 1999 and December 10, 1999 resulted in a bid proposal that was re-vamped from the October 1999 draft. Norton's contributions included the unlawful disclosure and/or use of First Health's trade secrets, and constitute a violation of Norton's Agreement with First Health. Moreover, in footnote 4 of paragraph 22, NPA and Norton take the testimony of Snedden out of context. Snedden's testimony pertained to the fact that PDA did

not, in evaluating NPA's 1999 bid proposal, compare it to NPA's 1995 bid proposal; Snedden did not testify, as NPA and Norton suggest, that comparing NPA's 1995 and 1999 bid proposals is inappropriate when the purpose of the comparison is to determine whether NPA used First Health's confidential and proprietary business information in 1999.

    25(c)(9).    First Health's PACE financial manager did not have access to First Health's cost proposal for the New York EPIC Program or any First Health cost proposal that applied a pricing strategy of bidding a turnover cost of zero; in addition, the financial manager did not calculate the labor overhead rates that are at issue. Moreover, a comparison of the competing 1999 cost proposals of First Health and NPA would not have led the PACE financial manager to discover what First Health found in evaluating NPA's 1995 and 1999 bid proposals – NPA's change in the pricing strategy and approach used in 1995 and the one used in 1999.

    25(f)(1).    NPA and Norton do not cite to the record for the proposition that the statements in NPA's 1999 bid proposal pertaining to First Health's PACE telephone system "evidence good business practice to verify that an existing system meets the standards of NPA and the Department."

    25(g)(10)-(13).  NPA and Norton do not recognize that the RFP only addresses specific, routine operational reports generated from the main point-of-sale system – not the project management tool of on-line, weekly status reports on PACE Program initiatives (DiMarco at 234-26). Norton, who knew of First Health's move toward the development of on-line weekly status reporting, admits that he recommended to NPA that it include such an enhancement in its 1999 bid proposal (Norton at 306). Paragraphs 25(g)(10) and (13) do not set forth citations to the record.[3]

---

[3] Contrary to the suggestion of NPA and Norton, it is not improper or incorrect for First Health to propose findings of fact that do have a citation to the record so long as the proposed finding of fact represents a reasonable conclusion

25(m)(9)(17).   NPA and Norton mischaracterize First Health's claim with respect to which personnel attend provider training sessions.  First Health's claim is not based on whether NPA has its provider relations manager attend provider training sessions.  First Health's claim is based on the fact that NPA, in its 1999 bid proposal, unlike in its 1995 bid proposal, states that the project director will accompany the provider relations manager to the provider training sessions (P-19; Norton 341; DiMarco at 92-93).  Further, Snedden did not testify that PDA's preference that the "project director" attend provider training sessions was publicly available information during the 1999 bid process.  Instead, Snedden testified that such information was not disclosed by PDA during the 1999 PACE bid process because no one requested it; only if such information was contained in FHSC's 1995 bid proposal and/or PDA's procedure manuals (which PDA allowed NPA to review) could NPA have known about it from PDA (Snedden at 22-23).  The information was not included in those documents, even if NPA had reviewed them (DiMarco at 92-93; Norton at 340; P-140).  Snedden's testimony that such information "would" be made public is very different than a statement that it was public when NPA prepared its 1999 bid proposal.  In fact, Snedden's statement is a very deliberate distinction that he made so as not to imply that PDA had made such information public – which PDA did not (Snedden at 22-23).

25(n)(14).     With respect to PDA's preference for a high quality cardholder and provider inquiry tracking system, NPA and Norton ignore Snedden's testimony that such information was not disclosed by PDA during the 1999 PACE bid process because no one requested it, and that only if such information was contained in FHSC's 1995 bid proposal and/or PDA's procedure manuals (which PDA allowed NPA to review) could NPA have known about it

---

that is based on the facts of record.  First Health proposes such findings of fact in those paragraphs that begin "I find as a fact that."   Accordingly, it is incorrect for NPA and Norton to assert that such proposed findings are not supported by the record.

from PDA (Snedden at 22-23). The information was <u>not</u> included in those documents, even if NPA had reviewed them (DiMarco at 78-80). Again, Snedden testified that PDA "would" (<u>not</u> <u>that</u> <u>it</u> <u>had</u>) make such information publicly available. In fact, Snedden's statement is a very deliberate distinction that he made so as not to imply that PDA <u>had</u> made such information public – which PDA did not (Snedden at 22-23).

25(p)(2).     NPA and Norton do not cite to the record for the statement that Ms. DiMarco "testified that the integration of imaging documentation and procedures into the cardholder procedure manual was after 1995."

25(p)(3).     With respect to First Health's integration of imaging documentation and procedures with the cardholder services manual, NPA and Norton cite DiMarco's statement out of context. DiMarco's response to the question was as follows: "The – there is not necessarily an advantage. This is really an issue of one of many items where NPA seemingly demonstrates considerable knowledge of exactly how First Health does things that go beyond what is available in public documents, and it's one of a long list of items that helps NPA build credibility into their proposal so that it rings true with PDA when they read it. It's information that's not otherwise available but they use it to build that credibility." (DiMarco at 245). Accordingly, DiMarco testified that NPA unlawfully misappropriated First Health's trade secrets in order to prepare a bid proposal that would be credible before PDA. DiMarco's full response to the question articulates the distinct "advantage" that NPA unfairly gained as a result of unlawfully misappropriating First Health's trade secrets.

25(p)(5).     As discussed in First Health's previous submissions, the "assumption" that Greiger claims that he was able to make in 1999, was <u>not</u> made when he prepared NPA's 1995 bid proposal pertaining to PACE. More important, NPA fails to explain why Greiger had to

make an assumption in 1999, when NPA asserts (in defendants' proposed finding of fact 25(p)(4)) that its 1995 bid proposal "noted that an imaging system exists in the cardholder services area".

25(p)(9).    With respect to First Health's integration of imaging documentation and procedures with the cardholder services manual, NPA and Norton ignore Snedden's testimony that such information was not disclosed by PDA during the 1999 PACE bid process because no one requested it; only if such information was contained in FHSC's 1995 bid proposal and/or PDA's procedure manuals (which PDA allowed NPA to review) could NPA have known about it from PDA (Snedden at 22-23).  The information was not included in those documents, even if NPA had reviewed them (DiMarco at 95-96).  Again, Snedden testified that PDA "would" (not that it had) make such information publicly available.  In fact, Snedden's statement is a very deliberate distinction that he made so as not to imply that PDA had made such information public – which PDA did not (Snedden at 22-23).

25(q)(5).    With respect to PDA's access to provider files from First Health's imaging system, NPA and Norton ignore Snedden's testimony that such information was not disclosed by PDA during the 1999 PACE bid process because no one requested it; only if such information was contained in FHSC's 1995 bid proposal and/or PDA's procedure manuals (which PDA allowed NPA to review) could NPA have known about it from PDA (Snedden at 22-23).  The information was not included in those documents, even if NPA had reviewed them (DiMarco at 96-97).  Again, Snedden testified that PDA "would" (not that it had) make such information publicly available.  In fact, Snedden's statement is a very deliberate distinction that he made so as not to imply that PDA had made such information public – which PDA did not (Snedden at 22-23).

8

25(q)(6).     As discussed in First Health's previous submissions, the "deduction" that Greiger claims that he was able to make in 1999 was <u>not</u> made when he prepared NPA's 1995 bid proposal pertaining to PACE.

25(s)(1).     Again, in light of the fact that her testimony is not favorable for the defendants, NPA and Norton fail to cite DiMarco's entire answer to the question concerning whether the fact that the software and processes for remittance advices are in the provider relations unit. Ms. DiMarco took issue with counsel for defendants' mischaracterization of her earlier testimony on the subject, and responded: "That's not what I'm saying. As I said earlier, the significance is the building of a credible proposal. It's – it's – it may be intangible. It may – it's more a function of NPA demonstrating a knowledge of exactly how things are done, exactly where things are done and exactly how they are documented that comes across in many, many places in their proposals, and that builds this whole aura of credibility about their – about their proposal that causes it to ring true to PDA." (DiMarco at 247). Accordingly, DiMarco testified that NPA unlawfully misappropriated First Health's trade secrets in order to prepare a bid proposal that would be credible before PDA. DiMarco's full response to the question articulates the distinct "advantage" that NPA unfairly gained as a result of unlawfully misappropriating First Health's trade secrets.

25(s)(4).     As discussed in First Health's previous submissions, the "inference" that Greiger claims that he was able to make in 1999 was <u>not</u> made when he prepared NPA's 1995 bid proposal pertaining to PACE.

25(s)(7).     With respect to the fact that the software and processes for remittance advices are located in the provider relations unit, NPA and Norton ignore Snedden's testimony that such information <u>was</u> not <u>disclosed</u> by PDA during the 1999 PACE bid process because no

9

one requested it; only if such information was contained in FHSC's 1995 bid proposal and/or PDA's procedure manuals (which PDA allowed NPA to review) could NPA have known about it from PDA (Snedden at 22-23). The information was <u>not</u> included in those documents, even if NPA had reviewed them (DiMarco at 246-47; Greiger at 473). Snedden testified that PDA "would" (<u>not that it had</u>) make such information publicly available. In fact, Snedden's statement is a very deliberate distinction that he made so as not to imply that PDA <u>had</u> made such information public – which PDA did not (Snedden at 22-23).

26(a)(1)-(12). NPA and Norton cannot circumvent the fact that the Court overruled their objection at the preliminary injunction hearing with respect to First Health's claim that they unlawfully misappropriated First Health's labor overhead rate. The Court ruled that DiMarco's testimony on the issue was admissible (DiMarco at 119, 189-90). With respect to NPA's unlawful misappropriation and use of First Health's labor overhead rate, NPA changed its labor overhead rate from being equal to, or greater than, First Health's labor overhead rate in 1995 to one percent (1%) less in 1999 (DiMarco at 119-20). The reduction by NPA is significant because labor cost is the single largest cost item in the PACE bid proposal. It is irrelevant whether or not the labor overhead rate was just for takeover or takeover and operations, because the takeover cost figure is small relative to the overall bid price. Norton, during his tenure with First Health, prepared First Health's budgets for PACE, as well as various First Health cost proposals (Norton at 290-93, 562); as a result, Norton knew First Health's labor overhead rate for the PACE Program (DiMarco at 119-20, 182-83). In preparing NPA's 1999 cost proposal, Norton developed costs for direct labor (Nicoletos at 509). In preparing NPA's 1999 cost proposal, Norton disclosed and/or used First Health's labor overhead rate.

10

26(b)(1)-(6).   As discussed in First Health's previous submissions, (i) Greiger's handwritten notes from his review of First Health's 1995 bid proposal for the PACE contract do not refer to any cost for turnover (P-64; P-69; Greiger at 478-79), (ii) NPA did not review First Health's cost proposal for the two-year (1998-2000) PACE contract extension, and (iii) First Health's 1998-2000 cost proposal with respect to turnover is not mentioned in the RFP or PDA's answers to the bidders' questions (Greiger at 458; Snedden at 23-24).  The evidence also establishes that, unlike its 1995 bid proposal for the PACE contract, in which it bid $759,000.00 as its cost for turnover, NPA bid zero dollars as its cost for turnover in its 1999 bid proposal for the PACE Contract (P-54 (cost and price proposal at 1); DiMarco at 99-100).  Norton, who knew from his First Health experience that First Health had a pricing strategy of bidding zero dollars as the cost for turnover in response to request for proposals to manage and administer government-funded entitlement programs, participated in NPA's decision to bid zero dollars as the cost for turnover in its 1999 bid proposal for the PACE Contract (DiMarco at 100; Nicoletos at 509).  Norton's participation resulted in the disclosure to NPA of First Health's confidential and proprietary pricing strategy for bidding the cost for turnover at zero dollars.  In addition, with respect to paragraph 26(b)(5), NPA and Norton ignore Snedden's testimony that such information was not disclosed by PDA during the 1999 PACE bid process because no one requested it; only if such information was contained in FHSC's 1995 bid proposal and/or PDA's procedure manuals (which PDA allowed NPA to review) could NPA have known about it from PDA (Snedden at 22-23)

26(d)(6).        To the contrary, Snedden testified that First Health's imaging system for the PACE Program was a First Health "tie" that, if removed, would make the PACE operations more difficult (Snedden at 27-28).

27(c)(1)-(3).   Contrary to the representation made by NPA and Norton, <u>Norton</u>, not counsel for First Health, testified that NPA's 1999 October draft bid proposal does not mention meeting with PDA to develop provider training topics, procedures for establishing provider training sites, logging registration by telephone, maintaining attendance logs, using evaluation forms to solicit feedback and "new initiatives." (Norton at 343-44).   Moreover, NPA and Norton did not establish that someone other than Norton provided NPA (or NPA "determined" on its own) what amounts to First Health's approach to provider training.   Norton did not identify someone else as the source.   Accordingly, Norton's testimony that these items or approach to provider training were "generally expected based on requirements in the RFP" is not credible. There is no evidence of record that these items were included as a result of what was contained in the RFP.   More important, these items or approach constitute First Health's method for conducting provider training and, as a result, are confidential and proprietary to First Health pursuant to Section 7 of the October 1, 1997 employment agreement between First Health and Norton (P-14 at Section 7).

27(d)(1)-(3).   Contrary to the representation made by NPA and Norton, <u>Norton</u>, not counsel for First Health, testified that NPA's 1999 October draft bid proposal, unlike NPA's final 1999 bid proposal, does not divide the functions that support the manufacturers' rebate program between the business/financial and utilization review departments (Norton at 345-36; P-144-; P-145).   Significantly, Norton admits that (i) he established First Health's method of dividing the functions that support the administration of the manufacturers' rebate program between the business/financial and utilization review departments (in order to maximize the recovery of rebates for the client) (Norton at 346), <u>and</u> (ii) that he recommended to NPA that it propose, in its 1999 bid proposal for the PACE Contract, the same method (Norton at 346, 393).

12

This approach constitutes First Health's procedure for managing the manufacturers' rebate program and, as a result, is confidential and proprietary to First Health pursuant to Section 7 of the October 1, 1997 employment agreement between First Health and Norton (P-14 at Section 7).

28(e)(1)-(3). Contrary to the representation made by NPA and Norton, <u>Norton</u>, not counsel for First Health, testified that NPA's 1999 October draft bid proposal, unlike NPA's final 1999 bid proposal, sets forth a surveillance utilization review process identical to the process used by First Health – a process that focuses on first establishing criteria and clinical analysis, and then taking certain required actions (Norton at 346-47, 356-59, P-146; P-147). Moreover, First Health's process for surveillance utilization review is confidential and proprietary to First Health pursuant to Section 7 of the October 1, 1997 employment agreement between First Health and Norton (P-14 at Section 7).

29.     To the extent that it constitutes a conclusion of law, the Court should not consider paragraph 29 of NPA and Norton's proposed findings of fact. In addition, First Health has met its burden of proof for injunctive relief with respect to its claim that NPA developed the price in its 1999 bid proposal with First Health's confidential and proprietary business information. First Health's claim that NPA and Norton unlawfully misappropriated and used its pricing strategy in preparing NPA's price for its 1999 cost proposal is established by the evidence of record as set forth in First Health's proposed findings of fact, 139-167, 201-21 and 298-306.

29(k).  Contrary to the assertion of NPA and Norton, it does not follow that, if Nicoletos was mistaken as to whether the Dun & Bradstreet report covered the PACE contract, NPA's pricing strategy in NPA's 1999 was still not based on First Health's confidential pricing and margin information. Nicoletos' mistake undermines the credibility of his alleged defense, and purported effort to determine First Health's margins on PACE for the purpose of formulating the

13

price in NPA's 1999 bid proposal.  Nicoletos' mistake reveals the fact that Norton disclosed and NPA unlawfully used, First Health's confidential and proprietary pricing and margins for PACE.

29(w).  The conclusory and unfounded statements by NPA and Norton that there is no "substantial" evidence of record that NPA used First Health's confidential and proprietary information in calculating the price for its 1999 bid proposal concedes, at the very least, that there is evidence that supports First Health claim.  In fact, the evidence of record establishes that First Health has met its burden of proof.

33.     As reflected in First Health's proposed findings of fact and memorandum of law in support of motion for injunctive relief, First Health does not seek any relief against Hofheimer.

49.     NPA and Norton do not cite any evidence of record to support the conclusory statement that the term "responding", as used in Section 8 of the October 1, 1997 employment agreement between First Health and Norton, "includes making an oral presentation if it is part of the necessary response" to an unsolicited request for proposal of a government agency.  Stated differently, there is no record support for the proposition that a bidder's oral interview with PDA is part of the response to the 1999 PACE RFP, or that the term "responding" was intended by the parties to the employment agreement to encompass an oral interview.  In fact, the evidence of record establishes that the term "responding", as used in Section 8, was intended not to include oral interviews (DiMarco at 63, 110-111).

80.     The assertion by NPA and Norton that First Health's Harrisburg staff cannot be deemed to have been "solicited" by Norton if they were unaware that a solicitation has occurred is not supported by fact or reason.  For the reasons discussed in First Health's previous submissions to the Court, Norton's participation in developing NPA's 1999 approach of

14

recruiting and hiring First Health's Harrisburg staff constitutes an improper "indirect" solicitation that violates the employee non-solicitation restriction (Section 9) in the October 1, 1997 employment agreement between First Health and Norton.  First Health's claim for relief under Section 9 is also based on the underlined threatened solicitation of First Health's Harrisburg staff by Norton (on NPA's behalf) that is proposed in NPA's 1999 bid proposal for the PACE Contract (Norton at 311-13, 321, 324-25, 573-75; D-11; P-45 at 30; P-54 (take over work plan at 16); P-17); such a threat warrants the granting of injunctive relief against NPA and Norton.

87.    Without any citation to the record, NPA and Norton unreasonably leap to the conclusion that First Health "convinced" Howells that Norton's statements during their February 3, 2000 telephone conversation constitute a solicitation.  Such a "factual" conclusion – unsupported by the record -- should not be considered by the Court.

### Reply To Defendants' Counter-Proposal For Findings Of Fact

80.    NPA and Norton incorrectly minimize the testimony pertaining to Consultec's concern that Norton's restrictive covenants inhibited employing him.  At the preliminary injunction hearing, Norton confirmed his deposition testimony that Consultec had stated that his restrictive covenants were an inhibition in employing him (Norton at 363).  Moreover, there is no record evidence that supports the conclusion by NPA and Norton that, "if Consultec had been willing or able to wait until October 28, it would have accepted Mr. Norton's consultation just as NPA accepted such consultation."  NPA and Norton did not present any witness from Consultec, or elsewhere, to testify as to facts that might support such a conclusion.

88.    Contrary to the assertion of NPA and Norton, First Health does not, expressly or by implication, state that Norton based his comment to NPA that the PACE Contract was more "winnable" in 1999 than in 1995, on First Health's confidential and proprietary business

15

information. Norton made this comment during his interview with NPA on November 17, 1999; during that interview, Norton emphasized to NPA his First Health PACE experience and purported friendship with Snedden as evidence that he would effectively help NPA win the PACE Contract. The reasonable conclusion is that Norton combined his comment about the PACE Contract being more "winnable" in 1999 with his other representations in an effort to bolster his credibility with NPA as someone with intimate understanding of PACE and, as a result, convince NPA to hire him as a consultant for its 1999 bid proposal.

89.     First Health does not claim that Norton "revealed or volunteered to reveal" any of First Health's confidential and proprietary business information to NPA during his November 17, 1999 interview. Instead, First Health's claim is based, in part, on the actual unlawful disclosure and use of such information by Norton while he prepared NPA's 1999 bid proposal for the PACE Contract.

92.     NPA and Norton cannot reasonably deny the import of Nicoletos' testimony. When NPA interviewed Norton, Nicoletos concluded that Norton "most definitely could add insights that we did not have" with respect to PDA and the PACE program (Nicoletos at 500-501). Nicoletos conceded that "[Norton] had worked [at First Health] for a number of years and we assumed that he could certainly add something we did not know." (Nicoletos at 501). As a result, this testimony belongs to Nicoletos, an NPA employee, and not to First Health's counsel.

128.     NPA and Norton cannot reasonably deny the dramatic shift in emphasis from NPA's 1995 bid proposal and to its final 1999 bid proposal with respect to the recruiting and hiring of First Health's Harrisburg staff. NPA's 1995 bid proposal for the PACE contract merely stated that NPA's philosophy was to "encourage" the incumbent's staff to remain in the event of a takeover of a contract; NPA did not propose to takeover First Health's entire Harrisburg staff,

16

nor did NPA set forth any specific recruiting and hiring strategy with respect to that staff
(Greiger at 430-31, 467). In contrast, NPA's 1999 bid proposal for the PACE Contract sets forth
a carefully crafted, detailed plan to recruit and hire First Health's entire Harrisburg staff (P-54
(takeover work plan at 5, 17-19, 56-57, 59-60, 141-142); P-17; P-131; P-133; Norton at 311-13,
332-35; Greiger at 476-77; DiMarco at 142). Greiger admits that the plan is the centerpiece of
NPA's 1999 bid proposal (Greiger at 476-77), and reveals a significant shift in emphasis from
NPA's passing reference in 1995 to a philosophy of encouraging an incumbent contractor's staff
to remain.

     130.    NPA and Norton simply mischaracterize the plain language they chose to include
in NPA's 1999 bid proposal pertaining to Norton's involvement in the recruiting and hiring of
First Health's Harrisburg staff. NPA's 1999 bid proposal states that "NPA's officer-in-charge
[Norton] and the project director will arrange and schedule interview sessions with the
incumbent's key management staff." (P-17). NPA's 1999 takeover work plan states that "[t]he
critical task for Mr. Greiger <u>and the officer-in-charge</u> is to make every effort to hire the
incumbent staff, both key managers and operations staff." (P-54 (takeover work plan at 16);
Norton at 574-75). NPA and Norton cannot rely on the "Program Management" chart in NPA's
1999 bid proposal that suggests that an administrative assistant is in charge of recruiting and
hiring <u>because that individual reports to Norton, the officer-in-charge</u> (D-11; Norton at 574-75).
Norton's own testimony reflects his knowledge of the direct role that he would play in NPA's
recruiting and hiring process. Norton admitted that his interviewing and recruiting of First
Health's current PACE staff would include Howells, the current officer-in-charge of the PACE
Program (Norton at 313-14). Norton also conceded that, at the oral interview with PDA, he
stated that he was "familiar with most of the staff that will be selective [sic]", and that "we"

[NPA and Norton] want to retain that staff (Norton at 324-25). Norton's participation in the recruiting and hiring process is further confirmed by the handwritten notes that he prepared while working on NPA's bid proposal; these notes list First Health's current Harrisburg key management staff and their positions (Norton at 321; P-21). As a result, Norton's "intimate involvement" in NPA's plan to recruit and hire First Health's Harrisburg staff is established by the overwhelming record evidence.

133.    PDA makes clear, in its answers to bidders' question 136(d), that it did not contemplate or approve of a bidder proposing the takeover of key managerial employees of First Health's Harrisburg staff (P-109 at 30; DiMarco at 250-51). Ms. DiMarco did not "assume" what PDA contemplated or approved; PDA's answer to bidders' question 136(d) is evidence that PDA did not contemplate or approve of a bidder proposing the takeover of key managerial employees of First Health's Harrisburg staff.

136.    There is no record evidence that First Health did not file a bid protest and object to a bidder proposing to hire First Health's Harrisburg staff because First Health wanted to first see if it would win the PACE Contract. In fact, DiMarco testified at length about the legitimate and reasonable basis on which First Health chose to refrain from filing a bid protest during the procurement process (DiMarco at 106-07).

147.    Nicoletos testified that he did not modify Norton's figures for professional staff pertaining to head count, and that he did not modify Norton's figures for travel, which he conceded were "reasonable" (Nicoletos at 507-08). Nicoletos did not, as NPA and Norton suggest, modify all of the figures submitted by Norton in preparing NPA's 1999 cost proposal. Moreover, there was no evidence presented that any "modifications" that may have been made were material or significant.

18

164.    Snedden testified that, in each and every re-procurement of the PACE contract before 1999, First Health had always been the "low ball" bidder with respect to its proposed price (Snedden deposition at 179).

170.    As discussed in First Health's previous submissions to the Court, First Health's confidential and proprietary costing, pricing and marketing strategies were unlawfully misappropriated by NPA and Norton.  These costing, pricing and marketing strategies include: (i) First Health's margins on the PACE contract; (ii) First Health's strategy of proposing a takeover cost of approximately $700,000.00 in a bid proposal similar to PACE; (iii) First Health's pricing strategy of proposing a turnover cost of zero dollars; (iv) First Health's marketing strategy of using certain incentives to retain an incumbent contractor's staff; (v) First Health's calculation of a labor overhead rate; and (vi) First Health's Harrisburg employee salary structure.  The confidential and proprietary nature of such information, as supported by the evidence, is set forth in First Health's proposed findings of fact, memorandum in support of motion for injunctive relief, and memorandum in reply to defendants' revised brief in opposition to motion for injunctive relief.

173.    First Health relies upon its proposed findings of fact and its legal memoranda to support a finding that NPA and Norton unlawfully misappropriated First Health's trade secrets. In addition, NPA and Norton incorrectly state that there is no record evidence to support a finding that the following are confidential and proprietary to First Health: (i) the approach of evaluating the results of the analysis provided by the surveillance utilization review system, and then taking action that is responsive to those results; (ii) an extensive disaster recovery and back-up plan; (iii) dividing the functions that support the manufacturers' rebate program between the business/financial and clinical utilization review departments; and (iv) implementing specific

19

methods to support the provider training function, such as meeting with PDA to determine new initiatives, allowing pharmacists to earn continuing education credits, and contacting hotels to establish training sites. Each of these items constitutes a process or "procedure" that First Health developed and implemented in the management and administration of the PACE Program, and which is not included in public documents. As a result, pursuant to the definition of "confidential and proprietary business information" that is set forth in the confidentiality restriction of the October 1, 1997 employment agreement between First Health and Norton, each such process or procedure constitutes First Health's confidential and proprietary business information (P-14 at Section 7).

193.    NPA and Norton cannot escape the fact that Norton admits that, during his tenure with First Health, he participated in establishing First Health's relationship with Paragon with respect to the PACE Program, and that he was the source of the statement in NPA's 1999 bid proposal that First Health uses Paragon as the hardware and software integrator, and maintenance vendor for the PACE program's imaging system (see First Health's proposed findings of fact 186, 190). Moreover, Greiger -- NPA's own witness – testified to the fact that Paragon's involvement with First Health's imaging system for the PACE Program is not public knowledge (see First Health's proposed findings at 188).

199.    As discussed in First Health's previous submissions to the Court, First Health's use of Kodak as a software vendor for the imaging operating system constitutes one of the many unique methods and detailed operational processes that are part of First Health's management and administration of the PACE Program, and that collectively reflect its "stamp" on the program, the economic value of which is First Health's competitive edge in the pharmacy benefit management market.

209.    The record does not support the conclusory statement made by NPA and Norton that First Health's 1995 bid proposal "revealed" First Health's strategy of bidding zero dollars for a turnover cost, or that NPA used that strategy in its 1999 bid proposal based on First Health's 1995 bid proposal.  In fact, the evidence establishes that Greiger's notes from his review of First Health's 1995 bid proposal at PDA do not mention First Health's turnover cost (Greiger at 478-79; P-64; P-69).  Greiger did not testify that he learned of First Health's pricing strategy of bidding a turnover cost of zero dollars from First Health's 1995 bid proposal. Moreover, NPA did not review First Health's cost proposal for the two-year (1998-2000) PACE contract extension, and First Health's 1998-2000 cost proposal with respect to turnover is not mentioned in the RFP or PDA's answers to the bidders' questions (Greiger at 458; Snedden at 23-24).  The reasonable conclusion from this evidence, and the evidence set forth in First Health's proposed findings of fact 204-08, is that Norton disclosed to NPA First Health's pricing strategy of bidding zero dollars for turnover costs.

215.    See First Health's response to paragraph 130 above, which addresses how NPA's 1999 bid proposal sets forth a plan to recruit and hire First Health's Harrisburg staff that is far greater in scope and significance than the reference in NPA's 1995 bid proposal to NPA's philosophy of "encourag[ing]" an incumbent contractor's staff to remain in the event of a takeover.

216.    See First Health's response to paragraph 215 above.

235-38. See First Health's response to paragraph 173 above.

241.    See First Health's response to paragraph 173 above.

246.    See First Health's response to paragraph 173 above.

21

254.    NPA and Norton fail to consider DiMarco's testimony that NPA's description in its 1999 bid proposal of an imaging system is identical to First Health's imaging system for the PACE Program (DiMarco at 84-87).

258-59.    NPA and Norton do not cite any record evidence for the proposition that NPA's description of the current imaging system was based on information set forth in the RFP or "information in the Procurement Library".  As demonstrated in First Health's proposed findings of fact and memoranda in support of First Health's motion for injunctive relief, Norton knew and disclosed to NPA confidential and proprietary business information pertaining to First Health's imaging system for the PACE Program.

263.    First Health withdraws its proposed finding of fact 263.

273.    Defendants' proposed findings of fact 25(l)-(m) do not address PDA's preference that the project director attend provider training sessions; NPA and Norton refer to a claim that First Health is not asserting – that PDA preferred that the provider relations manager attend these sessions.

274.    NPA and Norton do not recognize that DiMarco testified that NPA's 1999 bid proposal puts forth the same approach to provider training that First Health uses (DiMarco at 91), and which is confidential and proprietary to First Health (DiMarco at 90-93).

277.    See First Health's response to 274 above.

278-80.    See First Health's response to 274 above.

333.    Snedden testified that he had, and still has, a concern about whether NPA could takeover First Health's Harrisburg staff (Snedden deposition at 61-62, 153-55).

22

Respectfully submitted,

_____

SCOTT L. VERNICK, ESQUIRE
JEFFREY D. HUTTON, ESQUIRE
FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103-3291
(215) 299-2000

Attorneys for Plaintiff
FIRST HEALTH GROUP CORP.

Date: July 26, 2000

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST HEALTH GROUP CORP.,                    :
                                             :
                              Plaintiff,     :        NO. 1:00-CV-312
                                             :
        v.                                   :
                                             :
NATIONAL PRESCRIPTION                        :
ADMINISTRATORS, INC.                         :
and DAVID W. NORTON,                         :
                                             :
                              Defendants.    :

## CERTIFICATE OF SERVICE

I, SCOTT L. VERNICK, ESQUIRE, hereby certify that I served a true and correct copy

of the counter-proposal for findings of fact of plaintiff, First Health Group Corp., upon the

person identified below, via federal express mail:

> Thomas B. York, Esquire
> Dilworth Paxson, LLP
> 305 N. Front Street, Ste. 403
> Harrsiburg, PA 17101-1236
> (717) 236-4812
>
> Attorney for Defendants
> National Prescription Administrators, Inc. and David W. Norton

_____
Scott L. Vernick, Esquire

Date: July 26, 2000